NO. 12-20411

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA

PLAINTIFF/APPELLEE

V.

ROBERT ALLEN STANFORD

DEFENDANT/APPELLANT

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

NO. 4:09-cr-342-01

BRIEF OF THE APPELLANT

ROBERT ALLEN STANFORD

Robert Allen Stanford, Pro Se
Reg. No. #35017-183
FCC Coleman USP II
P.O. Box 1034
Coleman, FL 33521

1

# <u>CERTIFICATE OF INTERESTED PERSONS</u>

The persons listed below have an interest in the outcome of this case.

### UNITED STATES DISTRICT COURT JUDGE FOR THE NORTHERN DISTRICT OF TEXAS:

David C. Godbey

### UNITED STATES DISTRICT COURT JUDGE FOR THE SOUTHERN DISTRICT OF TEXAS:

David Hittner

### ASSISTANT UNITED STATES ATTORNEYS

Gregg Costa
William Stellmach
Andrew Warren

### STANFORD DEFENSE ATTORNEYS

Ali Fazel
Robert Scardino
Ken McGuire
John Parras

# STATEMENT REGARDING ORAL ARGUMENT

Appellant Robert Allen Stanford requests oral argument. This appeal arises from appellant's conviction of thirteen Counts of a fourteen Count Indictment. This conviction followed a seven week trial involving an extraordinary number of attorneys and witnesses and millions of pages of evidentiary documentation. The issues raised by appellant require an understanding of the complex and often esoteric regulatory standards, and structuring of a global financial institution. Therefore, oral argument would greatly facilitate this Court's ability to focus through these complexities, and directly on the issues at hand.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS...................................................2

STATEMENT REGARDING ORAL ARGUMENT ...........................................3

TABLE OF AUTHORITIES ..................................................................... 4-14

STATEMENT OF JURISDICTION................................................................15

STATEMENT OF THE ISSUES............................................................. 15-20

STATEMENT OF THE CASE................................................................ 20-27

SUMMARY OF ARGUMENT................................................................ 27-29

ARGUMENT ....................................................................................... 30-229

CLOSING SUMMARY...........................................................................230

CONCLUSION.........................................................................................258

EXHIBITS ....................................................................................... 262-297

CERTIFICATE OF SERVICE ...............................................................298

CERTIFICATE OF COMPLIANCE ......................................................299

## TABLE OF AUTHORITIES
### FEDERAL CASES:

*Alleyne v. United States*, 133 S.Ct. 2151 (June 17, 2013) . 195,202,205,207-209,213

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ..............................212,213

*Atkinson v. Federal Deposit Ins. Corp.*, 635 F.2d 508, 511 (5th Cir. 1981) ..........206

*Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946)............................122,123

*Brady v. Maryland*, 373 U.S. 83, 10 Led 2d 215, 83 S.Ct. 1194 (1963) ..............101

*California v. Trombetta*, 467 U.S. 479 (1984)........................................114

*Chadbourne & Parke, LLP v. Samuel Troice*, 134 S.Ct. 1058 (2014)...............40,42

*Crawford v. Washington*, 542 U.S. 36 (2004) ........................................146

*Daimler AG v. Bauman*, 571 U.S. 134 S.Ct. 746 (2014) ...........................34

*Davis v. Elmira Savings Bank*, 161 U.S. 275 (1896)................................38

*Dollar v. Long Mfg.*, 561 F.2d 613, 618 (5th Cir. 1977) .......................223

*Dusky v. United States*, 362 U.S. 402 (1960) .......................................156

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248, 11 S.Ct. 1227, 113 L.Ed. 2d.274 (1991) (Aramco) ..........................................................45

*Estes v. State of Texas*, 381 U.S. 532, 538-39 (1965)............................129

*Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949) ..........................................................................45

*Franks v. Delaware*, 438 U.S. 154 (1978).................................................82

*Fuentes v. Shevin*, 407 U.S. 67 (1972)......................................................103

*Geders v. United States*, 425 U.S. 80 (1976)...........................................116

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991)............................132

*Grandy v. Alabama*, 569 F.2d 1318 (5th Cir. 1978)................................108

*Holmes v. King*, 709 F.2d 965,967 (5th Cir. 1983) ................................156

*Irvin v. Dowd*, 366 U.S. 717 (1961)..........................................................135

*Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2010) .........134,232,235,253

*Janvey v. Jose Manuel Fernandez, et al.* 03:10-CV-1002-N (5th Cir. 2011). 239,247

*Kennedy v. Mindprint*, 587 F.3d 296 (5th Cir. 2009) ..............................107

*Mata v. Johnson*, 210 F.3d 324 (5th Cir. 2000)........................................155

*Matthew v. Eldridge*, 424 U.S. 319 (1979)...............................................104

*Marine Bank v. Fulton Bank*, 69 US 252, 256 (1865) .............................206

*Marine Bank v. Weaver*, 455 U.S. 551 (1982)...........................................39

*Marshal v. United States*, 360 U.S. 310, 313 (1959)................................130

*Morrison v. National Australia Bank*, 561 U.S. 130 S.Ct. 177 L.Ed. 2d.535 (2010) ........................................................45,46,47,48,49

*Murphy v. Florida*, 421 U.S. 794 (1925)..................................................130

*Old Chief v. United States*, 519 U.S. 172 (1997) ....................................223

*Powell v. Alabama*, 287 U.S. 45 (1932) ..................................................108

*Richardson v. United States*, 526 U.S. 813 (1999)................................................176

*Rideau v. Louisiana*, 373 U.S. 813 (1999)................................................132

*Rock v. Arkansas*, 483 U.S. 44 (1987)................................................157

*Roland v. Green*, 673 F.3d 503 (5th Cir. 2012)................................................40

*Sampson Indus., Inc. v. Amega Indus,* No. Civ. A. 3-98-CV-1440-P, 1998 ...........68

*Schmuck v. United States*, 489 U.S. 705, 723 (1989) ............................................183

*SEC v. IPIC Intl. Inc. et al.* case no: 03-CV-02781................................................85,86

*SEC v. SIPC,* 12-5286, District of Columbia Circuit (2014)............................53,206

*Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966)....................................................135

*Stanford v. State of Texas*, 379 U.S. 476 (1965)....................................................83

*Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S.Ct. 2052, 80 L.Ed. 674 (1984) ................................................113

*Strickland v. Washington*, 466 U.S. 688 (1989) ................................................109

*Unger v. Safarite*, 376 U.S. 576................................................164

*Waller v. Georgia*, 467 U.S. 39 (1984)................................................95

*Wardius v. Oregon*, 412 U.S. 470, 475 n.9 (1973) ........................................114,216

*Washington v. Texas,* 388 U.S. 14, 18-19 (1967) ................................................218

*Wolf v. Banco Nacional de Mexico*, 739 F.2d 1458 (9th Cir. 1984) ........................39

*United States v. Adair,* 436 F.3d 520,526 (5th Cir. 2006) ................................285

*United States v. Ayala,* 47 F.3d 688,690 (5th Cir. 1995)........................................202

*United States v. Beechum,* 582 F.2d 898,911 (5th Cir. 1978) ..................................285

*United States v. Birdsell,* 755 F.2d 645 (5th Cir. 1985) ..........................................156

*United States v. Bissell,* 866 F.2d 1343 (11th Cir. 1989) .......................................104

*United States v. Blasco,* 702, F.2d 1315, 1329 (11th Cir. 1983) ...........................229

*United States v. Brown,* 650 F.3d 581, 587-88 (5th Cir. 2011) .............................101

*United States v. Bullard,* 162 Fed.Appx. 106,110 (3rd Cir. 2005) ........................223

*United States v. Carter,* 491 F.2d 625, 633 (5th Cir. 1974) ..................................118

*United States v. Candelaria-Silva,* 166 F.3d 19 (1st Cir. 1999)...............................73

*United States v. Diamond,* 430 F.2d 688, 692 (5th Cir. 1970) ..............................218

*United States v. Duke,* 171 F.3d 240 (5th Cir. 1999).............................................140

*United States v. Emeron Taken Alive,* 262 F.2d 711 (8th Cir. 2001) ....................223

*United States v. Flanagan,* 80 F.3d 143, 146 (5th Cir. 1996)................................202

*United States v. Foley,* 508 F.3d 627, 632 (11th Cir. 2007) ..................................203

*United States v. Foshee,* 578 F.2d 629, 633 (5th Cir. 1978) ..................................218

*United States v. Frye,* 489 F.3d 201, 207 (5th Cir. 2007)......................................181

*United States v. Gaffney,* 469 F.3d 211, 218-219 (1st Cir. 2006) .........................111

*United States v. Gentry,* 839 F.2d 1065 (5th Cir. 1988).........................................160

*United States v. German,* 486 F.3d 849 (5th Cir. 2007).........................................160

*United States v. Gipson,* 553 F.2d 453 (5th Cir. 1977)..................................177,179

*United States v. Gonzalez-Lopez,* 548 U.S. 140 (2006)..................................108,109

8

*United States v. Grant* 683 F.2d 639, 642 (5th Cir. 2012) ....................................181

*United States v. Gray*, 751 F.2d 733 (5th Cir. 1985)...................................83,84,85,87

*United States v. Hale*, 435 F.2d 737, 741 (5th Cir. 1970) ....................................184

*United States v. Halper*, 490 U.S. 435.................................................................74

*United States v. Hands*, 184 F.3d at 1329 (11th Cir. 1999) ...................................229

*United States v. Hare*, 873 F.2d 796, 801 (5th Cir. 1989).......................................76

*United States v. Harrelson*, 705 F.2d 733 (5th Cir. 1983).......................................78

*United States v. Harris* 597 F.3d 242,254-55 (5th Cir. 2010) .......................191,213

*United States v. He* 245 F.3d 954, 958 (7th Cir. 2001) .........................................122

*United States v. Holley*, 942 F.2d 916 (5th Cir. 1991) ...........................177,178,179

*United States v. Infante*, 404 F.3d 376,388 (5th Cir. 2005) ...................................285

*United States v. James M. Davis*, (case no. H:09-335, Doc. 755) .......................213

*United States v. Jenkins*, 46 F.3d 447 (5th Cir. 1995)............................................88

*United States v. Jones*, 160 F.3d 641, (10th Cir. 1998)..........................................103

*United States v. Kaley*, 579 F.3d 1246 (11th Cir. 2009)................................103,104

*United States v. Kordel*, 397 U.S. 1 (1970) ..........................................................71

*United States v. Labarbera*, 581 F.2d 107 (5th Cir. 1978) ....................................229

*United States v. LaFranca*, 282 U.S. 568 (1931) ...................................................73

*United States v. Laura*, 607 F.2d 52 (3rd Cir. 1979).............................................109

*United States v. Lawrence*, 47 F.3d 1559, 1566-68 (11th Cir. 1995) ....................203

*United States v. Lee*, 427 F.3d 881, 892, 894-95 (11th Circ. 2005) ......................203

*United States v. Lindell*, 881 F.2d 1313 (5th Cir. 1989)..........................................184

*United States v. Lipscomb*, 299 F.3d 303 (5th Cir. 2002)......................................129

*United States v. Maki*, 535 F.2d 889 (5th Cir. 1976)................................................157

*United States v. Maze*, 414 U.S. 395, 405 (1974)....................................................183

*United States v. McClelland*, 868 F.2d 704, 706 (5th Cir. 1989) ..........................181

*United States v. McDaniel*, 436 Fed.Appx. 399, 408 (5th Cir. 2011) ....................136

*United States v. Miller*, 688 F.2d 652 (9th Cir. 1982) ...............................................88

*United States v. Monsanto*, 491 U.S. 600, 613-14 1989...........................65,105,106

*United States v. Moya-Gomez*, 860 F.2d 706 (7th Cir. 1998)..................................104

*United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998) ...............................30,228

*United States v. Murray*, 648 F.3d 251, 254 (5th Cir. 2011)...................................188

*United States v. Nixon*, 418 U.S. 683, 698 (1974) ..................................................169

*United States v. O'Hagan*, 521 U.S. 642, 651 117 S. Ct. 2199, 138 L.Ed. 2d.724

(1997) ......................................................................................................................47

*United States v. Parris*, 573 F3d. F. Supp. 2d 744, 745 (EDNY 2008) ...............209

*United States v. Porter*, 542 F.3d 1088, 1093 (5th Cir. 2008)................................174

*United States v. Rabbon*, 628 F.3d 200 (5th Cir. 2010)............................................63

*United States v. Radomski*, 473 F.3d 728 (7th Cir. 2007) ......................................139

*United States v. Robertson*, 493, F.3d 1322, 1330 (11th Cir. 2007) ......................203

*United States v. Rodriguez* case no: 11-15911-DD (11th Cir. 2013) ....................203

*United States v. Salerno*, 481 U.S. 739 (1987)................................................75,76

*United States v. Sepulveda*, 15 F.3d 1161 (1st Cir. 1993)...................................228

*United States v. Sepulveda,* 115 F.3d 882, 890 (11th Cir. 1997) ...........................204

*United States v. Setser*, 568 F.3d 482 (5th Cir. 2009) ...............................85,86,87,88

*United States v. Shellnut* 2009 WL 3681,827 (MD.GA.2009) ...........................136

*United States v. Skilling*, 554 F.3d 529,559 (5th Cir. 2009)...........................138,264

*United States v. Smith*, 546 F.2d 1275 (5th Cir. 1977)...........................................78

*United States v. Speed Joyeros,* 204 F. Supp.2d 412 (EDNY 2002) ....................210

*United States v. Stead,* 548 F.3d 961, 973 (11th Cir. 2008) .................................145

*United States v. Stevens*, 487 F.3d 232 (5th Cir. 2007)...........................................30

*United States v. Straach*, 982 F.2d 232 (5th Cir. 1989)..........................................184

*United States v. Tucker*, 345 F.3d 320, 336 (5th Cir. 2003)...........................179,180

*United States v. Ursery*, 518 U.S. 267 (1996) ..............................................73,74

*United States v. Valdez*, 453 F.3d 252, 262 (5th Cir. 2006) .................................188

*United States v. Valladares*, 544 F.3d 1257 (5th Cir. 2008)..................................158

*United States v. Verderame*, 51 F.3d 249 (11th Cir. 1995) ....................................172

*United States v. Vilar, et. al.,* 729 F.3d 62, 77-78 n. 11 (2nd Cir. 2013) .................52

*United States v. Washington,* (case no. 11-14177) (April 26, 2013) ....................201

*United States v. Walters*, 351 F.3d 159, 170 (5th Cir. 2003)..................................159

*United States v. Williams,* 568, 899 F.2d (5th Cir. 1987) ......................135

## **FEDERAL STATUTE:**

15 U.S.C. § 78bb(F)(1)(A)......................................................................40

15 U.S.C. § 78 (j)(b) ...........................................................................39

15 U.S.C. § 1681 .................................................................................95

15 U.S.C. § 78c(a)(17) .........................................................................48

Section 10(b) of the Securities Exchange Act of 1934........................42

Title VII of the Civil Rights Act of 1964........................................46,49

Section 206 of the Investment Advisors Act ........................................35

HR Rep. No. 104 622 at 1634 (1996) ...................................................40

National Security Market Improvement Act of 1996 ...........................40

Rule 10b-5 of the Exchange Act ...............................................30,42,47

Rule 506 ................................................................................................43

Fifth Circuit Pattern Jury Instruction 2.59-60...................................217

FASB Rule 142 (Financial Accounting Standards Board) ...................245

NASD Conduct Rule 2210(d)(1)(A) .....................................................38

12 Charles Alan Wright et. al., Fed. Prac. & Pro. § 2981 ...................65

18 U.S.C. § 1030 ..................................................................................94

18 U.S.C. § 1341 ........................................................................181,183

18 U.S.C. § 3141-3150 ...................................................................264

18 U.S.C. § 4241(d) .....................................................................141

18 U.S.C. § 4241(e) ......................................................................155

28 U.S.C. § 754.............................................................................66

28 U.S.C. § 959.............................................................................67

28 U.S.C. § 1291 ...........................................................................15

28 U.S.C. § 1781-1782 ..................................................................100

28 U.S.C. § 2674-2680(k) ..............................................................48

U.S.S.G. § 2B1.1(b)(1)(P) .......................................................189,190

U.S.S.G. § 2B1.1(b)(15)(B)(iii) ...............................................189,195

U.S.S.G. § 2B1.1(b)(2)(B) ..............................................................203

U.S.S.G. § 2B1.1(b)(2)(C).....................................................189,200,211

U.S.S.G. § 2B1.1(b)(10)(A) .....................................................189,204

U.S.S.G. § 3B1.3...................................................................189,205

U.S.S.G. § 3B1.1(a) ...............................................................189,207

U.S.S.G. § 3C1.1...................................................................190,207

U.S.S.G. § 2S1.1(b)(2)(B) ......................................................190,208

## **FEDERAL RULE:**

Fed.R.Crim.P. 29..........................................................................31

Fed.R.Crim.P. 53..................................................................................136

Fed.R.Crim.P. 506...............................................................................43

J. Bishop, Criminal Procedure 50 (2d.ed.1872) .....................................213

Fed.R.Civ.P. 12(b)(1)...........................................................................46

Fed.R.Civ.P. 12(b)(3) .........................................................................68

Fed.R.Civ.P. 12(b)(6) .........................................................................46

Fed.R.Civ.P. 26(b)(5)(B) ...................................................................93

Fed.R.Civ.P. 26(c)(1)(G) ...................................................................93

Fed.R.Civ.P. 45(c)(3)(A)(iii) ......................................................91,92,93

Fed.R.Civ.P. 66 .............................................................................66,67

Fed.R.Evid. 803(6) ...........................................................................169

Fed.R.Evid. 401 ...............................................................................285

Fed.R.Evid. 403 ....................................................................265,284,285

Fed.R.Evid. 404(b)............................................................................285

## TEXAS RULES OF PROFESSIONAL CONDUCT:

Rule 1.15(a) .....................................................................................117

## TEXAS ADMINISTRATIVE CODE

Title 22 ...........................................................................................254

## INTERNATIONAL STATUTE

International Business Corporation Act 244 (1) (Antigua and Barbuda)............90

## STATEMENT OF JURISDICTION

This appeal arises from the defendant's conviction in the United States District Court for the Southern District of Texas, Houston Division. Timely Notice of Appeal was filed on June 15, 2012. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 4(b) of the Federal Rules of Appellate Procedure.

## STATEMENT OF ISSUES

### I. (pages 30-62)

Whether the Securities and Exchange Commission (SEC) had jurisdiction and regulatory authority over Stanford International Bank Limited (SIB), or its Certificates of Deposit (CDs). And whether, following the SEC's civil action, the Department of Justice's (DOJ) criminal Indictment was defective.

### II. (pages 63-77)

Whether the simultaneous civil and criminal prosecutions (and sanctions imposed), based on the same underlying events, were violations of the Due

Process Clause of the Fifth and Eighth Amendments, and defendant Stanford's protection from Double Jeopardy.

### III. (pages 78-102)

Whether the Trial Court violated defendant Stanford's Fourth Amendment protection from illegal searches and seizures.

### IV. (pages 103-106)

Whether the District Court abused its discretion when it failed to hold a pre-trial Hearing to determine whether defendant Stanford had any "untainted" funds that could be used to pay for his defense.

### V. (pages 107-117)

Whether the Trial Court abused its discretion by

(a) disqualifying defendant Stanford's competent counsel of choice, and;

(b) forcing ill-prepared appointed counsel to proceed to trial.

## VI. (pages 118-128)

Whether the Trial Court violated defendant Stanford's Sixth Amendment right to a fair trial, by failing to provide appropriate responses to Jury Notes Two and Three.

## VII. (pages 129-139)

Whether defendant Stanford was deprived of his Sixth Amendment right to a fair trial, because pre-trial publicity precluded the assembly of an impartial jury.

## VIII. (pages 140-157)

Whether the Trial Court abused its discretion by first deeming defendant Stanford competent, and then failing to grant him adequate time to prepare an effective defense, assist his counsel, or prepare to testify on his own behalf; in violation of the Due Process Clause of the Fourteenth Amendment, as well as his Fifth and Sixth Amendment rights to a fair trial.

## IX. (pages 158-173)

Whether the Trial Court abused its discretion by denying defendant Stanford adequate time to prepare an effective defense.

## X. (pages 174-180)

Whether the Trial Court violated defendant Stanford's Sixth Amendment right to a fair trial by failing to provide the jury with a "unanimity of theory" instruction specific to which "misrepresentation" (element), on each of the mail fraud and/or wire fraud Counts constituted the overall "scheme to defraud."

## XI. (pages 181-183)

Whether the Trial Court violated the Due Process Clause of the Fourteenth Amendment, by proceeding with evidence which was insufficient to prove the essential elements of the mail fraud statute.

## XII. (pages 184-187)

Whether the Trial Court violated defendant Stanford's Sixth Amendment right to a fair trial by issuing a modified "Allen charge" that was coercive.

## XIII. (pages 188-214)

Whether the Trial Court abused its discretion by enhancing defendant Stanford's sentence based on information not found in any Count of the Indictment, and that was neither entered into evidence, nor submitted to the jury and proven beyond a reasonable doubt.

## XIV. (pages 215-227)

Whether the Trial Court, through its rulings, demonstrated a partiality in favor of the Government that denied defendant Stanford an opportunity to present an adequate defense, in violation of his Fifth Amendment right to Due Process, and his Sixth Amendment right to a fair trial.

**XV.** (pages 228-229)

**Whether under the Cumulative Error Doctrine the issues presented here amount to a denial of defendant Stanford's Constitutional right to a fair trial, and thus undermined the reliability of the verdict.**

## STATEMENT OF THE CASE
## INTRODUCTION

On February 16, 2009 the Securities and Exchange Commission (SEC) filed a Complaint in the Northern District of Texas against defendant Stanford, et. al., alleging a multitude of securities violations.

In connection with this Complaint, the SEC then sought, and was granted, a Temporary Restraining Order (TRO), freezing all assets under the defendant's control, followed by a companion Order appointing a Receiver to take possession and control these assets.

Simultaneous with the SEC's (civil) action and continuing investigation, the Department of Justice (DOJ) had conducted a (criminal) investigation, and four months later on June 18, 2009 a Grand Jury in the Southern District of Texas returned a twenty-one Count Indictment charging the defendant with Securities

Fraud and Conspiracy to Commit Mail and Wire Fraud, Money Laundering and Obstruction of an SEC Investigation.

Defendant Stanford surrendered into custody on June 18, 2009, and was held without bond in pre-trial detention. On September 24, 2009, while being held in pre-trial detention at the Joe Corley Detention Center (Conroe, Texas), defendant Stanford was assaulted by other prisoners and suffered massive head injuries, and multiple fractures. (See Exhibit A)

These injuries and the psychotropic drugs prescribed by Government doctors to treat them, caused extensive neurological and cognitive debilitations, near-fatal liver toxicity and further complicated an already extraordinarily complex trial.

On January 6, 2011 a Competency Hearing was held, whereby defendant Stanford was declared unfit for trial, and subsequently transferred to FMC Butner for further treatment and psychological evaluation.

On May 4, 2011, a second Grand Jury returned a fourteen Count Superseding Indictment, in which the "Securities Fraud" and other charges (found in the original Indictment) had been dropped, and the time frame of the remaining charges surreptitiously broadened – from (on or about 1999 to February 17, 2009) to (on or about 1990 to February 2010).

On November 14, 2011 defendant Stanford was returned to the Federal Detention Center (FDC - Houston).

On December 20-22, 2011 a second Competency Hearing was held, whereby defendant Stanford was declared fit for trial.

On January 18, 2012 defendant Stanford was arraigned on the Superseding Indictment, and five days later, on January 23, 2012, the trial began.

On March 6, 2012 the jury returned a verdict of guilty on 13 of 14 Counts.

On March 20, 2012 counsel for defendant Stanford filed a Motion for a New Trial, which was DENIED on March 22, 2012.

On June 14, 2012 defendant Stanford was sentenced to a total of 110 years in prison.

On June 15, 2012 counsel for defendant Stanford filed a timely Notice of Appeal, which is now before this Court.

## GOVERNMENT INVESTIGATION

In the summer of 2008 the SEC was contacted by two former Stanford employees with allegations that Stanford Financial Group was engaging in fraud. Stanford Financial Group was the parent company of a global organization that included Stanford Group Company (SGC), a licensed Broker-Dealer, where these two men had been employed. These former employees, financial advisors Charles Rawl and Mark Tidwell, had been terminated by SGC and were then required to repay the unearned portion of their industry-typical (signing bonus) Employee Forgivable Loans (EFL). In an attempt to escape this repayment, these two former

22

employees had brought wrongful termination suits against SGC, but in FINRA[1] arbitration, they had not prevailed and had instead been ordered to repay the EFL amounts, which totaled nearly two million dollars.

By then contacting the SEC with the allegations of fraud, they were expectant that the SEC would reward them with assistance in avoiding the FINRA ordered repayment of their EFL's.

At first, the SEC had dismissed these allegations of fraud as unsupported and unreliable. But then, a few months later, in the wake of the subprime and Madoff debacles (December '08), the SEC suddenly developed a renewed interest in what these former Stanford employees had to offer.

Two years later (May 13, 2011) and following the criminal Indictment of defendant Stanford, when called to testify before the House Financial Services Subcommittee on Oversight and Investigations, Charles Rawl would characterize the SEC's renewed interest this way:

> "Within days of the Madoff arrest, the SEC contacted us in a panic, wanting to meet immediately after many months of silence. The SEC was so anxious at that point, they asked us to meet them over the Christmas weekend. We met with the SEC the first week of January 2009. At this point, the SEC expressed its concerns about lacking jurisdiction over the Antiguan-based bank. We helped the SEC design the legal strategy to implicate the domestic Broker-Dealer in the offshore bank fraud."

---

[1] Financial Industry Regulatory Authority

23

Based on this strategy, on February 16, 2009 the SEC had filed the (civil) Complaint against defendant Stanford, which declared that the Certificates of Deposit (CDs) sold by the bank (SIB) were "securities" under the jurisdiction of U.S. Federal Securities Laws.

## TEMPORARY RESTRAINING ORDER/APPOINTMENT OF RECEIVER

Defendant Stanford was the sole shareholder in, and owner of, the global Stanford organization. As such, the TRO issued by Judge David Godbey in the (civil) matter effected the freeze and resulting denial of access to his every asset, both personal and corporate.

Additionally, this Order included the impossible-to-comply-with directive that defendant Stanford (et al) immediately provide to the Government:

> [A]n interim accounting, under oath...
> (1) Detailing all monies and other benefits which each received, directly or indirectly, as a result of activities alleged in the complaint...
> Temporary Restraining Order (vol. 2)(USCA5 649)

Not only was compliance with this Order impossible (as his every asset, including financial records, were in the Receiver's possession), it forced upon defendant Stanford the added dilemma of having to choose between an act of self-incrimination, or involuntarily asserting his rights under the Fifth Amendment

without counsel.   Further complicating this matter and potential of self-incrimination, the Court-appointed Receiver was directed to:

> 5.(k) Promptly provide the United States Securities and Exchange Commission and other Governmental agencies with all information and documentation they may seek in connection with its regulatory or investigatory activities. Appointment of the Receiver (**vol. 6**)(**USCA5 1482**)

Ultimately, the Receiver's compliance with this directive of self-incrimination would result in the Receivership Estate's disbursement of more than **100 million dollars**, for his:

> [C]oordination with the SEC, the FBI, and the Department of Justice in identifying and gathering large amounts of information and documents relevant to their ongoing investigations, and responding to numerous and extensive requests from the SEC, the FBI, and the Department of Justice to analyze and provide information and documents...
> Report of the Receiver, April 23, 2009
> (**vol. 2**)(**USCA5 606**)


## THE TRIAL

During the approximately six weeks of testimony, the Government presented the theory that, through the companies defendant Stanford controlled, and for more than twenty years, he and his co-defendants carried out a massive Ponzi scheme.

More specifically that, through his global network of financial services companies – with Stanford Financial Group as the parent company – the financial

advisors at Stanford Group Company, a U.S.-based Broker/Dealer, was alleged to have sold purportedly-fraudulent Certificates of Deposit issued by Stanford International Bank, an offshore bank domiciled in the sovereign nation of Antigua and Barbuda.

The Government's theory, and in fact its entire case, was founded on the testimony of co-defendant (and cooperating witness) James Davis, the Chief Financial Officer (CFO) of Stanford Financial Group and was (un)supported by the forensic auditing "Declarations" of a single accountant Karyl Van Tassel, Senior Managing Director of FTI Consulting, a firm retained by the Receiver that was unlicensed in Texas and not permitted to perform such work under the Texas Public Accountancy Act.

## <u>MOTION FOR A NEW TRIAL</u>

On March 20, 2012 counsel for defendant Stanford filed a "Motion for a New Trial" **(Doc. 829)** based on the following issues:

        Pre-trial Publicity
        Publicity During Trial
        Courtroom Broadcasting
        Denial of Continuance
        Budget Constraints

This Motion was DENIED by the Trial Judge, David Hittner.

## SENTENCING

In their "Sentencing Memorandum", counsel for defendant Stanford objected to the calculation (in the PSR) of the sentencing enhancements based on facts that were neither (1) properly identified as specific elements of the alleged crime in any Count in the charging Indictment; (2) entered into evidence at trial; nor (3) submitted to the jury and proven beyond a reasonable doubt.

At trial, the Government presented only 3 persons, whose losses occurred **after, and not prior to**, the Temporary Restraining Order and Government seizure. And at sentencing, the Trial Court (Judge Hittner) reasoned its grossly disproportionate enhancements on 350 "purported" victim letters sent directly to the Judge after the trial, and thus these letters were never entered into evidence and subject to challenge by the defense. Defendant Stanford's counsel objected once again at Sentencing, and the objection was OVERRULED.

Since that time, and as will be argued, the Supreme Court has ruled that this sort of reasoning (and Judge-finding) is unconstitutional.

## SUMMARY OF ARGUMENT

In a combined civil and criminal action that was admittedly "coordinated" and begun as a reckless misinterpretation of U.S. law, the SEC asserted its regulatory authority over the foreign-domiciled and foreign-regulated Stanford International

Bank – based on jurisdiction it did not have and charges it could not substantiate. This "securities-related" action, which obliterated a global group of companies worth an estimated 11 billion dollars, evolved into violations of both U.S. and International Law, and was the clearest of assaults on the U.S. Constitution.

In furtherance of their reckless action and 'by-any-means' pursuit of this global company's owner, Robert Allen Stanford, the Government later dropped its leading (unauthorized and unfounded) "Securities Fraud" and related charges and proceeded to trial with the remaining lesser charges from the Original Indictment - including the "Obstruction of an SEC Investigation" charge, which, as indicated in section 13 of the SEC's February 17, 2009 civil Complaint **(Doc.1)(3:09-CV-00298-N)**, was an investigation of, about, and concerning nothing other than, the (alleged and dropped) 'Securities' violations.

With their (undeniable) understanding that none of these remaining charges could have been brought independent of the (alleged and dropped) 'Securities'-related charges (and therefore should not have survived them) the prosecutors then not only allowed this illegal tactic to stand and proceed, they aided in "legitimizing" it by allowing cooperating co-defendant Davis to immediately plead guilty to these (alleged and dropped) 'Securities' violations, and others, thereby providing both the appearance of validity to this illegal tactic, and a "mea culpa" credibility to Davis, their star witness.  Beyond these tactics, and the extensive coordination among the

28

civil and criminal investigations involved, which was equally illegal and equally "legitimized," the Trial Court would later dismiss as unreliable the findings of 4 highly experienced doctors: a neuropsychologist, psychiatrists, a neurologist and a neurosurgeon, who had found defendant Stanford unfit for trial, and go on to admit illegally-obtained evidence and rule in violation and denial of his rights under the Fourth, Fifth, Sixth and Eighth Amendments.

# ARGUMENT

## I.

**THE SECURITIES AND EXCHANGE COMMISSION HAD NEITHER JURISDICTION NOR REGULATORY AUTHORITY OVER STANFORD INTERNATIONAL BANK, LIMITED OR ITS CERTIFICATES OF DEPOSIT.**

## STANDARD OF REVIEW

Courts of Appeal Review the denial of a Motion to Suppress *de novo* for clear error, *United States v. Stevens*, 487 F.3d 232, 238 (5th Cir. 2007) and for abuse of discretion when a defendant was prejudiced by a deprivation of substantial Due Process rights. *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998).

## DISCUSSION

In their action against the Antiguan-domiciled Stanford International Bank, the SEC dishonestly asserted that, under U.S. Federal Securities Laws:

a.) The Certificates of Deposit were "covered securities", defined in Sections 10(b) and Rule 10b-5, and that therein;

b.) The SEC had both jurisdictional and regulatory authority over the foreign-domiciled Bank.

This "dishonesty" (on which the SEC had founded their allegations of "Securities Fraud") manifested itself when (on October 4, 2010) counsel for defendant Stanford filed a <u>Motion to Dismiss Due to Government's Failure to Satisfy</u>

<u>Pleading Requirements</u> **(vol. 2)(USCA5 254-268)**, in which they argued both the SEC's lack of jurisdiction, and that the Bank's CDs were in fact "debt obligations" and **not** "securities." This Motion compelled the Government to remove Counts One, Nineteen, Twenty, and Twenty-one from the Indictment.

The (defense-prompted) removal of these specific Counts served as verification that the SEC had brought the unauthorized and unfounded "Securities Fraud" charge solely as a means of empowerment to assert its authority over SIB and to seize all Stanford-owned and related assets. Therefore, as this jettisoning of the "Securities Fraud" and related charges clearly exposed the SEC's deceit, it also should have nullified the action in its entirety and ended the unauthorized and unfounded case against defendant Stanford.

The DOJ, however, proceeded with their falsely-premised case as if the dropped "Securities Fraud" and related other charges were immaterial.

During the trial, counsel for defendant Stanford would further attempt to address this injustice by submitting the following:

> <u>Mr. McGuire</u>: [A]t this time Mr. Stanford, the defendant, would move for Judgment of Acquittal under Rule 29 on the basis that there's been insufficient evidence presented in the case at trial, when looking at all the evidence in the record, as to all elements of all Counts of the Indictment.
> <u>The Court (Judge Hittner)</u>: That's it?
> <u>Mr. McGuire</u>: No. I have a little bit more, Judge.

The Court: I assume that you're going to discuss it a little more.

Mr. McGuire: Specifically, as to Count 12, which is the Conspiracy to Obstruct the SEC Investigation; we don't believe the Government put on any evidence or showed that the SEC had authority to investigate Stanford International Bank, which was an offshore bank.

First of all, the SEC does not have the authority to investigate banks in general, much less an offshore [foreign] bank. So, they had no lawful authority to require Mr. Stanford to participate in or cooperate with an investigation of his bank, for which they had no lawful authority to investigate...

**(vol. 56)(USCA5 11534-11535)**

And continued with:

Mr. McGuire:    [Y]our Honor, we would just raise a Motion that there's insufficient evidence based on all the record, all the evidence that's been introduced at trial as to all Counts - as to all elements and all Counts of the Indictment.

The Court: Okay. Government's response please.

AUSA Costa: Yes, your Honor. [T]heir argument is that the SEC didn't have a valid basis for the investigation.

The Court: A valid basis?

AUSA Costa: Or jurisdiction.

The Court: He said authority.

AUSA Costa:  No authority. The law is - first of all, we strongly disagree with that. The SEC... Judge Godbey in Dallas shut them down based on the SEC's authority. But regardless -

The Court: Go on. Next. What else?

AUSA Costa: Under the law of obstruction, even if the investigation isn't authorized, or even if there isn't valid

32

jurisdiction, it's still unlawful to obstruct an investigation. The case law is clear that if you obstruct an investigation you don't get into whether the investigation has validity or not...

<u>The Court</u>: Even if they had no jurisdiction, assuming as they say in law school, arguendo, they had no authority?

<u>AUSA Costa</u>: That's irrelevant to...

<u>The Court</u>: Just the mere obstruction of what? A federal investigation?

<u>AUSA Costa</u>: I want to make clear the SEC did have jurisdiction. But assuming arguendo, the case law says it's still obstruction. You don't get into whether the investigation was valid or there was authority.

**(vol. 56)(USCA5 11536-11538)**

Following this logic, for which AUSA Costa failed to cite any supporting case law, "probable cause" disappears as a necessary element of a valid search and seizure or arrest. Accordingly, to secure a "valid" conviction, any federal agent can simply initiate an investigation for any fabricated reason, on any person, anywhere in the world, and that person's lack of cooperation in the matter both legitimizes the fabrication and suffices as evidence of guilt.

But assuming that "arguendo," and ignoring the utter absurdity of this unsupported logic, the laws and investigatory powers of the United States are not enforceable – or acceptable – in other countries. No matter their reasoning, the <u>SEC</u>

33

never had jurisdiction or regulatory power over Stanford International Bank, with no subsidiaries, or **"home"** in the United States[2].

As the Supreme Court has made clear in *Daimler AG v. Bauman*, 571 U.S. 134 S.Ct. 746 (2014) the paradigm all-purpose forums for "general jurisdiction" are a corporation's place of incorporation and principal place of business. SIB was neither incorporated, nor did it conduct the principal portion of its business in the United States. In fact, the Bank's U.S. customers represented only a very limited part of its business. And more importantly, during the first 13 years of its operations (1985-1998), SIB did no business whatsoever with U.S. citizens or residents.

To provide the needed clarity here concerning "affiliate", Stanford International Bank was a foreign-incorporated, foreign-based and foreign-regulated, stand-alone affiliate of Stanford Financial Group. Outside of its **"home"** in Antigua, Stanford International Bank had only a single subsidiary (representative office) in Canada. SIB had no office located in the United States and no employees working from the U.S., and therefore was not under the jurisdiction or regulatory authority of any U.S. Government agency...including the SEC.

---

[2] "SIB therefore was never eligible for TARP funds: it was based in Antigua and it had no United States subsidiary. In fact, Stanford directed efforts to ensure that SIB (and its predecessor) remained based offshore by never opening an office or branch in this country, and satisfying offshore residence requirements – and was never subject to United States banking regulation."
**Government's 'Motion in Limine' (vol. 5)(USCA5 1381-1392)(Doc. 585)**

Defendant Stanford's licensed U.S. Broker-Dealer, Stanford Group Company, another stand-alone affiliate of the Stanford Financial Group, was "**home**"-based in Houston, Texas with over 30 offices throughout the U.S. and was the **only** Stanford company under the regulatory authority of the SEC. Thus, upon any suspected "securities" violation (of the Investment Advisors Act, Section 206), the SEC could have pursued a complaint against that affiliate company. For instance, in their wrongful categorization of the SIB CDs as fraudulent "securities," they could have sought any and all applicable sanctions against SGC, up to and including a "Cease & Desist" Order. But they chose not to do that, and instead crafted their guileful jurisdiction and regulatory authority over SIB for reasons which are obvious and despicable in equal measure.

In the plainest of English, such a pursuit of Stanford Group Company – the only SFG affiliate over which the SEC had actual authority – would not have resulted in the sensational headlines they were seeking to redeem themselves in the agency-blemishing and career-threatening 'securitized debt' and Madoff debacles. Nor would it have provided them the weighty "exigent circumstances" to justify the drastic-measured Temporary Restraining Order, their guarantor of success.

Further proof that this Antiguan-based affiliate (SIB) was never under the SEC's jurisdiction and regulatory authority, and, moreover, that the CDs sold by the Bank were <u>not</u> "covered securities" under Federal Securities Laws – and that their

purchase was in no way "in connection with" the sale or purchase of any "covered security" – is found in a multitude of forums.

For instance, at a pre-trial Hearing where the Government was requesting a Motion in Limine, barring any discussion about SIB's eligibility or ineligibility to access federal bailout money (TARP Funds), the prosecution pointed out the following:

> AUSA Stellmach:  There are two points, Judge; one, we just want to preclude any suggestion that the SIB was ever eligible.  Foreign banks only received funds if they had U.S. subsidiaries, which Mr. Stanford's bank did not, because he didn't want to subject it to U.S. regulations. So it was never eligible for the TARP or any bailout funds. So it would be misleading to the jury to suggest otherwise...
> **(vol. 36)(USCA5 15453)**

Ultimately, the Trial Judge (Hittner) would grant this Motion in Limine (vol. 5)(USCA5 1381-1392)(Doc. 585) and, in the process, would further confirm the SEC's lack of jurisdiction over the bank by stating:

> "[T]he allegation about TARP funds which foreign banks like SIB was not eligible to receive, is GRANTED at this time..."
> **(vol. 36)(USCA5 15469)**

And again, in a different context concerning the courtroom qualifications of defense expert Michael Callahan:

AUSA Warren: Yes, your Honor, I would object. This witness is an expert with regard to domestic [SEC] compliance, FINRA, NASD. And so, if he's talking about companies that are regulated by NASD and FINRA [or SEC], he's clearly an expert. If we're talking about SIB, that was a foreign company regulated by a different entity, there's no foundation for his expertise as to that.
(vol. 59)(USCA5 10468)

And yet again, on direct examination of IRS agent Kalford Young, when questioned by lead prosecutor Gregg Costa:

AUSA Costa:    [w]ho directly regulated Stanford International Bank throughout its histories?
Mr. Young: The FSRC.
AUSA Costa: Which is just in Antigua?
Mr. Young: Yes.
(vol. 50)(USCA5 7697-7698)

The most definitive proof of all, however, is found in the Superseding Indictment itself, under Section (5), which states:

Although SIB marketed and sold its CDs within the United States, SIB was an Antiguan-based bank, and was not regulated by any United States banking authority. Instead, SIB was regulated by an agency of the Antiguan Government known as the Financial Services Regulatory Commission (the "Antiguan Regulatory Commission") which claimed to conduct inspections to determine the solvency of banks, to review the quality of bank's investments, and to confirm the accuracy of bank's reported returns.
(Doc. 422)

The National Association of Securities Dealers (NASD) agreed. In a letter

37

(dated September 27, 2006) to Stanford Group Company advising them of NASD's "inquiry with respect to the firm's offering of Certificates of Deposit offered by Stanford International Bank", and specifically concerning information contained in SIB's brochures, Special Investigator Stacy L. Hagar stated:

> "[I]n addition, there should have been further disclosure of the differences in regulation of U.S. banks and SIBL; for example, that U.S. banks are subject to regulation by an agency of the U.S. Government, whereas SIB is not subject to such oversight. This is an apparent violation of NASD Conduct Rule 2210(d)(1)(A). Please comment. **(Case no: 3:09-cv-00724-N-BL Doc.393)**

Furthermore, and again, the Certificates of Deposit sold by the Bank were <u>not</u> "covered securities." They were not registered or traded on any exchange, national or otherwise; the purchasers acquired no interest in any securities maintained in the Bank's investment portfolio, and thus the sale of them was not, and could not have been, "in connection with" the purchase or sale of a "covered security."

By definition, a Certificate of Deposit is a "debt obligation"; in essence, a loan to the bank. As defined by the (never-challenged) Supreme Court decision in *Davis v. Elmira Savings Bank*, 40 L.Ed. 700, 161 U.S. 275 (1896), and repeated in the <u>Receivers Report</u> of April 23, 2009:

> "The assumption that a Certificate of Deposit represents identifiable funds held in a separate account for the benefit of the individual CD investor is not correct.

The CD, [unlike a "security"] represents an obligation on the part of the bank to pay the investor an amount of money. In other words, it is a debt owed by SIB to the investor." **(vol. 2)(USCA5 593)**

Extensive case law provides that as long as the investor's deposit is protected by comprehensive banking regulation (such as FSRC) – and especially when (as per Antiguan law in case of insolvency) that investor is placed in first position for payment – the CDs are not categorized as "securities." See *Marine Bank v. Weaver*, 455 U.S. 551, 558059 (1982); *Wolf v. Banco Nacional de Mexico*, S.A. 739 F.2d 1458 (9th Cir. 1984), which clarified:

(1) the Certificate of Deposit purchased from a government regulated bank with a six year maturity date was not a security for purposes of the anti-fraud provision of § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78 (j)(b)) since (a) a Certificate of Deposit is not the functional equivalent of the withdrawable capital shares of a savings and loan association, nor is a Certificate of Deposit similar to any other long-term debt obligation commonly found to be a security, and (b) the purchaser of a Certificate of Deposit is virtually guaranteed payment in full, whereas the holder of an ordinary long-term debt obligation assumes the risk of the borrower's insolvency, and;

(2) the agreement between the purchasers of the Certificate of Deposit and the owners of the business was not a security for purposes of the anti-fraud provision of § 10(b) of the Securities Exchange Act of 1934 (15 USCS § 78 (j)(b) since (a) the business owners distributed no prospectus to the purchases of the Certificate or to other potential investors and the agreement was not to be traded publicly, and (b) although the agreement provided for

distribution of a share of the profits, that provision alone was not sufficient to make the agreement a security.

"Unlike a brokerage account [security], it [Certificate of Deposit] does not represent identifiable funds that are held by SIB in a specific segregated account for the holder's benefit."
Report of the Receiver, April 23, 2009
**(vol. 2)(USCA5 593-594)**

In a related case, the Fifth Circuit has concluded that the Certificates of Deposit offered by SIB were not "covered securities" within the meaning of the preclusion provisions to the <u>Securities Litigation Uniform Standard Act</u> (SLUSA), specified in 15 U.S.C. § 78bb(F)(1)(A).

See: *Roland v. Green*, 673 F.3d 503, 510 (5th Cir. 2012) which held:

"In order to preserve State regulatory authority over fraud involving other securities that were not traded on national markets, Congress imported the phrase "covered security" from the National Security Market Improvement Act of 1996 Pub.L. 104-290, 110 Stat. 3416 (1996), where its role is to divide regulatory authority between the Federal and the State Governments, so that the Federal Government takes responsibility for national offerings of securities while State and individuals retain authority...to bring actions pursuant to state laws and regulations prohibiting fraud and deceit." HR Rep. No. 104 622 at 1634 (1996).

In yet another Stanford related case (*Chadbourne & Parke, LLP v. Samuel Troice,* et. al. 134 S.Ct. 1058 (2014) – recently before the Supreme Court), on the

issue of "in connection with" and "covered securities", Justices Scalia, Kagan and

Breyer noted the following:

### JUSTICE SCALIA

"I had assumed that the purpose of the securities laws was to protect the purchasers and sellers of covered securities.  There is no purchaser – or seller of a covered security involved here.

It's...it's a purchaser of not-covered securities who is being defrauded, if anyone...why...why would the Federal Securities Laws protect that person?"

### JUSTICE KAGAN

"In all our cases, there's been something to say when somebody asks the question:  how has this affected a potential purchaser or seller in the market for the relevant securities?"

"And here there's nothing to say."

### JUSTICE BREYER

"In Line[3], there is a broker who says to a client:  give me some money and I'll buy some securities on the Exchange for you.  And they gave him the money, and he didn't.  Well, that's directly related to a promise that is going to affect the purchase or sale of a security directly.  He's promising someone to buy securities for his account.
I don't think that's this case."

### JUSTICE SCALIA

"What troubles me, Ms. Goldberg [SEC attorney] is not the problem of our figuring out these economic consequences, but the text of the statute [Section 10b-5], which says, "in connection with" the purchase or sale of

---

[3] Richard J. Line, Administrative Procedure (SEC 1996).

41

one of the "covered securities".  I mean, it could have read in connection with the purchase or sale, or the promised sale, or the contemplated purchase or sale, but it doesn't'.  It says "in connection with the purchase or sale."  I don't know how you can make that stick to a situation where there has been no purchase or sale."

As expected, where the SEC's misinterpretation and over-broad application of Section 10(b) and Rule 10b-5 is concerned, when the Supreme Court issued a ruling in this case (*Chadbourne & Parke LLC v. Samuel Troice, et. al.*) these comments became all the more clarifying, and telling.

Most clarifying and telling of all, however, is the general consensus of "major jurisdictional issues" found in the March 31, 2010 Office of the Inspector General Report (**case no. OIG-526**) on the:

## INVESTIGATION OF THE SEC'S RESPONSE TO CONCERN REGARDING ROBERT ALLEN STANFORD'S ALLEGED PONZI SCHEME.

The following are random characterizations found in the report, remarks contained in actual SEC inter-office emails, and actual testimony.

> [Mary Lou] Felsman recalled that Enforcement was concerned about a "**major jurisdictional issue**" related to the matter before she left the Commission at the end of 1997.

> [T]hey didn't have any clear evidence of a fraud......

> [T]hey had questions about the **jurisdiction**....

[T]he fact that SIB was an offshore entity, which was a **jurisdictional** issue.
(Testimony Tr. at 26, 44)

[A] glaring absence of basis for a recommendation that it amounted to deceit or fraud upon the client.
(Testimony T. at 41-44)

[A]fter our exam a couple years ago, Stanford started filing form D's, relying on Rule 506, although they did so under protest. This would seem to make it difficult to work a case for selling unregistered securities. If we don't go on that basis, then we would have to prove that they are operating a Ponzi scheme, which would be very difficult, if not impossible, considering that, as far as I am aware, there have never been any complaints by investors, and all of the bank records and sales records are maintained offshore in Antigua. In my opinion, there is nothing further for us to do at this point. E-mail from Hugh Wright to Harold Degenhardt, Exhibit 87 at 2)

[T]he international dimensions concern me because it limits our investigative powers. [M]oreover, the immediate impact on U.S. investors, of an action against the domestic Broker-Dealer, might not be favorable.
(E-mail from Julie Previtt to Victoria Prescott, Exhibit 114).

[O]ne of the obvious logistical and **jurisdictional** problems with this case is the location of the issuer in Antigua. E-mail from Victoria Prescott to Jeffery Cohen, Exhibit 115)

[U]nlike a lot of Ponzi Schemes that have collapsed, when you've got investors calling you and they can't get their money out or there's clear misrepresentation...here...we just didn't have that.

43

[Y]ou don't have anybody complaining about anything going wrong; everybody is happy, so they are not particularly cooperative. In fact, they are usually against us when we go in and talk to them, as was the case with a lot of the investors in Stanford. They were against us even meddling. (Testimony Tr. 18-19)

[Enforcement Staff attorney 1], the former SEC Enforcement Staff attorney who had worked on the SEC's 1998 MUI concerning Stanford, worked at FINRA and "joined the discussion on the CD issue" while the FINRA examiners prepared for their Stanford exam. (Tr. at 33)

"From the moment she became involved in the discussions regarding the CD aspect of the 2005 Stanford cycle exam, [Enforcement Staff attorney 1] reportedly expressed the view that the Stanford CDs were not "securities" regulated under the Federal Securities Laws, and were therefore outside FINRA's **jurisdiction**." (Exhibit 120 at 20)

This former SEC Enforcement attorney's interpretation that the Certificates of Deposit issued by Stanford International Bank were not "securities" (and not regulated by the SEC), was correct.

Simply put, Stanford International Bank was regulated by – and only by – the Financial Services Regulatory Commission of Antigua & Barbuda. The CDs offered by SIB were not "covered securities", nor were they offered or sold in connection with any "covered securities," and therefore neither SIB nor its CD products was ever subject to the regulatory authority and enforcement powers of the U.S. Securities and Exchange Commission.

## <u>THE PRESUMPTION AGAINST EXTRATERRITORIALITY;</u>
## <u>INTERNATIONAL COMITY</u>

In *Morrison v. National Australia Bank*, 561 U.S.-130 S.Ct. 177 L.Ed.2d 535 (2010), the Supreme Court clarified:

> It is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States".

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 11 S.Ct. 1227, 113 L.Ed. 2d274 (1991) (Aramco) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S.281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949);

> "When a statute gives no clear indication of an extraterritorial application, it has none."

Nonetheless, in *Morrison*, the Second Circuit believed the Exchange Act's silence about 10(b)'s extraterritorial application permitted the Court to "discern" whether Congress would have wanted the statute to apply. This disregard of the presumption against extraterritoriality has occurred over many decades in many Courts of Appeals and has produced a collection of tests for "divining" congressional intent that are complex in formulation and unpredictable in application. The results, over the years...which now include the SEC's unlawful overreach in the Stanford case... demonstrate the wisdom of the presumption against extraterritoriality.

As stated in Title VII of the Civil Rights Act of 1964, the presumption against extraterritoriality (statute 84), serves to protect against unintended clashes between the laws of the United States and those of other nations, which very understandably could result in international discord.

When applying this rule of construction, the Courts look to see whether language in the relevant legislation gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty, or has some measure of legislative control. The Courts assume that Congress legislates against the backdrop of the 'presumption against extraterritoriality', and therefore, unless the affirmative intention of Congress is clearly expressed, the Courts must presume that Congress is primarily concerned with domestic conditions. In *Morrison*, the Respondents moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim under Rule 12(b)(6). The District Court granted the motion on the former ground, finding no jurisdiction because the acts in this country were "at most, a link in the chain of an alleged overall Securities Fraud scheme that culminated abroad". The Court of Appeals for the Second Circuit affirmed on similar grounds; finding that the acts performed in the United States did not "compris[e] the heart of the alleged fraud".

46

The Second Circuit determined that dismissal for failure to state a claim on which relief could be granted was warranted because;

> (1) based on the presumption against extraterritoriality, there was no affirmative indication in the Exchange Act that 10(b) applied extraterritorially, and therefore it did not;
>
> (2) 10(b) applied only to transactions in securities listed on domestic exchanges and domestic transactions in other securities, and;
>
> (3) the present case involved no securities listed on a domestic exchange, and all aspects of the purchases occurred outside the United States.

Once the matter was before them, the Supreme Court noted that:

[7] Rule 10b-5, the regulation under which petitioners brought their suit, was promulgated under 10(b), and does not extend beyond conduct encompassed by 10(b)'s prohibition. *United States v. O'Hagan*, 521 U.S.642, 651, 117 S.Ct. 2199,138 L.Ed. 2d.724 (1997).    Therefore, if 10(b) is not extraterritorial, neither is Rule 10b-5.

[9] On its face, 10(b) contains nothing to suggest it applies abroad.

In *Morrison*, the petitioners and the Solicitor General contended that language in 10(b) of the Exchange Act had at least some extraterritorial application. Specifically they pointed to the definition of "interstate commerce", a term used in 10(b), which includes...

"trade, commerce, transportation, or communication...
between any foreign country and any state"
**15 U.S.C. 78c(a)(17)**.

But as the Supreme Court would note:

"[w]e have repeatedly held that even statutes that contain
broad language in their definitions of 'commerce' that
expressly refer to 'foreign commerce' do not apply
abroad". (See *Aramco*, 499 U.S. at 251,111 S.Ct. 1227,113
L.Ed. 2d 274; see id., at 251-252,111 S.Ct.1227, 113 L.Ed.
2d 274) (discussing cases).

In particular, the Court made clear that the general reference to foreign
commerce in the definition of "interstate commerce" does not defeat the presumption
against extraterritoriality.

Affirming the dismissal in *Morrison* 8-0 (with Justice Sotomayor abstaining),
the Court concluded:

"In short, there is no affirmative indication in the
Exchange Act that 10(b) of the Exchange Act applies
extraterritorially, and we therefore conclude that it does
not."

In their unlawful overreach in the Stanford case, and to overcome the
"presumption against extraterritoriality" the SEC "presumed", apparently, that the
sovereign nation of Antigua and Barbuda is a "foreign country" within the meaning
of 28 USCS 2674-2680(k)..."a place that has no law", where SIB was virtually
unregulated and its owner, Robert Allen Stanford, was free to make his own laws.

48

This "presumption" – and resulting action – on the part of the SEC, is precisely the sort of recklessness and danger of "international discord" addressed in Title VII of the Civil Rights Act of 1964.

As evidenced by the numerous rulings in this matter from the High Court of Antigua and Barbuda – and contrary to the SEC's disparaging mischaracterizations – the sovereign nation of Antigua and Barbuda (a member of the British Commonwealth) is a respected member of the United Nations with well-established laws and comprehensive banking regulations, all of which meet the high standards mandated by the International Monetary Fund.

Beyond the perspective that *Morrison* and these other cases provide to the SEC's reckless and unlawful overreach in the Stanford case, *Morrison* also makes clear that, whenever the Securities and Exchange Commission seeks to file a Complaint, the most relevant factor for them to consider is the actual "scene" of the alleged offense...or, as the Second Circuit put it, where the alleged offense "culminated".

Cited by the District of Columbia Circuit Court for their "preeminence in the field of securities law", in *Morrison* the Second Circuit noted that whenever subject-matter jurisdiction is asserted under 10(b), that "jurisdiction" cannot merely be where the "preparatory activities" occurred, but rather is where the "offense"

49

actually...became an "offense". In other words, not merely "a link in the chain" along the way to that alleged offense, but where the alleged offense was "completed".

As previously indicated, Stanford International Bank had no **"home"** in the United States, and only a single subsidiary (representative office) in Canada. Stanford Group Company, which was also a member of the Stanford Financial Group, was a U.S licensed and U.S. based Broker-Dealer with offices throughout the United States...and it was via the Financial Advisors at those U.S. based Broker-Dealer offices that preparatory information (concerning subscriber agreements for the SIB Certificates of Deposit) was provided to prospective depositors who were "accredited investors" and resided in the United States.

The distinction here, between provider of information and provider of the actual Certificates of Deposit, is important to the extraterritoriality issue in that it clarifies the U.S. based Broker-Dealer (SGC), as an entity where nothing more than "preparatory activities" occurred. And therefore, as nothing more than a mere... "link in the chain" ...along the way... to Stanford International Bank in Antigua... where the alleged offenses in this matter were "culminated".

As the SEC's own Examiner pointed out to the Northern District Court in Dallas, approximately 85% of SIB's CD customers were non-U.S. citizens residing abroad. The remaining small percentage (15%) of the Bank's customers, (U.S. citizens residing in the U.S.), received "advice" on their prospective (CD) deposits

with the Bank through the Financial Advisors at its affiliate (and sister member) of the Stanford Financial Group, SGC. Each (and every one) of these CD agreements were then filled out by the prospective depositors themselves, then forwarded by the employees at SGC (by Fed-Ex), to the Bank in Antigua, for acceptance or rejection.

In other words, beyond the information provided by the Financial Advisors at the various offices of SGC, it wasn't until those customer-completed application forms reached the Bank's staff in Antigua, and were approved by them, that the purchases of the CDs were ..."complete"...or "culminated".

Furthermore, as is clearly stated in SIB's subscriber's application/agreement under "General Terms and Conditions" (**Doc.203**), the prospective Depositor did not incur "irrevocable liability" until; (1) the application/agreement was received at the Bank in Antigua, (2) the Bank performed its due diligence to verify the information contained in it was accurate and, as approval was not guaranteed, (3) the application/agreement was either approved (or rejected) by the Bank there in Antigua.

In short, and notwithstanding the fact that, as with any such agreement, the prospective Depositor could cancel at any time in between, the "commitment" was made not to the "provider of the information" (SGC, in the U.S.), but rather – upon the Bank's receipt, acceptance and approval of that "information" – directly to and between the Bank (SIB) in Antigua. Therefore, upon acceptance, SIB in Antigua

was both 'when and where' the prospective Depositor "committed" to the agreement, and 'when and where' that agreement was executed; the location where "irrevocable liability" was incurred, and "where physically, the purchaser or seller committed him or herself, not where, as a matter of law [not only] a contract is said to have been executed." *U.S. v. Vilar, et al.,* 729 F.3d 62, 77-78 n. 11 (2nd Cir. 2013)

Further establishing this fact, in that same subscriber's application/agreement **(Doc.203)** the Bank made clear that upon said acceptance:

> 23. "[F]or any action or proceeding which the Bank or the Depositor may commence with the account or with any operation or transaction involving payment to or from the account, the Depositor irrevocably submits to the jurisdiction of the Courts of Antigua and Barbuda, W.I., and to the fullest extent permitted by law, waiving any claim that such Courts would be an inconvenient forum. Jurisdiction for all legal proceedings shall be in Antigua."

In what can thus only be described as a paradox borne out of the DOJ's apparent acknowledgement – and blatant disregard of – "the presumption against extraterritoriality" in this matter, the undeniable proof of the existence of this ..."link in the chain" ...and place of "culmination"...preclusion can be found right in the Indictment itself. In Counts seven, eight, nine, ten and eleven, they alleged that defendant Stanford "sent to be delivered" a total of five: **"Package[s] of documents, including investor subscription information, sent and delivered via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua."**

And finally here, from the District of Columbia Circuit...

At 'Summation' just prior to the jurors deliberation, AUSA Stellmach told the jury...

> "[Y]ou'll remember that after 1998, the brokerage firm was selling CDs right here in the United States, through the brokerage firm Stanford Group Company."
> **(vol. 66)(USCA5 12638)**

This was not a simple and inconsequential inaccuracy. This was, in a nutshell, the entire premise on which the SEC had wrongfully and unlawfully asserted their regulatory authority over Stanford International Bank.

On July 18, 2014, in '*Securities and Exchange Commission v. Securities Investor Protection Corporation*' (*SEC v. SIPC*) (**case no. 12-5286**) the D.C. Circuit conclusively determined, and conclusively ruled, that the CDs offered by the foreign-incorporated and foreign-domiciled Stanford International Bank were; (a) not "securities" as defined by, or regulated under, the federal securities laws of the United States, and instead were; (b) "debt obligations" of the Bank, which were; (c) not "sold" through, or by, Stanford Group Company, and thus; (d) the purchasers of those CDs were not "customers" of SGC, and were therefore never under the jurisdiction or subject to the regulatory authority of the U.S. Securities and Exchange Commission.

In addition to the briefs submitted by the appellant and appellee, Amicus Curiae brief(s) (**Doc. 1431806**) were submitted in this matter by the following Amici:

The Honorable Joseph A. Grundfest, who served as Commissioner of the SEC from 1985 to 1990, and is currently the W.A. Franke Professor of Law and Business at Stanford Law School.

The Honorable Paul S. Atkin, who served as Commissioner of the SEC from 2002 to 2008, during which time he advocated better transparency and consistency in the SEC's decision-making and enforcement activities, as well as smarter regulation.

The Honorable Simon M. Lorne, former General Counsel of the SEC from 1993 to 1996, who is currently a Co-Director of Stanford Law School's Directors College, and an Adjunct Professor at New York University School of Law.

Professor William J. Carney, who is the Charles Howard Candler Professor Emeritus of Law at Emory Law School, with considerable expertise in the field of securities regulation and corporate law.

Professor Kenneth E. Scott, who is the Ralph M. Parsons Professor of Law and Business Emeritus at Stanford Law School, and a senior research fellow at the Hoover Institution.

The central issue in this appeal was whether or not the CDs offered by the foreign-domiciled SIB – and "suggested" by the U.S.-based SGC, were in fact "purchased" through SGC, thereby qualifying those purchasers as "customers" of SGC, and thus enacting the federal securities laws.

In the learned and collective opinion of these Amici, the answer was a resounding "NO". They stated:

> "[t]he SEC's proposal to deem purchasers of CDs issued by a foreign bank to be 'customers' of a domestic broker-dealer contravenes the plain language of the statute...and conflicts with the relevant statutory history, and is at odds with more than 40 years of judicial precedent."

> "The critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker/dealer for the purposes of trading securities." (quoting In re Bernard L. Madoff Inv.Sec.LLC,654 F.3d 229,236 (2nd Circ. 2011))

> "The investors lent money to the offshore bank, which is a foreign institution that is not a member of SIPC and was not subject to regulation under United States law."

Not surprisingly, the U.S. Court of Appeals for the District of Columbia – which is recognized as the preeminent authority on "securities" related matters – concurred. The following are key excerpts from the opinion written by Circuit Judge Srinivasan:

"The [District] Court reasoned that the investors obtained the Antiguan bank's CDs by depositing funds with the bank itself, not with SGC, and they thus cannot be considered customers of the latter.
We agree that the CD investors do not qualify as customers of SGC under the operative statutory definition."

"As for the 'physical CDs', they presumably 'were issued to, and delivered to' the investors, and SGC did not 'maintain' [...] possession or control of the CDs."

"The central issue in this appeal is whether investors who purchased SIBL CDs at the suggestion of SGC employees qualify as SGC customers under the [Exchange] Act.
[W]e conclude, in agreement with the District Court, that SIBL CD investors are not customers within the meaning of the Act."

"That is because SGC never 'received acquired, or held' the investors' cash or securities.    With regard to the investors' cash, it is undisputed that the investors at no time deposited funds with SGC to purchase the SIBL CDs. The funds went instead to SIBL."

"The [SEC] Commission's principal response is that we should disregard the legal separateness of SGC and SIBL and treat them as a combined entity."

"This case stands on a markedly different footing.  Here, as explained, the investors who purchased SIBL CDs acted as lenders.  Even assuming those investors reasonably believed SIBL and SGC were part of a unified Stanford entity, they deposited their cash with that entity as lenders:

56

in exchange for a promise of repayment in the form of a CD.

Their funds thus became part of the Stanford entity's capital for purposes of the 78 (2)(C)(ii) exclusion."

"In declining to grant the SEC's requested relief, the District Court expressed that it was truly sympathetic to the plight of the SGC clients who purchased the SIBL CDs and now find themselves searching desperately for relief. We fully agree. But we also agree with the District Court's conclusion that SIBL CD investors were not 'customers' under the Act."

On September 5, 2014 the Securities and Exchange Commission conceded to the aforementioned facts as found by the D.C. Circuit Court, and decided that they would not appeal the decision any further.

And eclipsing all of this...

## DEFECTIVE INDICTMENT

In their May 4, 2011 Superseding Indictment **(Doc. 422)** under "Overview of the Fraudulent Scheme", the Government asserted:

13. From in or about 1990 through in or about February 2010, STANFORD, together with others, perpetrated a scheme to defraud investors who purchased SIB CDs, of billions of dollars by soliciting funds under false pretenses [...]

57

Beyond the extraterritoriality issue – which is that the United States never had jurisdiction nor regulatory authority over the foreign-incorporated and foreign-domiciled Stanford International Bank – in their new Superseding Indictment the DOJ broadened the dates of the alleged offenses from 1999-2009 (in their June 18, 2009 Indictment)(**Doc. 1**) to 1990-2010 (**Doc. 422**).  This reach-back (to the year 1990) and forward (to the year 2010) not only renders the Indictment "defective", it is representative of another DOJ goal, and is a "fraud upon the Court".

To begin with – and beyond the fact that by February of 2010 defendant Stanford had been in federal custody a full eight months – in 1990 the U.S.-based (Broker/Dealer) Stanford Group Company did not yet exist.

> <u>AUSA Costa:</u>  In 1995, he took a big step in that direction. He started a company called Stanford Group Company. Their offices ended up on Westheimer here in Houston, right across from the Galleria.
> [I]n 1998, he took another big step in that direction.  For the first 13 years of his bank, even though he had that downtown office just a few blocks from where we are in Houston, he didn't sell the CDs in the United States.
> [I]n 1998, he filed papers with the Securities and Exchange Commission to start selling those CDs here in the United States.
> **(vol. 39)(USCA5 4290-4291)**

That's correct – 1998.  Contrary to his assertions in the Superseding Indictment, AUSA Costa knew that the CDs issued by SIB were neither "offered"

by SIB nor "suggested" by SGC to any American citizens or residents until the year 1998 – a full eight years beyond the time frame alleged in the Indictment.

As made clear in the Bank's marketing brochure, and read aloud by the Government's first witness at trial **(Government's Exhibit 522):**

> Ms. Chambliess:  "Our past success has enabled Guardian International (predecessor to SIB) to build a reputation as a leader in delivering top quality financial products to the investor who is neither a citizen nor a resident of the United States of America.
>
> AUSA Stellmach:  Is that description, was that consistent with your understanding of the Bank's strategy?
>
> Ms. Chambliess:  Absolutely.
>
> **(vol. 40)(USCA5 4422-4423)**
>
> AUSA Stellmach:  And just to be clear, your clients, were they U.S. residents or were they international clients?
>
> Ms. Chambliess:  Mine were international clients.[4]
>
> **(vol. 40)(USCA5 44480)**
>
> Mr. Fazel (defense):  [I]n your time at Stanford International Bank, or Guardian, was there ever anybody, that did not get paid their money when the CDs were due?
>
> Ms. Chambliess:  Not during the time I was there.
>
> **(vol. 40)(USCA5 4581)**

In short here, the dates (1990) of the DOJ's alleged offenses involving the sale of SIB CDs to U.S. citizens are not even possible.  As such, the only explanation for their date-broadening reach-back (to 1990) – and their true goal here – is clear, and

---

[4] Ms. Chambliess worked for the Stanford organization from 1987-2002.  During her fifteen years with Stanford, she never had a U.S. citizen or resident as a client.  She was the only Financial Advisor from Stanford called as a witness by the Government.

clearly duplicitous.  In crafting their new Superseding Indictment, the DOJ realized that a vast amount of defendant Stanford's wealth was created through real estate ventures prior to 1998 – the year of his "Regulation D" filing with the SEC, and long before SIB began "offering" and SGC began "suggesting" the CDs to U.S. citizens. By their expanding the year of the "fraudulent scheme" back to 1990, the DOJ was then able to lay claim to that pre-1998 wealth, "justify" the Receiver's unlawful liquidations of pre-1998 assets, and thereby prevent defendant Stanford from accessing any of these assets to utilize in his defense.  And more importantly, by expanding the year of the "fraudulent scheme" forward to 2010, they were able (as detailed in ISSUE XIII) to create the appearance that defendant Stanford was culpable for losses which occurred a full year beyond the date of the TRO – a time when the Court-appointed Receiver was in control, and when Stanford was incapable (prohibited by the Government) of honoring SIB's obligations.

Finally here, concerning the Government's duplicitous date-broadening and the defects of the Indictment, under "Count One" the Government broadens the dates yet again from ("in or about 1990 to February 2010") to ("in or about 1990 through on or about March 3, 2009)… and then once more under "Overt Acts" reaching back in (a) to ("in or about December 1987…").  And then lastly, in (i) refers to a "Count Two through 18 of the Indictment"… referring to an extra '4 Counts' that don't even exist.

As indicated by the testimony below (between defense attorney Robert Scardino and defense expert Leonard Lyons), these inaccuracies did not go unnoticed, or unchallenged, by the defense:

> Mr. Scardino: Did I ask you to review the Indictment in this case?
>
> Mr. Lyons: Yes, you did.
>
> Mr. Scardino: Okay.  Were there problems in the Indictment?
>
> Mr. Lyons: Yes, there were.
>
> AUSA Stellmach: Objection.
>
> The Court (Judge Hittner): What? What's the objection?
>
> AUSA Stellmach: As to form.
>
> The Court: "Problems in the Indictment", the Indictment is the Indictment.
>
> Mr. Scardino: He's right.
>
> The Court: Okay.
>
> Mr. Scardino: Were there mistakes made in the Indictment?
>
> AUSA Stellmach: Objection.
>
> The Court: Sustained.
>
> Mr. Scardino: Were there mischaracterizations in the Indictment?
>
> AUSA Stellmach: Objection.
>
> The Court: Sustained.  That's my job.  If there's a problem, they can bring it to me, and I'll either—I'm not getting into that. (vol. 63)(USCA5 12331)

The United States Court of Appeals for the Fifth Circuit has held that an implicit or constructive amendment occurs when it permits the defendant to be convicted upon a factual basis that effectively modifies an essential element of the

61

offense charged or permits the Government to convict the defendant on a materially different theory or set of facts than that which he was charged. "We have been willing to consider sua sponte whether an issue was waived when an appellant failed to preserve or raise that issue before the District Court. *United States v. Hoover*, 467 F.3d 496 (5th Cir. 2006). (See *Harden v. United States,* 688 F.2d 1025, 1032 n.7(5th Cir. Unit B 1982) "We also are required to raise sua sponte the issue of whether an indictment properly charges an offense, since that represents a jurisdictional issue. (See *United States v. Meacham,* 626 F.2d 503, 509 (5th Cir. 1980).

## II.

**THE SIMULTANEOUS CIVIL AND CRIMINAL PROSECUTIONS (AND SANCTIONS IMPOSED) BASED ON THE SAME UNDERLYING EVENTS WERE VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FIFTH AND EIGHTH AMENDMENTS, AND DEFENDANT STANFORD'S PROTECTION FROM DOUBLE JEOPARDY.**

## STANDARD OF REVIEW

Double Jeopardy challenges are a matter of law which are reviewed *de novo*, *United States v. Rabbon*, 628 F.3d 200 (5th Cir. 2010)

## DISCUSSION

On February 16, 2009 the Securities and Exchange Commission (SEC) filed a <u>civil</u> Complaint in the Northern District of Texas (Dallas division) and requested that a <u>Temporary Restraining Order</u> (TRO) **(vol. 2)(USCA5 644-653)** be issued to seize control of all of defendant Stanford's global assets, both personal and corporate. The SEC then requested the appointment of a Receiver in the person of Dallas attorney Ralph S. Janvey.

This Receiver was then appointed by Judge Reed O'Conner and "authorized to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate, and to any assets traceable to assets owned by

the Receivership Estate." Per this <u>Appointment of Receiver,</u> **(vol. 6)(USCA5 1482)**, the Receiver, under section 5 (g), was specifically directed and authorized to:

> "Perform all acts necessary to conserve, hold, manage and preserve the value of the Receivership Estate, in order to prevent any irreparable loss, damage and injury to the estate."

This <u>Order</u> to "preserve the value" of the Receivership Estate, was instead treated as a suggestion. In addition to the global, knee-jerk reaction to the SEC complaint and subsequent seizure that resulted in dramatic and irreparable losses beyond the Receiver's jurisdiction, the Receiver himself immediately began to sell at auction or squander Stanford's assets located in the United States.

As these extra-Order liquidations were conducted with the SEC's approval, it is abundantly clear that the SEC intended, and in fact, used, the Receiver Order to deny defendant Stanford access to any and all funds with which to defend himself against the criminal charges that would follow. Equally clear is the fact that the appointment of the Receiver was part of the Government's pre-planning to use the Receiver and his broad authority to gather (under civil rules) information that would be outside the boundaries of a (criminal) investigation. This strategy amounted to a well-defined coordination of the civil and criminal investigations, and the resulting punishments were a clear violation of defendant Stanford's Fifth Amendment Right to Due Process and protection from dual punishment for a single offense.

On October 4, 2010, defense counsel filed a 98 page <u>Motion to Dismiss and/or Suppress</u> based on Fourth and Fifth Amendment violations, which was DENIED. **(vol. 2)(USCA5 285-382)**

In their Response, **(vol. 4)(USCA5 898)** under "the Receiver's Authority," the Government quoted from *12 Charles Alan Wright* et. al., Fed. Prac. & Pro. § 2981 at 8-9 (2d. Ed. 1997), and stated:

> "An equity Receiver is appointed by the Court to take control, custody or management of property that is involved or is likely to become involved in litigation for the purposes of preserving the property, receiving rents, issues or profits…"

But failed to complete that particular sentence, which continued with:

> "**… the property earns, until a final disposition by the Court.**"

In that 23 page Response, the Government referenced a total of 26 cases, and completed every sentence they quoted but this one.

The reasoning is clear. By the date of this Response (October 25, 2010) the equity Receiver (with the SEC's "imprimatur", and approval from the civil court) had already violated the mandate contained in this omission.

At this point in the Receivership – disregarding the required asset-validating evidentiary (*Monsanto*) Hearing and long before a final disposition by the Court –

65

the Receiver sought and was granted approval (from Judge David Godbey) for the sale of a multitude of defendant Stanford's assets.

For example, prior to any finding of wrongdoing, either civilly or criminally, on February 24, 2010 the Civil Court in Dallas had approved the sale of two vessels owned by defendant Stanford.  (See **case no. 3:09-CV-0298-N)(Doc. 1023)**.  In his approval of this sale, Judge Godbey Ordered the Receiver "to sequester one-half the proceeds of both sales, pending disposition of Susan Stanford's claim [ex-wife] to a one-half community property interest in the vessels."

This was an unmistakable acknowledgment of the "until final disposition" mandate (as outlined in Rule 66 of the Fed. R. Civ. Pro.), and should have applied, in equal measure and meaning, to the still-presumed-innocent defendant Stanford.

Instead, this and the other premature sales and disbursements of his assets were an unconstitutional presumption of his guilt, a veritable fait accompli.  Which then begs the question; if, as the Government had maintained, every of defendant Stanford's assets were purchased with the proceeds from the fraudulent CDs, why then was Susan Stanford entitled to a portion of these assets?

Under the Receivers authority in their Response, the Government goes on to quote:

> "Federal Law vests a Receiver with complete jurisdiction and control of all such [received] property with the right to take possession thereof."  28 U.S.C. § 754.  See also

28 U.S.C. § 959; Fed. R. Civ. Pro. 66 (both discussing the
law applicable to Receivers).
**(vol. 4)(USCA5 898)**

Federal Law also states, under Rule 66:

> "Because the appointment of the Receiver is a type of 'in
> rem' proceeding, the appointing Court **Must** enjoy a
> strong relationship to the contemplated Receivership, a
> substantial portion of the defendants business **Must** be
> conducted in the host district, or a substantial portion of
> the anticipated Receivership property **Must** be located
> within the host district."

In direct violation of this additional mandate, neither a "substantial portion of

defendant Stanford's business" was conducted in the <u>Northern District of Texas</u>

(Dallas), nor was "a substantial portion of the anticipated Receivership property"

located there.

Defendant Stanford had only a small office in Dallas and no other assets in

that district.  As the SEC was well aware, the North American Headquarters of the

global Stanford organization was located in the Southern District of Texas

(Houston), and the far greater "portion of the anticipated Receivership property" was

situated in that area[5].

---

[5] Offices for the Stanford-owned headquarters, where the company had recently spent $17 million
in renovations and added a 6 level garage, were located in a (multi-story) building at 5050
Westheimer. 5051 Westheimer, directly across the street (where Stanford Financial Group
occupied an additional 10 floors of office space) was under contract to be purchased by them.
Stanford Financial Group had more than 500 employees in Houston (representing approximately
30% of their total U.S. workforce), and occupied over 250,000 square feet of office space in
Houston. Stanford's corporate jets were based just outside Houston, in Sugarland, Texas.  In recent

Moreover, in addition to disregarding the letter of the law – treating **Must** as if it were merely a synonym of **May** – this geographically inappropriate establishment of the Receivership added unnecessary costs to its execution. These costs, which were indeed extraordinary and quantified in the numerous "Interim Fee Requests"[6] made by the Receiver under travel expenses, resulted in "preventable, irreparable loss, damage and injury to the estate."

Of equal importance here, and as counsel for Stanford (in the civil matter) argued in their 'Motion for Dismissal' under Rule of Civil Procedure 12(b)(3) (**case no. 3:09-CV-0298-N, Doc. 1019**) is the fact, in their original Complaint, the SEC failed to identify any specific conduct occurring in the Northern District of Texas. Therefore, on that basis alone, this Complaint should have been dismissed. See *Sampson Indus., Inc. v. Amega Indus,* No. Civ. A. 3-98-CV-1440-P, 1998 WL 826907, at *3 (N.D. Texas Nov. 18, 1998) (granting defendant's Rule 12(b)(3) Motion to Dismiss for improper venue because there was "no evidence whatsoever…that any, much less a substantial part, of the events giving rise to the claim occurred in the Northern District [of Texas]").

---

years, Stanford had completed numerous multi-million dollar real estate developments in Houston, and had multiple millions in assets there.

[6] According to the Receivers fee application for February 15, 2009 through April 12, 2009 (55 days), these expenses for travel, and lodging, etc., came to a total of $1,241,464.00 – see Interim Fee Application, filed May 15, 2009.

In their Response to this previously mentioned 'Motion to Dismiss' (vol. 4.)(USCA5 896-918) the Government further stated:

> 4). There is no support for Stanford's other allegations of concerted action between the Receiver and DOJ.

To the astonishing contrary, this "support" is found right in the Receiver's own Report of the Receiver dated April 23, 2009 under <u>Assistance To And Communication With Governmental And Regulatory Agencies</u>, in which he states:

> "This Receiver and his team have spent substantial amounts of time on these activities, the principal such activities have been <u>coordination</u> with the SEC, the FBI, and the Department of Justice in identifying and gathering large amounts of documents and information relevant to their ongoing investigations and responding to numerous and extensive requests from the SEC, the FBI and to the Department of Justice to analyze and provide information and documents." **(vol. 2)(USCA5 606-607)**

> Assisting, reporting to and responding to Governmental and regulatory agencies is appropriate, including responses to inquiries from the SEC, Department of Justice and FBI in connection with their investigations. **(vol. 2)(USCA5 611)**

This same section (4) of the Government's Response **(vol. 4)(USCA5 903)** goes on to claim:

> "Stanford's Motion contends that the Receiver's Forensic Consultant, FTI Consulting, demonstrated a "Governmental investigatory mindset." Stanford does not cite any evidence that the United States hired FTI or directed its Forensic Analysis."

Ignoring the utter absurdity of their employing more than 100 CPA's, fraud investigators and forensic auditors, who billed the Receivership Estate tens of millions of dollars per month as "consultants"…support for defendant Stanford's contention here is found in the Receivers "Interim Fee Application/Request" for May 15, 2009 (vol. 2)(USCA5 724) where he states:

> "A significant portion of FTI's work has involved collecting information at the request of the SEC, the FBI and the DOJ in connection with their investigations, utilizing numerous complex data bases, emails, accounting records, financial documents and files found in searching e-mails and file shares."

In fact, the investigatory reports generated by this Receiver-retained and Stanford Receivership-funded firm were used by the Government as the foundation of their entire case. For instance, in her "Declaration" of July 27, 2009 (vol. 2)(USCA5 433), FTI's Karyl Van Tassel declared that one purpose of her and FTI's work included:

> "Determin(ing) the roles that the various Stanford entities played in the fraud alleged by the SEC…"

Based on the Receivers own acknowledgement that "a significant portion of his work" involved…

> Coordinating with and assisting the SEC, FBI and DOJ; responding to numerous and extensive requests; identifying and gathering large amounts of documents and collecting information at their requests; as well as actually "Reporting" to them. (vol. 2)(USCA5 606, 607, 611)

70

....Defendant Stanford would submit that this is undeniably "supportive" of his contention that the <u>civil</u> and <u>criminal</u> investigations were indeed a concerted action and conducted as one. And just because the Government denies it and insists on referring to them as "parallel proceedings" doesn't make it so.

When one analyzes Ralph Janvey's (the Receiver) own reports, and considers the tens of millions of dollars he's billed for his efforts to "preserve the value of the estate," it becomes abundantly clear that Mr. Janvey wasn't merely complying with the requests of the Government investigators, he was actually conducting "a significant portion" of their investigations.

Through any lens, this hand-in-hand effort clarifies the Receiver not as an "Officer of the Court," but rather a thinly disguised "Agent of the Government" - an essential arm of the prosecution.

In *United States v. Kordel*, 397 U.S. 1, 11 (1970), the Supreme Court cited five situations in which a finding of a Due Process violation may result:

> 1). Whereas the Government brings a civil action solely to obtain evidence for its criminal prosecution.
> 2). Whereas the Government fails to advise the defendant in its Civil case that it contemplates criminal charges.
> 3). Whereas the defendant is without counsel.
> 4). Whereas the defendant reasonably fears prejudice from adverse pre-trial publicity or other unfair injury.
> 5). Whereas there exists any other special circumstances that might suggest unconstitutionality, or even the impropriety of a criminal prosecution.

Whereas any <u>one</u> of these situations would present a Due Process violation, in the Stanford case we find <u>three</u>.

For clear and irrefutable evidence of situation (1), one need look no further than the Receivers own reports, and the "investigatory" revelations found in the myriad of "Declarations" of FTI's Karyl Van Tassel, which were used as a basis for the criminal case against defendant Stanford, repeatedly touted as proof of his guilt, and funded by the Stanford Receivership Estate. Additional evidence is present, and validated, in defendant Stanford's "Fourth Amendment" claim.

Equally valid evidence of situations (4) and (5) is presented here in defendant Stanford's "Pre-Trial Publicity/Change of Venue" and "Jurisdiction" claims.

But even ignoring the undeniable presence of these added situations (4) and (5), the repeatedly admitted "<u>extensive coordination</u>" of these two supposedly "parallel" investigations is stand-alone proof of situation (1) and thus the clearest of violations of defendant Stanford's right to Due Process as afforded under the Fifth Amendment.

As well, the unlawful <u>civil</u> liquidation of his assets <u>prior to a final disposition</u> by the Court – which, since all said assets were frozen by the Court and thus cannot possibly be argued as "remedial" - was clearly "punitive" in nature.

This punishment, then followed by the imposition of a <u>110 year prison term</u> and <u>money judgment of 5.9 billion dollars</u> for the same underlying offenses, was a

further violation of defendant Stanford's rights under the Fifth Amendment for protection from Double Jeopardy[7].     Furthermore, even if these pre-adjudication liquidations were somehow interpreted as "remedial," they were not credited (in any way) against the money judgment amount.

*United States v. Candelaria-Silva*, 166 F.3d 42 (1st Cir. 1999).   Money received from the forfeiture of specific property is credited against the money judgment amount.

In *United States v. Ursery*, 518 U.S. 267, 289 (1996) the Supreme Court held that Congress has authorized the Government to bring parallel criminal actions and 'in rem' civil forfeiture proceedings based upon the same underlying events. However, the Court also noted:

> "Nevertheless, where the clearest proof indicates that an 'in rem' civil forfeiture is so punitive either in purpose or effect as to be equivalent to a criminal proceeding, that forfeiture may be subject to the Double Jeopardy Clause."

The omissions of the qualifying adverb "criminally" from the formulations of the prohibitions against double punishment suggest, albeit indirectly, that "punishment" may indeed arise from either criminal or civil proceedings.  *United States v. LaFranca*, 282 U.S. 568 (1931).  The question of law that the Court should review is, whether a civil sanction, in its application, may be so divorced from any

---

[7] In addition to these penalties, on April 25, 2013 the SEC moved for and was granted a "summary judgment" against Stanford in the amount of $12.6 billion.

73

remedial goal that it constitutes "punishment" for the purpose of Double Jeopardy analysis. *United States v. Halper*, 490 U.S. 435, 443 (1989).

In *Ursery*, the Court said that "in rem civil forfeiture has not historically been regarded as punishment." And since *Ursery*, and for the purposes of Double Jeopardy, no other court has gone on to interpret precisely when a civil remedy is "so punitive either in purpose or effect" as to transform it to "punishment."

Nevertheless, appellant Stanford would submit that if ever a case would meet this threshold, it is his.

Through the Receiver appointed in the civil matter - and in addition to the unlawful liquidations of his assets - the Government seized (or caused to be seized) from him billions of dollars in cash and assets.

This money, under the Receivers court-Ordered control, was then utilized to fund the multitude of forensic investigations, audits and accountings which were central to the Stanford prosecution.

Most (monetarily) punitive of all, however, was the resulting extraterritorial actions (in Antigua, Aruba, Canada, Colombia, Ecuador, England, Mexico, New Zealand, Panama, Peru, Switzerland, Venezuela, Israel, St. Croix and elsewhere) that destroyed his global company and assets representing more than 30 years of his life's work.

And while it is, of course, impossible to (precisely) quantify these additional losses in dollar amounts, there is no disputing that, when included among the civil liquidations, forfeitures and criminal penalties in this case (and the atrocities he suffered during the three years he was held in pre-trial detention), their total "purpose or effect" can only be described as both horrendous - and historic.

Finally here, concerning defendant Stanford's unconstitutional DENIAL of bail and nearly three years of pre-trial detention, which was unprecedented...

Instead of imposing length limitations on pre-trial detention, when enacting the Bail Reform Act (1987) Congress relied instead on the Speedy Trial Act as a safety valve for protection from extended periods beyond 90 days. There is, however, no indication that, in their decision making, they considered a scenario where a penniless, self-surrendered and non-dangerous defendant in a highly complex white collar case - involving the seizure of a global company and millions of pages of Discovery - might someday be denied bail (under any condition) and held for nearly three years in a maximum security setting based upon an unjustifiable concern that he could be a "flight risk."

In *United States v. Salerno*, 481 U.S. 739, 746-47 (1987), the Supreme Court observed that there exists "a point at which detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal." Id at 747, 4.

In the Stanford case, that point wasn't just reached, it was far exceeded - its "punitive" result unparalleled in the annals of (alleged) white collar crime.  In that 'maximum security setting' - and in addition to the extraordinary length of his inexcusable detainment - defendant Stanford was physically assaulted and very nearly killed.  He suffered a Traumatic Brain Injury (TBI), a multitude of facial and orbital fractures and severe psychological debilitation.  He was mis-"treated" with a toxic cocktail of psychotropic drugs that worsened his cognitive functioning and nearly destroyed his liver, and then finally, instead of being placed in a "normal" post-surgery environment, he was virtually abandoned in the prison's solitary confinement for a month.

In the succeeding years since *Salerno,* courts have uniformly recognized that, at some point, the duration and conditions of a defendant's pre-trial detention may cross the line separating the regulatory from the punitive, and thereby violate the Due Process Clause.  (See *United States v. Hare*, 873 F.2d 801 (5th Cir. 1989)) Indeed, a number of courts have found Due Process violations in prolonged detention and ordered the defendants released on conditions, both before and after the decision in *Salerno.*

Detention is a rarity in cases alleging white collar fraud, and defendants who are facing (and have faced) charges just as serious as defendant Stanford and who, unlike defendant Stanford, have both the resources and the incentive to flee, and the

76

contacts to enable them to do so are, nonetheless, generally released on conditions which will reasonably ensure their appearance.

Moreover, the fact that he had a full four months to flee (from February 17, 2009 – June 18, 2009) and didn't, and instead repeatedly annunciated his intent to stand and fight the charges – and repeatedly offered to surrender himself to authorities – and ultimately did – should have removed all concerns, real or imagined, about any risk of flight.

As it were, however, these very significant and distinguishing factors were ignored by the Court and resulted in a pre-trial imprisonment that crossed the line from "regulatory" to "manifestly punitive."  In short, where defining "punishment" for the purposes of Double Jeopardy is concerned, there really is only one remaining question:  **What more could possibly have been done to this man?**

## III.

**THE TRIAL COURT VIOLATED DEFENDANT STANFORD'S 4TH AMENDMENT RIGHT TO PROTECTION FROM ILLEGAL SEARCHES AND SEIZURES BY:**

**A)    ALLOWING THE    (CIVIL) RECEIVER ORDER TO BE UTILIZED AS A "WRIT OF ASSISTANCE," AND;**

**B)    ALLOWING THE APPOINTED RECEIVER TO ACT OUTSIDE THE SCOPE OF THE RECEIVERSHIP ORDER.**

## STANDARD OF REVIEW

A District Court's decision not to conduct an Evidentiary Hearing after a defendant alleges sufficient facts which, if proven, is an abuse of discretion. *United States v. Harrelson*, 205 F.2d 733, 737 (5th Cir. 1983).

The Court must determine whether the allegations set forth in the defendant's Motion, including any accompanying affidavit, are sufficiently definite, specific, detailed, and not conjectural, to enable the Court to conclude that a substantial claim is presented. If so, a Hearing is required. Id. *United States v. Smith*, 546, F.2d page 1275, 1279-80 (5th Cir. 1977).

78

## DISCUSSION

**A.**    On October 4, 2010, counsel for defendant Stanford's defense filed a "Motion to Suppress".  **(vol. 2)(USCA5 285-382)**

This motion was DENIED by the Trial Court, and no Evidentiary Hearing was held.

On February 17, 2009, the Receiver appointed in the civil matter, entered the offices of Stanford Financial Group (in Houston and elsewhere), for the purposes of seizing control of all paper and electronic documentation and assets as outlined in the Receiver Order **(vol. 6)(USCA5 1478-1488)**.  This Receiver was accompanied by U.S. Marshals, police officers and agents of the FBI who, based on the Receiver's apparent invitation (on this day and others), were free to conduct a warrantless search and seizure of various items on the premises, of which the DOJ would later utilize in the subsequent criminal investigation and prosecution.

These items were not "promptly provided" to these Governmental agencies, but rather <u>collected</u> by them in a manner which relied upon the Receiver's court-appointed authorization and access.  Specific among these items was Government's Exhibit 1500.  (RAS phone book)  **(vol. 23)(USCA5 12926).**

At trial, Defense Counsel objected to the admission of this Exhibit (and referred back to their "Motion to Suppress") on the grounds that it was one of the items obtained by the FBI without a warrant.

Mr. Fazel (Defense) "[A]s far as action is concerned and…police action…state action is concerned, we briefed in our motion.  But just to the Courts inquiry, our position is state action is attached.    It attaches when in circumstances such as this, where you have a circumstance where there's police officers, U.S. Marshals.  We have video that we attached with our submission showing officer's coming in with the Receiver, and, therefore, we have case law that shows that's state action.

The Court (Judge Hittner) - But you're saying it was seized…it's been seized in a civil action and the Receiver in the civil action turned it over to the Government.

Mr. Fazel - Correct.    But we're saying the Fourth Amendment does apply because state action occurred when officers - law enforcement officers were interacting with the Receiver.

The Court - **How can you go back and clean it up in a situation like this?** I think there's no way to redeem it, because they had no warrant, that's for sure.

Mr. Fazel - That's for sure.

**(vol. 46)(USCA5 6865-6866)**

In violation of defendant Stanford's rights under the Fourth Amendment, counsel's objection was OVERRULLED and this Exhibit (1500) – obtained without the required search warrant – was admitted into evidence.

Further evidence that the Receiver Order was utilized as a general warrant or "Writ of Assistance" can be found in the accessing and admission of Government's Exhibit 616 (2006 faxes and letters between King and Alvarado Re: Draft response

80

to ECCB[8]). The following is an excerpt from the direct-examination of IRS criminal investigator <u>Kalford Young</u>, by AUSA Gregg Costa.

> <u>AUSA Costa</u>: [Y]ou said as part of your investigation you went to the Stanford offices in Houston and reviewed documents?
>
> <u>Agent Young</u>: Yes
>
> <u>AUSA Costa</u>: Was this after the Receiver had taken over the companies?
>
> <u>Agent Young</u>: Yes, this was, I believe, in April of 2009 after the Receiver had taken over the companies.
>
> <u>AUSA Costa</u>: And had the Receiver allowed you and other law enforcement agents to come on the premises and look for records related to the criminal investigation?
>
> <u>Agent Young</u>: Yes they did.
>
> <u>AUSA Costa</u>: Was there also a court Order from the federal judge in Dallas talking about the Receiver cooperating with law enforcement?
>
> <u>Agent Young</u>: Yes, there was. **(vol. 50)(USCA5 7691)**

This was a purposeful mischaracterization of the <u>Receiver Order</u> which <u>does</u> <u>not</u> order "cooperation with law enforcement." **(Case No: 3:09-CV-0298-L, Defendants Exhibit #3)**

Continuing…

> <u>Mr. Fazel</u> (Defense): Judge, I'm just renewing my Motion to Suppress. I know you've overruled it, but I don't want to waive it. This is stuff they got from the Receiver without a warrant, and the Court's already ruled on it, but

---

[8] Eastern Caribbean Central Bank.

I'm going to renew it...the Motion on the record saying that they should be suppressed.

The Court: OVERRULED.

(vol. 50)(USCA5 7691-7692)

Continuing...

AUSA Costa:   Agent Young, I'm going to hand you what's marked as Government 616 and ask you if you recognize it.

Agent Young:  Yes, I do.

AUSA Costa:  Who found the document at the Stanford Financial Group headquarters in Houston?

Agent Young:  I did...I found it.

AUSA Costa:  Where did you find it?

Agent Young:  It was contained in file cabinets located in the basement of the Stanford Financial Building.

(vol. 50)(USCA5 7692)

As with the Government's Exhibit 1500, this Exhibit (616) was seized without a warrant and admitted into evidence under protest.   "The bulwark of Fourth Amendment protection" is its requirement that "police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search" *Franks v. Delaware*, 438 U.S. 154 (1978).  No matter whether these items were "promptly provided" to law enforcement or collected by them in an independent manner, they were accessed without a warrant through the utilization of the Receiver Order as a "Writ of Assistance."  The Fourth Amendment, by its literal language, "provides that no warrants shall issue, but upon probable cause supported by Oath or Affirmation,

82

and particularly describing the place to be searched, and the persons or things to be seized." *Stanford v. State of Texas*, 379 U.S. 476, 481 (1965).  As the Supreme Court observed in <u>Stanford</u>:

> These words are precise and clear.  They reflect the determination of those who wrote the <u>Bill of Rights</u> that the people of this new nation should forever be secure in their persons, houses, papers and effects from the intrusion and seizure by officers acting under the unbridled authority of a general warrant.  Vivid in the memory of the newly independent Americans were these general warrants known as "Writs of Assistance" under which officers of the Crown had so bedeviled the colonists.  The hated Writs of Assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws.  They were denounced by James Otis as "the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law that was ever found in an English law book," because they placed the "liberty of every man in the hands of every petty officer."  The historic occasion of that denunciation, in 1761 at Boston, has been characterized as perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the Mother country.  Then and there, said John Adams, then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain.  Then and there, the child Independence was born.

In *United States v. Gray*, 751 F.2d 733 (5th Cir. 1985) the Fifth Circuit held that a Receiver, who has properly come into possession of property, may turn the property over to law enforcement without a warrant.  In *Gray,* however, the document at issue - a brochure containing false statements - was discovered

83

independently by a Receiver who was later visited by an FBI agent who informed the Receiver that the defendant was under investigation; in response, the Receiver apparently voluntarily provided the FBI agent with the brochure at issue. *Gray*, 751 F.2d at 735.

In rejecting the Defense's assertion that the FBI agent should have obtained a warrant before seizing the brochure, the Court held; (1) the defendant no longer had a reasonable expectation of privacy because custody and control of the materials had passed to the Receiver, and (2) the Government had the consent of the lawful custodian - the Receiver - and therefore did not need a warrant. *Gray*, 757 F.2d at 737.

The facts here significantly distinguish this case from *Gray*. Here, the Government has undoubtedly acted in concert with the Receiver, starting before, at, and no later than immediately following, the appointment of the Receiver and subsequent seizure of a vast universe of materials. Unlike *Gray,* where the FBI agent visited the Receiver as part of an independent investigation, there is no apparent independence between the Receiver and the Government in this case. Indeed, immediately after the Receiver's appointment, the flow of materials from the Receiver to the Government began - pursuant to an Order that fully anticipated this inter-dependent and on-going relationship between the Receiver and the DOJ, FBI, IRS, USAO and the U.S. Postal Service.

In *United States v. Setser*, 568 F.3d 482, 488 (5th Cir. 2009), the Fifth Circuit recently rejected a challenge to a Receiver's transfer of records to law enforcement officials, holding that the Receiver lawfully took possession of the records pursuant to a court Order, and further particularity within the Receivership Order was not necessary.    *Setser*, 568, F.3d at 488 ("one reason that 'particularity' is not translatable to the Receiver context is that, once appointed, the Receiver often takes possession of all property of the distressed or distrusted entity.  That seizure of all assets on behalf of the Court is a central purpose for the appointment of the Receiver.")

Several critical facts distinguish this case from *Setser*.

First, here, unlike *Setser* (and *Gray),* the <u>Receivership Order</u> actually Ordered the Receiver to provide the Government with documents.  In *Setser,* the Government relied heavily upon the so-called <u>voluntary consent</u> of the Receiver in providing the Government access to books and records seized pursuant to the Receivership.  (See, *SEC v. IPIC Intl. Inc.* et. al., **case no: 03-cv-02781, Dkt. Entry 273**) (Government's Response to Motion to Suppress) at 7 (distinguishing prior case law, arguing Receiver "had sole legal possession of the premises and business when he gave his consent for the IPIC books and records in his possession to be reviewed by criminal authorities").

Whatever the applicability of the Fourth Amendment, where a Receiver voluntarily and independently provides documents to law enforcement officials, certainly the protections of this Amendment apply where the Court "Orders" the Receiver to furnish documents to "any and all Government agencies" who request them - which apparently (at least in this case) included law enforcement.

Second, the facts presented here demonstrate that the Receiver and his agents (FTI and the 13 other firms he hired) are not independent actors, as argued by the Government in *Setser*, but instead represent an axiomatic "arm" of the Government.

In *Setser*, on the date of the defendant's arrest, federal agents went with a Receiver and FTI Consulting to conduct searches of the defendant's offices (the Receiver having been appointed in a previously filed parallel SEC Action) (See *SEC v. IPIC Intl.*, Inc. et al, **case no: 03-cv-02781, Dkt. Entry 269**) (Defendant's Reply to Government's Response to Motion to Suppress) at 2. In their pleadings, the defendants argued that the federal agents were working in concert with the Receiver and FTI Consulting, including the submission of memoranda prepared in advance of the execution of the searches, setting forth protocol to be utilized during the searches. Id. At 3.

In response to the defendant's Motion, the Government represented to the Court that the defendant's assertion that the Receiver was acting at the behest of the DOJ or the SEC was "patently false", asserting that the Receiver was legally an

"Officer of the Court," not an "Agent of the Government." *SEC. v. IPIC, Intl., Inc.* et al. (**case no. 03-CV-02781, Dkt. entry 273**) at 6. Where the Government has once again employed FTI Consulting and a Receiver as its agent and vehicle to seize and search mountains of materials, the Government's argument in *Setser* – that the Receiver is independent and an Officer of the Court – rings hollow. While, under the law, a Receiver is intended to be an Officer of the Court and not an agent of either party, the Government's conduct in *Setser*, and again here, strongly indicates that the Government has designed and implemented a policy and strategy to employ Receivers and their consultants – and particularly FTI Consulting – as agents of the Department of Justice, in direct contravention to the protections of the Fourth Amendment. A review of the pleadings in *Setser* indicate that the Government has construed *Gray* as a vehicle to systematically circumvent the protections guaranteed by the Fourth Amendment. At a minimum, an <u>Evidentiary Hearing</u> should have been conducted, as requested, to determine the particulars of the Government's relationship to the Receiver, FTI Consulting[9], Baker Botts, and the other attorneys and firms working for and with the Receiver.

Third, there are material differences between the <u>Receivership Order</u> issued here and that of the one issued in *Setser* (in addition to the fact that the <u>Order</u> in the Stanford case compelled the Receiver to provide documents to investigating

---

[9] In its Form 10-K filing with the SEC, FTI trumpets its close relationship to the Government.

agencies). Here, unlike *Setser,* the <u>Receivership Order</u> expressly assumed attorney-client and work product privileges to the Court and thus the Receiver. Such a directive is utterly beyond the objective of preventing waste and dissipation, or marshalling assets to protect investors and other creditors, and instead is more akin to a wholesale, warrantless and un-particularized seizure and subsequent liquidation of personal and corporate possessions.

It seems incomprehensible that the provision at issue here - which obligated the Receiver to produce to unnamed investigatory agencies any document they requested - is an ordinary provision within <u>Receivership Orders</u> issued pursuant to the Court's general equitable powers. As noted, it was not part of the Receivership Order imposed in the *Setser* case.

In *United States v. Jenkins,* 46 F.3d 447, 459-60 (5th Cir. 1995), the Court "assumed the adequacy of" the formulation of the Ninth Circuit in *United States v. Miller,* 688 F.2d 652, 657 (9th Cir. 1982), wherein "the Court held that two critical factors in the instrument or agent analysis are: (1) whether the Government knew of or acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts, or to further his own ends. *Jenkins,* 46, F.3d at 460.

In the Stanford case there is no doubt that the Receiver (and those he employed) were instruments of, and agents for, the prosecution. The Government

very clearly knew of, and even orchestrated, the conduct in question.

The evidence of this pre-planned and extensively <u>coordinated</u> effort is both ubiquitous and overwhelming.

Not for any reason, real or imagined, should the Government be allowed to circumvent the Fourth Amendment and centuries of legal precedent by employing a Receiver to search and seize without limitation, as it did in this case.

As clearly evidenced by these violations of the Fourth Amendment (and the next one in this discussion) and by any other analysis, there is no material distinction between the structuring of the <u>Receivership Order</u> in this case and the oppressive general warrants and "Writs of Assistance" that served as the catalyst for that very amendment.

**B.** On <u>January 6, 2012</u>, counsel for the Stanford defense filed a subsequent "Motion to Suppress" and request for an <u>Evidentiary Hearing</u>.

**(vol. 5)(USCA5 1435-1474)**

This Motion was also DENIED by the Trial Court (Judge Hittner), and no <u>Evidentiary Hearing</u> was held.

Specifically, the issue in this matter concerned the Receiver's unauthorized accessing and dissemination of Stanford International Bank's complete customer account information which was held in 'Data Pro' and 'Temenos' databases located in Antigua, and protected by the bank secrecy and privacy laws of Antigua and

Barbuda (Intl. Bus. Corp. Act 244(1)).  Far exceeding the scope of the <u>Receiver</u> <u>Order,</u> and thus its authority, this unauthorized and **unlawful** accessing of SIB's customer account information, was achieved by a "Letter of Authorization" issued by Ralph S. Janvey (Receiver) to Mr. Sohil Merchant, the Stanford employee who had designed the databases, and therefore knew how to circumvent the Bank's computer security firewall.. (See Exhibit B)

When issuing his (extra-Order) "Letter of Authorization", commanding (Mr. Sohil Merchant) to access the...

> "[Temenos and DataPro] information that is obtainable through computer systems located in the United States, but which may be protected from certain disclosures under the Laws of Antigua [...]" **(vol. 6)(USCA5 1500)**

...and very conspicuously drafting that document on a plain and dateless sheet of paper, and addressing it not to the only Stanford employee capable of circumventing the Bank's computer security firewall, Mr. Sohil Merchant, but rather to...

> "Stanford Employees, c/o John Varkey"

...the Receiver cited as his authority the February 16, 2009 'Order Appointing Receiver' **(vol. 2)(USCA5 387-397)**.  He was apparently relying on section 12(c) of that Order which provides:

> (c) The Commission and Receiver may obtain, by presentation of this Order, documents, books, records, accounts, deposits, or other information within the custody

or control of any person or entity sufficient to identify accounts, properties, liabilities, causes of action, or employees of the Receivership Estate.  The attendance of a person or entity for examination and/or production of documents may be compelled in a manner provided in Rule 45, Fed.R.Civ.P., or as provided under the laws of any foreign country where such documents, books, records, accounts, deposits, or testimony may be located.

Defendant Stanford would submit that, notwithstanding the Receiver's disregard for this "as provided under the laws of any foreign country" mandate, and his subsequent defiance of the February 26, 2009 Order from the High Court of Antigua and Barbuda, and in addition to his violation of 18 USC 1030 (a)(2)(A), the very specific "manner provided in Rule 45 of the Federal Rules Of Civil Procedure" is not a few authoritative-sounding words on a plain and undated sheet of paper...it's a 'subpoena' obtainable from the Clerk of Court.

And according to that same "Rule 45" – and clearly the reason that the Receiver very intentionally disregarded this particular mandate – is that:

> (c)  An attorney has a duty not to issue a subpoena for improper purposes, or to impose undue burden on the recipient of the subpoena.

...and under:

> (d)(2)(B) Anyone believing that a person has produced privileged information in response to a subpoena may provide a notification to the parties who have received the information.  After receiving such a notification, the

receiving parties MUST return, sequester, or destroy the specified information and all copies, including taking reasonable steps to retrieve any information that the receiving party had already disclosed to other persons.

In fact, written at the bottom of the actual document (subpoena) that the Receiver was duty-bound to utilize, are the words:

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena MUST be served on each party in this case BEFORE it is served on the person to whom it is directed. Fed.R.Civ.P. 45(a)(4).

In other words, even when removing from the equation the indisputable authority of the Laws of, and Orders from, the High Court of Antigua and Barbuda, and 18 USC 1030 (a)(2)(A), as a Court-appointed officer and concerning such a sensitive matter as this, (per the 'Order Appointing Receiver') Mr. Janvey should have retrieved from the Clerk of Court, and then issued, a directive-specific 'subpoena'.  And as the subpoena itself very clearly evidences, the reason the Receiver chose to simply disregard and circumvent this "in a manner provided in Rule 45" directive and issue his own 'extra-Order', is obvious and revealing in equal measure.

Simply put, had the Receiver complied with this directive and utilized a subpoena, under the law, he would have been required to provide a copy of that document to defendant Stanford.  And then, aware of this illegal action, under

92

Rule 26(b)(5)(B), defendant Stanford's counsel would have then been able to challenge it through a 'Motion To Quash'. Or, failing that, seek from the Court a 'Protective Order' under Rule 26(c)(1)(G).

...and as clearly clarified in Rule 45 under:

> (c)(3)(A)(iii) A subpoena may be quashed if it requires the disclosure of privileged or other protected matters.

No matter the 'authoritative-sounding' wording found in this "Letter of Authorization", a plain and undated sheet of typing paper is not a lawfully acceptable alternative to a valid and directive-specific subpoena.

As an experienced attorney and Court-appointed Receiver, Ralph Janvey cannot deny that;

(1) In a matter involving "electronically-stored" data which was very clearly protected under the privacy laws of the country where it was located (Antigua and Barbuda), he was most assuredly aware of the unlikelihood that the District Court Judge (Godbey) would abet him in his unlawful act by issuing from his Court an Order to employee Merchant "compelling" him to access that information. And that;

(2) In the alternative, the mandated "Rule 45" subpoena commanding Mr. Merchant to access this information would have been subject to, and likely not survived, a challenge by defense counsel. And that;

(3) As this detailed customer account information was expected to reveal "victims" of, and thus validate, the SEC's Ponzi scheme allegations (and later support the criminal allegations of the Department of Justice), it was clear in his mind that;

(4) He and his "team of professionals" were tacitly expected to obtain it, and then manage to withhold it from Stanford's defense counsel...by whatever "manner" necessary.

And so he did – unlawfully circumventing the Court-mandated 'subpoena' and privately utilizing a plain, undated, and "unchallengeable" sheet of paper. Then shortly thereafter, when this information unexpectedly failed to produce a single "victim" and instead served to completely disprove these Ponzi scheme allegations and exonerate defendant Stanford, directed his forensic accounting firm (FTI) to sequester those Temenos/DataPro databases in an FTI-controlled and Stanford defense-inaccessible warehouse in distant Washington, D.C.

Additionally, this accessing and dissemination of computerized banking information was a violation of U.S. Law, under Section (2) of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030.  18 U.S.C. § 1030, Section (2):

> [I]ntentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains A) information contained in a financial record of a financial institution, or of a card issuer as defined in Section 1602(a) of Title 15, or contained in a file of a consumer reporting

agency on a consumer, as such terms are defined in the
Fair Credit Reporting Act (15 U.S.C. § 1681)

"A "Motion to Suppress" is sometimes more important than the trial itself"
*Waller v. Georgia*, 467, U.S. 39, 46 (1984).  At the Stanford trial, and based solely
on AUSA Costa's word to the Court (and statement in his 'Motion in Limine'
**(Doc. 742)**, that the Government had not utilized information from the illegally
accessed 'DataPro' and 'Temenos' databases, the Trial Court (Judge Hittner) ruled
that the defense's Motion was moot and it was DENIED.

> AUSA Costa: —[T]emenos has nothing to do with the
> Bank's investment portfolio, and none of that was relied
> on by Agent Martin, none of that is on the Government's
> Exhibit list, and none of it was used at all in this trial.
> **(vol. 57)(USCA5 10018)**

> AUSA Costa: —[T]he key point is that none of this was
> used by the Government at trial, so it's a moot issue.
> **(vol. 57)(USCA5 10019)**

As evidence to the contrary, the following exchange between defense witness
Frank Goll and AUSA Stellmach reveals that the Government did indeed utilize the
unlawfully accessed "Data Pro" and (the updated) "Temenos" databases located in
Antigua, as it was the only possible source for the stated information:

> AUSA Stellmach: Good morning, Mr. Goll.  Are you
> aware that three years ago today a federal court appointed
> a Receiver to take control of the Stanford Companies?
> You understand that, correct?

95

Mr. Goll: (witness) Yes. Yes, I do.

AUSA Stellmach: And that Receiver, among other things, seized control of the records and documents related to the operations of the Stanford companies?

Mr. Goll: Yes.

AUSA Stellmach: Did you know that?

Mr. Goll: Yes.

AUSA Stellmach: Including records related to depositors and clients of Stanford Companies.

Mr. Goll: Okay.

AUSA Stellmach: Did you know that the Receiver has no record whatsoever-

Mr. McGuire: (Defense) your Honor, I object.

AUSA Stellmach: of you...

The Court: (Judge Hittner) Excuse me.

Mr. McGuire: I'm objecting on the basis that this goes into what the Government has agreed not to use in this case.

AUSA Stellmach: Not at all

The Court: OVERRULED - we haven't heard - before you answer it, sir, let me hear about - the question.

**(vol. 58)(USCA5 10281-10283)**

And again during trial, as elicited by AUSA Warren from Defense witness Morris Hollander:

AUSA Warren: [I]f we turn to the balance sheet on the next page. Do you see the total liabilities, the $6.7 Billion, the vast majority of which is from deposits from clients?

Mr. Hollander: (witness): Yes, sir.

AUSA Warren: And you know that includes both principal and interest, right, that's owed to the depositors?

Mr. Hollander: Yes, it does. That's disclosed in Note 16.

> AUSA Warren: Sir, are you aware that that number has been verified through detailed account statements and bank records of the depositors?
>
> **(vol. 62)(USCA5 10667-10668)**

Further contradiction of the prosecutions claim (of non-usage), and thus the same only logical conclusion, is found in the Government's ability to determine the names and actual account balances of each SIB depositor **(Doc. 346-1)**, both in the United States and abroad[10]. At a June 25, 2009 Detention Hearing in Judge Frances Stacy's Court, when the prosecution called FTI's lead forensic auditor Jeffrey Ferguson, he admitted the following:

> AUSA Pelletier: Tell us, would you please, what records you used to analyze the obligations of Stanford International Bank to its customers, the CD deposit customers, in February of 2009.
>
> Mr. Ferguson: We reviewed financial statements of the Bank, of Stanford International Bank. We reviewed a database, a Stanford International Bank customer account database, as well as we've reviewed third-party bank documentation to come to that estimate.
>
> **(vol. 6)(USCA5 1527)**
>
> Mr. DeGuerin: (Defense) Clarification, your Honor. Are they talking about SIB Worldwide or only the SIB that's reflected in the United States or records that are available to the Receiver in the United States as opposed to records elsewhere in the world, particularly Antigua?

---

[10] These 'Data Pro' and 'Temenos' databases, which were previously inaccessible by FTI, were made available to them only after, and as a result of, the unauthorized accessing by the Receiver. When this (illegal) breach was discovered by the Antiguan Government, the servers were immediately shut down and all (further) access was thwarted.(June 25, 2009, Detention Hearing).

The Court (Judge Stacy): What's the answer to that?

Mr. Ferguson:    This record purports to provide the financial statements for Stanford International Bank, Limited, where I believe is located in Antigua.

**(vol. 6)(USCA5 1529-1530)**

AUSA Pelletier:  Tell the Court, if you would, what this database consisted of and how you had access to it.

Mr. Ferguson:    The database consists of transactions, deposit transactions, withdrawals; for example, balances at a customer level, at a customer account level, and it's actually, you know, a number of tables and what-not that make up the database.

AUSA Pelletier:  And did you continuously have access to the database?

Mr. Ferguson:  No

AUSA Pelletier:    All right.    What happened to the database?

Mr. Ferguson:  At one point our access was shut off.

**(vol. 6)(USCA5 1535)**

But by this time, the (illegal) accessing was complete and, as admitted by FTI's Senior Managing Director (Karyl Van Tassel), these two DataPro and Temenos databases had been moved from Houston to distant Washington, D.C., well out of the defense's budget-restricted ability to access.

Karyl Van Tassel: [W]e have a database of the SIB CD information, which is Temenos and DataPro.

Michael Stanley (attorney): Okay. Where are those located?

Karyl Van Tassel: **[I] would say that the Temenos and DataPro are in the Washington office...**

ORAL DEPOSITION OF KARYL VAN TASSEL
**case no: 03:10-CV-1002-N** (August 2, 2011)
(pages 16, 18)

Concerning the Stanford matters, on <u>February 26, 2009</u>, and prior to this illegal accessing of privacy law-protected information, the <u>High Court of Antigua and Barbuda</u> issued an Order **(vol. 6)(USCA5 1727-1750)** in which they explicitly ruled that:

> "(1) No disclosure of customer specific information is authorized without further, or other, Order of the Court; and (2) No disclosure of information is permitted under this Order to any foreign Government or regulatory body unless such disclosure is subject to mutual disclosure obligations. For purposes of this Order, customer specific information means information of sufficient detail to enable a recipient of the information to identify the customer in question, the customer's address or other location, and/or the amount of such credit balances or other investments of the Respondent/Defendants accounts."
> **(vol. 6)(USCA5 1729-1730)**

The U.S. Department of Justice recognizes that searches taking place in another country and conducted by (American) 'state actors' (or Ralph Janvey, acting as an "Officer" of Judge Godbey's Court) must be accomplished with the permission of the local country and its laws. In the Department of Justice manual under "Searching and Seizing Computers and Obtaining Electronic Evidence in a Criminal Investigation," it notes:

When United States authorities investigating a crime believe electronic evidence is stored by an Internet Service Provider or on a computer located abroad (in "Country A"), U.S. law enforcement must seek assistance from law enforcement officers in Country A. Since, in general, law enforcement officers exercise their functions in the territory of another country with the consent of that country, U.S. law enforcement should only make contact with an ISP located in Country A with, (1) prior permission of the foreign government; (2) approval of DOJ's Office of International Affairs (OIA) (which would know of particular sensitivities and/or accepted practices); or (3) other clear indicia that such practice would not be objectionable in Country A…where Country A cannot otherwise provide informal assistance, request for evidence usually will be made under existing Mutual Legal Assistance Treaties (MLAT's) or Mutual Legal Assistance Agreements, or through the letters rogatory process. (See 28 U.S.C. § 1781-1782).

In the event that the United States law enforcement inadvertently accesses a computer located in another Country, CCIPS, OIA or another appropriate authority should be consulted immediately, as issues such as sovereignty and comity may be implicated.
**(vol. 5)(USCA5 1452)**

None of these High Court instructions or Treaty-related safeguards or protocols were adhered to in this case. As is axiomatic, the Receiver (Ralph Janvey) wielded the (civil) <u>Receiver Order</u> like a "Writ of Assistance" and far exceeded its scope. In addition to his extensive investigatory assistance and <u>coordination</u> with (criminal) investigators, by issuing this "Letter of Authorization" for the accessing of privacy law-protected data located in Antigua, he violated both the laws of the sovereign nation of Antigua and Barbuda, and the treaty laws of the United States.

Finally, and most important in these proceedings, as this illegally accessed (and exculpatory) Temenos and DataPro database was provided to the FBI (vol. 2)(USCA5 410) (see Exhibit G) and very clearly and selectively utilized by the Government at trial, under *Brady v. Maryland,* 373 U.S. 83, 10 Led 2d 215, 83 S.Ct. 1194 (1963) it should have been, but never was, provided to the Defense.

Therefore, in their countenance of this act, followed by the usage of this information and failure to provide it to the Defense, U.S. prosecutors violated, in the most egregious manner, both the Rules of Discovery and defendant Stanford's Fourth Amendment right to Due Process and protection from illegal searches and seizures. (See Exhibit C)

To establish a *Brady* violation, defendant Stanford must prove that (1) the prosecution actually suppressed the information, (2) that the information was favorable to him, and (3) the information was material. *United States v. Brown,* 650 F. 3d 581, 587-88 (5th Cir. 2011).

As the Stanford prosecutors clearly found "material" and utilized the specific account information contained in the Temenos and DataPro databases, then suppressed it by not providing it to the Defense, and in fact, relocated it well outside Defense's budget-restrained reach, (see 'Confidential Memorandum')(**SEALED** Doc. 603, pages 3,4) the three prongs required to establish a *Brady* violation have been met.

Notwithstanding the means by which this Temenos and DataPro information was obtained, it was not merely "favorable" to the Defense, once exposed it would have both unequivocally verified the Receiver's illegal accessing of it, and completely exonerated defendant Stanford.

In short, with the same unrestricted access that the Government had to the information contained in this customer account database, Stanford's counsel could easily have exposed as erroneous and unreliable the findings in the multitude of Van Tassel 'Declarations' – the "findings" utilized to obtain his conviction.

## IV.

**THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT FAILED TO HOLD A PRE-TRIAL HEARING TO DETERMINE WHETHER DEFENDANT STANFORD HAD ANY "UNTAINTED" FUNDS THAT COULD BE USED TO PAY FOR HIS DEFENSE.**

## STANDARD OF REVIEW

The failure of the District Court to entertain a defendant's Motion to release restrained assets should be reviewed for abuse of discretion, (see *United States v. Kaley*, 579 F.3d 1246 (11th Cir. 2004)). The resulting deprivation of a defendant's Fifth Amendment right to Due Process should be reviewed *de novo*, *United States v. Jones*, 160 F.3d 641, (10th Cir. 1998).

## DISCUSSION

As a result of the asset-freeing TRO issued by the civil Court, on July 6, 2009 counsel for defendant Stanford filed a pre-trial Motion to release funds to pay for his defense **(vol. 2)(USCA5 561-579).** The District Court, without holding an Evidentiary Hearing, denied this Motion. The absence of such a Hearing deprived defendant Stanford of an opportunity to adequately respond to the allegations set forth in the Temporary Restraining Order (TRO) **(vol. 2)(USCA5 644-653).**

Due Process requires that a person not be deprived of his property without notice and an opportunity for a Hearing. (*Fuentes v. Shevin*, 407 U.S. 67) (1972)

To determine what process is due in a particular setting, courts must consider these facts:

> (1) The private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional procedural safeguards and (3) the Government's interest, including the functions involved and the fiscal and administrative burdens that the additional or substitute procedural prerequisites would entail (see *Matthew v. Eldridge*, 424 U.S., 319, 335 (1979)).

Pre-and-post-Indictment Restraining Orders may cause a tremendous hardship on a defendant by stripping him of all major portions of his financial resources in which to provide the preparations of his legal defense. *United States v. Moya-Gomez*, 860 F.2d 706, 726 (7th Cir. 1988). With respect to attorney fees, the freeze of a defendant's assets operated as a permanent deprivation where he could not utilize the funds to hire counsel of choice or in trial preparation. Consequently, relief not obtained prior to the commencement of trial simply will not be helpful in securing a meaningful defense as guaranteed by the Sixth Amendment; Id. At 728. More importantly, the purpose of a post-restraint Hearing is to determine whether legitimate assets - those outside the scope of the Indictment - have been wrongfully restrained. *United States v. Kaley*, 579 F.3d 1246, 1256 (11th Cir. 2009) citing *United States v. Bissell*, 866 F.2d, 1343 (11thCir.1989).

In a similar case where a TRO was issued prior to the filing of criminal charges, (*United States v. Monsanto*, 491, U.S. 600, 613-14 (1989)), the Supreme Court held:

> When the Government seeks to restrain assets prior to the filing of an Indictment, a defense procedure is provided. In that case a Protective Order may be issued only if, after notice to persons who may have an interest in the property - and an opportunity for a Hearing - the Court determines that (1) there is a substantial probability that the Government will prevail on the merits of the forfeiture claim; (2) the Protective Order is necessary to protect the Government's interest in the property, and (3) the need for the Order outweighs the hardship causes.

Defendant Stanford was not offered such a Hearing, and thus was deprived of his Fifth Amendment Right to Due Process, as clarified in '*Monsanto*'.

## MATERIAL FACTS THAT WOULD HAVE BEEN PRESENTED AT AN EVIDENTIARY HEARING.

1.) Defendant Stanford was beneficiary to a Directors and Officers (D & O) insurance policy (Lloyd's of London) which would have provided approximately 150 million dollars in coverage for his legal expenses.

> Mr. DeGuerin (defense):  There's even—we've thought that we might be able to get paid through a D&O insurance policy, which insures directors and officers individually. And now it looks like the Receiver's going to step in and say all that money that should go to the lawyers that are representing Mr. Stanford, should [instead] go to the Receiver. (vol. 9)(USCA5 502)

105

**2.)** On the day of the criminal arraignment (June 25, 2009) the Receiver laid claim to this policy even though;

**3.)** This policy had no cash value of which to secure for the Receivership Estate, and therefore;

**4.)** Since as the Government has repeatedly claimed, that the Receiver was not a "state actor," and instead an **"Officer of the Court,"** this civil court action can only be construed as purposeful in its prevention of defendant Stanford's securing the counsel of his choice.

In the absence of an immediate ('*MONSANTO HEARING*') to establish legitimacy and ownership, a great deal of time and money was later spent in litigation over this policy.  With the well-established fact that this D & O policy had no intrinsic value to be preserved for the Receivership Estate, this litigation (by the Receiver) was also a waste of Receivership's assets, and thus a violation of section 5(g)[11] of the <u>Receivership Order</u>.

An immediate <u>Evidentiary Hearing</u> would have established these facts, and preserved both the <u>Receivership Estate</u> as <u>Ordered</u>, and defendant Stanford's right to access "untainted" funds (outside the scope of the TRO) to retain the counsel of his choice.

---

[11] 5(g). Perform all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate, in order to prevent any irreparable loss, damage, and injury to the estate.

# V.

## THE TRIAL COURT ABUSED ITS DISCRETION IN; (A) DISQUALIFYING DEFENDANT STANFORD'S COMPETENT COUNSEL OF CHOICE; AND (B) FORCING ILL-PREPARED APPOINTED COUNSEL TO PROCEED.

## STANDARD OF REVIEW

The dismissal of counsel of choice by the District Court will be reviewed for abuse of discretion.  (See *Kennedy v. Mindprint*, 587 F.3d. 296 (5th Cir. 2009)).

## DISCUSSION

A.  ## DISQUALIFYING DEFENDANT STANFORD'S COMPETENT COUNSEL OF CHOICE.

On August 4, 2009, attorney Michael D. Sydow filed a Notice of Appearance on behalf of defendant Stanford **(vol. 5)(USCA5 1270)**.

On August 6, 2009 the Trial Court Ordered that:

> The Notice of Appearance is stricken from the record as the attorney had no prior approval by the Court to enter an appearance in this matter.   It is further Ordered that Michael D. Sydow shall have no further involvement in the Court proceedings in this case.
> **(vol. 5)(USCA5 1303)**

The Trial Court (Judge Hittner) gave no explanation as to the disqualification of attorney Sydow, other than stating that (in regards to representing defendant Stanford) he would not be allowed to practice law in his court.

Attorney Sydow is a member of the Texas Bar Association, and is certified to practice law in all Federal Courts and Jurisdictions.

It should also be noted here that just 18 days after this DENIAL of defendant Stanford's counsel of choice, Judge Hittner GRANTED a Motion filed by AUSA Costa to add three additional AUSA's to appear (pro hac vice) on behalf of the Government. (Matthew A. Klecka, Paul E. Pelletier, Jack B. Patrick - Dkt. 106 August 24, 2009).

The Constitution guarantees that a defendant in a criminal prosecution must be afforded a fair opportunity to secure counsel of his own choice. *Powell v. Alabama*, 287 U.S. 45, 53 (1932), which further provides "that the accused be defended by counsel he believes to be the best." *Grandy v. Alabama*, 569 F.2d 1318, 1323 (5th Cir. 1978).

In *United States v. Gonzalez-Lopez*, 548 U.S. 140, 126 S.Ct. 2257, 165 L.Ed. 2d, 409 (2006) the Supreme Court held that an erroneous denial of counsel of choice is a structural Sixth Amendment error which entitles a defendant to an automatic reversal without showing that a defendant was denied a fair trial as a result. In summary, the Court said:

> "The right at stake is the right to counsel of choice, not the right to a fair trial. No additional showing of prejudice is required to make an erroneous violation complete; to gain reversal from a conviction for the deprivation of that basic right."

In *Gonzalez-Lopez* supra the Government tried to adopt the two-prong test according to *Strickland v. Washington*, 466 U.S. 688 (1989) to adjudicate cases of an erroneous denial of counsel of choice.  The Supreme Court rejected that argument by stating that there are too many different strategies that a different attorney could pursue throughout the entire criminal proceeding.  It is impossible to tell how a preferred lawyer would have handled the case.  (See *Gonzalez-Lopez*, Id., at 417) Justice Scalia went on to clarify:

> "Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of jury, presentation of witnesses, style of witness examination, and jury argument.   In light of these myriad aspects of representation, the erroneous denial of counsel bears directly on the framework within which the trial proceeds, and indeed, on whether it proceeds at all.  It is impossible to know what effect going forward with a different attorney would have on the outcome of the criminal proceeding.  Harmless error analysis in such a context would be speculative inquiry into what might have occurred in an alternate universe." Id., at 420.

The most important decision a defendant makes in shaping his defense is his selection of his attorney.  *United States v. Laura*, 607 F.2d 52, 55 (3rd Cir. 1979), "attorneys are not tangible" and "the ability of a defendant to select his own counsel permits him to choose an individual in which he has confidence", Id., at 56.  Recognizing the importance of this selection, the Third Circuit held:

109

"If a defendant chooses a particular lawyer, a court may not take arbitrary action prohibiting the effective use of that counsel."

Attorney Sydow, who was defendant Stanford's counsel of choice, was willing to enter the (criminal) case and represent him based on the likelihood that the issues of the D & O policy (Directors and Officers litigation insurance) would be resolved in his favor. He was already representing defendant Stanford (in the civil matter) before Judge Nancy Atlas, without issue.

> Mr. Sydow: (Defense) Michael Sydow, your Honor.
> The Court: (Judge Atlas) Spell that, Sydow.
> Mr. Sydow: S-y-d-o-w.
> The Court: Oh.
> The Court: And why are you participating?
> Mr. Sydow: I've been engaged by Mr. Stanford to give him advice about SEC matters, both criminal and civil.
> The Court: Okay. Anybody else?
> (vol.4)(USCA5 750)

Following the disqualification of attorney Sydow, the Trial Court (Judge Hittner) appointed counsel to represent defendant Stanford, thus forcing him to proceed (in the criminal matter) with counsel that was not of his choosing.

The Trial Court then further abused its discretion when on Nov. 17, 2011 it issued a Preclusion Order (vol. 3)(USCA5 967-968) DENYING attorney Stephen Cochell from in-person access to defendant Stanford at the FDC in Houston. Attorney Cochell (who is also a member of the Texas Bar Association and certified

to practice law in Federal Courts) was at the time representing defendant Stanford in the <u>civil</u> proceedings, and would have assisted in the preparation for the <u>criminal</u> proceedings.

Although Stephen Cochell requested to be heard on the merits **(Doc. 612)**, the Trial Court (Judge Hittner) (by not ruling on this request) DENIED any further discussion in the matter. Cochell was thus denied all access to defendant Stanford prior to, and up until, the start of the trial (January 23, 2012) – at which time Judge Hittner simply WITHDREW his Order. **(SEALED** Dkt. 643)

## B.    <u>FORCING ILL-PREPARED APPOINTED COUNSEL TO PROCEED</u>

Citing circumstances which resulted in their inability to provide adequate, effective counsel in such a complex case, on <u>January 11, 2012</u> (twelve days prior to the start of the trial) defendant Stanford's Court-appointed counsel (all four of them) joined in a "Motion to Withdraw" from the case. **(vol. 7)(USCA5 1776-1794)** (See *United States v. Gaffney*, 469 F.3d 211, 218-219 (1st Cir. 2006) (if a lawyer feels he is not prepared for trial he has an ethical duty to inform the Court.)

The Trial Court (Judge Hittner) then DENIED this Motion and <u>Ordered</u> that these attorneys proceed to trial. **(vol. 15)(USCA5 3557-3558)** This defense Motion (with accompanying affidavits from each of these attorneys) was based on untenable budgetary constraints and rulings of the Trial Court which, in their total, would have

amounted (and did amount) to a defense that failed to meet the Constitutional threshold of effective assistance.

Specifically, the Trial Court:

1.) **GRANTED a SEALED Motion (Doc. 434) requesting a jury consultant on May 27, 2011. Defense Counsel then retained Mr. Robert Hirschhorn and began discussing defense strategy, jury questionnaire and other critical trial matters with this Court authorized expert, only to then later be told (by the same Court) that this authorization had been a "mistake" and was REVOKED. (Doc. 596)**

2.) **Found defendant Stanford legally competent to stand trial on December 22, 2011 (vol. 35)(USCA5 13789) and ORDERED trial to begin on January 23, 2012. Thus affording counsel a mere 30 days of prison-restrictive assistance from a still-symptomatic client whose input in decrypting the overwhelmingly complex and voluminous discovery material was essential.**

3.) **Prohibited, by its budgetary restrictions on experts, the completion of investigations which counsel thought to be critical to the defense.**
**This (Fifth Circuit-sanctioned) prohibition, which was both unreasonable and untenable, prompted first (and just days before trial) the resignation of these experts, then an Order from this Court forcing them to proceed with no guarantee of payment…and under threat of contempt.**

4.) **DENIED defense's request for an additional 90 days to prepare for trial (Doc. 566), as well as a subsequent request for a 3-week continuance (Doc. 577) when Defense's one and only skilled and**

112

critically important Discovery and trial document expert (who is an attorney), was diagnosed with cancer 10 days prior to the trial date and had to leave the case for emergency medical care.

<u>Mr. Fazel</u>: [T]here's a fundamental issue here, that the Court is well aware of, is that we have done our best within the time constraints that we've been under to get this information to the Government. The Court is aware that the person that was handling our exhibits had cancer, had to go to the hospital. We don't have her anymore. So we had to supplant her with somebody else. That was a big loss to us, because she's the one that's organizing these things. (vol. 51)(USCA5 7936)

"Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S.Ct. 2052, 80 L.Ed. 674 (1984).

"The result of these enumerated budgetary restrictions and denials of additional time to prepare amounted to an unequal access to evidence. (See

*California v. Trombetta*, 467 U.S. 479, 485 (1984)).  [The] "Court has long interpreted [Due Process Clauses] standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense."

The imbalance in favor of the Government is also contrary to the principle that, given the prosecution's inherent information-gathering advantages, "If there is to be any imbalance in discovery rights, it should work in the defendant's favor." *Wardius v. Oregon*, 412 U.S. 470, 475 N.9 (1973).  (See also *Id.*, at 480 (Douglas, J. Concurring). ("The Constitution recognized the awesome power of the Indictment and the virtually limitless resources of Government investigators.  Much of the Bill of Rights is designed to redress the advantage that inheres in a Government prosecution.  It is not for the Court to change that balance").

In addition to the immense resources at the Government's disposal, the prosecution in this case had the benefit of the extensive information-gathering capability of the Receiver.  The Order appointing the Receiver **(vol. 2)(USCA5 387-397)** directed the Receiver to promptly provide the United States Securities and Exchange Commission, and any other Governmental agency, with all information and documentation they may seek in connection with their regulatory or investigatory activities.

Evidencing the intent of this information-gathering assistance to the Government, the Receiver submitted bills well in excess of **a hundred million dollars**, for:

> "[C]ollecting information at the request of the SEC, the FBI and the DOJ in connection with their investigations, utilizing numerous complex databases, mails, accounting records, financial documents and files found in searching e-mails and file shares."
> **(vol. 2)(USCA5 724)**

## INEFFECTIVE ASSISTANCE OF COUNSEL

Although as a general rule Courts of Appeal do not review claims of Ineffective Assistance of Counsel (on direct appeal), the circumstances in the instant case are extraordinary, and therefore Defendant Stanford's claim should be viewed as an exception to that rule.

At the time of the 'Motion And Memorandum Of Law For Leave For Counsel To Withdraw' **(vol. 7)(USCA5 1776-1794) (Doc. 602)** Defendant Stanford's counsel advised him that their decision to withdraw was not a mere "defense tactic" (or "ploy"), but rather a forced decision stemming from the Court's unreasonable and untenable trial preparation time and budgetary constraints, and the sudden loss of their highly trained and indispensable discovery expert.

The evidence on record in this case (and detailed in **Docs. 602-1,2,3,4**) and admitted, in their own words, that:

> "[S]imply stated, the rulings of the Court, the budget matters made public by this Court, and matters still under seal have placed counsel in an untenable position."

> "[t]he rulings of the Court along with the budget process has placed counsel in a legal position of being unprepared for trial."

> "[A]s a result of the funding issues in this case and in light of the current trial deadlines, the defense will be compelled to try the case without having had the resources necessary to render constitutionally adequate representation, while the Government has been entirely unfettered by any financial resource constraints."

> "[I]n light of the time and funding constraints imposed in this case, the constitutional rights of Mr. Stanford – including his right to confront the evidence against him, to present his defense, and to the effective assistance of counsel – will be effectively denied."

Nevertheless, as previously stated this Motion was DENIED by Judge Hittner. **(vol. 15)(USCA5 3557-3558)**

The Supreme Court has recognized a number of situations in which counsel can be rendered ineffective by actions of the Government or the Trial Court. For instance, in *Geders v. United States*, 425 U.S. 80 (1976), the Court held that the defendant was denied Effective Assistance of Counsel when the Trial Court, at the

insistence of the prosecutor, forbade Defense counsel from speaking with the defendant during an overnight recess between direct and cross-examination. Id., at 91.

Although appointed and present, counsel was unfairly restricted in their ability to prepare for, or present, an adequate, effective defense.

Further, under <u>Texas Rules of Professional Conduct</u>, <u>Rule 1.15(a)</u> states, "A lawyer shall withdraw from the representation of a client, if:

> (1)  The representation will result in violation of...other law.

Under the stated circumstances, for these (4) attorneys to have (voluntarily) remained on the Stanford case would have been a violation of "other law." And thus, for the Trial Court to...

> A.) **Disqualify defendant's counsel of choice**, and then;
>
> B.) **Order that these 4 admittedly ill-prepared and ineffective (Hittner-appointed) attorneys proceed to trial against their will.**

...was the clearest of violations of the <u>Texas Rules of Professional Conduct</u>, and both the Fifth and Sixth Amendments to the U.S. Constitution.

## VI.

**THE TRIAL COURT VIOLATED DEFENDANT
STANFORD'S SIXTH AMENDMENT RIGHT TO A
FAIR TRIAL BY FAILING TO PROVIDE
APPROPRIATE RESPONSES TO JURY NOTES
TWO AND THREE.**

### STANDARD OF REVIEW

In *United States v. Carter*, 491 F.2d 625, 633 (5th Cir. 1974), this Court considered whether the Trial Court's answer was reasonably responsive to the jury's questions, and whether the original and supplemental instructions, as a whole, provided the jury an adequate guide to understand the issues presented.

### DURING THEIR DELIBERATIONS THE JURORS REQUESTED SUPPLEMENTAL INSTRUCTION

In Jury Note # 2, the jurors asked, **"May we have [a] definition of the word scheme, as it pertains to Counts two through eleven."** (vol. 23)(USCA5 12799)

In the courtroom and outside the jury's presence, a number of possible responses were discussed. The prosecution requested that the response be limited to "a design or plan."

The response requested by the defense was "a design or plan formed to accomplish some purpose."

Ultimately, and after having just provided the jurors a dictionary in response to their request in Jury Note # 1, which asked, "May we have access to a dictionary?" **(vol. 23)(USCA5 12798)**…

Judge Hittner decided that the appropriate response to Jury Note #2 would be precisely, and nothing more than, the definition they already had in the just-provided dictionary.

> <u>The Court</u>(Judge Hittner): All right.  What's the…what's the defense tender, please?
> <u>Mr. Parras</u>:  We…
> <u>Mr. Scardino</u>:   I think we would prefer this one, the original, "Design or plan formed to accomplish some purpose."
> <u>Mr. Parras</u>:  Your first sentence, Judge.
> <u>The Court</u>:  And the Government's.
> <u>AUSA Stellmach</u>:  "Design or plan."
> <u>AUSA Costa</u>:  Just "a design or plan."
> <u>The Court</u>:  All right.  I assume - from what I understand, Jury Note # 1 refers to Jury Note #2.  And I'm putting in quotes the words … the word "scheme" and colon "a design or plan" that's it.  The objection and the tender of the defense for a **more complete definition** at this time is DENIED.
> **(vol. 67)(USCA5 14836-14837)**

The fact is, the defense's tender was the more edifying and therefore should have been granted on that basis alone in this case, even though it, too, was woefully inadequate.  And no matter the defense's failure here to fully comprehend the <u>Due Process</u> significance and the critical importance of providing the jurors with a clearer and more complete definition of the word "scheme", as the final authority, the

119

presiding judge (Hittner) should have promptly returned the jurors to the courtroom to make certain that the word "scheme" was explained to their satisfaction. Notwithstanding the fact that the response in no way addressed the definition of the word "scheme" - **"as it pertains to Counts two through eleven"** - the overarching reality is that defendant Stanford was being tried in an atmosphere poisoned with the word "scheme".  In area newspapers, magazines, on television, and every other form of media, he was being labeled a "Ponzi schemer", as well as in publications from the Receiver, the civil court, and even the Fifth Circuit Court of Appeals.  And further, the trial itself was permeated with various usages of the word "scheme", all of which were negative in meaning and association.  In his opening remarks, and clearly illustrating the negative, media-derived preconceptions held by the jurors from the first day of the proceedings, the Trial Judge said:

> "I want to read you a description of the case.  Of course, a
> lot of you have written in here – oh, this is a certain type
> of scheme or whatever."
> **(vol. 37)(USCA5 4001)**

Then later, in his closing remarks prior to their deliberations, Judge Hittner uttered a total of 22 times, the terms:

(2)  "a plan or scheme"..............(vol.66)(USCA5 12568) at 17,18
(1)  "unlawful scheme"..............(vol.66)(USCA5 12568) at 15
(11) "scheme to defraud"...........(vol.66)(USCA5 12570) at 1,10
                                    (vol.66)(USCA5 12571) at 16
                                    (vol.66)(USCA5 12572) at 2,6,11,20

120

```
                              (vol.66)(USCA5 12573) at 13,23
                              (vol.66)(USCA5 12669) at 16
                              (vol.66)(USCA5 12670) at 9
    (3)  "devise a scheme"..............(vol.66)(USCA5 12571) at 15
                              (vol.66)(USCA5 12669) at 16
                              (vol.66)(UCSA5 12670) at 9
   (1)  "carry out a scheme"..............................(vol.66)(USCA5 12571) at 21
   (2)  "purpose of carrying out the scheme".....(vol.66)(USCA5 12570) at 8
                                      (vol.66)(USCA5 12572) at 19
   (1)  "purpose of the scheme".....(vol.66)(USCA5 12571) at 8
   (1)  "created a scheme"............(vol.66)(USCA5 12570) at 1
```

And immediately following, and in his summation alone, AUSA Stellmach

uttered a total of **8** times, the terms:

```
   (1)  "further the scheme"............(vol.66)(USCA5 12654) at 15
   (1)  "promote the scheme"..........(vol.66)(USCA5 12654) at 8
   (1)  "executed the scheme".........(vol.66)(USCA5 12596) at 20
   (1)  "get-rich scheme"................(vol.66)(USCA5 12599) at 18
   (1)  "the entire scheme"..............(vol.66)(USCA5 12618) at 8
   (1)  "this scheme".......................(vol.66)(USCA5 12620) at 17
                              (vol.66)(USCA5 12646) at 15
   (1)  "a scheme"..........................(vol.66)(USCA5 12642) at 12
   (1)  "from the scheme"...............(vol.66)(USCA5 12653) at 25
```

And then finally, in the Government's summation, AUSA Costa added:

<u>AUSA Costa</u>: Thank you, your Honor. Who else have
they blamed? Well, the Receiver, the fact that they try to
say everyone was paid until the Receiver came in. First of
all, you heard about depositors who were denied payment
before the Receiver came in. But that's the way a <u>scheme</u>
like this works. They were paid for 20 years, just like
Madoff was able to carry something on that long.
**(vol. 66)(USCA5 12730)**

This personal analysis was improper, and the reference to Bernard Madoff was purposefully inflammatory.

Most noteworthy of all, however, were the references these jurors heard just moments before their deliberations. In Jury Instructions 19-21, Judge Hittner uttered the word "scheme" a total of **24** times:

(vol.66)(USCA5 12568) at 15,17,18,24,25
(vol.66)(USCA5 12569) at 22
(vol.66)(USCA5 12570) at 1,9,10,12-12
(vol.66)(USCA5 12571) at 8,10,16,19,21
(vol.66)(USCA5 12572) at 2,6,11,19,20
(vol.66)(USCA5 12573) at 13,23

"A trial judge does have broad discretion in formulating his response to jury questions, but in all events he must strive to clear away any difficulties with concrete accuracy." *United States v. He*, 245 F.3d 954, 958 (7th Cir. 2001), quoting *Bollenbach v. United States*, 326, U.S. 607, 612-13 (1946) "particularly where a difficult legal issue such as "intent" ["or scheme"], which is not precisely defined by the statute, is the subject of the jury's inquiry, the Trial Court should carefully inform the jury of the law, and not allow the troubled jury to rely on a layman's interpretation of a superficially simple but actually complex statute. Failure to provide clarification on such a critical issue was not a harmless error, for "the jury convicted on the basis of an instruction which did not provide them with the legal information they themselves indicated that they needed." *Id*.

Quoting *Bollenbach* (326 U.S. 612, 66 S.Ct. at 405),

> "Particularly in a criminal trial, the judge's last word is apt to be the decisive word. If it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptional and un-illuminating abstract charge.
>
> "When after <u>an hour and forty minutes</u> of deliberation, a jury returns, not with a verdict but with a request for clarification of a particular point of law, it must be recognized that the jury has been unable to reach a decision on the basis of all it has heard up until that time.
>
> "Under the circumstances a trial judge must be actually sensitive to the probability that the jurors will listen to his additional instructions with particular interest, and will rely more heavily on such instructions than on any single portion of the original charge. Thus, the Court must exercise special care to see that inaccuracy or imbalance in supplemental instructions do not poison an otherwise healthy trial."

In Jury Note number three, the jurors asked:

> **"On Government Exhibit # 1149; item # 3 refers to "CDO" products; what is the meaning of "CDO"? (vol. 23)(USCA5 12804).**

Government Exhibit #1149 **(vol. 23)(USCA5 12923)** contains two documents from a November 2008 meeting between defendant Stanford and two of his employees, <u>Danny Bogar</u> and <u>Jason Green</u>. At this meeting, which was held in Sugarland, Texas, the referenced documents (Exhibit #1149), had been presented to Mr. Bogar and Mr. Green by defendant Stanford. In them, he had outlined a number of "talking points" for these two men to use in their upcoming meetings with Stanford Financial Advisors about the then-current global financial crisis.

123

In one of these "talking points," defendant Stanford reminds these employees that SIB had "no exposure to any CDO products."

The Government's purpose for presenting this exhibit, however, was to focus the jurors attention on a referenced "capital infusion" made by defendant Stanford, and the reference to "no exposure to any CDO products," was not discussed. Nor was the "meaning" of "CDO", which is an esoteric financial term of both recent origin and negative inference, ever explained (Motion in Limine). (vol. 6)(USCA5 7231-7233)

Upon receipt of Jury Note # 3 (vol. 23)(USCA5 12804), the following courtroom discussion reveals that the un-enlightenment of the meaning of "CDO" extended beyond the jury room.

> The Court (Judge Hittner): Thank you. Be seated. Got two questions. First one is, on Government Exhibit 1149, item number 3 refers to "CDO" products. What is the meaning of "CDO?" Government's position please?
> AUSA Stellmach: We don't believe there was any testimony about it, but the phrase refers to "Collateralized Debt Obligation."
> The Court: And the defense's position?
> Mr. Fazel (Defense): It's also known as "subprime loans", your Honor.
> The Court: Say it again.
> Mr. Fazel: It's also known as "subprime loans."
> The Court: Well, do you want to give them both?
> AUSA Stellmach: Well, I think their question only referred to the document and the use of "CDO" products.

So, we would feel more comfortable just answering their direct question. A "CDO" is a "Collateralized Debt Obligation."

Mr. Fazel: But the common layman term for it is "subprime loan."

AUSA Stellmach: And the document directly - on the document they're referring to, it refers to "subprime exposure" in the line directly above the "CDO" line. So, they're not asking about "subprime", they're asking about "CDO".

The Court: I think we can combine it in an answer for them if it will do away with an objection. Do you have any objection to just, you know...just work out the wording while I sit here, before we're done, okay?

AUSA Stellmach: Yes, sir.

The Court: In other words, you can say "CDO stands for" and such as, "also note: referring to subprime language in the prior line" or something like that.

AUSA Stellmach: Well, I think the only technical problem is that a "CDO" doesn't necessarily refer to subprime products.

The Court: Okay. You work it out. If you can't, I'll rule on it, but keep in mind, looking at both sides, "CDO" is just sitting there by itself with no other testimony relative to what it meant. So, you may have a trade-off there. Because there's no other testimony. I don't remember any. Looks like we may have a trade-off. So, I'm not saying you need to agree on anything. But if you can, it avoids a court ruling, ruling on something that there may not be any testimony concerning a definition.

**(vol. 68)(USCA5 14844-14845)**

The Court: Okay. Where are we? Relative to quesiton number one, the "CDO", what's the defense's position?

**Mr. Fazel:** Your Honor, we tendered our suggestion to the Government, and our suggestion would read as follows: ...Quote, "CDO," unquote, refers to, quote, "Collateralized Debt Obligations", unquote, "like subprime loans" period.

**AUSA Stellmach:** The question only asks for what the meaning of "CDO" is. A "CDO" is a "Collateralized Debt Obligation."

**The Court:** Let me ask you this. What's the Government's position on...let's assume there's no other independent evidence as to what those initials are. There's no contest as to it's a...what a "CDO" is. This question is...that the defense's position is they had a concern. Is that right? In allowing it in? In other words, you want it with the definition plus "subprime loans," correct?

**Mr. Fazel:** Correct

**The Court:** Okay, and the Government's position?

**AUSA Stellmach:** Just to let "CDO" be defined. On its own. There's -

**The Court:** All right.

**AUSA Stellmach:** already a reference in the documents to "subprime loans."

**(vol. 68)(USCA5 14849-14850)**

**The Court:** All right. The ruling on the first one is as follows. I'm going to give them a definition just for the initials "CDO". **What does it stand for again?**

**AUSA Stellmach:** "Collateralized"

**The Court:** C – O –

**Mr. Fazel:** "CDO", your Honor

**The Court:** Collateralized, right? "Collateral"?

**AUSA Stellmach:** "Collateralized," yes.

**The Court:** C – A –

**AUSA Stellmach:** C – O –

**The Court:** O –

126

AUSA Stellmach:  L – L –

The Court:  C – O – L – L, that's what I've got.  Alright. As to Jury Note number Three, I have "CDO" in quotes, hyphen – colon, "Collateralized Debt Obligation," and I've signed it.  The defense's objection is duly noted, and it's OVERRULED.

**(vol. 68)(USCA5 14852)**

Here again, as with Note number 2, the Trial Judge failed to provide a proper response to the question submitted.  To begin with, Note number 3 asked: "What's the meaning of CDO?"  It did not ask what CDO "stands for," "the definition of," or "definition of the initials CDO".  Which is:

> **"Collateralized Debt Obligation... "CDOs" are structured financial instruments that purchase and pool financial assets such as riskier tranches of various mortgage-backed securities."**
> Financial Crisis Inquiry Commission Report[12].

By responding with nothing more than a "definition of the initials "CDO", the Trial Court denied the jurors an adequate answer to their question and, in the process, denied defendant Stanford his Sixth Amendment right to a fair trial.   Even though not universally understood, the term "CDO" had for the past several years been widely reported in the media as associated with the 2008-2009 'securitized debt' debacle and subsequent multi-billion-dollar TARP[13] program - a bailout of the

---

[12] Financial Report Of The National Commission On The Causes Of The Financial Crisis In The United States (January 2011)(page 128)
[13] Troubled Asset Relief Program

nation's biggest banks and investment firms. And while it's true that not all "CDOs" consist of "subprime loans", in reality, and certainly in the public's perception, these and other 'Wall Street bailout'-related terms are now inextricably linked and prejudicially impactful on anyone charged, as defendant Stanford was, with a financial crime.

Additionally, there is the following underlying issue. While, theoretically, Government's Exhibit #1149 was only intended to evidence a controversial "capital infusion", it also indirectly introduced an important element of an issue prohibited by the Government's 'Motion in Limine.' **(vol. 6)(USCA5 7231-7233)**

In other words, by introducing Exhibit #1149 and directing the juror's attention to the "capital infusion," the Government manages to infer guilt by association - in a way that defendant Stanford was prohibited from defending against. The effectiveness of this guileful 'implication' was evidenced by the juror's bewilderment when presented with the matter (concerning CDOs), an issue that was barred (by the Government's Motion in Limine), and not allowed to be discussed during trial.

# VII.

## DEFENDANT STANFORD WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL, BECAUSE PRE-TRIAL AND MID-TRIAL PUBLICITY PRECLUDED THE ASSEMBLY OF AN IMPARTIAL JURY.

## STANDARD OF REVIEW

District Court's decision to deny a Motion for Transfer of Venue is reviewed for abuse of discretion. *United States v. Lipscomb*, 299 F.3d 303, 338 (5th Cir. 2002).

## DISCUSSION

"The primary concern of all must be the proper administration of justice, that the life or liberty of any individual in this land should not be put in jeopardy because of the actions of any news media; and that the Due Process requirements in both the Fifth and Fourteenth Amendments, and the provisions of the Sixth Amendment, require a procedure that will assure a fair trial: *Estes v. State of Texas*, 381 U.S. 532, 538-39 (1965).

Two broad classes of prejudicial publicity can exist: (1) "massive pretrial publicity media circus cases (though often with extensive coverage of the trial itself) typically necessitating a change of venue because of extreme prejudice and inflamed community atmosphere;" and (2) "publicity that occurs during the trial, necessitating a poll of the jury to determine whether a significant possibility of prejudice exists."

129

The Supreme Court has examined this kind of publicity in the context of its "supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts." *Marshal v. United States,* 360 U.S. 310, 313 (1959) (per curium), "and not as a matter of Constitutional compulsion." *Murphy v. Florida*, 421 U.S. 794, 797 (1975).

As a result of the massive pre-trial publicity in this case, on October 2, 2011 counsel for defendant Stanford moved the Court for a 'Change of Venue', which was DENIED. (**SEALED** Dkt. 346).

The Trial Court (Judge Hittner) apparently agreed, however, that the prejudice resulting from this pre-trial publicity was "of a kind or to a degree not susceptible to remediation by prompt curative instructions", when (in spite of the Government's spirited argument against it) it granted Stanford's co-defendants a severance (from him) based on their claims of a media "circus" atmosphere. (Dkt. 257)

From the issuance of the February 16, 2009 Temporary Restraining Order (TRO) **(vol. 2)(USCA5 644-653)** prompting the Receiver's very-public seizing of Stanford's U.S. companies, and all of his assets (personal and corporate), the Houston community was saturated with publicity prejudicial to defendant Stanford – up to and throughout his trial.

> **(1)** Houston's largest newspaper published numerous articles about defendant Stanford during the three years leading up to and during the trial. These articles (many on

130

the front page, above the fold) in which he was referred to as a "swindler," "con man," "disgraced financier" and "Ponzi schemer," contained equally prejudicial photos of defendant Stanford handcuffed, and in jail garb, arriving in a dogcatcher- like van at the Federal Courthouse in Houston.

(2) <u>Texas Monthly</u> (magazine) published an article in May of 2009 titled "The Dark Knight", a reference to defendant Stanford who was pictured in a caricature. This drawing was undeniably prejudicial to him, as it placed him atop an "island" of cash, grinning and holding a bottle of champagne, a clear reference to his offshore bank in Antigua.

(3) ABC, CBS, NBC, CNBC and other news channels ran multiple stories throughout 2009, 2010 and 2011 about the Stanford trial. In one, a clip from his pre-trial prison assault was shown, evidence which was not introduced at trial and information which the jury must be presumed to have seen. In another, the headline in bold referred to him as the "Jailed Financier."

(4) Further evidence of inherent jury prejudice is found in the jurors questionaires. Four jurors listed the <u>Houston Chronicle</u> as their primary source of news. Of those four jurors, two were dismissed as alternates prior to deliberations, and two participated in the jury's deliberation.

(5) Stanford Financial Group's North American headquarters (with the largest U.S. workforce) was situated at 5050 and 5051 Westheimer – where the company conducted business for years – was located in the

world renowned Galleria Center – the busiest street in Houston.

(Motion for a New Trial)(vol. 23)(USCA5 12943-131020) at 12951-12955

These examples of pre-trial prejudice meet the standard set forth in

*Rideau v. Louisiana*, 373 U.S. 813 (1999):

> An appellant can demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury…proof of such poisonous publicity raised a presumption the appellant's jury was prejudiced, relieving him of the obligation to establish actual prejudice by a juror in his case. Id., Paramount among the dangers is the potential that pretrial publicity may taint the jury venire, resulting in a jury that is biased toward one party or another. Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by impartial jurors, and an outcome affected by extra-judicial statements would violate that fundamental right. *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991).

When questioned (during pre-trial voir dire) about the massive pre-trial

publicity, how it effected them, the prospective jurors responded with the following:

**Judge Hittner:** (to prospective Juror #1)  I see you have some knowledge of the Stanford operatons.   Is that correct?

**P.J. #1:**   I have knowledge of some people that were impacted by it, yes.  What I've read in the papers.

**Judge Hittner:** (to prospective Juror #1)  what you've read in the papers, but you say here, I believe - I knew you're a

20-year private banker. And he's been accused of...you know, of that which we covered - the basic Ponzi Scheme. **(vol. 38)(USCA5 3876-3877)**

<u>P.J. #2:</u>  Honestly, nothing personal, but I pretty much made up my mind about this a long time ago.

<u>Judge Hittner:</u> (to prospective Juror #2)  how so?

<u>P.J. #2:</u>  That he's guilty, probably. **(vol. 38)(USCA5 3884)**

<u>Mr. Fazel:</u> (Defense) (to prospective Juror #3)  Let me ask you - here's what we need to know.  Sitting here today, knowing what you know, do you think he's guilty?

<u>P.J. #3:</u>  Yes, sir.

<u>Mr. Fazel:</u> (to prospective Juror #3)  without hearing any evidence, would you find him guilty?

<u>P.J. #3:</u>  I'm just going off what I've read and what I've seen.  **(vol. 38)(USCA5 3886)**

<u>P.J. #4:</u>  I read that Mr. Stanford had been involved in some money laundering for the Gulf Cartel, or was suspected of it, and to me that's like a huge thing, because I have lots of family in Mexico.  And I believe that anybody who's even remotely involved in anything like that should be punished, like, to the maximum extent.

<u>AUSA Costa:</u> (to prospective Juror #4)  Do you know where you read that, about the Gulf Cartel?  Because this case has... no allegations in this case are about the Gulf Cartel or laundering of drug money. **(vol. 38)(USCA5 3904, 3905)**

<u>P.J. #5:</u> I feel like anybody who picks a fight in prison has got a screw loose.

<u>Judge Hittner:</u> (to prospective Juror #5)  Well, you don't know whether anybody picked a fight or not, or that he was jumped by other people.

<u>P.J. #5:</u>  That's true, that's true.  But just the fact...and I have a little experience with the prison system. And just

the fact that he was involved in an altercation in prison, I think, is pretty outrageous. And I would have a real hard time being impartial regarding his character and impulsivity.
**(vol. 38)(USCA5 3922)**
<u>P.J. #6:</u>  I'm going to stay with…I mean, I think he's a thief.
**(vol. 38)(USCA5 3906)**

In fact, this pre-trial judgment of defendant Stanford extended to, and emanated from, the judges in **this very Court**, whereby in *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2010) it published (among many others) the following conclusions:

"The Davis plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprize operated as a Ponzi scheme."

"The District Court did not err when it found, for the purposes of this proceeding, that Stanford operated as a "Ponzi scheme"."

"The Employee defendants […] received funds as a fraudulent transfer from the Stanford Ponzi scheme."

Further still, this prejudicial pre-trail publicity stemmed from the U.S. Congress, when on <u>May 13, 2011</u> **(just eight months before trial)** the House Financial Services Subcommittee on Oversight & Investigations held a Hearing on **<u>The Stanford Ponzi Scheme</u>: Lessons for protecting investors from the next Securities Fraud."** (vol.6)(USCA5 1490-1496)  As this Hearing was broadcast to

134

the world, not only was it more fuel on the fire that destroyed defendant Stanford's chances of impaneling an impartial jury, it was an **erroneous** publication of the charges against him. **Nine days earlier, on <u>May 4, 2011</u>, a Superseding Indictment was handed down in which the original meritless "Securities Fraud" charge had been dropped. (Doc. 422).**

In *Irvin v. Dowd*, 366 U.S. 717 (1961), the Supreme Court set aside a conviction even though each juror indicated that he could render an impartial verdict despite exposure to prejudicial newspaper articles. "With his life at stake, it is not requiring too much that a petitioner be tried in an atmosphere undisturbed by so huge a public wave of passion." Id., at 728. In *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966), the Supreme Court looked at the totality of the circumstances, notably that:

> (1) the defendant was not granted a change of venue to a location away from where the publicity generated;
> (2) the jury was not sequestered;
> (3) the jurors were subjected to newspaper, radio and television coverage of the trial while not taking part in the proceedings.

## PUBLICITY DURING TRIAL

The Fifth Circuit recognizes a stricter standard for mid-trial publicity breaches than pre-trial ones. See *United States v. Williams*, 568, 899 F.2d at 468 (5th Cir. 1987)(noting that "information reported during the trial seems far more likely to

135

remain in the mind of a juror exposed to it, and he may be more inclined to seek out this information when he is personally involved in the case").

The news coverage of the Stanford case was circus-like, prior to and throughout the trial, and the jurors were not sequestered from its effect.

In *United States v. McDaniel*, 436 Fed.Appx. 399, 408 (5th Cir. 2011) the Court did not abuse its discretion in denying mid-trial voir dire. "He gave lengthy and repeated instructions informing the jury that they were not to read any news of the case. Moreover, the judge took proactive steps to reduce the likelihood that the jury would be exposed to such stories, removing media from the jury room even before the trial started."

**Not so in the Stanford case.** The Trial Court (Judge Hittner) neither conducted a mid-trial voir dire, nor did it ban the practice of "live" courtroom broadcasting, as mandated under Rule 53 of the Fed.R.Crim.P.

The Court allowed the media to remain in the courtroom when the jury was not present, and thus allowed them to hear discussions (bench conferences) that were not on the record. Without admonishment, the media continued to "<u>tweet</u>" during this time, resulting in an instantaneous dissemination of information, to which the jury had not been exposed, but thus could easily access.

<u>Rule 53</u> bars "<u>tweeting</u>" or "<u>twittering</u>" from a courtroom. (See *United States v. Shellnut*, 2009 WL 3681, 827 (MD. GA. 2009)) **(vol.23)(USCA5 12971)**

136

The Stanford Court (Judge Hittner) never instructed the jury to stay off "twitter", despite his knowledge of the media tweets that were taking place throughout the six week trial. **(vol. 52)( USCA5 8428-8429)**

> Mr. Fazel (defense):  Your Honor has allowed folks to be in here—
> The Court (Judge Hittner):  Allowed who?
> Mr. Fazel:  Reporters to be in here who are tweeting information. And so I would submit to the Court, tweeting is a form of—like a newspaper now, where people are—
> Mr. Stellmach (AUSA):  That's exactly the problem.
> Mr. Costa (AUSA):  Even the newspaper they're not supposed to be reading if they're a witness.  But tweets are even worse because-- **(vol. 52)(USCA5 8428-8429)**

In their Response to defendant Stanford's "Motion for Change of Venue," (Dkt. 313) the Government repeatedly asserted that any juror bias could effectively be screened and cured through trial voir dire.  They were partly correct.  It could be "screened" there, but in the Stanford case, not **"cured"** by it.

Later, at the pre-trial voir dire, the evidence was clear that the massive circus-like publicity had poisoned the jury pool, and that the only possible cure was a change of venue.

Moreover, once the trial was underway, and further examples of prejudice to defendant Stanford were brought to the Court's attention, it failed to conduct a mid-trial voir dire.

> Mr. Scardino: [T]he Houston Chronicle ran a front page
> article in yesterday's paper that's dated February 13th.
> [T]hey have photographs of six men that they identify.
> One is the ex-leader of the one time Gulf Cartel; four,
> Al Qaeda sympathizers; next, billionaire on trial
> [showing] Mr. Stanford.
> [S]o this is clearly inflammatory.  It's clearly harmful to
> our case.  We're concerned about the jury having access
> to this sort of public[ly] disseminated information.
> **(vol. 54)(USCA5 8924-8925)**

Finally, in their <u>Response,</u> the Government cited *United States v. Skilling*,

554, F.3d, 529, 559 (5th Cir. 2009) and argued,  Second, although the media coverage

generally painted Skilling in a negative light, it did not include a "confession or other

blatantly prejudicing information of the type readers or viewers could not reasonably

be expected to shut from sight."  Id. at 2916.

The Government, however, neglected to mention the fact that (unlike

defendant Stanford) Skilling was; (1) allowed access to his own assets to fund his

multi-million dollar defense; (2) did not spend a single night in pre-trial detention,

and remained free on bail; (3) was allowed to enter and exit the courthouse wearing

freshly pressed suits, and; (4) was never photographed (as defendant Stanford was,

continuously) exiting prisoner transport vans in jail garb and full restraints.

More importantly, defendant Stanford made no "confession" to any of the

charges in this case, and any confessions made by a co-defendant <u>are no indication</u>

<u>of his guilt</u>, and should not have been a factor in the Court's denial of his Motion for Change of Venue.

*United States v. Radomski*, 473 F.3d 728 (7th Cir. 2004) a co-conspirator's guilty plea is not and cannot be evidence in another conspirator's case, because to allow a co-conspirator's guilty plea into evidence might make the jury trial a formality since if one conspirator is guilty, so must the others be.

In whole or in part, for the Stanford Court (Judge Hittner) to have relied upon the confession of a cooperating co-defendant as evidence on which to base its ruling was a clear violation of defendant Stanford's Sixth Amendment right to a fair trial.

## VIII.

**THE TRIAL COURT ABUSED ITS DISCRETION BY FIRST DEEMING DEFENDANT STANFORD COMPETENT, AND THEN FAILING TO GRANT HIM ADEQUATE TIME TO PREPARE AN EFFECTIVE DEFENSE, ASSIST HIS COUNSEL, AND PREPARE TO TESTIFY ON HIS OWN BEHALF; IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT AS WELL AS HIS FIFTH AND SIXTH AMENDMENT RIGHT TO A FAIR TRIAL.**

## STANDARD OF REVIEW

Appeals Court reviews a District Court's determination of competence under the abuse of discretion standard, *United States v. Duke*, 171 F.3d 240, 247 (5th Cir. 1999).

## DISCUSSION

On September 24, 2009 while being held in pre-trial detention, defendant Stanford was brutally assaulted by other inmates. This assault resulted in a 'Traumatic Brain Injury' (32 fractures to his face and head), required extensive reconstructive surgery, and was followed by a massive over-medication of psychotropic drugs. All of which, combined, profoundly affected his ability to communicate with his attorneys and prepare his defense.

Upon a continuous post-surgery decline in his health, and numerous subsequent psychiatric evaluations, on January 6, 2011 the Trial Court held a

140

Hearing and determined that he was not competent to stand trial **(vol. 32)(USCA5 278-601)**. He was then transferred to the Federal Medical Center (FMC) in North Carolina to undergo treatment for both physical and psychological impairment relating to his Traumatic Brain Injury, as well as to detox from the dangerous over-medication of (FDC doctor-prescribed) psychotropic drugs.

After the first 4 month period of treatment at FMC Butner, the staff there determined that defendant Stanford was still mentally incompetent (and therefore unfit to stand trial) and requested an additional 4 months of treatment time from the Trial Court, which was granted. However, nearing the end of this second 4 month period – at which time and **whereupon as mandated in 18 U.S.C. § 4241(d), (as defendant Stanford was never determined to be a threat to himself, or the community) the Government would have been required to drop all charges and immediately release him from custody** – suddenly FMC psychologist Robert Cochrane "adjusted" his diagnosis from "mentally incompetent" to the mandate-negating "malingering" **(vol. 7)(USCA5 1803-1806)**.

After this sudden and otherwise unexplainable "adjustment", Stanford was returned to pre-trial detention at FDC Houston, where he was further evaluated by three independent medical doctors, experts in forensic psychiatry, neurosurgery and cardiology, and a forensic neuropsychologist. All four doctors were experts in Traumatic Brain Injuries.

Days later, on December 20-22, 2011, the Trial Court (Judge Hittner) conducted a second Hearing whereby each of these professionals, with more than 100 years of experience between them, testified that defendant Stanford was **not competent** to stand trial. The Court then rejected this testimony in favor of the opinion of a single, lesser-credentialed staff psychologist from FMC Butner, and declared that defendant Stanford was now fit to stand trial **(vol. 35)(USCA5 13789)**. Regarding his qualifications to determine defendant Stanford's (medical or mental) fitness, FMC staff psychologist Cochrane would admit the following:

> "That's outside my area."
> **(vol. 33)(USCA5 13104)**
>
> "I don't have prescription privileges."
> **(vol. 33)(USCA5 13107**
>
> "You're pushing the bounds of my expertise."
> **(vol. 33)(USCA5 13104)**
>
> "I don't believe he has any brain injury."
> **(vol. 33)(USCA5 13145)**
>
> "Sorry I couldn't provide you a better medical explanation."
> **(vol. 33)(USCA5 13065)**
>
> "I'm not a neurologist, so I can only tell you my lay understanding."
> **(vol. 33)(USCA5 13064-13065)**

While at FMC Butner, defendant Stanford had been under the (primary) care of Robert Cochrane, PhD., and Byron Herbel, MD.   And just prior to the statutory deadline, he had been tested for competency by a third staff member, Tracy Pennuto, PhD.  As the lead "doctor" responsible for his treatment, when questioned by defense attorney Scardino about this final competency testing, Mr. Cochrane would admit the following:

> <u>Mr. Scardino</u> (Defense): So he was kind of having a bad summer, wasn't he?  I mean, he had heart problems.  He was withdrawing from the Clonazepam, was diagnosed with 'stage 2' liver disease, and all this was going on at the same time he was administered the Neuropsych exam; wasn't it?
>
> <u>Mr. Cochrane:</u>  Yes.
>
> **(vol. 33)(USCA5 13172)**
>
> <u>Mr. Scardino</u>:  And on the next page [of Dr. Pennuto's report], "On 8-25-11, Mr. Stanford again appeared fatigued, complaining of persistent headaches and ringing in his ears, which appear to be a plausible long-standing effect of the Clonazepam withdrawal.
>
> <u>Mr. Cochrane:</u>  That's right.
>
> <u>Mr. Scardino</u>:   You attribute those symptoms to the withdrawing from the drug, correct?
>
> <u>Mr. Cochrane:</u>  Yeah
>
> **(vol. 33)(USCA5 13173)**
>
> <u>Mr. Scardino</u>:   So he was consistently given the Benzodiazepines after this date, up until he took the Neuropsych test?
>
> <u>Mr. Cochrane:</u>  Yes.
>
> <u>Mr. Scardino</u>:   Page 17, Doctor, down, about 15 lines down, where the sentence starts, "The consultant indicated

it was possible that psychological stress could worsen the course of this illness, and there is a chance Mr. Stanford's liver disease will progress to liver cancer or liver failure, requiring liver transplant." Would that be upsetting?

Mr. Cochrane:  Well, certainly.  I would be upset.  I think anyone would be.

**(vol. 33)(USCA5 13174-13175)**

Mr. Scardino:  On page 19, one, two, three...third full paragraph starts, "On 10-7-11 Mr. Stanford was prescribed Lorazepam two milligrams at bedtime for 3 days." Complaints of feeling exhausted ongoing, consistent throughout your report, same complaints by Mr. Stanford.

Mr. Cochrane:  Same complaints.

Mr. Scardino:  No signs of faking that, is there?

Mr. Cochrane:  I didn't have any reason to believe he was faking.

**(vol. 33)(USCA5 13176)**

Mr. Scardino:      The consultant [Dr. Pennuto, a Neuropsychologist] concluded there was no medical treatment for restoration of Mr. Stanford's severe retrograde memory loss.  Is that correct?

Mr. Cochrane:  That's right.

Mr. Scardino:  Then I'll direct you to page 24, Doctor, the summary at the bottom of the page.  The line that starts, "That is, the administered test battery has questionable validity due to Mr. Stanford's lack of engagement, motivation, or effort, put forth during testing."

Mr. Cochrane:  That's right.  If you read her entire section she makes it clear the tests were not completely valid because he was not putting forth full effort, i.e., he was malingering.

**(vol. 33)(USCA5 13177-13178)**

Appeals Courts have held that forensic opinion prepared by a non-testifying expert is only admissible where the [non-testifying] expert is also a qualified expert in the same field of expertise. *United States v. Stead*, 548 F.3d 961, 973 (11th Cir. 2008).

To contradict this (FMC) 'malingering' determination, just prior to this Hearing (on 12-16-11) (Dkt. 546, 547, 550) the Defense had asked the Court to subpoena Dr. Byron Herbel, (Dkt. 546) the other, better-trained and more-experienced physician, (psychiatrist), who had treated defendant Stanford, and contributed to the Pennuto report. And the response from the Court was:

> The Court (Judge Hittner): [I] am going to contact the psychiatric staff out there and determine ahead of time what days they can be here in Houston [...]
> I am going to give dates because we're on a tight schedule to get this thing to trial. I am going to determine when these psychiatrists from North Carolina could be here to clear their schedule now months in advance [...] so they can immediately get here. **(vol. 31)(USCA5 15356-15357)**

However, when made by Stanford's defense counsel, this request **(Dkt. 547)**, and a subsequent 'Motion for Reconsideration' **(Dkt. 550)** was DENIED by the same Judge (Hittner) who stated to the prosecutors:

> **"If any of the people you issued subpoenas for are giving you a hassle, they're coming, one way or another, if you need them; you tell me, I will get them served. I will back you up completely. If it's somebody**

**you really need, I'll have them arrested and brought down in custody and put on the stand for you. You have the absolute right to subpoena. So again, I'm telling you, for the record, I'll back you up."**
**(vol. 57)(USCA5 9675-9676)**

The Trial Court's (Judge Hittner) refusal to subpoena Dr. Herbel to this Hearing deprived defendant Stanford of his Sixth Amendment right under the Confrontation Clause. *Crawford v. Washington*, 542, U.S. 36 (2004) which allows prior testimonial statements to be admitted only if both (1) the declarant is unavailable and (2) the defendant had an opportunity to cross-examine the witness.

In addition to being assured (by both Judge Hittner and the prosecutors) that both Drs. Herbel and Pennuto would appear, there is no evidence to suggest that either of these doctors was unavailable on the date of this second Hearing. And as a result of their absence, defendant Stanford was not afforded an opportunity to cross-examine them.

First of these other four, independent and better-credentialed Defense experts to testify was Dr. Richard Pollack, a clinical psychologist and neuropsychologist, who opined:

Ali Fazel: (Defense) Okay. Could you tell us briefly what is the difference between a Neuropsychologist and somebody like Dr. Cochrane, who you listened to this morning.

Dr. Pollack: A Clinical Psychologist is basically trained in the diagnosis and treatment of mental disorders in a

146

broad general way. He mentioned things such as depression, anxiety, schizophrenia, and so forth this morning when describing his background.

I'm trained in the same areas of professional activity, with additional training in the specific diagnosis and treatment of mental disorders that are caused by dysfunctions of the brain and central nervous system.

Mr. Fazel: So, you focus in more on brain-type injuries and matters that affect the brain than a regular person with a simple degree in psychology?

Dr. Pollack: That's correct.

**(vol. 33)(USCA5 13217-13218)**

Mr. Fazel: Were you asked to create a report regarding Robert Allen Stanford?

Dr. Pollack: I was.

**(vol. 33)(USCA5 13218)**

Mr. Fazel: Now, once you completed all your testing type of functionalities, were you able to come to a conclusion as to whether your tests were valid with Mr. Stanford?

Dr. Pollack: Yes, in my opinion they were. From the moment that he came into the room where we did the testing, over at the Federal Detention Center, throughout all his interactions with us, he was candid, he was sincere. He tried hard, and he got frustrated whenever the tests were difficult. There was no indication whatsoever that he wasn't putting forth 100 percent effort and trying his best.

Mr. Fazel: And what were the results you came up with at the conclusion of your testing?

Dr. Pollack: Well, based on the results that we just went over, it was my opinion that he does have a Cognitive Disorder, meaning there are parts of his brain and central nervous system, cognitive functioning, that are impaired and that warranted the diagnosis of Cognitive Disorder.

Mr. Stanford had a Major Depressive Disorder, best diagnosed as Post Traumatic Stress Disorder.

<u>Mr. Fazel:</u> Now let's talk about that. Both the Cognitive Disorder and the PTSD, these are things that Dr. Cochrane does not believe he suffers from?

**(vol.33)(USCA5 13244-13245)**

<u>Dr. Pollack:</u> That's correct. One of the things that Dr. Cochrane didn't talk about, and I was a little surprised, because it was so obvious in my interactions with Mr. Stanford, is that there are a couple of qualities that he has that can't be missed as a clinician, when I was working with him.

Number one, he is a very rugged individualist kind of person who has a very strong 'can-do', 'I can overcome.' And that's the approach that he takes to life. Following the assault and surgery, he was in solitary confinement for a lengthy period where he was …you know, that kind of surgery, with your face crushed, is very painful, and your sinuses are stuffed with gauze. And he wasn't having very many people come in and look after him, and reported that he felt like he was in a black hole; and he used that phrase a lot to describe different things. In my opinion he has a Cognitive Disorder indicating that there is cerebral dysfunction that's impairing his ability to process information accurately, a Major Depressive Disorder and Post-Traumatic Stress Disorder.

**(vol. 33)(USCA5 13245-13246)**

<u>Mr. Fazel:</u>    A person suffering from what you just described, would that person be able to stand or assist counsel in trial?

<u>Dr. Pollack:</u> I think that Mr. Stanford would have a very difficult time assisting an attorney with preparing for a trial. The main reason isn't the amnesia he's experiencing or reporting. The main reason is that when I was trying to

evaluate him, he is not able to sustain concentration, focus, and attention on one topic and stay relevant long enough to conduct a good clinical interview. I had to redirect and redirect and redirect in order to get the evaluation done. His brain works so that, if he starts talking about one topic, he'll…that will take him down a tangent to the next topic and never completing the one that you started on. It's a typical problem of patients with frontal lobe injury like he sustained because the frontal lobe has a filtering process where it separates relevant from irrelevant information.

Having reviewed a lot of medical records on Mr. Stanford, my impression was that there was a lot of kicking, beating, and bruising that was going on, and that's pretty difficult when that's going on, for there to be those kind of fractures and injuries without the frontal lobe being impacted.

Mr. Fazel: So, again, in a court of law, when you say it would be difficult for him to assist his counsel, I need to know whether he can do it, or can't do it.

Dr. Pollack: I don't think that he could competently help you prepare for his testimony, or for a trial, because I don't think he can focus, concentrate, and stay on track and do analytical thinking.

Mr. Fazel: And that's because of the frontal lobe damage to his brain?

Dr. Pollack: That's correct.

(vol. 33)(USCA5 13252-13254)

Mr. Fazel: Dr. Pollack, do you believe that Mr. Stanford was malingering at Butner?

Dr. Pollack: No, I do not.

Mr. Fazel: Tell us why.

Dr. Pollack: When we talk about tests of effort, the emphasis should be on the word "effort." There are many reasons why people are unable to put effort into a

149

particular test. It may be because they chose not to, and that is the assumption that Dr. Cochrane and Dr. Pennuto seem to be making; that Mr. Stanford chose not to put effort into these particular tests. The insomnia, the sleep problems, the depression, the fatigue, all of those issues can cause someone to not put forth maximum effort.

Mr. Fazel: So, in a nutshell, he was not malingering at Butner?

Dr. Pollack: That's my opinion.

(vol. 33)(USCA5 13259-13260).

The three other better-credentialed medical doctors were:

Dr. Ralph I. Lilly, a behavioral neurologist and neurosurgeon with special training in acquired brain injuries.

Dr. Victor Scarano, a thoracic and cardiovascular surgeon and forensic psychiatrist.

Dr. Allan D. Axelrad, a medical doctor trained in psychiatry and neurology.

Each of these doctors concurred with Dr. Pollack, and when directed to their independent conclusions, they stated the following:

Dr. Lilly, on direct by Mr. Scardino:

Mr. Scardino (Defense): And do you feel like Mr. Stanford is malingering?

Dr. Lilly: No, I do not, sir. I don't see any evidence from my clinical judgment that he shows any evidence of malingering. I think his symptoms and his syndrome are characteristic of an individual who has sustained a significant Traumatic Brain Injury, and produces this kind of multiple cognitive deficits.

(vol. 34)(USCA5 13361)

<u>Mr. Scardino:</u>  Do you feel like Mr. Stanford is able to assist his lawyers in preparing his defense in a complex fraud case?

<u>Dr. Lilly:</u>  No, he is not, sir.

**(vol. 34)(USCA5 13362)**

<u>Dr. Scarano</u> on direct by <u>Mr. Fazel:</u>

<u>Mr. Fazel</u> (Defense): Now directing your attention to 8-24-2011, there appears to be some sort of axes described in your report.

<u>Dr. Scarano:</u>  Yes.

<u>Mr. Fazel:</u>  I'm going to bring your attention down to problem number one.  It says "incompetent to stand trial." What does it say right after that?

<u>Dr. Scarano:</u>  It says "unchanged".

**(vol. 34)(USCA5 13453)**

<u>Mr. Fazel:</u>  All right, tell me what your opinion is of the testing done at Butner?

<u>Dr. Scarano:</u>  My opinion is that they should have delayed the testing; it was not a proper time to do the testing.  He was not in any mental shape to actually go through testing.

**(vol. 34)(USCA5 13458-13459)**

<u>Mr. Fazel:</u>  Do you find it credible for somebody to say that he was malingering?

<u>Dr. Scarano:</u>  I don't, no.

**(vol. 34)(USCA5 13459)**

<u>Mr. Fazel:</u>  Will he be able to assist his counsel should he go to trial today?

<u>Dr. Scarano:</u>  No.

<u>Mr. Fazel:</u>  Would he be able to testify, as he has a constitutional right to testify, should he go to trial today?

<u>Dr. Scarano:</u>    In my view, his mental state is not good enough for him to get up and testify before a jury. **(vol. 34)(USCA5 13471-13472)**

Dr. Axelrad on direct by Mr. Scardino:

<u>Mr. Scardino:</u>  Do you not reflect in your report that you have examined the report from Butner signed by Dr. Herbel and Dr. Cochrane?

<u>Dr. Axelrad:</u>  Yes, sir. And Dr. Pennuto signed it as well.

<u>Mr. Scardino:</u>  And then, do you opine on that report?

<u>Dr. Axelrad:</u>  [Yes], I disagree with their opinions and conclusions – the medical evaluations of Mr. Stanford.  I also strenuously disagree with their findings relating to legal issues of competency to stand trial. **(vol. 34)(USCA5 13637-13638)**

<u>Mr. Scardino:</u>  Dr. Axelrad, are there other reasons in your professional medical opinion as to why Mr. Stanford may be incompetent, other than memory loss?

<u>Dr. Axelrad:</u>  As I previously stated, the other reasons have to do with the fact that the psychiatric disorders that this man has were not adequately addressed, and obviously - obviously - are rendering him incompetent to stand trial. **(vol. 35)(USCA5 13640)**

<u>Mr. Scardino:</u>  Let's go to another subject.  You've heard testimony from Dr. Cochrane that Mr. Stanford is malingering regarding his memory.  Do you have an opinion on that?

<u>Dr. Axelrad:</u>   Yes, sir, I do.  I do not believe he is malingering. **(vol. 35)(USCA5 13658)**

<u>Mr. Scardino:</u>    Did you consider the test that was conducted by Dr. Pennuto to be valid?

**Dr. Axelrad:** No sir. It was not valid based upon her own statements in the report. [I]f you have a concern about a patient you're treating, that he is malingering symptoms, you make that the focus of your treatment. They had Mr. Stanford in their hospital for eight months. The only time the malingering issues come up in this case is the last month before the testing was done; and it never became part of their treatment plan.

**(vol. 35)(USCA5 13659-13661)**

**Mr. Scardino:** And doctor, do you feel like the Butner facility's Drs. Herbel and Cochrane failed in this case?

**Dr. Axelrad:** Well of course [...] they did. [T]hey discharged this man with a very serious diagnosis of malingering. That's a very serious diagnosis, particularly in the context of a psychiatric patient.

**Mr. Scardino:** Do you have an opinion as to whether the Butner facility used the correct personnel to help make the diagnosis? In other words, using a psychologist as opposed to a psychiatrist to come to these conclusions?

**Dr. Axelrad:** Yes, sir. I have a very strong opinion about that. [I] don't know what system is in place there, but I think they need to seriously consider changing it. [B]ecause if a defendant is sent over to their system and the defendant is incompetent because of medical problems, medical injuries the person is experiencing, the Traumatic Brain Injury, the addiction and influence of Benzodiazepines on neurological functioning is important, a knowledge about that is important. If the person has a Post Traumatic Stress Disorder, since the treatment for that is majorly involved - there's a major part of that that's psychiatric, the psychiatrist should be the lead person undertaking the evaluation.

**Mr. Scardino:** Why a psychiatrist?

<u>Dr. Axelrad:</u> Because a clinical psychologist, with all due respect to Dr. Cochrane, does not have the educational background that Dr. Herbel has in anatomy, pharmacology, physiology and neurophysiology. **(vol. 35)(USCA5 13663-13665)**

And in conclusion, on re-direct by Mr. Scardino...

<u>Mr. Scardino:</u> Okay.  And does he suffer from severe amnesia?

<u>Dr. Axelrad:</u> No, sir.

<u>Mr. Scardino:</u> Explain that, if you would.

<u>Dr. Axelrad:</u> Severe amnesia, if its anterograde, would mean that he has no significant ability to learn or lay down new memories.  Persons who have major strokes and major tumors, Brain Tumors, major Traumatic Brain Injuries followed by a Coma awaken and have Severe Amnestic Syndrome.  He doesn't have that.

<u>Mr. Scardino:</u> But is the amnesia significant enough to make him incompetent to stand trial?

<u>Dr. Axelrad:</u> It's my opinion, sir - I've testified to this with reasonable medical certainty - this man is incompetent to stand trial based upon the legal term.  He is not competent to defend himself in this case. **(vol. 35)(USCA5 13744-13745)**

Further illustrating the confluence of his own (judicial) incompetence and undeniable prejudice against defendant Stanford (and his clear and complete disregard and mischaracterization of the collective medical opinions rendered at this Hearing)...

In a subsequent ruling (DENIAL) of Defense counsel's final 'Motion for Continuance', (vol. 5)(USCA5 1364-1373) Judge Hittner noted:

> "On December 22, 2011, the Court determined that, based upon the preponderance of the evidence, including the testimony of the five different doctors and corresponding exhibits admitted at the Hearing, Stanford had recovered to the extent that he is now able to understand the nature and consequences of the proceedings against him and to assist properly in his defense." (vol. 5)(USCA5 1365)

In this same ruling – and apparently in an attempt to whitewash his equal disregard for 18 U.S.C. § 4241(e) and the fact that he had set the trial date at a time when defendant Stanford was still legally "incompetent" – Judge Hittner went on to state:

> "By the time of Stanford's January 23, 2012 trial date, Stanford's defense team will have had two and a half months with Stanford's medically and legally determined cogent assistance in preparing for trial."
> (vol. 5)(USCA5 1366)(January 5, 2012)

According to the calendar used by the rest of the world, December 22, 2011 (the date he declared defendant Stanford legally competent) to January 23, 2012 (the start of the trial) is precisely ONE month – not TWO AND A HALF.

"If the Trial Court received evidence, viewed objectively, that should have raised a reasonable doubt as to competency, the defendant has been denied a fair trial". See *Mata v. Johnson*, 210 F.3d 324, 329 N.2 (5th Cir. 2000).

"In addition to this substantive right, the accused has a procedural Due Process right that guarantees procedures adequate to guard his right not to stand trial or suffer conviction while incompetent" - *Holmes v. King*, 709 F.2d 965, 967 (5th Cir. 1983).

## LEGAL AUTHORITY

The federal standard for determining competency to stand trial prohibits trial if the Court finds, by a preponderance of evidence, that "the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him to assist properly in his defense" 18 USC § 4241(d).

In *Dusky v. United States*, 362 U.S. 402 (1960), the Supreme Court held that the trial judge determines whether the defendant "has sufficient present ability to consult with his lawyer, with a reasonable degree of rational understanding, to be able to testify in his own behalf, if he so chooses - and whether he has a rational, as well as factual, understanding of the proceedings against him." *United States v. Birdsell*, 755 F.2d 645, 648 (5th Cir. 1985). "A District Court's determination of competency to stand trial must not be set aside on review unless it is clearly arbitrary or unwarranted." Id.

In determining whether the District Court's finding is clearly arbitrary or unwarranted, the Appeal Court must remember that the question of competency is a

mixed question of law and fact which has direct constitutional implications. *United States v. Maki*, 533 F.2d. 889, 907 (5th Cir. 1976). Thus while not undertaking a *de novo* review, the Appeals Court must re-analyze the facts and "take a hard look at the trial judge's ultimate decision." Id.

## RIGHT TO TESTIFY

The Trial Court (Judge Hittner) was fully aware of defendant Stanford's mental and physical impairments, and that as a result, his defense attorneys had declared their inability to adequately prepare him to testify on his own behalf.

Therefore, in declaring defendant Stanford competent to stand trial, in the face of overwhelming evidence to the contrary, the Trial Court failed to factor into, and uphold, his right to testify.

To testify on his own behalf at his criminal trial is rooted in the Constitution, and is essential to Due Process of Law in a fair adversary process. *Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987).

# IX.

## THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT STANFORD ADEQUATE TIME TO PREPARE AN EFFECTIVE DEFENSE.

### STANDARD OF REVIEW

The denial of a Motion for Continuance by the District Court is reviewed for abuse of discretion. *United States v. Valladares*, 544 F.3d 1257, 1261 (5th Cir. 2008).

### DISCUSSION

Upon declaring defendant Stanford competent, Judge Hittner then ordered him to trial in only **30 days**.  Defense Counsel vigorously argued that at a minimum, a **90 days** continuance was necessary to ensure that their client would receive a fair trial with effective representation.

In the Motion for Continuance **(vol. 4)(USCA5 1232-1249)** defense counsel outlined the following reasons:

a.) The need for Mr. Stanford and counsel to adequately complete the review of the voluminous material provided in the discovery.

b.) Adequately prepare to cross-examine witnesses anticipated to testify regarding the voluminous material.

c.) Additional time to effectively investigate meritorious defenses, interview potential fact and expert defense witnesses for preparation in trial testimony.

d.) Additional time to adequately advise Mr. Stanford about the nature of the charges.

e.) Additional time to adequately consult with Mr. Stanford regarding the evidence against him.

f.) Additional time to adequately consult with Mr. Stanford about legal options and consequences about his plea.

Furthermore, counsel informed the Court that the FDC-Houston would only allow defendant Stanford access to Discovery recorded on compact discs. This required counsel to prepare 500 compact discs of Discovery which they considered critical to his defense.

Counsel then learned that FDC staff would only allow the review of **one compact disc per day,** from his cell block, Monday to Friday, excluding holidays. With this limitation it was **impossible** for defendant Stanford to review all relevant Discovery within the <u>30 day</u> period between competency and trial.

In reviewing the Denial of Continuance, this Court has adopted the "totality of the circumstances test" which includes:

(a) The amount of time available; (b) the defendant's role in shortening the time needed; (c) the likelihood of prejudice from denial; (d) the availability of Discovery from the prosecution; (e) the complexity of the case; (f) the adequacy of the defense actually provided at trial; (g) the experience of the attorney with the accused. See: *United States v. Walters*, 351 F.3d 159, 170 (5th Cir. 2003).

159

In addition to review under Due Process, this Circuit has recognized that a request for continuance also implicates Fifth Amendment concerns. *United States v. Gentry*, 839 F.2d 1065, 1073 (5th Cir. 1998). "Circumstances beyond an attorney's control that prevents him from adequate trial preparation merits granting a Continuance Motion on Sixth Amendment grounds."

To demonstrate reversible error, the defendant must show that the demand for the continuance resulted in actual prejudice to the defense. *United States v. German*, 486 F.3d 849, 854 (5th Cir. 2007).

On December 22, 2011 the Trial Court (Judge Hittner) found defendant Stanford competent and ready to proceed to trial. **(vol. 35)(USCA5 13789)**

Barely three weeks later (on January 18, 2012), upon arraigning Stanford on the May 4, 2011 Superseding Indictment (a mere 5 days before the start of his trial), this Judge stated:

> The Court (Judge Hittner): [A]ll right. Since a Superseding Indictment came down while Mr. Stanford was in the medical facility, we need to at least have an arraignment on the new Superseding Indictment which basically, if I recall, some Counts I think were dropped and just cleaning up language. Is that correct?
> AUSA Costa: Correct, your Honor.
> The Court: Basically?
> AUSA Costa: Yes.
> **(vol.36)(USCA5 15371)**

This excerpted exchange between U.S. District Court Judge David Hittner and (future Circuit Court Judge) Gregg Costa was purposefully deceptive, very clearly carried out with scienter, and is illustrative of the poisonous "by-any-means-necessary" mindset that permeated, was, and literally defined the Stanford prosecution. When considering the fact that this Assistant U.S. Attorney (and future Judge) Costa had himself crafted and signed both the (June 18, 2009) Original Indictment and the instant (May 4, 2011) Superseding Indictment, and that as the Trial Judge, Judge Hittner had most assuredly read both versions of this charging instrument, there is no denying that these two "Judges" knew well that this new Superseding Indictment (**Doc.422**) involved much more than "some Counts I think were dropped and just cleaning up language".

More importantly, when considering the entirety of this January 18, 2012 Pre-trial Hearing (**vol.36**)(**USCA5 15368 15482**), it becomes abundantly clear that (at the moment these words were spoken by them) these two "Judges" had a tacit understanding of the critical importance of their words, and that this "minimizing" of the brand new and entirely different Superseding Indictment (and their purposeful concealment of the truth about it), was not only an outright lie and an undeniable "Fraud in Fact", but one that, if exposed, would derail both the prosecution of Robert Allen Stanford, and future Judge Costa's (pending) nomination for a federal Judgeship.

161

Simply put, beyond the multitudinous and previously presented (trial preparation) complications and complexities associated with; (a) Stanford's traumatic brain injury and over-medication of psychotropic drugs (which occurred as a result of his unjustifiable denial of bail and detainment in pre-trial detention); (b) the dropped 'Securities Fraud' and related charges; (c) the unjustifiable date-broadening, and; (d) the fact that they were now arraigning defendant Stanford and forcing him to trial in FIVE DAYS, these two "Judges" cannot deny their acute awareness of the fact that:

a.) The new Superseding Indictment contained a total of FOUR new and entirely different charges, and a total of EIGHT new and entirely different "overt acts" ...all of which were nowhere to be found in the original Indictment[14]. And that;

b.) If exposed, their purposeful minimizing (or concealment) of these FOUR new and entirely different charges, and EIGHT new and entirely different "overt acts", would reveal the fact that they were arraigning a man (who had arguably been competent for a mere 27 days) on new and entirely different charges, and were forcing him to trial in an impossible-to-be-prepared FIVE DAYS.

---

[14] New Overt Acts
Pages 14-15 (a, b, c, e)
Page 21 (a, b, c, e)

New Counts
Page 17- TWO & THREE
Page 19- TEN & ELEVEN

Immediately following this collusive exercise in deception, Judge Hittner went on to inquire:

> The Court (Judge Hittner):  All right, the question I have for Mr. Stanford, have you had time to review these charges with your lawyer?
>
> The Defendant (Stanford):  No, I haven't.
>
> The Court:  You have not?
>
> The Defendant:  No, sir.
>
> The Court:  All right. Then we're going to keep moving. Are you ready to enter a formal plea at this time?
>
> Mr. Scardino (defense):  Your Honor, if I may address the Court. The defense position is Mr. Stanford is not competent to enter a plea.
>
> The Court:  You're still publishing that?
>
> Mr. Scardino:  That's correct, your Honor.
>
> The Court:  All right. Then I'm going to continue down. Mr. Stanford, are you ready to enter a formal plea at this time?
>
> The Defendant:  No, sir.
>
> **(vol.36)(USCA5 15372)**

At a minimum, with this new, surreptitiously-broadened and completely different Indictment – and not to mention, a defendant who (after a traumatic brain injury and months of being drugged with dangerous psychotropics by Government doctors), had been "competent" for a mere 3 weeks, and that said defendant had not been arraigned within the prescribed 10 DAYS, counsel for defendant Stanford needed additional time to analyze (with their newly competent client) the importance

163

of the dropped 'Securities Fraud' and related charges, the FOUR new charges and EIGHT new overt acts, and time to prepare their defense strategy to match.

Again, they were given a mere FIVE DAYS.

There are not mechanical tests for deciding when a Denial of Continuance is so arbitrary as to violate the Due Process Clause. The answer must be found in the circumstances presented in every case, particularly in the reason presented to the trial judge at the time the request is denied. *Unger v. Safarite* 376 U.S. 575, 589 (1964).

While defendant Stanford was receiving medical treatment in Butner, his counsel were informed (July 2011) that approximately 20,000 boxes of highly technical Discovery material were being warehoused in the Houston area; material collected from over one hundred Stanford-owned companies, and thousands of employees from locations around the globe. These 20,000 boxes were in addition to the nearly 3 terabytes of information that the Government had already provided to the defense, on the iConnect system, (referred to as the "hot documents") which equated to more than 20 million electronic files. This additional material located in the warehouse had, in part, been gathered for the Receiver by the accounting firm Ernst & Young, and provided to the Government for their use in the prosecution of Stanford. The Government had selected from all of this material (and provided as 'Discovery') only the documents relevant to their prosecution of defendant Stanford,

to the exclusion of all exculpatory material.  This forced the defense to painstakingly go page by page through this vast amount of material in search of that purposefully-excluded and not-provided material contained on iConnect and stored in the warehouse.

Additionally, defense counsel learned (from a Report Ordered by Fifth Circuit Chief Judge Edith Jones to examine the defense's budget for the purpose of reducing it; See **SEALED** Doc. 603 **"Confidential Memorandum"**) that, contrary to the Receiver's assertion in his April 23, 2009 "Receiver's Report" **(vol. 2)(USCA5 582-639)**, the Receiver-retained firm FTI Consulting had moved a select, untold number of these warehoused boxes and data servers to an FTI-controlled warehouse in distant Washington, D.C.

To the Court, the Receiver reported:

> "Before physically closing each office, the representatives of the Receiver had: - packed all documentary and electronic evidence and shipped it to a single warehouse in Houston."
> **(vol. 2)(USCA5 590)**

Shortly after defense counsel became aware of the boxes located in the Houston area warehouse, (July 2011) and were provided limited access to examine them, they quickly realized the need for, and subsequently requested (via subpoena) **(vol. 2)(USCA5 703-706)(Doc. 443)** an indexing of these boxes to guide them in their search for documentation they would need to defend their client at trial.

Initially they were advised that no indexing had been performed.  However, when at a Hearing to discuss this subpoena (on August 25, 2011) defense was able to refute this claim by directing the Court's attention to Ernst & Young's billing, which clearly detailed such an "indexing" of these boxes.  Defense was then provided a 519 page "partial index" that detailed little more than the provenance of each box, and virtually no information about the actual contents.

In response to a subpoena for (all of) the same work product they had provided to the Receiver, who in turn had provided it to the Government, Ernst & Young's counsel general told defense attorney Fazel, by phone:

> "You know what.  Call me back next week when you have some time.  Let's talk about it."

> Mr. Fazel: (Defense) He called me back.  He said, "Well, this is too broad[15].  There's a lot of stuff.  What can we do?"  I said, "Well, do you have some kind of indices you can provide me so that I can look at it and tell you what I want?"  There were three or four phone calls back and forth.  We finally had a phone conference where I had – a lot of people are here just in case that I need to put them on the witness stand – to get him to talk to me about what they had.

> What he indicated to me was that he doesn't have any type of indices; that the work started very fast, as soon as it

---

[15] The "broadness" of defense's request in this subpoena was directly related to defendant Stanford's Traumatic Brain Injury and over-medication of psychotropic drugs by Government doctors. He was, at the time, receiving medical treatment at FMC Butner in North Carolina for his "incompetence", and was therefore incapable of aiding his lawyers in any possible narrowing of the scope of this request.

happened, we started working, and there were no indexes for us to look at.

I am tendering to the Court what's been marked <u>Exhibit No. 1</u>. These are bills that were turned over to the Court in Dallas. If the Court looks at it, hour after hour that they've spent indexing things.

<u>The Court:</u> (Judge Hittner) Okay.

<u>Mr. Fazel:</u> That doesn't even include the first couple of months, the months of February and April when there was a thousand hours turned in. And those thousand hours, the spreadsheet that I have turned in to the Court on top of it, were by the same people who then turned around and continued, or we suspect continued, to do indexes.

('Motion to Quash' Hearing)

**(vol. 31)(USCA5 15343-15344)**

Later in this Hearing (in which the Receiver was asking the Court to quash the Ernst & Young subpoena), when defense counsel then requested the "other" work product of Ernst & Young (accounting records, tax records, balance sheets of all the Stanford companies, and various asset valuations which had been provided to the Government, and therefore fell under 'Discovery') they were told that Ernst & Young had been retained by the Receiver's attorneys (Baker Botts), at the Receiver's direction, and thus "attorney client" privilege applied.

Not only was this inaccurate, (as the Receiver, in his own April 23, 2009 Report, declared that he, and not Baker Botts, had retained Ernst & Young), it was then clear to the defense that, beyond their indexing, Ernst & Young's work product contained critically important exculpatory material that the Receiver was

167

purposefully withholding; balance sheets and valuations which would prove that defendant Stanford did not misrepresent SIB's fiscal soundness or the investment practices as charged in the Indictment.

> **Mr. Sadler** (Baker Botts): The issue was whether Baker Botts retained Ernst & Young.  Yes, we did, at the direction of the Receiver.  There is no dispute about that.
> **(vol. 31)(USCA5 15353)**
>
> **Mr. Fazel:** Two other things, your Honor.  An accused has a Fifth Amendment right to compel documents.
>
> **The Court** (Judge Hittner): Within limits.
>
> **Mr. Fazel:** Within limits.  But those limits, when it comes to third parties, are a little wider in my position.  And I went ahead, and those are in my briefing as well.  We would submit to the Court that, given our briefing, it's clear that this subpoena is not outside of those bounds and that we need this information to be able to defend our client under the Fifth Amendment right to be able to have a defense and the Sixth Amendment right to compel documents.
>
> I mean, think about it.  In any Receivership case in which a defendant is accused of a crime, if the Receiver gets to say "Oh, I am invoking my privilege", then he [the defendant] won't be entitled to any document at all, and that would be a violation, in my opinion, of the Constitution.
> **(vol. 31)(USCA5 15354)**

To the extent that the subpoenaed documents sought might have been "hearsay", they were admissible under the business records exception to the hearsay

rule.  See Fed. R. Evid. 803(6). In *United States v. Nixon,* 418 U.S. 683, 698 (1974) the Court found that "valid potential evidentiary uses" was sufficient to support authorization of a subpoena.  *Nixon*, 418 U.S. at 702.

Ultimately, the Trial Judge (Judge Hittner) allowed only a negligible portion of this requested work product from Ernst & Young to be shared with the defense – none of which contained the critical balance sheet and valuation information needed by the defense to prove defendant Stanford's innocence.

Limited, then, to only this negligible and non-critical portion of information from Ernst & Young, and the contents of the 20 thousand unmarked boxes located in the Houston area warehouse, after several weeks of laborious review of these boxes, counsel determined their need for the documents in approximately 3,000 of these boxes and requested $787,000 in CJA funding to copy this material and have it available for use in preparation for trial.

This request was also DENIED by Judge Hittner. (**SEALED** Doc. 518).  This ruling created an untenable situation for defense counsel as it denied them the ability to readily access and effectively utilize the same material provided to, and freely being used by, the prosecution.

**More importantly here is the denied access to the 'select' material which was mysteriously relocated to Washington, D.C.**

As there can be no other logical purpose, defendant Stanford contends that this mysteriously segregated material was in fact the detailed 'customer account' records obtained by the Receiver (via the "hacking" detailed in issue III) and which the Government, through the Receiver, had very purposefully placed well out of defense counsel's reach.

Further proof of the unlawful procurement and possession of this material, and its usage by the Government, and the importance of keeping it from the Stanford defense, is found in the Receiver's numerous "claw back" actions against the so-called "net winners" in this matter – SIB depositors who had received full repayment. These "claw backs" serve as proof positive that the Receiver had accessed SIB's customer account information, and therefore had a detailed list of every SIB depositor who had been paid every dollar owed to them – as well as the **hard copy records and electronic data servers revealing that not a single one of those SIB customers had ever lost a penny when dealing with defendant Stanford.** This precipitated the question...to support their claim of "thousands of victims", with every one of SIB's customer account information in their possession, why then didn't the Government either produce or somehow identify a single one of these "thousands of victims"?

Applying this same logical algorithm, it must also be concluded that in dismissing the results of this "Confidential Memorandum" (for which she had

wasted $50,000 of the defense's budget, and revealed this selectively relocated material) **Judge Edith Jones had chosen to aid in this concealment – rather than insisting that this material be returned to the Houston area and be made available to the Defense.**

Support for defendant Stanford's conclusions concerning the contents of this selectively relocated material, and Judge Jones' inaction, is found in other areas of this same "Confidential Memorandum" – (**SEALED** Doc. 603) (See Exhibit G).

Additionally, this report went on to confirm that:

> "...in addition, because the allegations in the Indictment center on accounting and financial irregularities, Mr. Stanford's defense is necessarily expert-dependent. Accordingly, de-funding all defense experts at this point would leave Mr. Stanford without any defense at all."

And yet, this is precisely what was done by Fifth Circuit Chief Judge Edith Jones. Followed, when these experts all resigned, by an ORDER from the Fifth Circuit Court of Appeals that they proceed...with absolutely no guarantee of payment...or face contempt of court. **(vol. 36)(USCA5 15376)**

These hardships in providing effective assistance of counsel were then further exacerbated, **just 10 days** prior to trial, with the sudden loss of the defense's litigation support specialist, who had been diagnosed with cancer and had to undergo immediate, emergency surgery. This critically important specialist - who was also an attorney – had, for a number of months, been working with counsel in identifying

171

and collating the documentation for trial. She possessed the needed experience in quickly retrieving documents in a document-intensive trial, and the <u>10 days</u> remaining before trial were not nearly enough time to familiarize her replacement with the <u>17,700</u> exhibits and other documentation, and their location. When presented with this additional hardship, the defense filed another last-ditch request, for a 3-week continuance (SEALED Doc. 632) (See also SEALED Doc. 626-1,2,3) which was also DENIED. **(vol. 36)(USCA5 15376)**

In a similar case, *United States v. Verderame*, 51 F.3d 249, 251 (11th Cir. 1995) the Court found that <u>34</u> days was inadequate time for the Government to supply the defendant with copies of documents it had seized and to which he was entitled. In that far less-complex case, involving far fewer documents, and where the request for continuance went unopposed by the prosecution, there was also no question of (or complications associated with) the defendant's competence to stand trial.

Finally, and perhaps the most compelling of the evidence that defendant Stanford was not afforded adequate time to prepare an effective defense - in a case that the Trial Court judge himself declared extraordinary in nature and complexity - can be found in the DENIED "Motion to Withdraw" by **all four** members of the Stanford defense team, just days before the trial was to begin.

**(vol. 7)(USCA5 1776-1794)**

172

This Court recognizes the extraordinary nature and complexity of this case, the extent and gravity of the charges levied against Stanford, the hundreds of thousands of records involved, and the enormous amount of time, no doubt, necessary to review those documents and adequately prepare a defense.

Judge David Hittner (Trial Court Judge)
(Order to move Robert Allen Stanford from
the Joe Corley facility to FDC Houston)
**(vol. 4)(USCA5 635-636)**

This recognition, however, was contradicted by his repeated refusal to grant

defendant Stanford and his defense team adequate time to prepare for trial.

## X.

**THE TRIAL COURT VIOLATED DEFENDANT STANFORD'S SIXTH AMENDMENT RIGHT TO A FAIR TRIAL BY FAILING TO PROVIDE THE JURY WITH A <u>UNANIMITY OF THEORY</u> INSTRUCTION SPECIFIC TO WHICH "MISREPRESENTATION" (ELEMENT), ON EACH OF THE MAIL FRAUD AND/OR WIRE FRAUD COUNTS CONSTITUTED THE OVERALL "SCHEME TO DEFRAUD."**

### STANDARD OF REVIEW

A denial of a proffered jury instruction is reviewed for abuse of discretion. *United States v. Porter*, 542 F.3d 1088, 1093 (5th Cir. 2008). A District Court abuses its discretion in denying a requested instruction if the instruction (1) was a substantively correct statement of the law, (2) was not substantively covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issues seriously impaired the defendant's ability to present a defense.

### DISCUSSION

A Superseding Indictment (filed May 4, 2011) **(Doc. 422)** charged defendant Stanford with a total of 14 Counts of mail and wire fraud, obstruction of an SEC investigation, and conspiracy to commit international money laundering.

The Government's <u>theory</u> was that, via specific "misrepresentations," defendant Stanford, together with co-conspirators, perpetrated a scheme to defraud

investors who, through Stanford Group Company, purchased Certificates of Deposit from Stanford International Bank.

According to the Government's theory, the proceeds from these CD purchases were (A) solicited via false pretenses, (B) not invested as promised, and (C) misappropriated for personal use.

The mail fraud and wire fraud Counts were premised on the following "misrepresentations":

(1) **MISREPRESENTATIONS REGARDING INVESTMENT STRATEGY**[16]

Stanford and his co-conspirators reviewed and caused the issuance of SIB periodic annual, quarterly and monthly financial reports, which were provided to investors and used by SGC's financial advisors in marketing SIB CDs, together with various other SIB documents and brochures that claimed to describe SIB's investment portfolio.

(2) **FALSIFIED FINANCIAL STATEMENTS**

To induce investors to purchase the CDs and to conceal their fraud, Stanford and his co-conspirators falsified the financial statements of SIB that were distributed to potential and existing CD investors, misrepresenting, among other material facts, the value and performance of SIB's investment portfolio.

---

[16] Superseding Indictment (USCA5 650-680)

### (3)  MISREPRESENTATIONS REGARDING STANFORD'S PERSONAL INVESTMENT

Stanford also misrepresented to investors the size of his own investment in SIB. As the financial crisis grew in 2008, investors began to redeem their CDs. Between in or about May 2008 and in or about December 2008, Stanford directed SGC's financial advisors to inform their clients that Stanford had increased SIB's capital to approximately $1 billion by investing an additional $740 million that year into the Bank's equity.

### (4)  MISREPRESENTATION REGARDING REGULATORY OVERSIGHT AND THE OUTSIDE AUDITOR.

Stanford and his co-conspirators made false and misleading representations regarding the nature and extent of regulatory oversight of SIB, including that SIB's operations and financial condition were being closely overseen by the Antiguan Regulatory Commission [FSRC] and that SIB's financial statements were subject to annual audits and regulatory inspections by Antiguan Regulators.

The Sixth Amendment requires <u>unanimity</u> as to the elements of the offense.

As the Supreme Court clarified in *Richardson v. United States*, 526 U.S. 813 (1999),

> "...in the routine case, a general <u>unanimity</u> instruction will ensure that the jury is unanimous on the factual basis for criminal liability."

Defendant Stanford's case, however, was extraordinarily complex in nature and therefore anything but routine.

176

At the outset of the trial, the prosecution stated that it would prove defendant Stanford (and co-defendants) made misrepresentations to investors concerning SIB's financial strength and stability, as well as how investor's monies were being invested, and that this proof of their "scheme to defraud" would demonstrate both wire fraud and mail fraud. **(vol. 39)(USCA5 4282-4312)**

The wire fraud and mail fraud statues require the establishment of a clear and definable "scheme to defraud." For the jury to properly determine that defendant Stanford (and co-defendants) had actually engaged in such an act, they must also have been <u>unanimous</u> in their verdict as to which "misrepresentation" (element) constituted the alleged act. Moreover, several cases from this Court support appellant Stanford's position that he was entitled to a <u>unanimous</u> finding as to which of these "misrepresentations" (elements) established guilt.

*United States v. Gipson*, 553 F.2d 453 (5th Cir. 1977) and *United States v. Holley*, 942 F.2d 916 (5th Cir. 1991) established that a defendant not only has a right to a <u>unanimous verdict</u>, but also a right to <u>unanimity</u> in their <u>theory</u> of which actions constituted the alleged crime.

In *Gipson*, the Trial Court improperly instructed the jury that they could convict based on a finding that *Gipson* had committed <u>any one</u> of the six actions prohibited by the statute; that they were not required to be <u>unanimous</u> on the same action. As in *Gipson*, the *Holley* court found that:

177

"A general <u>unanimity</u> instruction will ensure that a jury is unanimous on the factual basis for a conviction, even where the Indictment alleges numerous factual bases for criminal liability." *Holley*, 942 F.2d at 925-26.

This general rule fails, however, where there exists a genuine risk that the jury is confused, or that a conviction may occur as a result of different jurors concluding guilt of different acts.

Like *Holley*, defendant Stanford objected to the proposed general <u>unanimity</u> <u>of theory</u> instruction **(vol. 65)(USCA5 11026-11041),** as it failed to require <u>unanimity</u> not only as to either mail fraud and/or wire fraud, but also as to the specific "misrepresentation(s)" (alleged overt acts) on which they could find guilt on either 'mail fraud' or 'wire fraud'.

Defendant Stanford proffered a total of 4 different supplements to the proposed general instruction, requesting this specific <u>unanimity</u>, and all were DENIED. **(vol. 65)(USCA5 11026-11041)**

Furthermore...

During the discussion concerning the various proposals, Judge Hittner read aloud from the proposed Fifth Circuit general "unanimity of theory" (1.25) instruction, noting:

"The Government does not have to prove all of these [misrepresentations or overt acts as alleged in 'conspiracy'] for you to return a guilty verdict on this charge. Proof beyond a reasonable doubt on one is

178

enough; but in order for you to return a guilty verdict, all
12 of you must agree that the same one has been proven
beyond a reasonable doubt." **(vol. 64)(USCA5 10941)**

And yet, ultimately, although a "Special Verdict Form" was requested by the
Defense, it was DENIED by Judge Hittner and none was provided to the jurors for
them to indicate their unanimous agreement on any particular (single)
misrepresentation or overt act. **(vol. 65)(USCA5 11038-11040)**

At a criminal trial where a defendant's life is on the line, it is expected that, at
a minimum, the presiding judge be unbiased and have a clear understanding of all
aspects of the proceedings.    In the Stanford trial, however, Judge Hittner
demonstrated a clear bias against defendant Stanford and, concerning the
"unanimity-of-theory" issue, and just prior to reading the aforementioned
instruction, admitted the following:

> "**Unanimity-of-theory**.  **Would somebody explain that
> to me, the whole — the theory on unanimity?**"
> **(vol. 64)(USCA5 10940)**

With this admission, the aforementioned denials can only be viewed as a bias
in favor of the Government, and a very clear abuse of discretion.

Both *Gipson* and *Holley* provide a guideline for a defendant's right to a
unanimous verdict, and indicate that, in cases where circumstances undermine the
expectations that a general unanimity of theory is sufficient, a more specific
instruction is required.  In *United States v. Tucker*, 345 F.3d 320, 336 (5th Cir. 2003)

179

this Court failed to find any error in the jury instructions that warranted a reversal. This Court went on to state:

> "Tucker does not corroborate his claim of prejudicial error with a modicum of evidence tending to show that the jury was confused or possessed any difficulties reaching a unanimous verdict."

Unlike *Tucker*, however, the jury in defendant Stanford's case struggled to reach a <u>unanimous</u> verdict, and (over their three and a half days of deliberations) sent several notes to the judge requesting clarification on essential elements of the alleged offenses.

In particular, defendant Stanford's jury requested supplemental instruction on the definition of "scheme" "as it pertains to Counts <u>two</u> through <u>eleven</u>" **(Doc. 792)**. This request, followed by the jurors admission that:

> "We are unable to reach a <u>unanimous</u> verdict on each of the [14] Counts" (Jury Note #5) **(Doc. 799)**

very clearly demonstrated the need for a more specific <u>unanimity</u> instruction, and thus the only guarantee of a proper verdict.

## XI.

### THE TRIAL COURT VIOLATED THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT BY PROCEEDING WITH EVIDENCE WHICH WAS INSUFFICIENT TO PROVE THE ESSENTIAL ELEMENTS OF THE MAIL FRAUD STATUTE.

### STANDARD OF REVIEW

Appellant Stanford preserved his challenge to the sufficiency of the evidence by moving for a Judgment of Acquittal under the Federal Rules of Criminal Procedure 29, and renewing that Motion at the close of evidence. *United States v. Frye*, 489 F.3d 201, 207 (5th Cir. 2007). This Court reviews preserved challenges to the sufficiency of the evidence *de novo*. *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012).

### MAIL FRAUD REQUIREMENTS

The Government must prove (1) a scheme to defraud, (2) which involves a use of the mails, (3) for the purpose of executing the scheme. *United States v. McClelland*, 868 F.2d 704, 706 (5th Cir. 1989).

The Government charged defendant Stanford with 5 Counts of mail fraud under 18 U.S.C. § 1341.

Count seven concerns a package of documents sent via Federal Express from SGC in Houston to SIB in Antigua on February 22, 2008. Counts eight, nine, ten

and eleven concern identical packages of documents, between the same two locations, on August 13, 2008, September 18, 2008, October 16, 2008, and December 16, 2008 (Doc. 422). As this was clearly a replication (or cloning) of the same evidence, and used in multiple Counts, it was insufficient to prove guilt on each of the separate and otherwise distinct Counts, and therefore did not meet the elements required in the statute. And further, this package of documents consisted of new account subscription agreements, and information about SIB's (Reg-D) filing with the SEC, neither of which was alleged by the Government to have factored into their theory of defendant Stanford's "scheme to defraud."

More precisely, in no way did the Government's theory rely upon the subscription agreements or (Reg-D) filing statements that were sent from SGC to SIB.

In their theory, the Government premised defendant Stanford's "scheme to defraud" on "misrepresentations" to depositors through SIB's marketing materials and their annual, quarterly and monthly financial reports, as well as in brochures describing the banks investment portfolio.

The Supreme Court has held that the mailing element is not satisfied merely because a mailing resulted from the defendant's fraudulent scheme; rather, the mailing must be used for the purpose of executing the scheme. *United States v.*

*Maze*, 414 U.S. 395, 405, 94 S.Ct. 645 (1974) quoting 1341.  See, also *Schmuck v. United States*, 489 U.S. 705, 723, 109 S.Ct. 1443 (1989). (Scalia dissenting):

"[I]t is mail fraud, not mail and fraud, that incurs liability."

In short, the (replicated) evidence utilized in Counts 7 through 11 was not part of the alleged "scheme to defraud."  Therefore, the required "scheme to defraud" element under 18 U.S.C. § 1341 was neither met nor proven beyond a reasonable doubt.

## XII.

**THE TRIAL COURT VIOLATED DEFENDANT STANFORD'S SIXTH AMENDMENT RIGHT TO A FAIR TRIAL BY ISSUING A MODIFIED "ALLEN CHARGE" THAT WAS COERCIVE.**

### STANDARD OF REVIEW

Supplemental instructions telling a jury to continue deliberating should be reviewed for abuse of discretion. *United States v. Straach*, 987 F.2d 232, 243 (5th Cir. 1989) in order to judge whether an Allen Charge properly encouraged jurors to deliberate vigorously or unconstitutionally "coerced the jury" into abandoning their opinions, this circuit employs a two-part test. *United States v. Hale*, 435 F.2d 737, 741 (5th Cir. 1970) The test consists of: (1) the Trial Court administered the charge using appropriately non-prejudicial language, and (2) then scrutinized whether, in the totality of the circumstances, the charge coerced the jurors. *United States v. Lindell*, 881 F.2d 1313, 1321 (5th Cir. 1989)

### DISCUSSION

On the third day of deliberations, and upon receipt of Jury Note # 5 (**Doc. 799**) which stated:

> "The jury has been unable to reach a unanimous verdict on each of the (14) Counts."

The Trial Court (Judge Hittner) considered, and DENIED, two Allen Charge tenders from the defense, and then issued a third version that was prejudicially timed, contained unduly coercive language, and favored a particular verdict.

This third version was a deviation from the pattern instruction accepted in other circuits and, in lieu of the unique circumstances, a violation of defendant Stanford's Sixth and Fourteenth Amendment Rights to a fair trial and Procedural Due Process.

In order to address the specific issue of "unanimity" contained in the note, the defense had tendered two variations of the Allen Charge. Tender #1 was the pattern instruction used in the First Circuit; Tender # 2, a modified version of the pattern instruction used in the Fifth Circuit.

In the First Circuit version, the specific sentence which directly addressed the Jury Note, read:

> "And if, with respect to any element of any Count, you are left in reasonable doubt, the defendant is entitled to the benefit of such doubt and must be acquitted."
> (vol. 23)(USCA5 12814)

In the alternative "modified" Fifth Circuit version, the defense wanted only to add this single sentence - which was merely a restating of the law.

Nevertheless, both tenders were vehemently opposed by the prosecution, and thus were DENIED by Judge Hittner.

The First Circuit tender was appropriate as it directly addressed the "unanimity" issue contained in the Jury Note, and its denial and thus the failure to address the "unanimity" issue, was prejudicial in its timing. Moreover, the omission of this constitutionally important single sentence served no legitimate purpose, and therefore cannot be argued as 'in pursuit of justice'.

Secondly, the entire second paragraph of the Fifth Circuit version was, particularly in this case, unduly coercive. It read:

> "This is an important case. The trial has been expensive in time, effort, and money to both the defense and the prosecution. If you should fail to agree on a verdict, the case is left open and must be tried again. Obviously, another trial would only serve to increase the cost to both sides, and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried before you."
> **(vol. 23)(USCA5 12814)**

In the Stanford case, placing an emphasis on "money" and "cost" was particularly inappropriate and unduly coercive. Elemental in the enormous pre-trial and mid-trial publicity were the repeated references to the amounts of money being spent on the Stanford prosecution. Defendant Stanford had no control over the amount of money spent in connection with his prosecution, and to emphasize it as a relevant factor in the determination of his guilt or innocence was therefore both inappropriate and highly prejudicial.

Thirdly, in this paragraph of contention, the assertion that defendant Stanford "<u>must be tried again</u>" was suggestive that the only appropriate verdict was "<u>guilty</u>" - that justice would not be served until this guilty verdict was achieved.

In addition to the inappropriate emphasis on "<u>money</u>" and "<u>cost</u>" as a factor in determining defendant Stanford's guilt or innocence, this assertion that he **"must be tried again"** -  rather than - **"must be acquitted"** is an affront to justice in the First, Fifth, and every other circuit.

## XIII.

**THE TRIAL COURT ABUSED ITS DISCRETION BY ENHANCING DEFENDANT STANFORD'S SENTENCE BASED ON INFORMATION THAT WAS NEITHER SPECIFIED IN A COUNT OF THE INDICTMENT, NOR EVER ENTERED INTO EVIDENCE, AND THEREFORE NEVER SUBMITTED TO THE JURY AND PROVEN BEYOND A REASONABLE DOUBT.**

## STANDARD OF REVIEW

The District Court's legal interpretation of the Sentencing Guidelines is reviewed *de novo* and for factual findings of clear error. (See *U.S v. Murray*, 648 F.3d 251, 254 (5th Cir.2011). A factual finding is clearly erroneous if, based on the entirety of the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made. *U.S. v. Valdez*, 453 F.3d 252, 262 (5th Cir.2006).

## DISCUSSION

At the start of the trial, Judge David Hittner told the jurors:

> The Court (Judge Hittner): [B]ecause you want a cross section of the community sitting and listening to the facts and then rendering its verdict.
> I don't do any kind of fact finding. That's strictly the jury. In fact, when I read the final instructions to you I say: You are, in effect, judges, judges of the facts. I'll take care of the law. I'll take care of the rulings.
> **(vol. 37)(USCA5 3993)**

188

Prior to Sentencing, counsel for defendant Stanford objected to the numerous Enhancement calculations recommended by the Probation Department in their Pre-Sentence Report, under Guideline 2B1.1 (SEALED Doc. 849). Among these objections were the Enhancements for:

**AMOUNT OF LOSS MORE THAN $400 MILLION**
**2B1.1(b)(1)(P)**
**30 LEVELS**

**ENDANGERING THE SAFETY AND SOUNDNESS OF A FINANCIAL**
**2B1.1(b)(15)(B)(i)**
**2 LEVELS**

**AN OFFENSE INVOLVING 250 OR MORE VICTIMS**
**2B1.1(b)(2)(C)**
**6 LEVELS**

**RELOCATING A FRAUDULENT SCHEME TO ANOTHER JURISDICTION TO EVADE REGULATORY OFFICIALS**
**2B1.1(b)(10)(A)**
**2 LEVELS**

**ABUSE OF A POSITION OF TRUST**
**3B1.3**
**2 LEVELS**

**ORGANIZER OR LEADER OF CRIMINAL ACTIVITY**
**3B1.1(a)**
**4 LEVELS**

**OBSTRUCTION OF JUSTICE**
**3C1.1**
**2 LEVELS**


**ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM UNLAWFUL ACTIVITY**
**2S1.1(b)(2)(B)**
**2 LEVELS**


Ultimately, these and other objections were OVERRULED by the Trial Court (Judge Hittner) and the recommendations as outlined in the PSI Report were adopted in their entirety:

> "[A]ll objections by the Government and the Defense are now OVERRULED, and the Pre-Sentence Report and all addendums are hereby adopted by this Court." **(vol. 72)(USCA5 14631)**


## 2B1.1(b)(1)(P)

Defendant Stanford <u>always</u> intended to repay all monies owed to his SIB depositors. Since its inception in 1985, and for the entire 24 years that it was owned by defendant Stanford, the Bank had met every depositor obligation[17], (see footnote

---

[17] Michelle Chambliess worked for the Stanford organization for the years 1987-2002. She was the only Stanford Financial Advisor called by the Government, and when asked about the Bank's record of paying every depositor, stated:

<u>Mr. Fazel (defense):</u> In your time at Stanford International Bank, or Guardian, was there anybody you can tell this jury, anybody, that did not get paid their money when the CDs were due?
<u>Ms. Chambliess:</u> Not during the time I was there. **(vol. 40)(USCA5 4581)**

190

18), and there hadn't been a single depositor complaint.  Therefore the "intended loss" under the Guidelines is zero.

The general rule regarding the amount of loss calculations has been outlined in *United States v. Harris* 597 F.3d 242, 254-55 (5th Cir.2010) In that case the Fifth Circuit held that:

> "…where a defendant intends to repay the loan or replace the property, the intended loss is zero."

More importantly here, nowhere in their surreptitiously-broadened Superseding Indictment did the Government identify any victims by name or quantify any specific losses totaling "more than $400 million dollars", or for that matter, any specifics at all.

"Thousands of victims" who lost "billions of dollars" is diaphanous and much too vague to defend against, and simply not "specific" information. **(See SEALED Doc. 849, at 30c)**

And most importantly here – since none of these purported losses occurred prior to the day of the SEC's seizure of defendant Stanford's U.S. operations, on February 17, 2009 – is the Government's guileful extension of the dates (in the Superseding Indictment) of the alleged "fraudulent scheme".

Under "Overview Of The Fraudulent Scheme", the Government claimed:

"From on or about 1990 through on or about February
2010, Stanford, together with others, perpetrated a scheme
to defraud [...]" **(Doc. 422)**

This date (of the alleged fraudulent scheme) was changed from...

"[o]n or about September 1999, through on or about
February 17, 2009 [...]" **(Doc. 1)**

(in the June 18, 2009 Indictment) to...

"[o]n or about 1990 through on or about February 2010
[...]" **(Doc. 422)**

(in the May 4, 2011 Superseding Indictment, and attributing to defendant Stanford's
conduct) the dates of the purported losses, all of which were and occurred after, and
not prior to, the issuance of the February 16, 2009 Temporary Restraining Order
(TRO) from the Dallas Court.

In short, with no "identifiable victims" at the time of the SEC's February 17,
2009 actions, the Government had to expand the dates of defendant Stanford's
control (and conduct) to a time when these purported victims – which were never
identified at all – actually became "victims".

However, notwithstanding their reasoning or its insidious purpose, this
unjustifiable date-expanding of the time frame of the alleged "fraudulent scheme"
was neither factually nor actually possible.  To begin with, on February 17, 2009,

192

defendant Stanford was both personally and professionally "shut down" by the SEC's Complaint and the TRO issued by the District Court in Dallas.

> **The Court (Judge Hittner):** Was that part of the bank records, or was it done after the bank was shut down by the Securities and Exchange Commission?
> **(vol. 54)(USCA5 8999)**
> **AUSA Costa:** [T]he SEC – Judge Godbey in Dallas shut them down based on the SEC's authority.
> **(vol. 56)(USCA5 11537)**

As was the SEC's intent and the TRO's very purpose, from that February 17, 2009 "shut down" date forward, defendant Stanford had absolutely no control over his former companies, or any losses sustained beyond that date – and therefore bears no responsibility for anything that is claimed by the Government to have occurred in the time period between February 17, 2009 and February of 2010.

Furthermore, as noted here in the 'Statement of the Case', defendant Stanford surrendered into the custody of federal officers on June 18, 2009… eight months prior to February 2010… and has continuously been held in custody since that time.

Therefore, as these "thousands of victims" who lost "billions of dollars" were never specifically identified nor specifically quantified in the Superseding Indictment as "elements" of any Count, nor submitted to the jury for a finding beyond a reasonable doubt, and contrary to:

> **AUSA Costa:** [T]here's thousands of victims, some of whom's lives are forever changed by what happened in

193

this case.  And the jury needs to make its decision based
on true, accurate evidence[...]" **(vol. 51)(USCA5 7939)**

...the truth is that the dates and information contained in this Superseding Indictment

was anything but 'truthful and accurate', and therefore neither "specific" nor

"factual".  And to quickly dismiss here any potential suggestion by the Government

(or AUSA Costa) that this change from "February 17, 2009" to "February 2010" was

merely a "typo" and therefore unintentional and 'harmless error', this Court should

know that at a pre-trial Hearing on January 18, 2012 AUSA Costa, the lead

prosecutor in this case admitted:

> AUSA Costa: [T]he new Indictment does broaden the
> timeframe [...]"
> **(vol. 36)(USCA5 15383)**

> AUSA Costa:  [W]e believe Mr. Stanford's conduct over
> the 20 years he's charged with running a fraud scheme, is
> all encompassed within the Indictment."
> **(vol. 36)(USCA5 15384)**

As evidenced below, in addition to their guileful date-broadening, this

utilization and reliance on vague and unverified names and numbers of purported

victims and losses – which were neither created nor occurred as a result of any

conduct on the part of defendant Stanford, or prior to February 17, 2009 – continued

right on through Sentencing.

<u>The Court (Judge Hittner):</u>    [T]he Government as of March 23, 2012, has been able to identify at least 672 victims, though it's believed that the numbers of victims is in the tens of thousands of various amounts of money. **(vol. 72)(USCA5 14628)**

When considering all of the evidence presented here, defendant Stanford would submit that even ignoring this date-broadening in the Superseding Indictment, as these "thousands of victims" and "billions of dollars" were neither specifically identified nor more specifically quantified as "elements", nor incorporated in any Count of that Indictment – and that no such "specific information" was ever submitted to the jury for a finding beyond a reasonable doubt – under *Alleyne v. United States* 113 S.Ct. 215 (2013) this 30 level Enhancement should not have been applied.

### 2B1.1(b)(15)(B)(i)

Defendant Stanford did not intentionally endanger the solvency of a financial institution, and, to the contrary, had fully intended to repay (and if fact, up until the SEC's February 17, 2009 action, did repay) each and every depositor. **(See SEALED Doc. 849, at 32c)**

The Government's claim was that, from its inception, the Stanford organization was a "Ponzi scheme", a fraudulent enterprise much the same in its

design and purpose as the one orchestrated by Bernard L. Madoff. (**SEALED** Doc.871 P.6)

As well, during pre-trial voir dire, the Trial Judge (Hittner) stated to the jury pool:

> "[A]nd he's been accused of, you know, of that which we covered – the basic Ponzi scheme"
> (**vol. 38**)(**USCA5 3877**)

But then later, at Sentencing – outside the juror's presence and only to the attorneys - he stated:

> Judge Hittner: "Well, no.  It was cited that this is not a Ponzi scheme, and the case law to back it up."
> (**vol. 72**)(**USCA5 14467**)

In their (purposefully prejudicial) comparison to Mr. Madoff, the Government failed to acknowledge that, while Mr. Madoff had no legitimate business interests or investments, defendant Stanford had a multitude of legitimate (and viable) investments, and businesses in –

New Zealand, England, Israel, Venezuela, Peru, Colombia, Ecuador, Panama, Mexico, Switzerland, Aruba, Canada, USVI, the United States and of course, Antigua and elsewhere.

For instance, as noted at a June 29, 2009 bail Hearing by defense attorney DeGuerin:

196

"The Broker-Dealer firms that Mr. Stanford had were viable profit-center firms. They did deal in the CDs, or three types of CDs, the CDs offered by the Antigua Bank. But they also were ordinary brokerage firms handling millions of dollars of assets of their clients. These Broker-Dealers, the financial advisors - I guess is the term you use now for a stock broker - but these fellows and ladies were all high producers. They produced lots of revenue, some 700…excuse me…almost $500 million last year alone.

Mr. Stanford and the Stanford companies were in negotiations with Oppenheimer for Oppenheimer to buy the Broker-Dealer business from Mr. Stanford. A figure that was being mentioned [for 10 of the 33 offices] was $700 million. The Receiver gave those businesses to Oppenheimer. One of our Exhibits, which I'll mention in a moment, is a press release from Oppenheimer saying how happy they were to get all this business. They didn't have to pay for it. They would have paid for it, if allowed to, and if a hard bargain had been done, they would have paid the Stanford companies $700 Million."
(vol. 9)(USCA5 497-498)

They also failed to acknowledge that, while Mr. Madoff's company had only a few employees, defendant Stanford's companies, located around the world, employed thousands. As defense attorney DeGuerin noted at this same June 29, 2009 bail Hearing:

"[In] addition, there were thousands of employees, thousands of employees of the Stanford companies, all of whom have been put out of work by the SEC. Now that's not a Ponzi scheme, that's not a fraud. There were many, many employees with employee benefit plans, with retirement plans, with hospitalization insurance and places to go to work, and doing work, that were put out of business by the SEC's action"
(vol. 9)(USCA5 466)

197

More importantly here, according to the Government's own numbers, Stanford International Bank had over 25% liquidity – more, in fact, than any U.S. bank. And as revealed in trial testimony, when the financial crisis of 2008/2009 hit the world, causing runs on banks everywhere, SIB was able to, and did, meet every single redemption, including requests for early redemptions (paying out more than two billion dollars)[18]...right up until February 17, 2009, the day the Government padlocked Stanford's U.S. operations in one fell swoop, and began spending the cash and liquidated assets to investigate and prosecute its owner, defendant Robert Allen Stanford. (See Exhibit E)

Again, as noted by defense attorney DeGuerin at this same June 29, 2009 Hearing:

> Mr. DeGuerin: "So far the Receiver has asked for about $20 million in fees - this is as of a month or so ago - for himself, the law firms and the accounting firms that are working for the Receiver.
> The Court (Judge Hittner): Where are they getting the funds?

---

[18]. When Jim Davis (Government "star" witness) was asked the following question by defense attorney Robert Scardino, he responded:

Mr. Scardino: "Never a redemption that was effectively late, much less denied."

Jim Davis: "Yes, sir [...]that's correct." (referring to Defense. Exhibit 13-2). (vol. 49)(USCA5 11298)

> Mr. DeGuerin: They're getting it out of the assets of the
> Stanford companies. In other words, they're getting Mr.
> Stanford's companies to pay them to destroy the company.
> **(vol. 9)(USCA5 501)**

In short, the Government's entire case – and the 2 level Ehancement at issue –

was based on the presumption that defendant Stanford's companies were

perpetrating a Ponzi scheme. And yet, when questioned about it, the lead forensic

auditor of the firm hired to make that determination (Jeffrey Ferguson, FTI) would

not support such a conclusion.

The following exerpt is also from the June 29, 2009 Hearing:

> Mr. DeGuerin: Yes, sir. 121, page 121 starting at line 20.
> My cross-examination. "I'm going to use this bugaboo
> word that nobody's yet used in this courtroom. This isn't
> a Ponzi scheme, is it?
> Mr. Ferguson: "I haven't formulated an opinion on that."
> Mr. DeGuerin: (to the Court) "This is a gentleman who's
> a certified fraud examiner, whose firm has been paid six
> million dollars to look at records, and he cannot say under
> oath that this is a Ponzi scheme."
> **(vol. 9)(USCA5 469).**

In their surreptitiously-broadened Superseding Indictment, the Government

never presented any proof that defendant Stanford endangered "the solvency of a

financial institution". This judge-found "fact" was never argued during trial, nor

submitted to the jury as an "element" of any Count in the Indictment, and therefore

was not, and could not have been, found factual by the jurors beyond a reasonable doubt.

Accordingly, this (2 level) Enhancement should not have been applied.

## 2B1.1(b)(2)(C)

The conclusion that there were "more than 250 victims" was based on unsubstantiated supposition which included a purported "350 victim impact statements" received by Judge Hittner **after** the trial ended.

> The Court (Judge Hittner): [A]bout 350 letters were submitted to me...
> (vol. 72)(USCA5 14681)

> The Court (Judge Hittner): [T]he testimony graphically depicted that the defendant's actions ruined the lives of thousands of victims all over the world who entrusted him with their life savings.   Hundreds of victim impact statements were received by me and I read each one of them.  I felt I owed it to each writer to read their story and consider their anger and grief. (vol. 72)(USCA5 14691)

Neither the identity of a single one of these alleged "thousands of victims", nor the specific amount of their individual "loss" was present in either the original or Superseding Indictment, or revealed at trial.   As with these "victim impact statements", this information was never entered into evidence or subject to cross-examination or authentication by the defense.  And therefore never submitted to the jury for a factual finding by them.

As mentioned earlier, at sentencing – after the trial – this "thousands of victims" allegation was "confirmed" and relied on as sufficiently accurate by Judge Hittner, as is evidenced in the following:

> "The Governments as of March 23, 2012, has been able to identify at least 672 victims, though it is believed that the number of victims is in the tens of thousands of various amounts of money." **(vol. 72)(USCA5 14628)**

Faced with a similar situation, in *United States v. Washington* **(case no. 11-14177)** (April 26, 2013), the Eleventh Circuit stated,

> "[W]ith respect to Mr. Washington's challenge to the enhancement for 250 or more victims, the Government said that "thousands of individuals" had their credit card numbers stolen. It did not, however, submit any evidence to support this assertion."
>
> "[T]he government told the District Court at the sentencing hearing that over 6,000 individuals had their credit card numbers and related account information stolen, and that there were 250 or more victims […]"
>
> "[T]his representation, however, was insufficient. As we have said before, absent a stipulation or agreement between parties, an attorney's factual assertions at a sentencing hearing do not constitute evidence that a District Court can rely on."

As the Court noted in *Washington*, and just as the Government failed to do in the Stanford trial,

> "[T]he government did not present any evidence – no spreadsheets, no documents, no witnesses – identifying

201

250 or more victims.  Nor did it ask the District Court for an opportunity to put on any such evidence."

"[B]ecause it failed to present any evidence as to the identities of the individual victims [...] the Government did not meet its burden of establishing that the fraud scheme involved 250 or more victims [...]"

In order for the Government to seek an Enhancement, it has the burden of proving the facts to support the adjustment.  *United States v. Ayala*, 47 F.3d 688, 690 (5th Cir. 1995).  See *United States v. Flanagan*, 80 F.3d 143, 146 (5th Cir.1996) as clarified in *Alleyne v. United States*, 133, S.Ct. 1251 (June 17, 2013), any "fact" that increases the mandatory minimum punishment is an "element" that should be charged in the Indictment, submitted to a jury, and proven beyond a reasonable doubt.

The essential Sixth Amendment inquiry is whether a "fact" is an "element" of crime.  When a finding of facts alters the legally prescribed minimum punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury.  The Sixth Amendment provides for trial by jury as a "double security" against the prejudices of judges, who may partake of the wishes and opinions of the Government, and against the passions of the multitude, who may demand their victim with a clamorous precipitancy.

In *United States v. Rodriguez,* (**case no: 11-15911-DD**)(11th Cir. 2013) the Government sought a 4-level Enhancement under **U.S.S.G. 2B1.1(b)(2)(B)**, arguing that Mr. Rodriguez's offense involved 50 or more victims.

In support of this Enhancement, the Government submtted 42 affidavits from victims who sustained a loss after buying Mr. Rodriguez's coffee machines, as well as a summary chart indicating a total of 238 victims. Mr. Rodriguez objected and argued that there was insufficient evidence in the record to show that the offense involved more than 50 victims. Rodriguez pointed out that the Government provided no witnesses or underlying data to authenticate the summary chart. The 11th Circuit agreed, saying that the District Court's finding was not supported by reliable and specific evidence.

*United States v. Foley,* 508 F.3d 627, 632 (11th Cir. 2007); *United States v. Lee,* 427 F.3d 881, 892, 894-95 (11th Cir.2005) (applying clear error review to the District Court's determination of number of victims). "Although review for clear error is deferential, a finding of fact must be supported by substantial evidence". *United States v. Robertson,* 493 F.3d 1322, 1330 (11th Cir.2007)

"When a defendant challenges one of the factual bases of his sentence...the Government has the burden of establishing the disputed fact by a preponderance of the evidence." *United States v. Lawrence,* 47 F.3d 1559, 1566-68 (11th Cir.1995) "It is the District Court's duty to ensure that the Government carries this burden by

presenting reliable and specific evidence." Id. (holding that "perfunctory summaries of the evidence that the Government stood ready to present" were not evidence). While estimates are permissable, courts **"must not speculate concerning the existence of a fact which would permit a more severe sentence under the Guidelines."** *United States v. Sepulveda,* 115 F.3d 882, 890 (11th Cir.1997)

In the Stanford case, the Government presented no witnesses, no "victim" names or "victim" affidavits or any specific evidence (in any Count in the Indictment) to support a finding that there were "more than 250 victims", (or any at all), and thus this allegation amounted to nothing more than a wild supposition written on a piece of paper.

Accordingly, this 6-level Enhancement should not have been applied.

## 2B1.1(b)(10)(A)

Defendant Stanford did not relocate Guardian International Bank (GIB) from Montserrat to Antigua for the purpose of evading regulatory officials. GIB was relocated to Antigua primarily as a result of Hurricane Hugo (1989) and its devastation of Montserrat. **(See SEALED Doc. 850-1)(See also Doc. 849, at 3-Def.Ex.),** (J. Redhead opinion);(noting that two banks unrelated to Guardian International Bank, but using the name Guardian, lost their Charter.)

The Trial Court (Judge Hittner) had ample evidence that GIB was relocated from its domicile in Montserrat to Antigua based on the impact of this hurricane, as

204

well as (a) the fact that other banks were using the Guardian name; (b) the problems of operation associated with those banks, including the revocation of licenses and de-listing of those banks by the Montserrat Government; (c) inadequate regulations of the banking sector on Montserrat, creating a poor reputation of the banking industry there.  (See Defense Exhibit 2-14)

Moreover, GIB, a Montserrat-incorporated and Montserrat-domiciled financial institution, did not have a U. S. office address, or a single customer who was a U.S. citizen (or even a resident) and, neither Montserrat nor Antigua are part of the United States.  Therefore, any activity occurring in or between those two sovereign nations is not subject to the laws of the United States.

As well, and again, this "fact" found by Judge Hittner and used for the purposes of Enhancement, was neither an "element" of any Count in the Indictment, nor argued at trial or submitted to the jury.

Accordingly, under *Alleyne*, this 2-level Enhancement should not have been applied.

## 3B1.3

Defendant Stanford did not abuse a position of trust.

Stanford International Bank offered CD products to its customers, with a fixed rate of interest.  In the Stanford case, the Government presented three witnesses who were SIB depositors – **none of whom had lost any money prior to the**

**Government's seizure of the Stanford operations on February 17, 2009.** There were no "victim" names or "victim" affidavits, nor any other specific evidence to support a finding that there were any "victims" at all – much less the "more than 250 victims" claimed by them, and thus this allegation amounted to nothing more than the previously characterized 'wild supposition written on a piece of paper'. This Court in *Atkinson v. Federal Deposit Insurance Corporation*, 635 F.2d 508, 511 (5th Cir.1981) defined a <u>Certificate of Deposit</u> as follows:

> "A Certificate of Deposit is a written acknowledgement by a bank, of the receipt of a sum of money on deposit which it promises to pay to the depositor...whereby the relation of debtor and creditor between the bank and depositor is created."

Defendant Stanford <u>did not</u> have a "fiduciary" or "trust" relationship with the CD depositors **(See SEALED Doc. 849, at 32e).** SIB promised to pay a fixed rate of return to depositors, at a fixed time, thereby creating a debtor-creditor relationship. SIB did not invest depositor money directly on their behalf, and only made the promise to repay the depositor funds, with interest, when due. This is not a fiduciary or trust relationship, but rather a debtor-creditor relationship under well-established law. See *Marine Bank v. Fulton Bank*, 69 U.S. 252, 256 (1865). (See also *SEC v. SIPC*, 12-5286, District of Columbia Circuit)(2014)(quoting) "Here, as explained, the investors who purchased SIBL CDs acted as lenders."

206

More importantly here, and as with the previous Enhancements, this "fact" found by Judge Hittner was neither specified as an "element" of any Count in the Indictment, never argued at trial nor submitted to the jury for a factual finding by them.

Accordingly, this 2-level Enhancement should not have been applied.

## 3B1.1(a)

As with each of the previous judge-found "facts" used in these Enhancements, defendant Stanford strenuously denies this allegation of "Organizer or Leader of Criminal Activity" **(See also SEALED Doc. 849, at 33-page 52)** and is prepared to respond.   Under *Alleyne*, however, the "fact" that it was neither specified as an "element" in any Count of the Indictment, nor submitted to the jury for a finding, transcends the purpose of a response.

Accordingly, the 4-level Enhancement should not have been applied.

## 3C1.1

Although defendant Stanford was convicted of 'Conspiracy to Obstruct an SEC Proceeding', and 'Obstruction of an SEC Proceeding' (Counts 12 and 13), this Enhancement was neither specified as an "element" of either of these Counts, nor submitted to the jury for a finding beyond a reasonable doubt.

More importantly, Counts 12 and 13 charged defendant Stanford with "Conspiracy to Obstruct an SEC Investigation" and "Obstruction of an SEC

Investigation" **(Doc. 422, pages 20-22)** – not the charges of which the jurors found him guilty, which were "Conspiracy to Obstruct an SEC Proceeding" and "Obstruction of an SEC Proceeding" **(Doc.808)**.

Furthermore, this alleged 'Obstruction' concerned a civil (and not criminal) investigation with civil (and not criminal) penalties.  And as mentioned in the SUMMARY OF ARGUMENT, as these two charges were filed in connection and in tandem with the (alleged and dropped) "Securities Fraud" charges, they therefore should have been dropped, in connection and in tandem, with them.

In short, since there very clearly was no validity to the unauthorized and unfounded (and dropped) "Securities Fraud"-related charges, any alleged 'Obstruction' of them must be equally unauthorized and unfounded...and should also have been dropped.

Therefore, under *Alleyne,* this 2-level Enhancement should not have been applied.

## 2S1.1(b)(2)(B)

Although this 'element' was, in fact, included in the charging Indictment (Count 14), and defendant Stanford was found guilty of Count 14, this element of the Count was never submitted to the jury as a factor that would "enhance" the penalty for that charge.

Accordingly, under *Alleyne*, this 2-level Enhancement should not have been applied.

Since the enactment of the Guidelines in 1987, the United States Sentencing Commission has been aware of, but has not corrected, the problem of overlapping Enhancements. Therefore, in addressing this concern themselves, many courts have recognized that, on occasion, a departure or variance is warranted to avoid it. See *United States v. Parris*, 573 F.3d F.supp.2d 744, 745 (EDNY 2008) (Guidelines in financial fraud cases "are patently absurd on their face" due to the "piling on of points" under 2B1.1.)

In the Stanford case, it is apparent that the Government circumvented his Sixth Amendment protections and "piled on" these Enhancement points – and in the process far exceeded the applicable Guidelines. This was done without the juror's knowledge or consent, and solely for the purpose of achieving a sentence which would assure that defendant Stanford would perish in prison.

It should also be noted here that in addition to their objections to the Enhancements outlined in the PSI Report, counsel for defendant Stanford requested a "variance" in the Guidelines. **(SEALED Doc. 849 at 55)**(See also **(vol. 72) (USCA5 14638 at 20)(Doc. 897))**. This request was made as a result of the adverse effects on his health and defense preparation while being held in pre-trial detention. Not to mention the devastating effects of the seizure of his every asset and dollar.

Since the date of his surrender (June 18, 2009), defendant Stanford had been denied bail and held in continuous custody in a maximum security setting. In that absurdly unnecessary setting, he was violently assaulted by other prisoners resulting in a Traumatic Brain Injury (TBI). Additionally, as a result of the subsequent administering of improper drugs (by Government doctors) he suffered liver toxicity and near liver failure. (These medical issues were all well documented to the Court and made part of the record.)

Moreover, the astonishing volume of highly complex Discovery material was well established in numerous Motions to the Trial Court. This, combined with the aforementioned adversity he suffered in pre-trial detention, and the equally astonishing speed with which the Court marshalled defendant Stanford to trial (30 days), merited the requested (downward) variance. See *United States v. Speed Joyeros,* 204 F. Supp.2d 412 (EDNY 2002) (a two level departure was granted where defendant's livelihood was destroyed; she was subjected to lengthy and rigorous pre-trial detention, preventing her from effectively preparing her defense or seeing her child.)

Accordingly, for the foregoing reasons, instead of unlawfully "piling on the points" the Trial Court (Judge Hittner) should have granted defendant Stanford this variance (reduction) from the applicable Guidelines.

In their Reply to defendant Stanford's objections to the findings in the PSI Report (concerning these Enhancements), the Government accused Stanford of employing rhetoric. **(SEALED Doc. 871)** And yet, in this same Reply from them, the Government used the words:

> Ponzi scheme
> Profoundly offensive
> Traumatized
> Emotionally devastated
> Staggering misappropriation
> Hideously expensive lifestyle
> World's most expensive men's store
> Yacht (See Exhibit F)
> Red herring
> Won the lottery
> Undeveloped jungle
> Sham real estate
> Lavish lifestyle
> Tens of thousands of depositors

Not only is it clear in this case that the Government is actually the better employer of rhetoric, no possible rhetoric (from either side) negates the fact that the Sentencing Enhancements applied to defendant Stanford were improper. They were not specified in any Count in the Indictment, and never submitted to the jury for a finding by them to be factual beyond a reasonable doubt.

As emphasis of this, and concerning, specifically, the victim impact letters used in **2B1.1(b)(2)(C)** the Government admitted (in **SEALED Doc. 871**) that these letters were not received by Judge Hittner until **"after"** the trial. Therefore, it would

not have even been possible for the validity of these letters to have been challenged and established at trial, and then submitted to the jury and found by them to be factual and a basis for this Enhancement.

Finally here, and concerning the absence of any finding by the jury on which to establish merit for these Enhancements – and in fact, evidencing the jurors' complete removal from the equation – Judge Hittner stated to them:

> "[I]f a defendant is found guilty, it will be my duty to decide what the punishment will be. You should not be concerned with punishment in any way. It should not enter into your consideration or discussion."
> **(vol. 66)(USCA5 12567) (Jury Instruction #18) (vol. 23) (USCA5 12842)**

Not surprisingly, the United States Supreme Court has a different view. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000) Justice Scalia wrote:

> "[I]t is unclear what the right to trial by jury does guarantee, if it does not guarantee the right to have a jury determine those facts that determine the maximum sentence the law allows." 530 U.S., at 498-499

Further clarifying this Sixth Amendment protection, Justice Thomas in *Apprendi, supra* at 501, noted:

> "If a statute prescribes a particular punishment to be inflicted on those who commit it, under special circumstances, which it mentions, or particular

aggravation, then those special circumstances must be specified in the Indictment."
*J. Bishop*, Criminal Procedure 50 (2d.ed.1872)
See also *Bishop* 598, at 360-61.

"The Indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted." *Bishop* 81, at 51

This inalienable right enables a defendant to determine with precision the offense with which he is charged (and the prescribed punishment) and, accordingly, the course he takes when preparing his defense.

With *Apprendi,* and now *Alleyne,* (overturning *Harris*) the long-debated (finding) distinctions between "fact" vs. "element" and "judge" vs. "jury" have finally been settled.

As the Government very clearly indicated in the Davis Plea Agreement...any "fact" on which an Enhancement is to be based is an "element" of the alleged crime. It must be; (a) specified in the charging instrument and contained in a Count; (b) submitted to the jury; and (c) found by them to be factual beyond a reasonable doubt.

"[B]y entering this agreement, the defendant waives any right to have the facts that the law makes essential to the punishment of Counts One, Two, and Three, either charged in the Information, submitted to a jury, or proven beyond a reasonable doubt."
PLEA AGREEMENT (*United States v. James M. Davis*) (**case no.  H:09-335, Doc. 755** )

Finally here...

When immediately following defendant Stanford's criminal trial a 'Forfeiture Hearing' was held (in the same courtroom, using the same jurors) a "Special Verdict Form" was utilized for specificity. **(Doc. 824)**

However, when earlier in the criminal proceedings this same type of "Special Verdict Form" was requested by defendant Stanford's counsel – in order to establish unanimity as to the element and specific misrepresentation alleged in each Count – it was **DENIED** by Judge Hittner. **(vol. 65)(USCA5 11044)**

## XIV

**WHETHER THE TRIAL COURT, THROUGH ITS RULINGS, DEMONSTRATED A PARTIALITY IN FAVOR OF THE GOVERNMENT THAT DENIED DEFENDANT STANFORD AN OPPORTUNITY TO PRESENT AN ADEQUATE DEFENSE, IN VIOLATION OF HIS FIFTH AMENDMENT RIGHT TO DUE PROCESS, AND HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL.**

## DISCUSSION

In the three years of proceedings leading up to the trial, while defendant Stanford was held without bond in pre-trial detention, the Trial Court DENIED virtually every request from the defense. On January 11, 2012 defendant Stanford's (4) CJA-funded attorneys filed an unprecedented 'Motion to Withdraw' (vol. 7)(USCA5 1776-1794) in which, in part, they made clear:

> **"In short, the rulings of the Court, along with the budget process, has placed counsel in a legal position of being unprepared for trial"**

Any request coming from the Government, however, was granted without exception and virtually as a matter of course. For instance, and as mentioned, in addition to their limitless and unmatchable resources, whenever the Government moved to either minimize, obscure or exclude certain facts through 'Motion in Limine' - such as those that would tend to invalidate the valuation and other

215

"findings" in their highly touted "Van Tassel Declarations" - the Trial Court never failed to oblige them. **(vol. 5)(USCA5 1381-1392)(Doc. 585)**

The imbalance in favor of the Government is also contrary to the principle that, given the prosecution's inherent information-gathering advantage, "if there is to be an imbalance in discovery rights, it should work in the defendant's favor." *Wardius v. Oregon*, 412 U.S. 470,475 n.9 (1973); see also Id. at 480 (Douglas, J. concurring)

> ("the Constitution recognized the awesome power of the Indictment and the virtually limitless resources of Government investigators. Much of the Bill of Rights is designed to redress the advantage that inheres in a Government prosecution. It is not for the Court to change that balance.")

Most "imbalancing" of these Government 'Motions in Limine' were those that rendered unchallengeable the erroneous "findings" in the myriad and aforementioned "Van Tassel Declarations". **(Doc.628)** As with the illegally obtained and selectively relocated Temenos and DataPro SIB customer account information discussed in Issue III, (see Exhibit D) and the pre-trial related issues delineated in Exhibit B, this further restricting of the critically important information would, and did, limit the jurors consideration to only the Government's version of the facts - thereby denying defendant Stanford from presenting that which the Government was very purposefully attempting to conceal.

## VALUATION/CONSOLIDATION

Contrary to the Government's claim, as defendant Stanford was the sole owner of his global group of companies, the financial strength of those companies was, and always had been "consolidated" as one.

This reality, had he not been precluded by 'Motion in Limine' **(vol. 5)(USCA5 1381-1392)(Doc. 585)** from even mentioning it, both meant and would have shown, that the conclusions drawn from matching SIB's total balance sheet liabilities to a Karyl Van Tassel "adjusted" or "eliminated" matching of SIB's assets/investments, was, at best, grossly inaccurate. And at worst, purposeful in their intent to provide the appearance of insolvency.

In the simplest of terms...

Assuming there was lawful jurisdiction - which in this case, there very clearly was not - this was the equivalent of federal officers storming into a restaurant full of patrons, singling out and searching a man, and then arresting him for not having enough in his wallet to pay the bill. And in the process, ordering silent his wife and other family members seated around the table waving handfuls of cash.

According to the Fifth Circuit Pattern Jury Instruction 2.59-60, in addition to the fact that in its 24 years of operation, SIB had complied with every international regulation and met every depositor demand for payment, the jurors should also have

been allowed to hear that defendant Stanford had, through his sole ownership of these other companies:

> a.) the ability to repay every CD depositor every penny they were owed (i.e., the companies Stanford owned and controlled could, at any time, have been either resourced or liquidated, and their considerable value used to meet all obligations due to SIB depositors, and;
> b.) the (proven) efforts (and clear intent) to repay every CD depositor every penny they were owed, therein providing indisputable evidence of good faith.

This de facto consolidation – as well as the de jure one that was underway – was not merely factual evidence, it was exculpatory evidence. And as such, it should have been presented to the jurors and not withheld as it was. In the supposedly fair and impartial environment of a federal courtroom, there should exist the "right to present the defendant's version of the facts...to the jury", in order for the jury to "decide where the truth lies". *Washington v. Texas*, 388 U.S. 14,18-19 (1967). "[T]he Court must entrust to the jury the task of sifting the evidence and the ability to reach a reasonable conclusion upon the question of intent to defraud." *United States v. Foshee*, 578 F.2d 629,633 (5th. Circ.1978) (quoting *United States v. Diamond*, 430 F.2d 688,692 (5th. circ. 1970).

In their 'Reply' in support of this 'Motion in Limine' **(vol. 15)(USCA5 3577-3581)** and concerning these other of defendant Stanford's companies, and in particular his investments in them, the Government claimed:

"[a]t least $2 billion was diverted directly to Stanford in the form of undisclosed "loans" (**Doc.422 16(a), 18-20**).

In furtherance of this 'imbalancing' – and as would be common practice for the Government throughout the trial – this was yet another purposeful distortion of the facts in this case. It was both intentionally misleading and "unfairly prejudicial".

Directly addressing this purposeful distortion, the following excerpt from the trial was between defense attorney Scardino and defense witness Leonard Lyons:[19]

> Defense-Mr. Scardino: Are you familiar with this exhibit, Mr. Lyons? [**Government Exhibit 1603**]
>
> Mr. Lyons (witness): Yes, I am. It's an exhibit demonstrating money that was supposedly loaned to Mr. Stanford.
>
> Mr. Scardino: Is it your understanding, Mr. Lyons, this is a document created by the Government?
>
> Mr. Lyons: That is my understanding, yes.
>
> Mr. Scardino: Is it misleading?
>
> Mr. Lyons: Yes, it is.
>
> Mr. Scardino: How is it misleading?
>
> Mr. Lyons: In a couple of different ways.
>
> Mr. Scardino: And is that based--is it misleading based on your experience and education, Mr. Lyons?
>
> Mr. Lyons: Yes.
>
> Mr. Scardino: Okay. How is it misleading?
>
> Mr. Lyons: Well, first of all, if you take this document in relation to Exhibit 1604, which shows that these loans, as

---

[19] Mr. Lyons is an Attorney at Law, a Certified Fraud Examiner, a Certified Financial Forensic Analyst, a Certified Forensic Accountant, and an Accredited Valuation Analyst. (see Declaration of Leonard H. Lyons, Doc. 669-4)

they're called, and they're loans for tax purposes. You can have loans for tax purposes--

The Court (Judge Hittner): Hold it.

AUSA Stellmach: Objection, speculation and lack of notice.

The Court: All right.

AUSA Stellmach: And lack of foundation, your Honor.

Mr. Scardino: Lack of notice? But this was all part of his report, and plus they've had--I mean, these are their [Government's] exhibits.

(vol. 63)(USCA5 12368-12370)

Defense-Mr. Scardino: Let's get back to the point of this exhibit, Mr. Lyons. Do you think it's misleading?

Mr. Lyons (witness): Yes, I do.

Mr. Scardino: Okay. Doesn't show a complete picture of the transactions between Mr. Stanford and the bank?

Mr. Lyons: No, it does not.

Mr. Scardino: How is it misleading in that regard?

Mr. Lyons: Two ways. The first way is that they're styled here as loans to Mr. Stanford. For tax purposes, these transactions were loans to Mr. Stanford...and for IRS purposes.

On the books and records of the company, which are financial accounting purposes, they were shown as investments--or investments in affiliates. They were also shown the same way in their reports to the FSRC, the Financial Services Regulatory Commission of Antigua, such that they were documented for financial accounting purposes as investments or investments in affiliates.

Defense-Mr. Scardino: How could this exhibit have been drawn to not be misleading? What should it have shown?

**Mr. Lyons:** Well, it should show that they are loans/investments in affiliates, one for tax purposes. That would be full disclosure.

**Mr. Scardino:** Okay. And with your background as an MBA and as a lawyer, and all of your experience, do you have an opinion as to whether or not that is an acceptable way to book these transactions, for tax purposes in one way and for business purposes in another?

**Mr. Lyons:** It happens all the time.

**(vol. 63)(USCA5 12372-12373)**

Additional proof of this distortion of the "Loans to Shareholder" – which were repeatedly mischaracterized as inappropriate during the trial – is found in the following excerpt between defense attorney Scardino and Mr. Larry Campagna[20]:

**Defense-Mr. Scardino:** [D]id the IRS ever flip-flop on their position of whether or not these were loans?

**Mr. Campagna (witness):** Yes.

**Mr. Scardino:** Okay. Explain that, if you would.

**Mr. Campagna:** Yes. In the years 19--in the year 1999, the examination of Mr. Stanford and the companies resulted in the IRS taking the position that these were valid loans and should be treated as loans from the bank to Mr. Stanford, and from the bank to the companies, primarily SFGC, Stanford Financial Group Company. And then SFGC had re-loaned money to other companies.

In the 2000 and 2001 examinations, the IRS changed its position and took the position that the loans to Mr. Stanford were real loans, but the loans to SFGC should be

---

[20] Mr. Campagna is a shareholder with the Houston law firm of Chamberlain, Hrdlicka, White, Williams & Aughtry. His practice is in both civil tax issues and criminal tax issues. He teaches a course on tax crimes and money laundering, and has co-authored a book on tax crimes that has been adopted by more than a dozen law schools.

treated as dividends to Mr. Stanford and capital contributions by Mr. and Mrs. Stanford, to SFGC.

Mr. Scardino: How was the issue resolved?

Mr. Campagna: Well, in 1999, the IRS agreed that these were loans with--we all agreed in the resolution of the case that they were loans to Mr. Stanford and to SFGC.

And then, in 2000, 2001, we had tentatively reached an agreement to treat them as loans; and then for 2002 and 2003, we were negotiating an agreement to treat those as loans when the Receivership started.

Mr. Scardino: Okay. So, as far back as 1999, the Government was aware of these transactions?

Mr. Campagna: That's correct.

(vol. 60)(USCA5 11751-11752)

Defense-Mr. Scardino: Mr. Campagna, are you familiar that with the--in an IRS examination, if there's a determination that there's criminal fraud, there's a step to be taken?

Are you familiar with that?

Mr. Campagna: Yes.

Mr. Scardino: Were there any criminal fraud referrals made, to your knowledge, that came out of the IRS examination of Mr. Stanford's tax returns?

Mr. Campagna: No. There was no investigation for fraud. There were no fraud penalties on any of these years.

(vol. 60)(USCA5-11765)

The evidence here is clear. The Government's repeated distortion/mischaracterization of these **legitimate** and **fully disclosed** "Loans to Shareholder" was designed to, and did, "unfairly prejudice" defendant Stanford.

222

As this Court (Fifth Circuit) has explained, "unfair prejudice...is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair'." *Dollar v. Long Mfg.*, 561 F.2d 613,618 (5th. Circ. 1977), quoted in *Old Chief v. United States,* 519 U.S. 172 (1997). Evidence is "unfairly" prejudicial only when it would "influence the jury to decide the case on an improper basis", not relevant charges. *United States v. Emeron Taken Alive*, 262 F.3d 711 (8th. Circ.2001); *United States v. Bullard,* 162 Fed.Appx 106,110 (3rd. Cir. 2005)

> ("The relevant prejudice is not simply the tendency to hurt the defendant's case, but rather the tendency to hurt the defendant's case for reasons not relevant to the charge".)

Another example of the prejudice against defendant Stanford is found in the Trial Judge's extraordinary and highly improper dual role-playing as both Judge and Prosecutor. For instance, during the testimony of Defense expert Morris Hollander – and in the space of just three minutes and nine seconds – Judge Hittner asked Mr. Hollander the following (fifteen) questions:

> <u>Judge Hittner:</u> In what? An appraisal—is that what you said?
>
> <u>Mr. Hollander:</u> Well, that would be part of the judgment that management uses.
>
> <u>Judge Hittner:</u> Did you see any appraisals in the records you looked at?
>
> <u>Mr. Hollander:</u> I said I did not see any appraisals, Your Honor.

**Judge Hittner:** Okay. **(vol. 61)(USCA5 12224)**

**Judge Hittner:** That pie chart, is this not in evidence?
[…]Who made the demonstrative?
**Mr. Hollander:** I did, your Honor.
**Judge Hittner:** All right. So what did it say?
**Mr. Hollander:** It says 37 percent of $8.59 billion.
**Judge Hittner:** In other words, you don't have any independent information concerning that?
**Mr. Hollander:** No, your Honor. I do not, other than the analysis done-
**Judge Hittner:** Done where?
**Mr. Hollander:** Done on this exhibit.
**Judge Hittner:** The pie chart?
**Mr. Hollander:** No, sir. Not the pie chart.
**Judge Hittner:** This one?
**Mr. Hollander:** This one. **(vol. 61)(USCA5 12224-12225)**

**Judge Hittner:** So, do you know him?
**Mr. Hollander:** I do know him. That's what I indicated.
**Judge Hittner:** Is he independent, or what's his background?
**Mr. Hollander:** I don't know him well. I understand that he is a real estate appraiser.
**Judge Hittner:** Okay. **(vol. 61)(USCA5 12226)**

**Judge Hittner:** Are you aware of that?
**Mr. Hollander:** Not that I recall at the moment.
**Judge Hittner:** So, you knew then?
**Mr. Hollander:** I knew at the time. What I know now is different.
**Judge Hittner:** But you wrote your expert report based upon some information; correct?
**Mr. Hollander:** Yes, sir.

224

Judge Hittner: Where did you get that information that you put in your report?

Mr. Hollander: I got that information from what was publicly known at the time.

Judge Hittner: How publicly known? Well, what sources? Well, wait a second. (to AUSA Warren) You ask the questions.

Mr. Hollander: With all due respect, am I being double-teamed?

Judge Hittner: [...]You're right. That's why I said back to the prosecutor. **(vol. 61)(USCA5 12227-12228)**

And then lastly, in the aforementioned 'Reply', in support of their 'Motions in Limine' **(Doc.585, 629, 691) (vol. 15)(USCA5 3577-3581)**, the Government went on to claim that "Issues Surrounding TARP And The Financial Condition Of Other Banks Are Not Relevant", stating:

> "A defendant's right to put on a defense does not supersede the Federal Rules of Evidence. Any offered evidence must still be relevant."

Defendant/appellant Stanford agrees with the Government that "offered evidence" must indeed be relevant to the charges in the Indictment. And therefore finds it ironic, (and convenient), that such "relevance" could be found by them in photo spreads and hours of testimony about his yacht – and yet, not in the matters mentioned here. The fact is, through their Exhibit #1149, and other strategically injected references, the Government wanted to, and did, infer that defendant

225

Stanford was one of the banking culprits responsible for the subprime debacle and massive taxpayer bailout.

The 'Motion in Limine' on this precise issue **(vol. 15)(USCA5 3577-3581)**, which would, and did, prevent the defense from responding to these strategically injected references, was GRANTED by the Trial Court (Judge David Hittner) on January 18, 2012 in pre-trial conference.

Additionally, this 'Motion in Limine' would prevent counsel for defendant Stanford from revealing to the jurors the criteria for TARP funding, as outlined (outside the jury's presence) by AUSA Stellmach in Issue I. Which, in relevant part, was that:

> "[F]oreign banks only received funds if they had U.S. subsidiaries, which Mr. Stanford's bank did not, because he did not want to subject it to U.S. regulation."

In short here, the Government, through their 'Motion in Limine' **(vol. 5) (USCA5 1381-1392)(Doc. 585)**, was granted permission by the Court to conceal from the jurors, the fact that Stanford International Bank was a foreign bank – incorporated and domiciled in Antigua, regulated by the Financial Services Regulatory Commission (FSRC) of Antigua and Barbuda, and not under the jurisdiction of, or regulated by, any governmental agency of the United States.

In other words, through their multiple 'Motions in Limine', the Government managed to conceal that their complaint against defendant Stanford – and, in fact,

226

their entire case – rested on quicksand.    Moreover, as defense attorney Dick

DeGuerin put it, they managed to conceal:

> "This is not a Bernard Madoff case. There weren't any
> toxic assets [or] subprime loans. This isn't the collapse of
> a bank. He has not received a penny in bailout money. And
> if the SEC hadn't shut him down, they would have been
> solvent. They were solvent."

> Bail Hearing before
> Judge Frances Stacy
> June 25, 2009
> **(vol. 8)(USCA5 395)**

## XV.

## UNDER THE CUMULATIVE ERROR DOCTRINE, THE ISSUES PRESENTED HERE AMOUNT TO A DENIAL OF DEFENDANT STANFORD'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

## DISCUSSION

Defendant Stanford contends that the issues presented here <u>are not</u> harmless errors, and amounted to a denial of his constitutional rights to a fair and impartial trial; that, considered individually, any one of them was sufficiently injurious to him as to require a reversal of his conviction.

However, even if, individually, these issues were determined to be non-reversible errors, when considered in the aggregate, there can be no doubt as to their prejudicial effect.  The <u>Cumulative Error Doctrine</u>:

> "…provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal, and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal" *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998).

The cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error.  *United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993).  The total effect of errors on the trial will depend, among other things, on "the nature and number of the errors committed; their interrelationship; if any, and combined effect; how the District Court dealt with the

errors as they arose (including the efficacy – or lack of efficacy – of any remedial efforts); the strength of the Government's case" and the length of the trial.  Id., at 1196; *United States v. Hands,* 184 F.3d at 1329 (11th Cir. 1999) ("We determine whether an <u>error</u> had substantial influence on the outcome by weighing the record as a whole, examining the facts, the trial context of the error, and the prejudice created thereby juxtaposed against the strength of the evidence of defendant's guilt.") (Internal quotation marks and citations omitted).  We must review the prejudicial effect of <u>all</u> evidentiary errors, evaluated under both preserved and plain error standards, in the aggregate.  *United States v. Labarbera,* 581 F.2d 107, 110 (5th Cir. 1978).  We will therefore reverse if the cumulative effect of the errors is prejudicial, even if the prejudice caused by each individual <u>error</u> was harmless.  *United States v. Blasco,* 702 F.2d 1315, 1329 (11th Cir. 1983).

# CLOSING SUMMARY

In February of 2009, the Securities and Exchange Commission joined forces with the Department of Justice, and put forth their combined strength and unlimited resources on the side of injustice.

This alliance, disguised as a righteous pursuit of justice, resulted in the total destruction of a global network of legitimate and viable businesses, the displacement of thousands of dedicated employees, and the public disgrace ·and wrongful conviction of an innocent man.  It began with a meeting of the minds between two former Stanford employees and the SEC; the former seeking relief from their FINRA-ordered repayment of nearly two million dollars, and the latter seeking redemption for their failures – and worse – in connection with the "securitized debt" and Madoff debacles.

Need met opportunity, setting the stage for this injustice, when these two former employees:

> "helped the SEC craft its legal tactic to implicate the U.S.
> Broker-Dealer, Stanford Group Company, in the Stanford
> International Bank fraud."
> Written Testimony, Charles W. Rawl
> **House Financial Services Subcommittee on Oversight
> & Investigative Hearing
> May 13, 2011 (vol. 6)(USCA5 1491)**

Beyond the incomprehensibility of these two private citizens 'crafting' jurisdictional enforcement strategy for the Government – and that this strategy

(Securities Fraud) was known, all along, to be flawed – when it was exposed as unlawful, the DOJ (but not the SEC), acknowledged it (by abandoning this leading, jurisdiction-providing charge without a fight), and yet held to the regulatory authority claimed through it.  As if nothing had changed.

Further underscoring the Government's cavalier attitude and overreach here is the fact that, in their Indictment, they alleged defendant Stanford had 'relocated' his banking "scheme" from Montserrat to Antigua in order to escape 'regulatory oversight'.  To the contrary, and as previously noted, the one attempting to escape oversight here is the U.S. Government.  As neither Montserrat nor Antigua are part of the United States, nor its territories, nothing that may or may not have occurred in or between these two sovereign nations should ever have been a law enforcement concern of the United States.

In the months prior to the May 4, 2011 Superseding Indictment, (whereupon the Securities Fraud charge was abandoned), a number of subsequent other injustices occurred, all of which, combined, had the purpose and effect of guaranteeing defendant Stanford's conviction – and thereby validating the larger injustice. Beginning with the purposefully prejudicial labeling of him as a "Ponzi schemer," followed by the unjustifiable DENIAL of bail and equally unjustifiable DENIAL of Due Process, in the premature liquidation of his assets, while held in pre-trail detention – and through no fault of his own – defendant Stanford was brutally

assaulted by other prisoners and nearly killed. This assault, and associated physical and psychological debilitations, resulted in extensive reconstructive surgery, the prescribing of psychotropic drugs that worsened his cognitive functioning and nearly destroyed his liver, and an eight month stay at a federal mental hospital, located over a thousand miles away from his court-appointed defense attorneys.

Uninterrupted, and as presented here, upon his return from that mental hospital, these injustices continued – and even worsened – right on through perhaps the most "unfair" trial in U.S. history.

The worst of these injustices, however, and superimposed over them all, were the Declarations coming from the Courts themselves, that:

> "The Davis plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a "Ponzi scheme." *Janvey v. Alguire*, 628 F3d. 164 (5th Cir. 2010)

This was directly contradicted by the Trial Judge when he declared:

> "[T]he fact that an accomplice has entered a plea of guilty – a guilty plea to an offense charged is no evidence of the guilt of any other person.
> **(vol. 66)(USCA5 12563)**

Much like the 'craftings' of the two former Stanford employees, and their acceptance as valid, it is equally incomprehensible that the courts have made, and

232

published, (and continued to publish), such a plainly prejudicial finding based on the claims of two other individuals who stood to gain even more.

Co-defendant Davis quickly pled to and never challenged the charges contained in the Original Indictment (including Securities Fraud) for two reasons; (a) he had embezzled vast amounts of money from the company, and (b) he was offered a deal that would allow him to avoid prosecution on the embezzling, and, upon testifying to validate the Government's charges against defendant Stanford – the higher-value target – would result in him spending a short amount of time at a minimum-security "camp" near his home.

More importantly, when considering his admissions during that testimony, no one should ever have relied on anything he said. **(See also Defense Exhibit 13-2) (SEALED Doc. 849, at 7c).**

For instance, when questioned by defense attorney Robert Scardino, Davis admitted:

> <u>Mr. Scardino (Defense):</u>  Did you tell the Government when they first started talking to you, the United States attorneys, did you tell them, "Hey, I'm a liar"? Did you tell them that?
> <u>Mr. Davis:</u>  Yes, sir. I said I was a liar.
> <u>Mr. Scardino:</u>  Did you tell them, "I'm a crook." Did you tell them that?
> <u>Mr. Davis:</u>  Told them I was a liar and a fraudster.
> <u>Mr. Scardino:</u>  A fraudster. Did you tell them you're a coward?

Mr. Davis:  Yes, sir.  **(vol. 48)(USCA5 7391)**

Mr. Scardino:  Okay. Did you tell them that you had been a liar and you had been lying about what you'd been doing with the Stanford companies for over 16 years?

Mr. Davis:  Yes, sir. I did. **(vol.48)(USCA5 7392-7393)**

Mr. Scardino:  And did you tell them you are a crook?

Mr. Davis:  Probably.

Mr. Scardino:  You don't remember your testimony of yesterday where you said, "I'm a crook"?

Mr. Davis:  I was, so it doesn't matter.

Mr. Scardino:  I understand that. We'll get to that in a minute.  But these investigators and lawyers for the Government knew who and what you are before they made their deal with you, didn't they?

Mr. Davis: Yes, sir.

Mr. Scardino:  But knowing all of that, you still were able to negotiate some kind of deal with the Government lawyers to testify before this jury?

Mr. Davis:  A plea bargain, yes sir.  A plea bargain was arrived at some weeks, maybe a couple months, later.
**(vol. 48)(USCA5 7394-7395)**

Mr. Scardino:  So it was never revealed to you that in spite of who you are and what you've told them, that they ever questioned the information you were giving them?

Mr. Davis:  My agreement was to tell the truth, nothing but the truth, truth, truth, truth. That's what I'm doing.
**(vol. 48)(USCA5 7396)**

And then concerning his appointment as "trustee" over his late wife's estate…and the thefts of his sons' inheritance:

Mr. Scardino:  Don't you think it's a little ironic that you were called and named the "Trustee"?

Mr. Davis:  Oh, I'm sorry. Yes, sir.

**Mr. Scardino:** Did you tell the Government prosecutors about this particular theft [sons' inheritance] before you made your deal with them?

**Mr. Davis:** No, sir. **(vol. 49)(USCA5 11319)**

**Mr. Scardino:** So this is just another one of your thefts, isn't it?

**Mr. Davis:** Yes, sir.

**Mr. Scardino:** That's why you dummied up a document to show that and trick the probate judge into thinking you still had the money, but you really didn't have it?

**Mr. Davis:** Yes, sir, I lied.

**Mr. Scardino:** You lied and you stole, didn't you?

**Mr. Davis:** Yes, sir.

**Mr. Scardino:** You stole your kids' money from your dead wife's estate?

**Mr. Davis:** I misrepresented where there money went here in this report, yes, sir, I lied.

**(vol. 49)(USCA5 11320-11321)**

And concerning the Court's reliance on the findings in the Van Tassel Declarations, it should be noted that, when deposed in two Stanford-related cases concerning her forensic auditing of the Stanford companies, Ms. Van Tassel, whose (unlicensed) firm (FTI) was being paid tens of millions of dollars to produce a certain result, would admit to the following:

ORAL DEPOSITION (1) OF KARYL VAN TASSEL (May 6, 2010)
(*Janvey v. Alguire, et al*. case no. 3:09-CV-0724-N)

To attorney Matthew Nielson (with the firm Andrews Kurth, LLP)

Q. (Neilson) Have you made any determination as to whether Stanford Group Company was solvent between 2006 and 2009?

235

**A.** [I] have not done a solvency analysis of Stanford Group
Company, a specific solvency analysis as that term of art
is used.

[W]hat I know from the [BDO Seidman-audited]
financials is that it was balance sheet solvent. Its assets
exceeded its liabilities.

**Q.** What about in 2007?

**A.** I think – well, the same thing is true.

**Q.** 2008?

**A.** I don't have audited financials for 2008.

**Q.** Okay. Have you seen any financials for 2008?

**A.** I may have. I don't recall those. (page 16)

**Q.** (Neilson) Okay. Have you made any determination of
whether sales of SIB CDs were used to make purported
interest and redemption payments on pre-existing CDs for
a time period before 2008?

**A.** Yes.

**Q.** Okay. How far back have you gone?

**A.** Well, really, the analysis goes back to 2004.

**Q.** You have done an analysis of whether SIB was using,
in other words, the sale of new CDs to pay redemption and
interest payments on pre-existing CDs?

**A.** I would say I have performed an analysis to show
that—that indicates that was the possible way they were
making payments. (pages 19, 20)

Meaning, in other words, that is was also "possible" that it was not.

The fact is, and is only common sense, at a time when world financial markets
were spiraling down and headed for a crash (2008), cashing out an investment in that
market – and thereby disallowing that investment an opportunity to "bounce back"

– would have been unsound.   Regardless of Ms. Van Tassel's "Ponzi scheme"-validating characterization, during such a moment in time (described by AUSA Costa "[t]he worst economic times since the Great Depression") **(vol. 46)(USCA5 12682)** this practice of using available cash for redemptions was both pragmatic and employed by every bank in the world.

(continuing with Mr. Neilson)

Q. (Neilson)  [W]ho prepared Exhibit 22?
A. Well, it—
Q. Let's start with the Declaration.   Who prepared the Declaration?
A. [T]he Declaration was prepared between FTI and Baker Botts.
Q. Okay.  Who did the initial drafting?
A. Baker Botts did.
Q. The entire thing?
A. Yes. (pages 27, 28)

To attorney Michael Stanley (with the firm Stanley, Frank & Rose, LLP):

Q. (Stanley) When were – when was FTI first engaged in this matter?
A. By the Receivership?
Q. Yes.
A. We began February 15, 2009.
Q. Okay.   That was, I believe, the day before the Receivership Orders, or—
A. That's correct. (page 88)

237

Q. (Stanley) Okay.  I believe in your first affidavit, or last summer in the SEC case, you mentioned how a database had been compiled that had over 40 terabytes of information and two and a half million documents at that time.

A. Yes.

Q. Okay.  And where do those documents come from?

A.  Well, we talked about the Temenos database.  That would be a large portion of the data that we have available to us.

Q. Okay.  So, you – have you shared documents that have come out of the database?

A. We have been asked to produce some documents, yes.

Q. Is the Temenos a separate database?

A. Yes. (pages 95, 97, 98)

Q. (Stanley) Is it fair to say that there have always been investments made with SIB money?  I'll make it a little more clear.  When money came in from the depositors, this didn't sit in a big burlap bag under Allen Stanford's desk, did it?

A. No.

Q. Okay.  It was actually put into banks and investments were made with that money, right?

A. That's correct.


Q. (Stanley) Okay.  Now, when the depositors wanted to redeem their CDs, sometimes those redemptions would come from available cash, right?

A. Yes.

Q. Okay.  Did it – it came from cash they had in the accounts that had not been invested in private equity, right?

A. Or otherwise disseminated throughout the organization, yes. (pages 129, 130)

238

ORAL DEPOSITION (2) OF KARYL VAN TASSEL (August 2, 2011)

(*Janvey v. Jose Manuel Fernandez, et al.* **case no. 03:10-CV-1002-N**)

To attorney Michael Stanley (with the firm Stanley, Frank & Rose, LLP.):

**Q.** (Stanley) How many accounts were at Credit Suisse?

**A.** I think two, that I know of.

**Q.** Okay. Do you have all of the statements for the two Credit Suisse accounts?

**A.** No.

**Q.** Okay. And I just picked Credit Suisse out of the air. There were others. There's Lehman Brothers. There's some Lehman accounts, right?

**A.** Yes.

**Q.** Do you have all of the account statements for the Lehman accounts?

**A.** Not the account statements. (page 24)

**Q.** (Stanley) Okay. Which accounts have you now identified at Société Générale that are outside of Tier 1 or Tier 2?

**A.** We have, again, only some statements for those accounts. The ones that I recall are the 108731.

**Q.** [D]o you know when that account was opened?

**A.** [I] don't know when it was opened.

**Q.** Do you – so I take it you don't know what monies went into it to open that account, do you?

**A.** No.

**Q.** Okay. What – do you know the balance of that account as of December '08?

**A.** I don't.

239

Q. Do you know the year-end balance for that account as of December '07?

A. Not that I recall.

Q. Okay.    What about as of the inception of the Receivership?

A. I don't know that we have it as of that date.

Q. Okay. Are there funds sitting in that account today?

A. I—I—no, I don't—not that I know of.

Q. Okay. Have you undertaken any effort to compile the known statements or balances into some list or analysis?

A. No, not that I recall.

Q. And do you have any type of spreadsheet that you've compiled where you've identified the accounts and balances in those accounts?

A. I don't know. Not that I recall. (pages 38, 40, 41)


Q. (Stanley) How many companies had – were on this 'Tier 3' list by the end of 2008?

A. I don't know the number, the number of investments.


Q. (Stanley) Okay. How many companies did money go into?

A. I know of at least 50.

Q. These 50 companies did various things, such as – some were Broker-Dealers, right?

A. Yes.

Q. Okay. Others were – there were banks in there?

A. Yes.

Q. Was a gold and bullion company in there?

A. Yes.

Q. There were also – there was an airline or multiple airline companies in there, right?

A. At one point, yes. (pages 48, 49, 50)


240

Q. (Stanley) Did you talk to anybody that could help explain the structure to you in the transaction or transactions related to the Antiguan real estate?
A. [W]e did not talk to them specifically about this.

Q. (Stanley) Just so I understand, from a people stand point, a witness stand point, did you have any people that you talked to and sat down with where they explained the transaction either that took place, or as they had anticipated it would take place?
A. No. (pages 63, 64)

Q. (Stanley) Well, in your affidavit you talk about this real estate transaction. [I] want to ask you about a statement you made in there. [A]nd what is the analysis that you did of that Antiguan real estate?
A. Well, based upon the financial information available, we looked at information that led us to the conclusion that this real estate had been purchased.
Q. (Stanley) Okay. Do you know what the purpose of those purchases was?
A. No.

Q. (Stanley) So other than an increase in value or treating the property as increasing in value, you don't have any understanding of what was going to be done with those properties?
A. No. (pages 75, 76, 77)

Q. (Stanley) Okay. Have you gone through and done an analysis of all the private equity investments?
A. I haven't performed a separate valuation for any investments. (page 89)

241

**Q.** (Stanley) Okay. Any other – did you come up with a valuation number for the individual companies?

**A.** No. (page 92)

**Q.** (Stanley) [O]kay. Do you have any – going back a little bit in time. [I] think I've seen either your words or words attributed to your opinions that this was a Ponzi scheme from the beginning.

**A.** We have information from Mr. [Jim] Davis' testimony that there were really these issues from the beginning. That is, they falsified records, made false accounting entries, overstated assets, all those kinds of things from the beginning.

**Q.** Okay. Other than Jim Davis' plea agreement in his – the Hearing, do you have any other basis for that opinion that you just gave us?

**A.** Well, in talking to people and, you know, how things have changed over time, it seems like the same general procedures and criteria had been used since the beginning.

**Q.** Okay. You didn't speak to Mr. Davis about changes or procedures, right?

**A.** We did not speak to Mr. Davis.

**Q.** (Stanley) [W]ho did you speak to that gave you information or insight into how things were run from 1990 through 1999?

**A.** Again, I don't remember specifically.

**Q.** Okay. Well, did you talk to anybody that worked there during the 1990-99 time frame that had first-hand information about the policies and procedures?

**A.** No.

**Q.** Did you talk to anyone that had first-hand knowledge about how investments were made leading up to 1999?

**A.** No. (pages 130, 131, 132)

Q. (Stanley) Did you look at books and records – go back to the very beginning to Guardian days? Did you look at any balance sheets or accounting records for any of the Guardian entities?

A. No.

Q. Did you look at balance sheets or other financial statements for Stanford International Bank during the 80's?

A. No.

Q. (Stanley) Okay. Prior to 1999 are there any – do you have any recollections of– of even year-end balance sheets for the entities?

A. Not that I recall.

Q. Okay. Have you looked for them in the system?

A. Not specifically, no.

Q. [H]ave you directed any other people on your team to go look and see?

A. No. (pages 133, 134)

Q. (Stanley) Okay. Did you look for any schedules in the records of the companies that kept track of the maturities [of the CDs] so that they knew what cash their needs would be over time?

A. Specifically looking at that, no. (pages 133, 134 137)

Q. (Stanley) Okay. Did you try to calculate what the redemptions needs were for the maturity dates of the CDs?

A. No, because I know what they paid out at least in 2008. (page 140)

Q. (Stanley) Shifting a little bit from SIB to SGC, SGC was engaged in more than just selling the CDs, wasn't it?

A. They had some activity other than selling the CDs, yes.

**Q.** How much money did SGC have under management that was unrelated to CDs when the Receivership was instituted?

**A.** I don't know that number.

**Q.** It was billions of dollars, wasn't it?

**A.** I don't know.

**Q.** Did you ever undertake a calculation or look at the records of SGC to see what amount they had in assets under management?

**A.** Not specifically, no. (pages 144, 146)

**Q.** (Stanley) Okay. Were there any other cash reserves maintained, any other type accounts that had cash, from your review of the documents?

**A.** Other than Tier 1?

**Q.** Yes.

**A.** With the Tier 2 investments that were in the investment houses, some portion of those had some cash or cash equivalents in them.

**Q.** When you prepared this spreadsheet, <u>Exhibit number 13</u>, did you include in these totals, the cash that was housed within the Tier 2 investments?

**A.** No.

**Q.** Have you prepared any other spreadsheet where you identify this additional cash that was maintained, either directly through Treasury or through other investments?

**A.** No.

**Q.** Okay. Was there also cash maintained through the Tier 3 investments?

**A.** Yes. There were cash balances that were held at other Stanford-related entities.

**Q.** Okay. Did you undertake any effort to count those cash amounts to see what the value of those holdings were?

**A.** [I] don't remember a specific spreadsheet of that. No.

Q. Okay. When you undertook your analysis of SIB and the solvency of SIB, did you include these other cash amounts that are not part of Tier 1, but may have been held through Tier 2 or Tier 3 or otherwise?

A. [W]e didn't specifically break out cash in any specific way. (pages 162, 163)

Q. (Stanley) [I]'ts your view that it was – it was a Ponzi scheme from at least 1999, forward, right?

A. Yes.

Q. And that is based largely on this insolvency-versus-liability analysis that you've done; correct?

A. That's correct. (page 186)

At this point in these depositions, and concerning this Court's acceptance of Ms. Van Tassel as honest and ethical, and her findings and attestations as straightforward and credible, it should also be noted that FTI Consulting, the (unlicensed) firm hired by the Receiver to conduct this forensic accounting analysis (through Ms. Van Tassel), has itself been balance sheet insolvent...for the past ten years.

Before examining the insolvency of this highly-relied-upon-company (verifiable at FTI's website), a definition/explanation of a qualifying word that appears on FTI's and virtually all corporate balance sheets... "goodwill".

By definition, a company's "goodwill" is an intangible asset which, according to FASB Rule 142 (Financial Accounting Standards Board), is supposed to be based on that company's good reputation and name recognition – a "value" that is separate

245

and distinguishable from that of its other "tangible" assets.  "Goodwill" is not the sort of asset that can be either liquidated for shareholder redemptions, borrowed against, or in any way utilized to satisfy a company's liabilities.

According to the FASB, there are several valuation methodologies that can be used when estimating the value that a company assigns to "goodwill" and its other intangibles.  But the ultimate decision on what value to place on "goodwill" rests solely on the company's management.

However, any publicly traded, SEC regulated company (such as FTI) must have sufficient unencumbered stockholders equity to support the company and its subsidiary operations **before** any value can be given to goodwill.

And now with this "goodwill" explained…

It appears that, in much the same way that Ms. Van Tassel "adjusted" (downward) Stanford International Bank's assets to below its liabilities (to match her "Ponzi scheme" criteria), her firm FTI has been "adjusting" (upward) their own goodwill value to create the false appearance of balance sheet solvency.

To use AUSA Costa's words, "It doesn't take some fancy calculator and an accounting background to figure out that these numbers just don't make sense."  The truth here is that when you "adjust" FTI's total assets by eliminating the amount Ms. Van Tassel and her associates have assigned to "goodwill" (more than $1 billion),

246

their total stockholder's equity not only vanishes from the company's balance sheet, FTI suddenly has a negative net worth... in the tens of millions.

In short, should every shareholder of FTI suddenly decide to redeem their stock – the same hypothetical used by Ms. Van Tassel to demonstrate that SIB was a "Ponzi scheme" – her own company, FTI, would currently be short by more than a billion dollars.

With this said, it should also be noted here that while the globally recognized Stanford Financial Group of affiliated companies could have, like FTI, inflated their balance sheet with "goodwill", they never did. Defendant/Appellant Stanford was adamant that the only assets to be reported on the balance sheet(s) were cash and investments that had intrinsic value and could be sold.

And even more telling here...

Not only had the SEC clearly been turning a blind eye and allowing this insolvent company to trade themselves on the New York Stock Exchange (NYSE) for at least the past ten years, they have sanctioned their employment and relied on their "accounting" in the baseless investigations of a bank in a foreign country...where they had no jurisdiction.

And finally...

ORAL DEPOSITION (3) OF KARYL VAN TASSEL (August 3, 2011)
(*Janvey v. Jose Manuel Fernandez, et al.* **case no. 03:10-CV-1002-N**)

To attorney Monica Luebker (with the firm Fishman Jackson Luebker PLLC)

Q. (Luebker) [I]n fact, nowhere in any Declaration that you've signed in these Stanford cases do you make the actual statement that the declarations are true and correct of your own personal knowledge.

A. I don't, no. That's not how it's phrased.

Q. Okay. Quote it to me.

A. In which one would you like?

Q. Pick one.

A. Okay. In Exhibit 23, what is referenced as 3, it says, "The statements made in this Declaration are true and correct, based upon the knowledge I have gained from the many documents I reviewed and other work I and my team have performed in the course of FTI's investigation on behalf of the Receiver."

Q. You will agree with me, in plain English that does not say your statement is true and correct based upon your own personal knowledge?

A. That is —

Q. Correct?

A. — correct.

Q. Did you write any of these Declarations that were filed with the Court?

A. No. (pages 255, 256)

Q. (Luebker) How much do you charge per hour?

A. On this case?

Q. Yes.

A. I believe it comes to 400 and some an hour.

Q. 400 and how much, since I'm going to have to pay you for talking to you.

248

A. 480-something, I believe. It's discounted from my regular rates, so…(pages 262, 263)

To attorney Lawson Pedigo (with the firm Miller, Keffer & Pedigo)

Q. (Pedigo) The fact that they were planning to have this cash and anticipate redemptions. You've pointed to that as a badge of fraud, basically, all the cash—as I understood one of your exhibits, so I'm trying to understand, why is it so wrong to plan to have cash for redemptions? That's what a lot of investment houses do, certainly non-insured ones.

Mr. Arlington (attorney with Baker Botts):   Objection, foundation, calls for speculation.

A. And are you referring to this particular case?
Q. I'm trying to understand how you've testified or how you've done the analysis between when it's okay to have cash and plan for redemptions, verse[s] here having cash seemed to be used by you as a reason to think these were improper transactions.

Mr. Arlington:  Objection, calls for speculation, foundation and mischaracterizes prior testimony. (pages 286, 287)

Q. (Pedigo) Well, so the fact then that a business would have cash and use cash that came in from new investors, when does that cash cross over and become a Ponzi scheme, verse[s] we've got cash to be ready to handle redemptions? What criteria did you use for that?
Is there some you used, because there's a lot of different entities that are part of this consolidated reporting. It looks like there's cash stuck in a lot of different places.

A. Yes. They moved cash around quite readily.

Q. Right. But it would go to someplace and a lot of times, from what I can see, it would stay there, so it would be available to bring back into kind of the control center to then put it where it was needed. Isn't that common with a lot of businesses? (pages 287, 288)

To attorney Brent J. Rodine (with the firm Quilling, Selander, Lownds, Winslett, Moser)

Q. (Rodine) [G]oing back to this statement, "SIB offered CD rates significantly greater than those in the United States". I notice that that opinion compares them to CD rates offered by foreign banks?

A. No.

Q. Did FTI do any analysis on the CD rates offered during the same period of time by non-FDIC insured banks?

A. No.

Q. Was SIB a foreign bank?

A. Yes. (page 334)

Q. (Rodine) [I] believe my question is, what is the basis for your opinion that investors could have reasonab[ly] discovered before the Receivership that SIB was a Ponzi scheme?

A. I'll go through those that I went through this morning. One of those is the yield of the Stanford International Bank CDs compared to the U.S. yield of CDs that were provided in the marketing materials and annual reports. (page 356)

Q. (Rodine) So—okay. So what are the rates? What's the range of rates that's in the Stanford marketing materials?

250

A. For the periods of 1997 to 2006 the lowest rate is 6.21 percent in 2004 and the highest is 10.13 percent in 1997. (page 372)

Q. (Rodine) In your personal finances, have you ever realized an annual rate of return greater than 10.13 percent in one year?
A. Yes. (page 376)

In other words, when Ms. Van Tassel herself (a Certified Public Accountant) is attracted to and makes an investment in a financial product that earns a 10.13 percent return, it's a good investment. And yet, when anyone else does it, they are investing in a Ponzi scheme.

To attorney Mark Goranson (with the firm Goranson King PLLC)

Q. (Goranson) [I] want to talk a little bit about, you had experience, excluding the Stanford matter, on two other matters that involved Ponzi schemes; is that correct?
A. Yes.
Q. Okay. And one involved, I think you said, a computer reseller; is that right?
A. Yes.
Q. And who were you retained by?
A. A law firm and I can't recall the name.
Q. That was my next question. Can you recall the name of the case?
A. No.
Q. And did you issue a written report in that case?
A. No.
Q. And the second matter, I believe you said, was a real estate matter.

251

A. Yes, it involved real estate.

Q. And the name of the lawsuit?

A. I don't recall.

Q. And who retained you?

A. I don't remember the name of the law firm. (pages 439, 440)

When considering these under-oath responses from Ms. Van Tassel, it seems that the only thing there is "sufficient evidence to support a conclusion that there is a substantial likelihood of", is that this oft-quoted CPA, whose whole career is based on the retaining of information, has something in common with Mr. (Jim) Davis…they are both highly incentivized liars.

Jim Davis was an admitted "crook", "coward", "fraudster", "liar" and "thief" who, to avoid 30 years of hard time, would have said and admitted to anything asked of him – up to and including, if necessary, the Kennedy assassination. Though not yet faced with prison time, Karyl Van Tassel, Senior Managing Director of FTI Consulting, had an equally compelling reason to "find", "declare" and provide "attestations" consistent with the predeterminations contained in the SEC's complaint, whatever was needed by them – up to and including the "certification" of fraudulent information. She and her firm were siphoning tens of millions of dollars from the Stanford estate for (among their other investigatory work for the SEC) their "forensic accounting" of Stanford International Bank and the other Stanford entities.

In her own words (DECLARATION OF KARYL VAN TASSEL – *Janvey v. Alguire, et. al.* **3:09-CV-0724-N**) Ms. Van Tassel stated:

> [A]s explained in more detail below, my findings are consistent with the SEC's allegations and Davis' admission. SIB was insolvent (i.e. its liabilities exceeded the fair value of its assets) from at least 2004 and probably for much longer, yet it continued selling CDs to the end.

And then under "SEC ACTION AND FTI's INVESTIGATION", sections 4 and 7, went on to "declare":

> 4. On February 16, 2009, the United States District Court for the Northern District of Texas appointed Ralph S. Janvey the Receiver for SIB and the rest of the Stanford entities. On the same day, the Receiver retained FTI to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records of tracing. I oversee, and am personally involved in, FTI's forensic accounting and cash tracing activities. The purposes of FTI's work have been, in part, to (a) determine the roles that the various Stanford entities played in the fraud alleged by the SEC and specifically in the sale and redemption of SIB Certificates of Deposit (CDs); (b) identify the source(s) of income and cash flows of the various Stanford entities, and; (c) trace funds to determine how they were allocated and disbursed throughout the Stanford entities, and; (d) review the circumstances relating to the sale of SIB CDs.

> 7. FTI's analyses of the records of SIB and other Stanford entities were conducted using reliable practices and

methodologies that are standard in the fields of accounting and finance.

The findings and conclusions set forth herein are based on these analyses.

Conspicuously absent from this and all other of her many "Declarations" is any mention of the fact that her company is UNLICENSED (in Texas) to perform the work it performed.

Concerning the applicable licensing mandates in the state of Texas (where all of FTI's work was performed) – and with much less equivocation than Ms. Van Tassel's "under oath" recall – the Texas Board of Public Accountancy, requires that:

TEXAS ADMINISTRATIVE CODE
TITLE 22
PART 22
CHAPTER 501
SUBCHAPTER D
RULE 501.81

(a) A firm may not provide or offer to provide attest services or use the title "CPA", "CPA's", "CPA Firm", "Certified Public Accountants", "Certified Public Accounting Firm", or "Auditing Firm" or any variation of those titles unless the firm holds a firm license issued by the Board, or qualifies under the practice privilege.

(b) A firm is required to hold a license issued by the Board if the firm establishes or maintains an office in this state.

(c) A firm is required to hold a license issued by the Board and an individual must practice through a firm that holds such a license, if for a client that has its principal office in this state, the individual performs:

(1) A financial statement audit or other engagement that is to be performed in accordance with the Statements on Auditing Standards;

(2) An examination of prospective financial information that is to be performed in accordance with State on Standards of Attestation Engagements; or

(3) An engagement that is to be performed in accordance with auditing standards of the PCAOB or successor.

(d) Each advertisement or written promotional statement that refers to a CPA's designation and his or her association with an unlicensed entity in the client practice of public accountancy must include the disclaimer: "This firm is not a CPA firm". This disclaimer must be included in conspicuous proximity to the name of the unlicensed entity and be printed in type no less bold than that contained in the body of the advertisement or written statement. If the advertisement is in audio format only, the disclaimer shall be clearly declared at the conclusion of each such presentation.

(e) The requirements of subsection (d) of this section do not apply with regard to a person performing services.

(f) On determination by the Board that a person has practiced without a license or through an unlicensed firm in violation of subsection (d) of this section, the person's certificate shall be subject to revocation and may not be reinstated for at least 12 months from the date of the revocation.

In other words, in all of her "Declarations" in the Stanford matter, Ms. Van Tassel, CPA, was attesting to work performed by a firm that had no license to perform such work – and nowhere in any of the required locations did she or her firm (FTI) indicate, by way of disclaimer, that "This firm is not a CPA firm", and that the forensic accounting and investigatory work they were performing was being done with total disregard to the applicable laws in Texas.

255

The worst, however, and eclipsing even this very revealing (and unlawful) omission, is the fact that, as part of the work performed by FTI – and in addition to Ms. Van Tassel's certification of fraudulent information – by selectively segregating and placing out of defense counsel's reach the illegally accessed SIB customer account information, she and her firm (FTI) aided and abetted the SEC and DOJ in their fraudulent pursuit of Stanford International Bank, the concealment of an international crime, and ultimately, the purposeful denial of information that would have proven the solvency of SIB; and thus the innocence of Robert Allen Stanford.

Additional evidentiary support for this conclusion is found in the Receiver's decision to employ both the unlicensed FTI, and the more widely known and reputable (and appropriately licensed) accounting firm Ernst & Young.  As there can be no other reason for retaining both of these firms, and it is thus abundantly clear that the more accommodating and less reputable FTI was needed here to attest to the financial manipulations necessary to corroborate the SEC's allegation of a Ponzi scheme.

As even the SEC's own Examiner, John J. Little pointed out in his December 3, 2009 'Response' to one of the Receiver's many 'Interim Fee Requests' (case no. 3:09-CV-0298-N)(Doc. 896):

### III. Why Do The Receiver's Professionals Come In Pairs?

> [T]he Receiver's most recent filing resurrects a similar issue with respect to his two accounting firms – FTI and Ernst & Young.  In prior filings (and this filing), the

Receiver generally refers to FTI as the firm that was providing investigative services and forensic accounting. [G]iven that the Receiver describes both FTI and Ernst & Young as "internationally recognized" accounting firms, was it really necessary or appropriate to have both firms working on forensic accounting tasks?

The common sense answer, is no.  Unless, of course, as is the case here, one is needed to perform unethical (or illegal) tasks, and the other is needed to provide the 'obfuscating' appearance of legitimacy.

And finally, as is also sufficiently evident here...

To the subprime and Madoff-beleaguered SEC, the very public prosecution of Robert Allen Stanford, a billionaire financier with an offshore bank in the Caribbean, must've seemed an ideal path to redemption. In the process of 'crafting' their jurisdiction, they disregarded the fact that in its 24 years of operation, the bank (SIB) had never received a customer complaint, and had honored their every obligation. The SEC knew (in the civil matter) that with a carefully chosen Receiver (Ralph Janvey) and (Karyl Van Tassel's) auditing firm (FTI), the DOJ could then by-pass the usual warrants process (in the criminal matter) and make their judicial- 'crafting' and labeling of a "Ponzi scheme" appear valid and stick like glue.

## CONCLUSION

"When the law has exceeded its proper functions, it has not done so merely in some inconsequential and debatable matters. The law has gone further than this; it has acted in direct opposition to its own purpose. The law has been used to destroy its own objective; it has been applied to annihilating the justice that it was supposed to maintain; to limiting and destroying rights which its real purpose was to respect. The law has placed the collective force at the disposal of the unscrupulous who wish, without risk, to exploit the person, liberty, and property of others. It has converted plunder into a right, in order to protect plunder. And it has converted lawful defense into a crime, in order to punish lawful defense."

- Frederic Bastiat 1850

As if this French philosopher was prophesying 164 years into the future, this is precisely what was done in and through the collective and unscrupulous actions against Robert Allen Stanford and his companies. In short, in the annals of American jurisprudence, it is doubtful that any individual has suffered (and lived to talk about) a greater injustice than this appellant.

At the Stanford trial, when faced with a ruling on just one of the irrefutable violations of this appellant's rights under the U.S. Constitution, the Trial Judge (David Hittner) posed the question:

"How can you go back and clean it up in a situation like this? **(vol.46.)(USCA5 6865-6866)**

258

The answer to that question, which has been passed on to this Honorable Court, is as clear now as it was at the time of the Stanford trial.

## REQUESTED RELIEF

Based on the lawless and life-ruining actions of both the U.S. Securities and Exchange Commission and the U.S. Department of Justice, followed by the foregoing violations to this appellant's rights under the U.S. Constitution, Robert Allen Stanford prays that this Court will acquit him of all charges in this matter, and vacate his March 6, 2012 conviction in its entirety.

## RESTITUTION

Further, and in addition to a total acquittal and vacating his March 6, 2012 conviction in its entirety, Robert Allen Stanford prays that this Honorable Court will send a message to the "collective force" (the Securities and Exchange Commission and Department of Justice) and hold them publicly accountable, and monetarily liable, for their lawless and life-ruining actions. Collectively, these actions have resulted in the total destruction of the global group of Stanford companies, ruined both the personal and professional reputation of Robert Allen Stanford, and brought unimaginable and unquantifiable grief and hardship to his family. And not to mention, caused this appellant to be unjustly charged, convicted, and sentenced to an unprecedented 110 years in a maximum security federal penitentiary.

Additionally, these lawless and unscrupulous actions on the part of this "collective force" caused unquantifiable losses and (continue to cause) untold hardship to the thousands of dedicated Stanford employees throughout the United States and around the world.

And lastly, and most importantly for this Honorable Court to never forget, as Mr. Stanford himself never has, is the fact that the "collective force" of these two agencies of the United States Government have caused the many thousands of depositors in Stanford International Bank, in the United States and around the world, to lose virtually every dollar entrusted to it, and to its owner, this appellant, Robert Allen Stanford.

More precisely, appellant Robert Allen Stanford now prays that this Honorable Court will Order the full monetary restoration of every asset which was caused to be lost or destroyed by this "collective force", a restitution he very conservatively calculates at $15 billion.

Following his acquittal, and immediate release from prison, Stanford prays that this Honorable Court will begin this restoration process by Ordering the rightful return of the Stanford International Bank's 'Temenos and DataPro' customer account information (which was illegally accessed by the Receiver and is now being used in his insidious "clawback" actions), which precisely identifies each depositor and the amount currently owed to them - as it is this appellant's desire, and full intent, to

quickly return to Stanford International Bank in Antigua with this information and personally present a check in the full amount owed to each and every of these depositors, with 5% interest calculated from February 17, 2009.

Respectfully submitted,

*R. Allen Stanford*

Robert Allen Stanford, Pro se
Reg. No. #35017-183
FCC Coleman USP II
P.O. Box 1034
Coleman, FL 33521

Exhibit A



Paralleling his ruling in the Competency matter, Judge Hittner's (June 30, 2009)

reversal of Judge Frances Stacy's (June 25, 2009) Order granting defendant Stanford

bail was not justified and resulted in a tragic miscarriage of justice. It was not based

on any legitimate reasoning, and as defendant Stanford was not a "flight risk", served

only to accommodate the wishes – and create an unfair advantage in favor of – the prosecution. **(vol. 1)(USCA5 198-201)**

It was also unprecedented (at least in recent times) in any case of (alleged) white collar crime.[21]

In the immediate aftermath of the February 17, 2009 (civil) seizure of Stanford Financial's U.S. operations, defendant Stanford, through counsel, voluntarily surrendered his passport to the Government. This submission was followed by three letters to AUSA Costa communicating his intent to stand and fight any forthcoming (criminal) charges. **(vol. 1)(USCA5 175, 176, 177)**

Later, upon the criminal Indictment and surrendering as promised to FBI agents, on June 18, 2009 counsel for defendant Stanford proposed a variety of pre-trial release conditions which would have reasonably assured his appearance.

---

[21] *United States v. Richard Scrushy.* Charged in 2005 in the Northern District of Alabama with fraud in excess of $1 billion and other offenses in connection with his position as CEO of HealthSouth Corporation. Pre-trial release granted.
*United States v. Jeffrey Skilling, United States v. Kenneth Lay.* Charged in 2004 in the Southern District of Texas with fraud involving tens of billions of dollars, and other offenses in connection with their positions as president and CEO of Enron Corporation.
Pre-trial release granted.
*United States v. Bernard Ebbers.* Charged in 2003 in the Southern District of New York with fraud involving approximately $11 billion, and other offenses in connection with his position as CEO of WorldCom.
Pre-trial release granted.
*United States v. Bernard Madoff.* Charged in 2009 in the Southern District of New York with fraud and other offenses relating to Madoff's alleged operation of a $50 billion Ponzi scheme.
Pre-trial Release granted.
*United States v. John Rigas.* Charged in 2002 in the Southern District of New York with fraud involving $2.3 billion and other offenses in connection with his position as founder of Adelphia Communications Corp.
Pre-trial release granted.

These proposed conditions/measures which included electronic monitoring and even 24/7 armed security guards (off-duty Sheriff's Dept. Officers) were determined inadequate by Judge Hittner, and DENIED.

As in the extraordinarily complex cases of *Scrushy, Skilling, Lay, Ebbers and Rigas,* the pre-trial release of defendant Stanford was critical to his ability to assist his counsel and prepare for trial. As well, and in addition to defendant Stanford's right to bail under the Bail Reform Act of 1984 (18 U.S.C. § 3141-3150), Judge Hittner was cognizant of the dangers inherent in pre-trial detention – and in particular for a high profile defendant such as Stanford.

These dangers became a reality for defendant Stanford on September 24, 2009 when he was brutally assaulted at the notoriously violent Joe Corley facility – and then, as a result, was "treated" with a combination of psychotropic drugs that nearly poisoned him to death.

Concerning these pre-trial events, on January 6, 2012 the Government filed for, and was granted (by Judge Hittner) a 'Motion in Limine' **(Doc. 585)** barring defense counsel from mentioning this assault or the wrongfully prescribed drugs – both of which had severely hampered defendant Stanford's ability to assist his counsel, as well as their ability to prepare him to testify on his own behalf.

The Government argued that:

"[t]he videotape of Stanford's condition, after the September 2009 assault, would be inflammatory and inadmissible under Federal Rule of Evidence 403."

And then, later at trial, during the testimony of Ms. Lula Rodriguez (Government witness):

(at sidebar with all counsel)

AUSA Costa: There's another Motion in Limine that prevents talking – about Mr. Stanford's custodial status or anything that happened during that. And he's [Defense counsel] just twice now said he was jailed. So, I don't know where he's going with this, but I would –

The Court (Judge Hittner): You're just bringing it to our attention.

AUSA Costa: It's been excluded, that – whether he's been pre-trial detained. That's a standard. That should not be discussed without – **(vol. 53)(USCA5 8726)**

Mr. Scardino (Defense counsel): Previous witnesses that they've put on the witness stand have already talked about that.

The Court: Again, he's just bringing it –

AUSA Costa: I'm not sure what you want. We talked about it. I've made a mistake. He's on trial. [B]ut we object, too, to any more questions about his custodial status.

The Court: [W]here is it as far as – the Government's Motion in Limine or the defense?

AUSA Costa: The Government's, your Honor. [I] mean, specifically limited to the beating and everything else. **(vol. 53)(USCA5 8727)**

[B]ut my concern, too, is, as a general matter, the fact that someone is pre-trial detained should not be referenced. It

265

can inflame the jury to the defendant's detriment.  So I don't want an issue to be created here [w]here it creates reversible error that the jury was told that you, your Honor, held him detained pre-trial.  That can be prejudicial.

<u>The Court</u>: I'm looking for these items here.

<u>Mr. Scardino</u>: Well, I agree with the Government that if we decide it's detrimental to our position, we don't want it brought up.  But I don't know that the Government can take that position.

<u>The Court</u>: I tend to agree.

<u>AUSA Costa</u>: What about if he goes into what's happened to Mr. Stanford?

<u>The Court</u>: Oh, absolutely. **(vol. 53)(USCA5 8728)**

<u>AUSA Costa</u>: **So, he can't talk about getting beat up in detention?**

<u>The Court</u>: **Exactly.**

<u>AUSA Costa</u>: **Or drugged.**

<u>The Court</u>: **Yeah.**

**(vol. 53)(USCA5 8729)**

This argument, that defendant Stanford would somehow be prejudiced by the exposure of these events was, to put it mildly, disingenuous.  The actual purpose of this 'Motion in Limine' **(Doc. 585)** was two-fold: (1) to prevent any (ulterior motive) analysis on the part of the jurors, concerning Judge Hittner's unprecedented (and unwarranted) denial of bail, and the near-fatal assault and drug poisoning that occurred as a result.  And (2) to deny the jurors an explanation as to why defendant Stanford – who was still suffering the mentally debilitation effects of the Traumatic

Brain Injury, and drug poisoning – would not be testifying on his own behalf...
thereby implying...a guilty defendant's fear of cross-examination.

Furthermore, if AUSA Costa was genuinely concerned about defendant
Stanford being prejudiced by a matter that had absolutely nothing to do with any
conduct alleged in the Indictment, why then did he spend more than a day of trial
showing the jurors scores of color photographs, and discussing at length, "the
yacht"?

## Exhibit B

To:     Stanford Employees, c/o John Varkey

From:  Ralph Janvey, Receiver

I attach a copy of the February 16, 2009 order of the United States District Court for the Northern District of Texas appointing me as receiver for, among other entities, Stanford International Bank Limited (SIBL) and all entities that it controls; that specifically includes all financial and accounting documents, computers, computer hard drives, computer disks, and other information resources of or in possession of SIBL and in possession of any agent or employee of SIBL or any other persons. That court has taken exclusive possession of that information and resources and has authorized me, among other matters, to take and have complete and exclusive control, possession and custody of that information.

You have asked whether accessing information that is obtainable through computer systems located in the United States, but which may be information protected from certain disclosures under the laws of Antigua, can be provided to me (and persons under my direction and control) as Receiver under the order. The answer is yes; that information *is to be accessed* for the purposes of delivering that information to me as receiver for SIBL (and for the other persons for whom I am Receiver), and delivery to persons operating under my direction and control as Receiver.

Ralph S. Janvey, Receiver

268

<u>Exhibit C</u>

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE
COMMISSION,
    Plaintiff

v.

STANFORD INTERNATIONAL
BANK, LTD. et al.,
    Defendants

CIVIL ACTION NO. 3:09-CV-00298-N

PETITIONER'S MOTION TO SUPPLEMENT PREVIOUSLY FILED
'MOTION TO ADVISE THE COURT OF CRIMINAL CONDUCT
ON THE PART OF A COURT APPOINTED OFFICER, AND TO
REQUEST A REFERRAL TO THE OFFICE OF THE UNITED
STATES ATTORNEY GENERAL FOR APPOINTMENT OF A
SPECIAL PROSECUTOR'

To further edify and underscore the significance of the unlawful accessing of the
Stanford International Bank (SIB) customer account information ('Temenos and
DataPro' databases, located in the sovereign nation of Antigua and Barbuda), on the
orders of Ralph S. Janvey, the Court-appointed Receiver of the Stanford
Receivership Estate, Petitioner/Defendant R. Allen Stanford (hereinafter "Stanford")
requests leave to file this "Motion To Supplement" his previously filed 'Motion to

Advise The Court', which was filed on July 2, 2014. This additional evidence clarifies that:

(a) The Securities and Exchange Commission (SEC) and the Department of Justice (DOJ) were both aware that this illegal act had occurred, and;

(b) these two agencies colluded with Receiver (Ralph Janvey) to gain 'tactical advantages' over Stanford through the utilization of this information, and;

(c) then coordinated their efforts to conceal it from the Stanford defense, by rendering it 'undiscoverable'.

Outside of the scope of this Court's February 16, 2009 'Order Appointing Receiver' (Doc.9), on March 2, 2009, Ralph Janvey issued a declarative 'Order' of his own to Stanford (IT) employee Sohil Merchant (4:09-cr-00342) (Doc.590-4), directing him to access the privacy law-protected customer account information held in SIB's 'Temenos and DataPro' databases in Antigua. Upon this 'Order' from the Court-appointed Receiver, Mr. Merchant then performed a "data dump" of all data stored in those two databases.

Mr. Janvey, according to his April 23, 2009 'Report of the Receiver' (Doc.336), then promptly provided this ill-gotten information to both the SEC and DOJ. In that document he stated:

"This Receiver and his team have spent substantial amounts of time on these activities; the principal such activities have been in coordination with the SEC, the FBI, and the Department of Justice, in identifying and gathering large amounts of documents and information relevant to

their ongoing investigations, and responding to numerous and extensive requests from the SEC, the FBI and to the Department of Justice to analyze and provide information and documents."

Upon this revelation from the Receiver, and as Stanford was equally entitled to review this same 'large amount of documents and information' (per Rule 34 of the Federal Rules of Civil Procedure), on April 29, 2009 he filed a "First Request For Production From Receiver, Ralph S. Janvey" **(Doc.398)** in which he specifically requested:

> 4.) "Document" or "documents" includ[ing] writings, drawings, graphs, charts, photographs, phone records, sound recordings, images, audiotapes, computer disks, computer hard drives, computer back-up tapes, voicemail, and all other data and data compilations stored in any medium from which information can be obtained or translated by you into any reasonably usable form.

Instead of endeavoring to comply with this request, the Receiver immediately filed a 'Receiver's Objection' **(Doc.681)** in which he argued:

> "Expedited Discovery was authorized only for the 30 day period following service on the SEC's Complaint on Defendant Stanford. Stanford was served on February 17, 2009 Doc. #61, and more than 30 days has elapsed since that date."

With an absolute need for, and lawful entitlement to, the aforementioned information to defend himself – and with no other option – Stanford then filed a 'Motion To Compel Production From The Receiver and Request For Expedited Consideration' **(Doc 399)**. To which the DOJ promptly responded in a 'Motion by the United States

271

to Intervene Pursuant To Rule 24 and Supporting Brief, **(Doc.601-602)** whereby

they sought an immediate:

> "[stay] of discovery pending the outcome of the parallel criminal case
> in the Southern District of Texas against three of the defendants for
> substantially the same conduct with which they are charged in the civil
> case."

...and went on to argue:

> "The United States has a direct and substantial interest in the subject
> matter of the SEC's civil enforcement action, which substantially
> parallels the facts of the pending criminal case. Specifically, the United
> States has a discernible interest in intervening in order to prevent
> discovery in the civil case from being used to circumvent the more
> limited scope of discovery in the criminal matter."

...and that unless stayed, Stanford:

> "[w]ill gain an opportunity to benefit from discovery in the context of
> the civil case that they would be prohibited from receiving under the
> Federal rules of Criminal Procedure."

...and then, not surprisingly, the Receiver followed up with a 'Response To The

'Department of Justice's Motion To Intervene And Application For Stay Of

Discovery', **(Doc. 681)** in which he stated:

> "Receiver Ralph S. Janvey does not oppose the Department of Justice's
> Motion to Intervene or Application for Discovery. The purpose of the
> DOJ's requested relief is to ensure that defendants in the parallel
> criminal action will not be permitted to use civil discovery in this
> enforcement action to circumvent the limitations on criminal
> discovery."

Stanford then filed a 'Consolidated Opposition to Motion by DOJ to Intervene and For a Stay' (**Doc.687**).  In that Motion, while waiting for this Court to rule in his related Motion(s), concerning his entitlement to this discovery, his counsel very accurately determined:

> "This case presents a familiar pattern whereby the SEC institutes a civil action, moves immediately for discovery and other relief, and then when defendant attempts to defend himself through discovery, DOJ steps in and demands a stay either of discovery or of the entire case. "Significantly, one of the principal cases relied upon by DOJ in seeking to intervene actually held that mandatory intervention by DOJ to stay a civil companion case was properly denied. (See *SEC v. Chestman*, 861 F.2d 48) (2nd Circ. 1988) (finding that the district court denied intervention as of right).

While such interventions may be granted under Rule 24 subsection (b), allowing permissive intervention (See *SEC v. Chestman*), the requesting party is required to demonstrate a legitimate interest that could not otherwise be protected.  Since it is now clear that this specific discovery material (Temenos and DataPro) was "ill-gotten", the DOJ did not make, (and thus could not possibly have made), such a legitimate demonstration.  As such, the only "interest" they could offer was one of vagueness and non-specificity ...simply that it (DOJ) needed to intervene to make certain Stanford did "not obtain discovery that he would not be entitled to receive in the criminal case".  As the Court found in *Securities and Exchange Commission v. Oakford Corp.*, 181 F.R.D.269, 272-73 (SDNY 1998):

"To the extent that defendants' discovery requests simply result in the happenstance that in defending themselves against serious civil charges that another government agency has chosen to file against them they obtain certain ordinary discovery that will also be helpful in the defense of their criminal case, there is no cognizable harm to the government in providing such discovery beyond its desire to maintain a tactical advantage."

Indeed.  And as the Court also observed in *United States v. Cioffi*, 2008 U.S.Dist.

LEXIS 86088 (EDNY 2008):

"Courts are justifiably skeptical of blanket claims of prejudice by the government where – as here – the government is responsible for the simultaneous proceedings in the first place" (See also *SEC v. Saad*, 229 F.R.D. 90,91) (SDNY 2005) ("[I]t is strange that the U.S. Attorney's Office, having closely coordinated with the SEC in bringing simultaneous civil and criminal actions against some hapless defendant, should then wish to be relieved of the consequences that will flow if the two actions proceed simultaneously.")

As very clearly indicated here, the only interest of the Receiver, the SEC and the DOJ was (as revealed in **SEALED Doc.603**) nothing short of a coordinated effort to make certain this highly exculpatory Temenos and DataPro information was kept from Stanford... placed well out of the defense's budget-restricted reach, in an FTI-controlled warehouse in Washington, DC... thereby very purposefully and unlawfully gaining and maintaining just such a "tactical advantage" over Stanford. Stanford would submit that the purpose for these pleadings is now undeniably clear and indefensible.  Had there actually been some "legitimate" reason for this

274

intervention and stay of discovery, the Receiver, the SEC and the DOJ would have surely, and specifically, identified it.   Moreover, even beyond the only possible conclusion to be drawn here from the fact that there wasn't, and they didn't – as well as the timing and sequence of these pleadings – Stanford would underscore their "illegitimacy" with the following questions:

> Absent that legitimate reason (or "interest"), under what other circumstances would it ever be appropriate (and lawful) to prevent a defendant in a criminal matter from 'gaining an opportunity to benefit from discovery in the context of a civil case'...

> More specifically, when is it ever appropriate for the government to unlawfully obtain and conceal evidence, and then use it to convict an innocent man?  When, and why, is it ever appropriate to 'stay' the truth?

Simply put, after directing the Receiver to obtain (by whatever means necessary) the certain discovery needed by them to pursue their cases, the Receiver, the SEC and the DOJ then colluded in a coordinated (and desperate) effort to conceal it from Stanford, and thereby prevent him from using it to prove his innocence.

Respectfully submitted,

_____
Robert Allen Stanford, Pro-se
Reg. # 35017-183
FCC Coleman USP-2
P.O. Box 1034
Coleman, FL 33521

# CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2014 I filed the foregoing document with the Clerk of the Court for the Northern District Court of Texas, Dallas Division, via UPS Overnight Mail.

Respectfully submitted,

_____

Robert Allen Stanford, Pro-se
Reg. # 35017-183
FCC Coleman USP-2
P.O. Box 1034
Coleman, FL 33521

## Exhibit D

Case 4:09-cr-00342 Document 316-4 Filed in TXSD on 10/04/10 Page 2 of 21

FBI/DOJ Productions

Stanford Receivership
Production Log

Confidential

| Bates Range | Document Title | Produced To: | Date Produced: |
|---|---|---|---|
| STAN ELEC DOJ_00021 | Video: "Hard Work, Clear Vision, Value for the Client" FA Recruitment | FBI | 6/3/2009 |
| STAN ELEC DOJ_00022 | Recovered hard drive data for FL Lauderdale employees Belovich, Perraud, Raffanello, and Tenorio and from additional computer | FBI | 7/20/2009 |
| STAN ELEC DOJ_00023 | Pictures of Fort Lauderdale office | FBI | 7/20/2009 |
| STAN ELEC DOJ_00024 | Exchange email for Jason Green and Juan Rodriguez Tolentino | FBI | 9/30/2009 |
| STAN ELEC DOJ_00035 | Fort Lauderdale video footage from 2/23/09-2/25/09 (DVR Camera7) | FBI | 1/5/2010 |
| STAN ELEC DOJ_00036 | Fort Lauderdale video footage from 2/23/09-2/25/09 (DVR Camera2) | FBI | 1/5/2010 |
| STAN ELEC DOJ_00037 | Oracle and Platinum databases containing all general ledger data for various Stanford companies | DOJ | 2/17/2010 |
| STAN ELEC DOJ_00038 | TPC Video 1Q04 | FBI | 3/2/2010 |
| STAN ELEC DOJ_00039 | TPC Video 2Q04 | FBI | 3/2/2010 |
| STAN ELEC DOJ_00040 | TPC Video 3Q04 | FBI | 3/2/2010 |
| STAN ELEC DOJ_00041 | TPC Video 4Q04 | FBI | 3/2/2010 |
| STAN ELEC DOJ_00042 | TPC Video 1Q05 | FBI | 3/2/2010 |
| STAN ELEC DOJ_00043 | TPC Video 2Q05 | FBI | 3/2/2010 |
| STAN ELEC DOJ_00044 | TPC Video 3Q05 | FBI | 3/2/2010 |
| STAN ELEC DOJ_00045 | TPC Video 1Q06 | FBI | 3/2/2010 |
| STAN ELEC DOJ_00046 | TPC Video 2Q06 | FBI | 3/2/2010 |
| STAN ELEC DOJ_00047 | TPC Video 3Q06 | FBI | 3/2/2010 |
| STAN ELEC DOJ_00048 | Files pulled from SFG sharedrive by FBI | FBI | 3/3/2010 |
| STAN ELEC DOJ_00049 | Files from J. Davis USB flash drive | FBI | 3/5/2010 |
| STAN ELEC DOJ_00050 | Julie Hodge email | FBI | 4/12/2010 |
| STAN ELEC DOJ_00051 | Temenos Data Pro Source Data | FBI | 4/27/2010 |
| STAN ELEC DOJ_00052 | Files pulled from computers of S. Anguiano, F. Callava, J. Cordero, E. Barbar, R. Carillo, I. Diaz, and R. Gonzales and from SFG Miami server | DOJ | 5/17/2010 |
| STAN ELEC DOJ_00053 | Photos: SFG Boston, Bjerget House, Bingo Building, Sea Eagle, Hill Street Apt | FBI | 7/30/2010 |
| STAN ELEC DOJ_00054 | Files flagged by IRS from SFG Houston and San Antonio servers on 7/13/2010 | DOJ | 7/15/2010 |
| STAN ELEC DOJ_00055 | Video of Memphis Office 2.17.09 | FBI | 7/30/2010 |
| STAN ELEC DOJ_00056 | Video of Memphis Office 2.17.09 | FBI | 7/30/2010 |

(**) next to STAN ELEC DOJ_00051

### (vol. 2)(USCA5 410)
2

8/6/2010

<u>Exhibit E</u>

As previously stated, this Court has, in past rulings, relied heavily on the "Davis Plea" and "Van Tassel Declarations".

Concerning, as well, this Court's past reliance on the findings of the Civil Court-appointed Receiver, and in particular as it noted in *Janvey v. Alguire* where it declared:

> "The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed…"

…this Court should also now consider, for their probative value and reconsideration of such previous opinions, the following words:

> "Although the Receiver understands the indignation and pain the Relief Defendants express, he has a duty to pursue the claims against them for the benefit of those who have, so far, suffered a 100% loss.
> This duty is not shared by those who object to such claims including the Examiner and the SEC. If the Receiver did not pursue these claims, then an investor who redeemed millions of dollars in CDs just before the Receivership began could recover 100% or more of his initial investment – despite the absolute certainty that what he received was money stolen from other investors.
> For example, on or about January 23, 2009 Relief Defendant Gregory Alan Maddux received $3,669,735 in SIB CD proceeds, consisting of $3,500,000 in principal and $169,735.10 in purported interest. On December 19, 2008 Relief Defendant Regions Bank received over $13

million in CD proceeds. Mr. Maddux and Regions Bank were lucky. Had they waited only a few more weeks and tried to cash out after the Receivership began, they would have received nothing.

Through no fault of their own, more than 20,000 other investors were not so lucky. Those who did not cash out before the Receivership are waiting, and will continue to wait for some time, to receive pennies on the dollar."

Kevin Sadler (Baker Botts LLP)
attorney for the Receiver
Motion to Freeze Assets of Relief Defendants,
*Ralph S. Janvey v. James R. Alguire*
**case no. 03:09-CV-0724-N** (July 28, 2009)
**USCA5 292**

Beyond Mr. Sadler's (Receiver's attorney) referring to 20,000 SIB depositors (and thousands of Stanford employees around the world who serviced them) as knowing participants in a "Ponzi scheme" that never was – something so unbelievable that not even Hollywood would attempt to sell – he not only admitted the reality of the SEC takeover of Stanford, he prophesized the ultimate result, which was and is...

Prior to the SEC action, and for more than 24 years, SIB depositors had always received 100% of the amount agreed upon in their contract. Of that, there is no dispute. And after the SEC's (unlawful) action, they would be, and are now, "waiting for some time for pennies on the dollar."

279

And concerning that (unnecessary) reality, and this Receiver's role in it, these words

of SEC attorney Kevin Edmundson and their Examiner, John Little:

> "I might point the Court to two cases which are SIPC cases: *Universal Clearing House v. Abbot,* which is found at 77 BR 843, and *Bayou Superfund,* which is at 396 BR 810.   Those cases also support the--idea that the Commission and the Receiver cannot pursue an innocent – purely innocent investor for the return of payments."
>
> 

Kevin Edmundson (SEC)
*Janvey v. Alguire* (July 31, 2009)
**case no. 03:09-CV-1329-N**
**(USCA5 25-75, at 29)**

> "Okay, judge, we've asked for these orders in the first place but now we'd like to trim them back because we don't believe that what's happening is really in the best interest of our enforcement activities, of our regulation of this area, and of the public."
>
> 

John Little (SEC Examiner)
**case no. 03:09-CV-1329-N**
**(USCA5 25-75, at 40)**

> "Have you-all ever asked a Court to rein in a Receiver before?  You know, I certainly haven't read every SEC case, but this was a little bit of a new one for me."
>
> 

Judge David Godbey
Northern District Court, Dallas Division
**case no. 03:09-CV-1329-N**
**(USCA5 25-75 at 30)**

And then finally, words that speak directly to the origins of this case...

280

> "[I] think when I was the Assistant Director, there was a
> lot of pressure to bring a lot of cases. I think that was
> one of the metrics that was very important to the home
> office and to the regions."

(name redacted)
**(case no. OIG-526)**
(March 31, 2010)

In addition, according to the former head of the Fort Worth office, senior management in Enforcement at headquarters expressed concern to Fort Worth that they were bringing too many Temporary Restraining Order, Ponzi, and prime bank cases, which they referred to as "kick in the door and grab" cases, or "mainstream cases".

**(case no. OIG-526)**
(March 31, 2010)
(page 61)

[Former head of Enforcement at the Fort Worth office of the SEC] Spencer Barasch described the circumstances of his third request to represent Stanford as follows:

> "2009 the whole thing blows up. Every lawyer in Texas
> and beyond is going to get rich over this case. Okay? And
> I hated being on the sidelines. And I was contacted right
> and left by people [to] represent them."

Barasch Interview Tr. at 61
**(case no. OIG-526)**
(March 31, 2010)

281

These final words here were contained in a February 23, 2009 email between Spencer Barasch (now an attorney in private practice) and Richard Conner (SEC's General Counsel's office).  Barasch, who had left the SEC four years earlier, was seeking permission to represent Stanford in the then current (civil) proceedings. Ultimately, the SEC's Ethics Office determined that there would be a "conflict of interest" issue with Mr. Barasch's representing Stanford, and he was denied.

But there were many other 'lawyers in Texas' who knew the same about this case, and seized the moment – and some who not only ignored their undeniable "conflict of interest" in the Stanford case, but exploited it to the tune of tens of millions of dollars.

According to the multitude of "Interim Fee Requests", the 'lawyers in Texas' who would make out best in this matter, helping the SEC to reach into and destroy Stanford International Bank – and the rest of Stanford's vast global empire – were those at the Houston firm, Baker Botts...the very firm who, 24 years earlier, had helped Stanford form the bank.

Billing the Stanford Receivership tens of thousands of dollars an hour, they immediately began suing the CD depositors – the very people whose investments the Receivership was supposedly put in place to "protect" – as well as the hundreds of Stanford employees and virtually anyone else who would keep the tens of millions in fees coming in.

Ironically, when Mr. Kevin Sadler (the Baker Botts lawyer) said in his Motion that he "understands the pain and indignation" of the SIB depositors being sued by the Receiver ("Relief Defendants"), that "understanding" must have come from the "pain and indignation" he was experiencing regarding the "20% reduction" in his usual rates...down to a mere $555.00 an hour.

## Exhibit F

At trial, this exhibit (and numerous other such photographs of the yacht SEA

EAGLE) was discussed at length and mentioned by the Government or their



witnesses no less than 200 times.  As defendant Stanford's purchase, ownership and

use of this vessel was legal, and it was neither part of nor in any way material to any

conduct alleged in any Count of the Indictment – and had no legitimate probative

value or evidentiary purpose – under Rule 403 its introduction in these proceedings

can only be interpreted as a substitute for "other" evidence, and thus solely for the

purpose of using emotion to unfairly prejudice the jurors against Stanford.

Moreover, even if it were determined to be extrinsic evidence admissible under Rule 404(b), it must meet the following two criteria.

The evidence must: (1) be relevant under Rule 401 to some issue besides the defendant's character; (2) possess probative value that substantially outweighs its prejudicial impact under Rule 403. *United States v. Infante,* 404 F.3d 376, 388 (5th Cir. 2005). In determining whether the probative value outweighs any prejudicial impact, a key factor Courts consider is the "overall similarity of the extrinsic and charged offenses" because a strong similarity demonstrates that the extrinsic evidence is probative of intent and knowledge concerning the similar charged offense and not being used to show general bad character. See *United States v. Adair,* 436 F.3d 520, 526 (5th Cir. 2006) (quoting *United States v. Beechum,* 582 F.2d 898,911 (5th Cir. 1978) (en banc).

<u>AUSA Andrew Warren:</u> What's this picture of?

<u>Ms. Kelly Taylor</u> (Government Witness): That's the motor yacht SEA EAGLE.

<u>AUSA Warren:</u> And what's the length overall of the SEA EAGLE?

<u>Ms. Taylor:</u> It's 112 feet.

<u>AUSA Warren:</u> Ms. Taylor, do you see that picture of the profile?

<u>Ms. Taylor:</u> That's just a side shot of motor yacht SEA EAGLE.

<u>AUSA Warren:</u> And what about this picture of the transom? What's the transom?

<u>Ms. Taylor:</u> It's showing the swim ladder, the dive ladder, and swim platform.

<u>AUSA Warren:</u> Looking at the next page, this is a picture of what?

<u>Ms. Taylor</u>: That's a picture of the fly bridge with the console not fully rotated. (vol. 51)(USCA5 8102-8103)

<u>AUSA Warren</u>: And the top half of that picture, the cockpit, what's that?

<u>Ms. Taylor</u>: That's just the back deck, the main back deck of the vessel.

<u>AUSA Warren</u>: And the salon, what's this?

<u>Ms. Taylor</u>: The main living space on SEA EAGLE.

<u>AUSA Warren</u>: And this is another picture of the salon?

<u>Ms. Taylor</u>: Yes.

<u>AUSA Warren</u>: And these are more pictures of the salon?

<u>Ms. Taylor</u>: Yes.

<u>AUSA Warren</u>: What about this, what's this a picture of?

<u>Ms. Taylor</u>: That's—on the left there, that's the dining space with the TV console. The stairs go up to the wheelhouse and the upper salon. And to the right of the stairwell is the day head.

<u>AUSA Warren</u>: And this picture?

<u>Ms. Taylor</u>: That is the upper salon and the wheelhouse.

<u>AUSA Warren</u>: And the instrument panel?

<u>Ms. Taylor</u>: Yes, after the renovation.

<u>AUSA Warren</u>: What about this, the master SR?

<u>Ms. Taylor</u>: The master stateroom.

<u>AUSA Warren</u>: And there's this VIP room. It's like a second bedroom?

<u>Ms. Taylor</u>: Yes. It's a second bedroom; and normally "VIP" means it's got, like, a queen bed or larger.

<u>AUSA Warren</u>: And in this hallway, what's that on the wall there?

<u>Ms. Taylor</u>: That's the Stanford Eagle. (vol. 51)(USCA5 8101-8105)

<u>The Court</u> (Judge Hittner): **[I] want to make sure I have it noted, all of the yacht photos. (vol. 51)(USCA5 8109)**

<u>AUSA Greg Costa</u>: Ms. Hammer, I'm going to show you what's in evidence as Government 1300. Picture of the SEA EAGLE yacht. If you had known the tens of millions of dollars of CD money was going to pay expenses and rebuilds related to Mr. Stanford's yacht, would you have bought the CDs?

<u>Ms. Diane Hammer</u> (Government witness): No, I would not.

<u>AUSA Costa</u>: Do you wish you had some of the money that was in this yacht or in this glass case to help pay for your father's medical situation?

<u>Mr. Parras</u> (Defense attorney): Objection.

**(vol. 52)(USCA5 8713-8715)**

Ms. Hammer was a SIB depositor who had "rolled over" an initial CD with a maturity date of November 2008. On the day of the Government's seizure of the Stanford companies (February 17, 2009) her new CD had not yet reached its August 2013 maturity date. She had never attempted an early redemption, and her loss occurred after the seizure and at a time when defendant Stanford no longer owned or had control of his companies. Therefore she was not, and could not have been, identified in either the June 18, 2009 Indictment nor the May 4, 2011 Superseding Indictment as a "victim". And so for AUSA Costa to imply a direct connection between this yacht and the difficulties she experienced with her father's medical bills was not only improper, it was purposefully inflammatory.

Exhibit G

SHRED DO NOT RETURN SEALED COPY

# CONFIDENTIAL MEMORANDUM

To:        Chief Judge Edith H. Jones
           Judge Leslie H. Southwick

From:      Marlo P. Cadeddu

CC:        Joseph L. S. St. Amant, Senior Appellate Conference Attorney

Date:      December 20, 2011

Re:        *United States v. Robert Allen Stanford*

---

## MY DIRECTIVE

I was appointed on December 14, 2011 by United States District Judge David Hittner at the request of the Office of the Fifth Circuit to act as a discovery expert for the defense concerning Criminal Justice Act matters in the case of *United States v. Robert Allen Stanford,* Criminal Case No. H-09-342  (01). In preparation for serving as discovery expert, I had several telephone consultations with Fifth Circuit Senior Appellate Conference Attorney, Mr. Joseph St. Amant.   In addition, on December 15th, I met with Fifth Circuit Chief Judge, Hon.  Edith H. Jones.   On December 16th, I participated in a conference call with Fifth Circuit Judge, Hon.  Leslie H. Southwick and Mr. St. Amant.   I also participated in meetings over a period of two days with Mr. Stanford's defense counsel, defense experts and staff at the offices of Scardino Fazel in Houston.  I did not confer with the presiding United States District Judge, Hon. David Hittner.  Nor did I meet with the prosecution.

My understanding is that the billings in the *Stanford* case have significantly exceeded the interim budget approved by the Fifth Circuit on March 3, 2011.  Because of my experience both as the coordinating discovery expert in a Northern District of Texas case involving a large volume of electronic discovery and as appointed CJA counsel in several high-profile, criminal matters, I was asked to assist the attorneys in *Stanford* with budgeting matters.

As I understand it, my charge in this case was to meet with defense counsel in order to gain an understanding of the scope of the work already done by defense experts and the results of that work. I was to confer with the defense team regarding what further work the defense believes is required to prepare this case for trial. I was to obtain from defense counsel an updated interim budget delineating what expert funding the defense believes is necessary to defend the case. I was to focus on the budget for experts, rather than attorney, paralegal or investigator time. I was also told not to review any budgeting materials for mental health experts.

## CONFIDENTIALITY AND PRIVILEGE ISSUES

I was appointed as a discovery expert to the defense and thus I am bound by the attorney-client privilege. My role was structured in this way to ensure that defense counsel and other members of the defense team felt comfortable sharing defense strategy, client communications and other confidential or privileged matters with me. I confirmed with all parties my understanding that my communications with the defense were protected. Nonetheless, I encouraged defense counsel to consider consenting to my inclusion in this Memorandum of otherwise confidential information related to defenses, strategy and the results of expert investigation and analysis in order to assist the Court in making appropriate budget determinations. I advised defense counsel and the defense experts that 18 U.S.C. § 3006A(e) and Guide to Judiciary Policy – Volume 7, § 510.30(c) protect such information from disclosure to the public or the government.

Defense counsel, all experts and support staff were fully cooperative with my review. All attorneys, experts and staff made themselves available to me around the clock to answer questions and respond to document requests. In addition, defense counsel have reviewed this Memorandum prior to submission and have consented to the inclusion herein of detailed descriptions of anticipated defenses, investigative procedures, and expert analysis and conclusions.

## CRIMINAL CASE BACKGROUND

Stanford was charged by indictment on June 18, 2009 with conspiracy to commit mail, wire, and securities fraud; wire fraud; mail fraud; conspiracy to obstruct an SEC investigation; obstruction of an SEC investigation; and conspiracy to commit money laundering. On October 27, 2010, the District

Court appointed current trial counsel Ali Fazel and Robert Scardino to represent Stanford. Attorneys Fazel and Scardino were the tenth and eleventh attorneys to enter appearances for Stanford in this criminal matter.

On January 26, 2011, the District Court found Stanford to be incompetent to stand trial and he was remanded to the custody of the Federal Medical Center. The grand jury subsequently returned a superseding indictment on May 4, 2011 charging Stanford with conspiracy to commit mail and wire fraud; wire fraud; mail fraud; conspiracy to obstruct SEC investigation; obstruction of SEC investigation; and conspiracy to commit money laundering. A motion to continue the trial date until the end of April, 2012 was filed by the defense on December 19, 2011. A hearing was scheduled for December 20, 2011 before the District Court to revisit the question of Stanford's competency.

## POTENTIAL SOURCES OF CASE INFORMATION

One of the chief complexities of this case is that information that is potentially relevant to the case is in the possession of numerous governments and entities, both foreign and domestic. Below, are some of these potential repositories of case-related information:

Material in the Possession of the Receiver and His Agents

On February 17, 2009, the District Court in Dallas appointed a Receiver, Ralph S. Janvey, in order to preserve assets in the case of *Securities and Exchange Commission v. Stanford International Bank) Ltd. et al.,* Case No. 3:09-CV-0298-L. The Order appointing the Receiver directed him to take actions necessary to obtain control over receivership assets and receivership records. It is my understanding that pursuant to this directive, the Receiver moved to shutter Stanford offices throughout the United States, taking possession of all paper records and electronic storage devices found in those offices. These seizures from Stanford's U.S. offices yielded approximately 15,000 banker's boxes and 5,000 storage devices (desktops, laptops, CDs, DVDs, external hard drives, etc.) currently stored in a warehouse outside of Houston.[1] In addition, the

---

[1]The defense has been given a box-level index these items. The index is 578 pages long, single-spaced and it identifies the office location from which each box was seized. The index also usually identifies the name of the employee from whose office the records came and/or the department, but not always. It would appear that between half and two thirds of the entries include a corresponding general description of the contents of that box (e.g.

3

Receiver has an unknown number of Stanford data servers stored in a facility in Washington, D.C. and has obtained other documents through litigation.

The Receiver has retained a number of consultants, including FTI Consulting, to assist the Receiver in accomplishing the major goal of the receivership to find and distribute assets. Pleadings filed in the above matter and other related matters, including the clawback action against Mr. Stanford, reflect that FTI has had complete access to the seized materials, has performed detailed financial analyses relating to valuation of company assets and tracing of payments to Stanford himself and has reviewed and analyzed Stanford financial records, audit records, tax records, expense records. The Receiver has also retained Ernst & Young as a consultant to provide tax and accounting services to Stanford entities post-receivership. The Receiver has retained the Dallas firm of Baker Botts LLP as legal counsel. Each of these agents of the Receiver has in its possession documents related to the case.

## iConect Database

The discovery in this case provided to the defense by the government consists of an electronic database comprising approximately four terabytes of data. The database includes documents, voice mails, emails and other evidentiary items obtained by the government during its investigation. Importantly, the iConect database <u>does not</u> include all of the materials in the possession of the receiver, but only those items requested by the government. Nor does the iConect database include materials in the possession of authorities or entities outside of the United States.

## BDO Records

BDO is an accounting firm that provided audit services to the Stanford broker dealer. BDO has in its possession a significant cache of audit papers that the defense has identified as critical to its experts' financial and valuation analyses.

## Foreign Records

The *Stanford* case involves 102 privately held international companies operating offices worldwide. Accordingly the precise volume of potentially

---

"Operations Files," "Risk Management Files," "Miscellaneous Files") while the remaining boxes have no content description.

relevant records in the possession of authorities or entities outside of the United States is unknown, but is likely to be significant. The defense is aware that a number of Swiss bank accounts have been frozen and Switzerland has declined to turn over the assets therein, citing bank secrecy. In addition, records related to Stanford's foreign banks (Stanford Bank Venezuela, Stanford Bank Panama, Stanford Bank Peru, etc.) are in the possession of the respective foreign governments, which have thus far declined to provide those records to the American receiver. A liquidator has been appointed in Antigua, the locus of many of Stanford's investments. The Antiguan liquidator has declined to share records with the American Receiver. The owner of C.A.S. Hewlett, the Antiguan auditor of Stanford International Bank Limited (Stanford's Antiguan bank), has passed away. His daughter resides in the UK and has declined to be interviewed or to provide records.

## TIMELINE OF BUDGETING SUBMISSIONS AND ORDERS

I asked defense counsel to provide to me all written materials in their possession regarding budgeting, including budget-related motions, budget submissions and correspondence. My review of the documents provided to me shows the following:

In January of 2011, the defense submitted to the district court an ex parte sealed motion for an interim budget for experts. In that motion, the defense sought authorization to retain the Accumyn Consulting firm to provide computer expert and forensic accounting services as well as an investigative firm, the Worley Group. For technology consulting and document management, Accumyn predicted total costs for pre-trial work of approximately $225,000 and trial costs of $175,000. For forensic accounting expert services, Accumyn predicted an estimated total cost of $1.9 million. All of Accumyn's estimates assumed a six month trial preparation period and a trial one month in duration. The Worley group estimated an initial cost of $25,000 for one month of pre-trial investigative work, and did not provide a total anticipated cost.

On March 3, 2011, the Fifth Circuit issued an interim budget order approving (1) expenditures already incurred through January, 2011; (2) $50,000 for discovery management; (3) $50,000 for experts; (4) fees for attorneys and paralegals of $500,000 through trial.

In May of 2011, the defense moved ex part and under seal for advance authorization to retain a jury and trial consultant, Mr. Robert Hirschhorn. The

5

defense estimated a total cost of $25,000 to retain Mr. Hirschhorn. That motion was granted on May 27, 2011. In addition, in May of 2011, the defense also filed an ex parte sealed motion for approval of payment for $800 per month for additional office space to house additional staff and the large volume of discovery material.

In July of 2011, the defense submitted a sealed, ex parte motion to the district court seeking funding for (1) two clerical assistants at a rate of $15.00 per hour; and (2) two contract attorneys at a rate of $50.00 per hour. The district court denied the motion on August 8, 2011. Thereafter, the defense submitted an amended motion, renewing its request for funding for two clerical assistants for a total approximate cost of $12,750 and two contract attorneys for a total approximate cost of $40,800. The district court granted the amended motion on August 22, 2011.

In September of 2011, the defense submitted to the District Court an ex parte amended interim budget and accompanying workplan prepared by Marcum LLP. In the budget, defense counsel indicated their intent to limit Accumyn Consulting's role in the case as of September 1, 2011 to (1) maintenance of electronic data; (2) searching of that data; and (3) preparation of trial exhibits. Counsel requested that Marcum LLP be authorized to provide expert services, including forensic accounting analysis for the case. In the September ex parte amended interim budget, Defense counsel advised the District Court that Marcum LLP had agreed to substantially discount its usual hourly rates. Those discounted rates – the rates at which Marcum is currently billing- are as follows:

  $275 for expert work other than testimony before jury
  $360 for experts testifying before jury
  $225 for Managers
  $160 for Senior Staff
  $125 for Staff

In the workplan prepared by Marcum LLP, the company estimated its anticipated total fees and expenses from September 1, 2011 through the end of trial[2] to be $3,198,465.

## SIGNIFICANT ACCOMPLISHMENTS OF EXPERTS TO DATE

As part of my review, I asked the defense team to compile a list of significant accomplishments of the experts to date in the context of the charges

---

[2] Marcum assumed a project end date of June 30, 2012.

in the indictment and the anticipated defenses to those charges. That list is attached as Appendix A.

## STEPS TAKEN BY DEFENSE COUNSEL TO MINIMIZE COSTS

During my meetings with the defense team, they described their efforts to mmlmlze costs. Following are descriptions of cost minimizing efforts provided to me by defense counsel:

- Firing of Accumyn and Levine- Accumyn's role was greatly reduced in order to obtain a cheaper alternative who also produced better work product. The need for Mr. Levine and his connections to Miami expired, therefore defense counsel terminated those services.

- Negotiated rate reductions –In June of 2011, Marcum began working on the case at rates equal to or below those being charged by Accumyn. In September, 2011, Marcum agreed to additional rate reductions as requested by defense counsel and the District Court.

- Efforts to obtain documents/analysis from Receiver – when possible, the defense has eschewed laborious review of paper records in the Receiver's warehouse in favor of targeted subpoenas to alternate sources of records. For example, counsel subpoenaed BDO for their audit work papers, correspondence, and other documents, rather than attempting to locate those papers in the Receiver's warehouse. Counsel also subpoenaed Ernst & Young for valuations and appraisals and other work done for the Receiver to prepare and produce financial statements and tax returns for receivership entities. The purpose of subpoenaing Ernst & Young was to reduce time in the warehouse and to avoid having to duplicate Ernst & Young's work on the solvency and valuation issues. Additionally, counsel have sought production of substantive analyses and reports from other consultants to the Receiver in an effort to avoid duplication of effort by defense experts. The Receiver, their consultants, and counsel for the Receiver and its consultants (also represented by Baker Botts) have claimed work product protections and contested defense counsel's subpoena(s), refusing to produce such information.

## PROPOSED BUDGET

The Court asked me to obtain from the defense a proposed budget for experts Accumyn and Marcum through the end of trial. I asked the defense to prepare the proposed budget on a per-project basis and to prioritize those projects. The proposed per-project expert budget is attached as Appendix B. An explanatory document describing what is entailed to complete each of those pending projects and the justification for each *is* attached as Appendix C. The projects are listed in Appendix C in order of priority for the defense. Finally, also attached as Appendix D is a separate document management budget.

## OTHER ISSUES IMPACTING FUNDING

As the Court is aware, funding of Stanford's criminal defense by insurer Lloyds of London was foreclosed by this Court's decision in Case Number 10-20069 and the ensuing Memorandum and Order (Document 372) in Southern District of Texas Case Number H-09-3712. [3] Since that time, Stanford's defense costs have been paid pursuant to the Criminal Justice Act. In my evaluation of the budgeting issues in this case, I have become aware of several possible alternate sources of funds to pay Stanford's defense costs. A determination of the likelihood of obtaining access to alternate sources of funding is beyond the scope of this initial review. In the interest of completeness, however, I bring this information to the Court's attention in case the Court desires further action by me relative to these matters.

I understand that a motion seeking an accounting of assets held by the Receiver and designation of untainted funds that may be available to pay Stanford's civil and criminal defense costs has been filed by Stanford's civil counsel in Northern District of Texas Case Number 3:09-CV0298-N. The District Court initially set that motion for a hearing, but has since stayed those proceedings pending a determination that Stanford is competent to stand trial in this case.

I also understand that the Antiguan liquidator has petitioned for the Antiguan liquidation to be recognized as the authoritative Stanford insolvency proceeding. That petition *is* opposed by the U.S. Receiver. It has been reported in the press that the Antiguan liquidator recovered $20 million from

---

[3] I attempted to reach Lloyd's counsel by telephone for the purpose of corroborating statements by the current defense team that they inherited little criminal work product from previous counsel. My efforts to reach him were unsuccessful.

Case: 12-20411     Document: 00512763808     Page: 296     Date Filed: 09/...

case 4:09-cr-00342   Document 603 *SEALED*   Filed in TXSD on 01/11/12   Page 10 of 11

$100 million that had been frozen in the United Kingdom under criminal forfeiture proceedings.     I do not know whether it would be possible for Stanford could make application for release of part of the remaining U.K. funds for his defense, as he has in Case Number 3:09-CV-0298-N.

An important issue with implications for the cost of the defense arises from the somewhat unique fact that the Receiver- and not the prosecution –is in possession of all of the books and records of Stanford's U.S. entities.   It is my understanding that the Department of Justice and the FBI have obtained the documents being used to prosecute this case by submitting requests for materials to the Receiver. The order appointing the Receiver requires him to comply with all such requests.   The documents obtained by *DOJ* and the FBI from the Receiver in turn have been loaded into the iConect database discussed above.   The defense is not privy to the document requests submitted by *DOJ* and the FBI to the Receiver.    Accordingly defense counsel are unable to determine whether the materials obtained from the Receiver by *DOJ* and the FBI include all items relevant and necessary to the defense or *Bracfy* or *Giglio* material.

The Receiver has expended considerable time and apparently many tens of millions of dollars to marshal, organize, review and analyze Stanford's documents. The Receiver has taken the position that the service of subpoenas on consultants to the Receiver by defense counsel is a violation of the Receivership Order.   The receiver has also taken the position that analyses performed by its consultants constitutes work product.   Although the Receiver has permitted access of the defense to the warehouse in which Stanford's documents and storage devices are housed, I have reviewed the box-level index provided by the Receiver, and in my opinion, the descriptions of the contents of the boxes provided (when a description is given at all) are too general to permit the defense to do a targeted review of Stanford's own documents.   The Court will note that in the proposed per-project budget attached as Appendix B, the defense has listed as its number one priority the review of 3000 of the 15,000 boxes maintained in the Receiver's Houston storage facility.  It would significantly reduce the scope of the required review, and concomitantly, the cost to try this case if the defense were to be provided with either (1) a detailed file-level index of the contents of the boxes; or (2) in the alternative, access to an electronic documents database, if the Receiver has in fact scanned the contents of the boxes into digital form.

## CONCLUSION

The scope of my review of the budgeting issues in this case was constrained by the time limits within which I had to work. I have not independently audited the defense work product, but instead, have necessarily relied upon the representations and submissions of the defense in preparing this Memorandum.[4] Nonetheless, based upon my review of documents, independent research, and discussions with defense counsel, experts and staff, I do not see any evidence that the defense has taken a "scattershot" approach to trial preparation. Both the list of significant expert accomplishments (Appendix A) and the document describing pending expert projects (Appendix C) show that the defense team has cabined its work within the framework of the indictment, has achieved concrete results and has a targeted plan for final preparation of this case for trial.

I am aware that there are a number of outstanding vouchers for payment to Marcum and Accumyn that are awaiting approval. Based on my discussions with the Marcum and Accumyn consultants assigned to this project, I believe that there is a risk that denial of those pending vouchers in toto may lead those firms to withdraw their staff. In addition, because the allegations in the indictment center on accounting and financial irregularities, Mr. Stanford's defense is necessarily expert-dependant. Accordingly, de-funding all defense experts at this point would leave Mr. Stanford without any defense at all. In all, it is my hope that I have provided the Court with sufficient information to permit it to make informed funding decisions that will afford Mr. Stanford an adequate defense while also conserving scarce CJA resources.

---

[4] Defense counsel have advised me that they have no objection to a more formal audit, if the Court desires one.

## CERTIFICATE OF SERVICE

I, Robert Allen Stanford, swear under the penalty of perjury and certify that I have provided a true

and correct copy of "Appellant's Brief" to the United States Attorney's Office at the address below,

and four copies to the Clerk of the Court for the Fifth Circuit Court of Appeals via U.P.S. on,

*September 10,* _____ 2014.


*R. allen Stanford*
Robert Allen Stanford, Pro se
Reg. No. #35017-183
FCC Coleman USP II
P.O. Box 1034
Coleman, FL 33521

U.S. Attorneys Office
P.O. Box 61129
Houston, TX 77028

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).  It contains 56,442 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and this Defendant-Appellant Robert Allen Stanford asked permission to file a principal brief not exceeding 60,000 words.

Undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word 2013.

*A. allen Stanford*

Robert Allen Stanford, Pro se
Reg. No. #35017-183
FCC Coleman USP II
P.O. Box 1034
Coleman, FL 33521