NO. 12-20411

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ROBERT ALLEN STANFORD, also known as
Sir Allen Stanford, also known as Allen Stanford,

Defendant-Appellant.

_____

On Appeal from the United States District Court
For the Southern District of Texas
Houston Division, Criminal No. H-09-342

_____

BRIEF OF THE UNITED STATES

_____

KENNETH MAGIDSON
United States Attorney

RENATA A. GOWIE
Chief, Appellate Division

LAURETTA DRAKE BAHRY
Assistant United States Attorney
U.S. Attorney's Office for the
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, Texas 77002
713-567-9102

ATTORNEYS FOR APPELLEE

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary in this case. The facts and legal arguments are adequately presented in the briefs and record.  Most of the issues were fully briefed by the parties in the district court.  The remaining issues are clearly resolved under existing legal authority. Accordingly, oral argument would not significantly aid the decisional process. Fed. R. App. P. 34(a)(2)(C).

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ....................................i

TABLE OF AUTHORITIES.....................................................................ix

STATEMENT OF JURISDICTION.......................................................2

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE ..................................................................3

    A.    Course of Proceedings and Disposition Below.......................3

    B.    Statement of Facts .................................................................4

        1.    Overview.......................................................................4

        2.    The Origins of Stanford's 20-Year Investment Fraud Scheme ............................................................8

        3.    Stanford Closely Supervised the Fraud ......................19

        4.    Stanford Used CD Funds to Finance His Businesses and Opulent Lifestyle ...............................20

        5.    Stanford Orchestrated an Elaborate Cover-Up...........21

            a.    The Secretive Culture of the Organization ........21

            b.    Stanford Bribes C.A.S. Hewlett, the Antiguan Auditor...............................................25

            c.    Stanford Corrupts Leroy King, the FSRC Regulator..........................................................26

ii

# TABLE OF CONTENTS
## (continued)

Page

    6.     Stanford Obstructs the SEC Investigation .................27

    7.     The Scheme Unravels .................................................28

SUMMARY OF ARGUMENT ...................................................35

ARGUMENT .........................................................................40

  I.    Stanford's Jurisdictional Challenge Regarding the SEC Fails Because the SEC is Not a Party to the Criminal Prosecution ...........................................................40

    A.    Standard of Review ......................................40

    B.    Application .................................................40

  II.   Under Plain-Error Review, the Superseding Indictment Sufficiently Apprised Stanford of the Charges Against Him. ......................................................................46

    A.    Standard of Review ......................................46

    B.    Application .................................................48

         1.    Enlarged Time Period .........................49

         2.    Particularity........................................62

            Wire Fraud Count Four ......................63

            Mail Fraud Counts Seven through Eleven.........66

# <u>TABLE OF CONTENTS</u>
## (continued)

<u>Page</u>

3.    Multiplicity and Duplicity ................................. 70

4.    Incorporation by Reference................................. 73

III.  Judge Hittner Acted Within His Discretion in Denying Stanford's Request for a 90-Day Trial Continuance. ........... 75

A.    Standard of Review....................................................... 75

B.    Application ................................................................. 76

1.    Detention Center Conditions............................. 77

2.    Voluminous Discovery ....................................... 78

3.    Recent Competency............................................ 81

4.    Budgetary and Expert Restraints ...................... 82

5.    Illness of Litigation Specialist ........................... 84

C.    Under Plain-Error Review, Stanford Was Not Entitled to a Continuance on the Basis of His Challenges to the Superseding Indictment and on the Basis of an Alleged *Brady* Violation...................... 89

# TABLE OF CONTENTS
## (continued)

Page

IV.  The Parallel Civil Proceedings Brought by the SEC and Criminal Proceedings Brought by the United States Did Not Violate the Double Jeopardy Clause……………. ................................................................91

    A.  Standard of Review ....................................................91

    B.  Application ................................................................92

V.  Judge Hittner Correctly Denied Stanford's Motion to Suppress Evidence Obtained By the Receiver and Produced to Investigative Agencies. ....................................96

    A.  Factual Background....................................................96

    B.  Standard of Review ....................................................97

    C.  Application ................................................................98

        1.  No Government Action .......................................98

        2.  Lack of Standing .............................................103

        3.  Lawful Court Order .........................................107

        4.  Mootness.........................................................108

# TABLE OF CONTENTS
## (continued)

**Page**

VI.  Judge Hittner Properly Responded to Jury Notes #2 and #3 on the Definition of "Scheme" and the Meaning of "CDO." ............................................................. 116

    A.  Factual Background for "Scheme" Definition ........... 116

    B.  Standard of Review .................................................... 117

    C.  Application ................................................................. 117

    D.  Factual Background for "CDO" Definition ................ 123

    E.  Standard of Review .................................................... 124

    F.  Application ................................................................. 125

VII. Judge Hittner Correctly Applied the Sentencing Guideline Enhancements. ................................................... 127

    A.  Guideline Calculations and Sentence ........................... 127

    B.  Standard of Review ....................................................... 130

    C.  Stanford's Sentence was Procedurally Sound ................ 131

        1.  Amount of Loss ................................................... 132

        2.  Endangering the Safety of a Financial Institution ........................................................... 135

        3.  Number of Victims ............................................. 137

        4.  Relocation to Evade Regulatory Officials ......... 138

vi

# TABLE OF CONTENTS
## (continued)

**Page**

5.    Abuse of a Position of Trust ............................. 139

6.    Leader or Organizer of Criminal Activity ........ 141

7.    Obstruction of Justice ..................................... 143

8.    Engaging in Monetary Transactions Derived from Unlawful Activity ...................... 144

9.    No Cumulative Error ....................................... 145

VIII. Judge Hittner Showed No Partiality Toward the United States During Trial. ............................................... 146

A.    No Abuse of Discretion in Denying New Counsel ..... 147

1.    Factual Background as to Michael Sydow ....... 147

2.    Application ...................................................... 151

3.    Factual Background as to Stephen Cochell ...... 152

4.    Application ...................................................... 153

B.    Judge Hittner's Competency Ruling was Not "Clearly Arbitrary or Unwarranted." ........................ 154

1.    Relevant Facts ................................................ 155

2.    Application ...................................................... 156

vii

# TABLE OF CONTENTS
## (continued)

**Page**

3.    Dr. Herbel............................................................ 164

C.    Stanford's Challenge to the Jury Charge Fails for
Inadequate Briefing. .................................................. 167

D.    Stanford Fails to Establish that Judge Hittner
Abused His Discretion in Various Evidentiary
Rulings. ...................................................................... 168

IX.    No Cumulative Error Exists. ............................................... 174

CONCLUSION ........................................................................... 175

CERTIFICATE OF SERVICE........................................................ 176

CERTIFICATE OF COMPLIANCE................................................. 177

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Alleyne v. United States*, 133 S. Ct. 2151 (2013) .................... 38, 130, 131

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ......................... 38, 130, 131

*Brady v. Maryland*, 373 U.S. 83 (1963) ......................................... *passim*

*Braverman v. United States*, 317 U.S. 49 (1942) .................................... 73

*Davis v. United States*, 131 S. Ct. 2419 (2011) ..................................... 107

*Henderson v. United States*, __ U.S. __ , 133 S. Ct. 1121 (2013) ...... 46, 47

*Hudson v. United States*, 522 U.S. 93 (1997) .................................... 37, 93

*Janvey v. Adams*, 588 F.3d 831 (5th Cir. 2009) ................................... 100

*Maggio v. Fulford*, 462 U.S. 111 (1983) ........................................ 154, 155

*Minnesota v. Carter*, 525 U.S. 83 (1998) ............................................. 103

*Missouri v. Hunter*, 459 U.S. 359 (1983) ............................................... 72

*Oliver v. Scott*, 276 F.3d 736 (5th Cir. 2002) ................................. *passim*

*Pendergest-Holt v. Certain Underwriters*, 600 F.3d 562
    (5th Cir. 2010) ............................................................................. 151

*Pentz v. United States*, 2011 WL 3269460
    (M.D. Florida July 29, 2011) (unpublished) ................................ 104

*Quilling v. Funding Resource Grp.*, 227 F.3d 231 (5th Cir. 2000) ......... 94

# TABLE OF AUTHORITIES
## (Continued)

**Cases**                                                                **Page(s)**

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) ................................... 42, 43

*SEC v. Bilzerian*, 29 F.3d 689 (D.C. Cir. 1994) ..................................... 94

*SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376
    (S.D.N.Y. Sept. 13, 2010) ............................................................. 94

*SEC v. First Financial*, 659 F.2d 660 (5th Cir. 1981) ................... *passim*

*SEC v. Palmisano*, 135 F.3d 860 (2d Cir. 1998) .................................... 94

*SEC v. Stanford*, No. 3:09-CV-298 (N.D. Tex.) .............................. *passim*

*Smart v. Jones*, 530 F.2d 64 (5th Cir. 1976) ....................................... 100

*United States v. Akins*, 746 F.3d 590 (5th Cir.),
    *cert. denied,* 135 S. Ct. 189 (2014) ................................... 76, 78, 83

*United States v. Alaniz*, 726 F.3d 586 (5th Cir. 2013) ........................ 142

*United States v. Alford*, 999 F.3d 818 (5th Cir. 1993) ............... 86, 87, 88

*United States v. Arlen*, 947 F.2d 139 (5th Cir. 1991) ...................... 63, 64

*United States v. Beszborn*, 21 F.3d 62 (5th Cir. 1994) ..................... 94, 99

*United States v. Birdsell*, 775 F.2d 645 (5th Cir. 1985) ...................... 154

*United States v. Blevins*, 755 F.3d 312 (5th Cir. 2014) ......... 46, 70,71, 73

*United States v. Brooks*, 681 F.3d 678 (5th Cir. 2012) ........................ 144

x

# TABLE OF AUTHORITIES
## (Continued)

**Cases**                                                          **Page(s)**

*United States v. Bryant*, 770 F.2d 1283 (5th Cir. 1985) .................. 56, 57

*United States v. Creech*, 408 F.3d 264 (5th Cir. 2005) .......................... 71

*United States v. Crippen*, 579 F.2d 340 (5th Cir. 1978) ........................ 62

*United States v. Dadi*, 235 F.3d 945 (5th Cir. 2000) ........................... 142

*United States v. Davis*, 226 F.3d 346 (5th Cir. 2000) ........................... 60

*United States v. Davis*, 306 F.3d 398 (6th Cir. 2002) .................... *passim*

*United States v. Delgado*, 672 F.3d 320
    (5th Cir. 2012) (en banc) ..................................................... 122,123

*United States v. Dockins*, 986 F.2d 888
    (5th Cir. 1993) ................................................... 154, 156,164, 168

*United States v. Doggett*, 230 F.3d 160 (5th Cir. 2000) ....................... 131

*United States v. El-Mezain*, 684 F.3d 467 (5th Cir. 2011)...................... 98

*United States v. Ellender*, 947 F.2d 748 (5th Cir. 1991) .................. 49, 56

*United States v. Ely*, 142 F.3d 1113 (9th Cir. 1997) .............................. 99

*United States v. Feldman*, 761 F.2d 380 (7th Cir. 1985)........................ 90

*United States v. Ferguson*, 478 F. Supp. 2d 220 (D. Conn. 2007) .......... 80

*United States v. Fuchs*, 467 F.3d 889 (5th Cir. 2006).................... *passim*

xi

# TABLE OF AUTHORITIES
## (Continued)

**Cases**                                                                    **Page(s)**

*United States v. Gartner*, 93 F.3d 633 (9th Cir. 1996) ............................ 94

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) ......................... 147

*United States v. Goodwin*, 457 U.S. 368 (1982) ................................. 57, 58

*United States v. Gray*, 751 F.2d 733 (5th Cir. 1985) ..................... *passim*

*United States v. Guzman*, 754 F.2d 487 (2d Cir. 1985) ......................... 90

*United States v. Hamilton*, 440 F.3d 693 (5th Cir. 2006) ..................... 130

*United States v. Hatch*, 926 F.2d 387 (5th Cir. 1991) ....................... 63-69

*United States v. Hickey*, 367 F.3d 888 (9th Cir. 2004) .............. 40, 43, 45

*United States v. Hinojosa*, 749 F.3d 407 (5th Cir. 2014) ..................... 130

*United States v. Isgar*, 739 F.3d 829 (5th Cir.),
    *cert. denied,* 135 S. Ct. 123 (2014) ......................................... *passim*

*United States v. Ismoila*, 100 F.3d 380 (5th Cir. 1996) ......................... 61

*United States v. Jones*, 733 F.3d 574 (5th Cir. 2013) ..................... *passim*

*United States v. Kizzee*, 150 F.3d 497 (5th Cir. 1998) ............... 76, 89, 91

*United States v. Knowles*, 29 F.3d 947 (5th Cir. 1994) ........................... 74

*United States v. Kordel*, 397 U.S. 1 (1970) ................................. 36, 92, 95

# TABLE OF AUTHORITIES
## (Continued)

**Cases**                                                         **Page(s)**

*United States v. Leon*, 468 U.S. 897 (1984)...........................................107

*United States v. Marek*, 238 F.3d 310 (5th Cir. 2001) (en banc)............67

*United States v. Mauskar*, 557 F.3d 219 (5th Cir. 2009)........................73

*United States v. McGilberry*, 480 F.3d 326 (5th Cir. 2007)....................46

*United States v. Mendoza*, 522 F.3d 482 (5th Cir. 2008)......................120

*United States v. Mitov*, 460 F.3d 901 (7th Cir. 2006)..............................50

*United States v. Murray*, 648 F.3d 251 (5th Cir. 2011)........................136

*United States v. Njoku*, 737 F.3d 55 (5th Cir. 2013),
    *cert. denied,* 134 S. Ct. 2319 (2014)................................................71

*United States v. Ollison*, 555 F.3d 152 (5th Cir. 2009)........................140

*United States v. Paternostro*, 966 F.2d 907
    (5th Cir. 1992) ........................................................... 147, 152, 153

*United States v. Perry*, 152 F.3d 900 (8th Cir. 1998).............................94

*United States v. Pratt*, 728 F.3d 463 (5th Cir. 2013),
    *cert. denied,* 134 S. Ct. 1328 (2014)................................................62

*United States v. Rainey*, 757 F.3d 234 (5th Cir. 2014), *cert. denied,*
    2015 WL 303235 (U.S. Jan. 26, 2015) (No. 14-374)................73, 74

## TABLE OF AUTHORITIES
### (Continued)

**Cases**                                                    **Page(s)**

*United States v. Ramos-Cardenas*, 524 F.3d 600
  (5th Cir. 2008) ............................................................ 117, 125, 126

*United States v. Reagan*, 596 F.3d 251 (5th Cir. 2010) ......................... 72

*United States v. Reedy*, 304 F.3d 358 (5th Cir. 2002) ........................... 71

*United States v. Richardson*, 676 F.3d 491 (5th Cir. 2012) ................. 168

*United States v. Ruiz*, 621 F.3d 390 (5th Cir. 2010) ........................... 145

*United States v. Schmick*, 904 F.2d 936 (5th Cir. 1990) ....................... 49

*United States v. Setser*, 568 F.3d 482 (5th Cir. 2009).................... *passim*

*United  States v. Simpson*, 741 F.3d 539 (5th Cir.),
  *cert. denied,* 134 S. Ct. 2318 (2014)....................................... *passim*

*United States v. Skilling*, 554 F.3d 529 (5th Cir. 2009),
  *vacated on other grounds,* 130 S. Ct. 2896 (2010) ................ *passim*

*United States v. Stalnaker*, 571 F.3d 428
  (5th Cir. 2009) ......................................................... 76, 78, 88, 175

*United States v. Stephens*, 571 F.3d 401 (5th Cir. 2009)............... 61, 175

*United States v. Stricklin*, 591 F.2d 1112 (5th Cir. 1979) .......... 49, 73, 74

*United States v. Sutherland*, 656 F.2d 1181 (5th Cir. 1981).................. 62

*United States v. Swafford*, 512 F.3d 833 (6th Cir. 2008) ................. 50, 61

xiv

# TABLE OF AUTHORITIES
## (Continued)

**Cases**                                                                                      **Page(s)**

*United States v. Traxler*, 764 F.3d 486 (5th Cir. 2014) .......................... 40

*United States v. Tuma*, 738 F.3d 681 (5th Cir. 2013),
   *cert. denied,* 134 S. Ct. 2875 (2014).............................................. 131

*United States v. Umawa Oke Imo*, 739 F.3d 226 (5th Cir. 2014)......... 131

*United States v. Valdez*, 453 F.3d 252 (5th Cir. 2006) ..................... 50, 61

*United States v. Van Waeyenberghe*, 481 F.3d 951 (7th Cir. 2007)........ 94

*United States v. Verderame*, 51 F.3d 249 (11th Cir. 1995)............... 80, 81

*United States v. Villarreal*, 324 F.3d 319 (5th Cir. 2003) .................... 145

*United States v. Vincent*, 416 F.3d 593 (7th Cir. 2005) ................... 78, 80

*United States v. Wallace*, 759 F.3d 486 (5th Cir. 2014)....................... 130

*United States v. Willett*, 751 F.3d 335 (5th Cir. 2014)......................... 140

*United States v. Williams*, 819 F.2d 605 (5th Cir. 1987)..................... 155

*United States v. Wise*, 221 F.3d 140 (5th Cir. 2000)............................ 168

*United States v. Zuniga*, 720 F.3d 587 (5th Cir. 2013)........................ 131

*Walter v. United States*, 447 U.S. 649 (1980) ........................................ 98

*Weeks v. Angelone*, 528 U.S. 225 (2000)................................ 119, 120, 123

# TABLE OF AUTHORITIES
## (Continued)

**Cases**                                                                              **Page(s)**

*Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993) .............................. *passim*

Rules and Statutes

Fed. R. App. P. 4(b).......................................................................... 2

Fed. R. App. P. 34(a)(2)(C) ...............................................................i

Fed. R. Civ. P. 66............................................................................. 94

Fed. R. Crim. P. 8(a) ....................................................................... 72

Fed. R. Crim. P. 12(b)(3) ................................................................ 71

Fed. R. Crim. P. 12(e) ..................................................................... 71

Fed. R. Crim. P. 16(a)(2) ................................................................ 79

Fed. R. Crim. P. 49.1 ...................................................................... 64

Fed. R. Evid. 702 ..................................................................... 82, 83

18 U.S.C. § 371 ...................................................................... 50, 129

18 U.S.C. § 1341 ............................................... 66, 72, 118, 128

18 U.S.C. § 1343 ............................................... 63, 72, 118, 128

18 U.S.C. § 1349 .................................................... 50,  72, 129

18 U.S.C. § 1505 ........................................................................ 129

# TABLE OF AUTHORITIES
## (Continued)

**Rules and Statutes**                                          **Page(s)**

18 U.S.C. § 1956 .................................................................. 128, 144

18 U.S.C. § 1956(h)..................................................................... 129

18 U.S.C. § 3231 ............................................................................ 2

18 U.S.C. § 3742(a) ........................................................................ 2

28 U.S.C. § 1291 ............................................................................ 2

U.S. Sentencing Guidelines

U.S.S.G. § 2B1.1 ........................................................................ 127

U.S.S.G. § 2B1.1(b)(1)(P)...................................................... 127, 132

U.S.S.G. § 2B1.1(b)(2)(C)....................................................... 128, 137

U.S.S.G. § 2B1.1(b)(10)(A)..................................................... 127, 138

U.S.S.G. § 2B1.1(b)(15)(B)(i) ................................................ 127, 135

U.S.S.G. § 2S1.1(b)(2)(B) ....................................................... 128, 144

U.S.S.G. § 3B1.1(a)......................................................... 128, 141, 142

U.S.S.G. § 3B1.3 ...................................................................... 128, 139

U.S.S.G. § 3B1.3 cmt. (n.1).............................................................. 140

U.S.S.G. § 3C1.1 ...................................................................... 128, 143

# TABLE OF AUTHORITIES
## (Continued)

**U.S. Sentencing Guidelines**                                                     **Page(s)**

U.S.S.G. § 3D1.2(c) ................................................................................... 127

U.S.S.G. § 3D1.2(d) ................................................................................... 127

U.S.S.G. § 5A, cmt. (n.2) ........................................................................... 128

U.S.S.G. § 5G1.2(d) ............................................................................ 129, 145

U.S.S.G. Ch. 5, Pt. A ................................................................................. 128

<u>Other Authorities</u>

12 Charles Alan Wright, et. Al., Fed. Prac. & Proc. § 2981
    (2d ed. 1997) ....................................................................................... 99

Fifth Circuit Pattern Jury Instructions (Criminal)
    § 2.59 (West 2012) ............................................................................ 118

Fifth Circuit Pattern Jury Instructions (Criminal)
    § 2.60 (West 2012) ............................................................................ 118

No. 12-20411

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ROBERT ALLEN STANFORD, also known as
Sir Allen Stanford, also known as Allen Stanford,

Defendant-Appellant.

_____

On Appeal from the United States District Court
For the Southern District of Texas
Houston Division, Criminal No. H-09-342

_____

BRIEF OF THE UNITED STATES

_____

The United States of America, Plaintiff-Appellee, by the United States Attorney for the Southern District of Texas, files this brief in response to that of Defendant-Appellant Robert Allen Stanford.

## STATEMENT OF JURISDICTION

This was a prosecution of federal offenses; the district court had jurisdiction under 18 U.S.C. § 3231. Stanford appeals from the judgment imposed and entered by the district court (Hittner, J.) on June 14, 2012 (USCA5 Supp. 6 82, 14012-14018).[1] Stanford filed a timely notice of appeal the same day (USCA5 Supp. 6 82, 14008-14010), Fed. R. App. P. 4(b), thereby vesting this Court with jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

I.   Whether Stanford's jurisdictional challenge regarding the SEC fails because the SEC is not a party to the criminal prosecution.

II.  Whether, under plain-error review, the superseding indictment sufficiently apprised Stanford of the charges against him.

III. Whether Judge Hittner properly exercised his discretion in denying a 90-day trial continuance.

IV.  Whether the parallel civil proceedings brought by the SEC and criminal proceedings brought by the United States violate the Double Jeopardy Clause.

---

[1] The record is cited by the USCA5 page number in the lower right corner. Government Exhibits ("GX") are cited by exhibit number.

V.    Whether Judge Hittner correctly denied Stanford's motion to suppress evidence obtained by the Receiver and produced to investigative agencies.

VI.   Whether Judge Hittner properly responded to jury notes #2 and #3 on the definition of "scheme" and the meaning of "CDO."

VII.  Whether Judge Hittner correctly applied the sentencing guideline enhancements.

VIII. Whether Judge Hittner showed no partiality to the United States during trial.

IX.   Whether cumulative error exists.

## STATEMENT OF THE CASE

A.    <u>Course of Proceedings and Disposition Below</u>

A 14-count superseding indictment charged Stanford with the following offenses:  (1) conspiracy to commit wire fraud and mail fraud (count one); (2) five counts of wire fraud (counts two through six); (3) five counts of mail fraud (counts seven through 11); (4) conspiracy to obstruct an investigation by the United States Securities and Exchange Commission (SEC) (count 12); (5) obstruction of an SEC investigation (count 13); and (6) conspiracy to commit money laundering (count 14) (USCA5 Supp. 6 650-684).

3

After a 30-day trial, a jury found Stanford guilty of all counts except for one count of wire fraud (count two) (USCA5 Supp. 6 12688-12872).   Judge Hittner sentenced Stanford to a total term of 1,320 months of imprisonment (110 years) (USCA5 Supp. 6 14014).   The court also imposed a total three-year term of supervised release and a $1,300 special assessment, but no fine or restitution (USCA5 Supp. 6 14015, 14017).   The court ordered forfeiture of $ 5.9 billion in the form of a personal money judgment as stated in the Amended Order of Forfeiture entered on June 1, 2012 (ROA. 14018).

B.     Statement of Facts

1.     *Overview*

Stanford   Financial   Group   Company   (SFG),   a   company incorporated in Florida and the Caribbean island nation of Antigua, provided its affiliated companies in the financial services industry with a variety of services, including accounting and investment services. Stanford was the founder and sole shareholder of SFG and its subsidiaries, including Stanford International Bank Ltd. (SIB) and Stanford Group Company (SGC).

SIB, an offshore bank, operated on the island of Antigua and primarily sold certificates of deposit ("CDs") that promised higher rates of return than CDs sold in the United States. Stanford was the sole owner, shareholder, and chairman of the Board of Directors of SIB. The Financial Services Regulatory Commission (FSRC), an Antiguan government agency, conducted inspections of Antiguan banks to determine their solvency, review their investments, and confirm the accuracy of their reported returns. The FSRC regulated SIB.

SGC, headquartered in Houston, Texas, with over 20 offices throughout the United States, operated as a broker dealer and investment advisor. Financial advisors who worked for SGC sold SIB CDs to potential investors in the United States. The SEC regulated SGC.

From roughly 1990 through 2009, Stanford and his co-conspirators engaged in a fraudulent investment scheme to induce investors to purchase CDs from SIB. Stanford reviewed and approved all SIB marketing materials and annual reports disseminated to potential and existing SIB CD investors. These documents contained the following

5

material misrepresentations, among others: (1) CDs would be invested by global money managers in conservative, highly liquid assets, when in reality, Stanford funneled billions of dollars into his own projects and companies; (2) CDs consistently earned substantial rates of return with sufficient assets to repay depositors, when in reality, SIB steadily lost money because Stanford used the investment portfolio for his own personal use; (3) Stanford injected hundreds of millions of dollars of his own personal wealth into SIB, when in reality, no cash injections ever occurred; and (4) the FSRC, the Antiguan regulatory agency, in addition to C.A.S. Hewlett, an outside auditor, conducted regulatory oversight of SIB, when in reality, Stanford bribed both Leroy King, the administrator of the FSRC, and Hewlett with millions of dollars to affirm the accuracy of SIB's financial statements, annual reports, and other materials. Stanford also bribed King, beginning in 2005 and continuing through 2009, to assist in the obstruction of an SEC investigation into the accuracy and content of SIB's investment portfolio.

By the end of 2008, Stanford spent $2 billion of CD depositor money in the form of undisclosed "loans" to fund his failing personal business ventures, and lavish lifestyle that included numerous yachts, private jets, and worldwide residences.   In addition, he funneled millions of dollars to pay bribes to Hewlett and King to falsely affirm the solvency of SIB's investment portfolio.  By December 2008, during a serious worldwide economic downturn, SIB represented to its investors that the bank had $8.5 billion in assets.    As Stanford and his co-conspirators were aware, the $8.5 billion representation was entirely fictional and SIB owed investors $7 billion in CD deposits.   Despite Stanford's assurances to investors, the bank could not sustain the rate of redemptions during this time period because of its insufficient assets. Investors testified about unsuccessful attempts to withdraw their money in early January 2009.  On February 16, 2009, a federal judge in the Northern District of Texas appointed a Receiver for the Stanford companies.  The following day, the Receiver took over the companies, including SIB and SGC.

Testimony from former Stanford employees, including Jim Davis, the Chief Financial Officer (CFO) of SFG, SFG financial advisors, and SFG accountants established that Stanford committed the fraudulent investment scheme on investors. Bank marketing materials, disclosure statements, annual reports and other documents introduced at trial supported the witnesses' testimony.

2. *The Origins of Stanford's 20-Year Investment Fraud Scheme*

Stanford's investment fraud began when he founded Guardian International Bank, Ltd. (Guardian) prior to 1990 on the island of Montserrat in the Caribbean (USCA5 Supp. 6 4394-4395). The bank's primary business revolved around CDs, which averaged a higher rate of return than those issued by United States banks (USCA5 Supp. 6 4409-4410). Although Guardian was located offshore, its marketing and salesforce operated from Houston, Texas (USCA 5 Supp. 6 4396-4397).

Stanford explained to Michelle Chambliess, a 15-year sales executive, that the bank strictly prohibited United States customers because he did not want United States banking regulators performing audits (USCA5 Supp. 6 4401). As an offshore bank, Guardian had no

8

United States-regulated insurance, such as from the Federal Deposit Insurance Corporation (FDIC) (USCA5 Supp. 6 4402).

Through marketing materials and purportedly audited annual reports, Stanford represented that Guardian:   (1) invested in high quality, liquid, safe, conservative investments; (2) made no loans unless to depositors themselves and only up to 80% of the CD to ensure no credit risk; (3) employed global money managers to oversee investments on a daily basis; and (4) underwent rigorous audits by an independent auditor who applied more stringent regulations than those used in the United States (GX 100-106, 519, 522).  Employees such as Chambliess, Jason Green, and many others believed these representations based upon the very same marketing materials given to depositors, training materials, and Stanford's own statements (USCA5 Supp. 6 4406-4410, 4412, 4416, 4964, 4975, 6153, 6159, 6804-6805, 6910; GX 131, 136, 151). Victim-depositors such as Joseph Flynn, Diane Hammer, and James Larson materially relied upon the bank's representations of diversity, liquidity, and security as represented in the bank's promotional materials and annual reports (USCA5 Supp. 6 5354-5357, 5375-5378,

9

5416, 8291, 8294-8299, 8306, 8369-8370, 8377, 8538, 8541, 8545-8552, 8560; GX 118, 138, 1000, 1001, 1037).

None of the representations were true.  Before 1990, Stanford began siphoning depositor funds to speculative real estate ventures that he owned (USCA5 Supp. 6 6173, 6835-6836).  Jim Davis, Stanford's CFO, testified that by late 1990, at least half of the bank's assets were non-existent (USCA5 Supp. 6 6833-6834, 6840, 6877).  Davis and Stanford were college roommates and Davis began to work for Stanford in 1988 (USCA5 Supp. 6 4416, 6777-6778, 6780).  From 1988 through 2009, Davis participated with Stanford in lying to CD depositors about the assets of SIB, by overstating the value and types of investments (USCA5 Supp. 6 6774).  Davis pleaded guilty in August 2009 to conspiring with Stanford to commit mail, wire, and securities fraud and conspiring to impede an SEC investigation (USCA5 Supp. 6 6774-6775; GX 1514, 1515).

Stanford admitted to Davis that the depositors' funds were not invested as reported, nevertheless, Stanford believed his real estate ventures and future CD sales would fill "the hole" – the difference

10

between the principal and accrued interest owed to depositors and the bank's actual and much lower assets (USCA5 Supp. 6 6835-6836, 6839-6840, 6905-6906).

In reality, Stanford secretly diverted depositors' funds from the bank into a web of companies he personally owned, using overseas bank accounts to launder the stolen funds.  The bank never had the ability to repay its depositors all the funds owed to them (USCA5 Supp. 6 7072). Every year, Stanford signed annual reports containing material misrepresentations that were sent to depositors (USCA5 Supp. 6 7072-7077; GX 100-106).  For example, the bank always reported year-end profits in its annual reports (USCA5 Supp. 6 7073, 7075).  The annual reports provided depositors with information from management about the balance sheet of assets and liabilities and about the breakdown of investments in the bank's portfolio (USCA5 Supp. 6 6355, 6358, 6360-6361).  Stanford advised Davis that the bank never had a profitable year after 1986, but he needed to show a profit nonetheless to ensure CD sales (USCA5 Supp. 6 6888, 6898, 7074).  Each year, the two men discussed and created fake profit numbers for the annual report

11

(USCA5 Supp. 6 7074-7077).   Stanford approved the false numbers every single time (USCA5 Supp. 6 7077).   For victim-depositor Larson, the bank's representation of a 20-year consistent profitability influenced him to purchase a CD (USCA5 Supp. 6 8546-8547).

On November 28, 1990, the Ministry of Finance and Economic Development of Montserrat faxed an intent to revoke Guardian's banking license to Stanford at his Houston offices (USCA5 Supp. 6 4857, 4661-4662; GX 511).   The revocation letter cited the following reasons:   using an unapproved Antiguan auditor (C.A.S. Hewlett); operating in a manner detrimental to depositors; failing to supply satisfactory details about bank liquidity; having a formerly bankrupt director (Stanford had a failed fitness business); and failing to maintain good standing by failing to submit annual reports through January 31, 1990 (USCA5 Supp. 6 4859-4861, 6779-6780; GX 511).   Stanford told Davis about the letter in December 1990 and instructed him not to share it with anyone (USCA5 Supp. 6 6845-6846).   Because of the impending Montserrat revocation, Stanford advised Davis that he wanted to move the bank to Antigua (USCA5 Supp. 6 6845, 6847).   He

instructed Davis to tell employees that the bank was leaving Montserrat because the island had sustained damage from Hurricane Hugo in 1989 (USCA5 Supp. 6 6846). In Guardian's 1990 annual report, the following representation was made to depositors and potential clients: "At Sept. 17, 1990 board of directors meeting, a decision was made to consolidate the bank's operations in Antigua, West Indies" (USCA5 Supp. 6 4862-4863; GX 103). No board meeting had occurred on September 17, 1990 (R. 6845, 6849-50).

In 1991, Guardian relocated from Montserrat to Antigua (USCA5 Supp. 6 7090). In exchange for the banking license, the Antiguan government requested that Stanford buy the insolvent Bank of Antigua, which he did for $20 million in depositor funds (USCA5 Supp. 6 6851-6852). He also used depositor funds to loan the Antiguan government $40 million, which was never repaid (USCA5 Supp. 6 6853). The Antiguan government knighted him "Sir Allen Stanford," which Stanford asserted was a good marketing device for the bank (USCA5 Supp. 6 6854).

13

Although the bank relocated to Antigua and changed its name to SIB, the core fraud surrounding the CD remained the same (USCA5 Supp. 6 4442, 6850). By 1998, SIB began selling CDs in the United States through its broker dealer SGC located in Houston, Texas (USCA5 Supp. 6 4445-4447, 6909, 7232-7234). CD investors believed through marketing materials and assurances by financial advisors who sold SIB CDs that the bank invested in highly liquid, safe, globally-diversified, conservative investments overseen by global money managers, but their CD funds actually served as Stanford's personal piggy bank (GX 107-120, 131, 136).

By the end of 2008, over $2 billion in CD monies went to over 50 of Stanford's failing businesses in the Caribbean and elsewhere, including, among others: restaurants, two airlines, a newspaper, and a group of companies that existed exclusively for tax purposes for Stanford's fleet of jets and boats, including a 112-foot yacht that he spent $13 million renovating (USCA5 Supp. 6 6180-6182, 6225, 8102, 8107, 8096, 8098; GX 332C). One company, "Stanford 20/20," existed to sponsor a cricket tournament with a $20 million prize, all consisting of money from depositors (USCA5 Supp. 6 7019). Nothing in the annual reports or in

any promotional materials ever informed CD depositors that their money funded risky start-up investments in companies owned by Stanford (USCA5 Supp. 6 6929, 6723). Instead, depositors understood from marketing materials and financial advisors that SIB made conservative, safe, and liquid investments with their money (USCA5 Supp. 6 6723).

Because Stanford's businesses constantly hemorrhaged money, he routinely stole from SIB in the form of undisclosed "loans." Patricia Maldonado, Stanford's corporate treasurer, regularly advised Stanford of the cash needs of his businesses (USCA5 Supp. 6 6934-6937; GX 302, 313). Stanford approved the transfer of depositor funds to one of his Swiss bank accounts, from there the funds would be routed to his various companies or to his own personal account for various expenses (USCA5 Supp. 6 6934-6937). By 2008, Stanford infused approximately $1 million dollars a day in depositor funds to keep his businesses afloat (USCA5 Supp. 6 6725, 6766, 7265-7266, 7566).

15

Henry Amadio, an accountant at SFG, tracked the flow of CD funds from SIB to Stanford, the sole shareholder, to the different Stanford-affiliated companies (USCA5 Supp. 6 6367, 6372, 6380; GX 331A, 331B, 331C, 332C).  He compiled shareholder funding reports on a monthly basis and sent them to his supervisors, Gil Lopez, SFG Controller and ultimately Chief Accounting Officer, and Mark Kuhrt, SFG Global Controller, who shared them with Davis (USCA5 Supp. 6 6350-6352, 6383-6384).  Stanford received the shareholder funding reports from Davis and the two men discussed them on a regular basis (USCA5 Supp. 6 6383, 6933).  Emails confirmed Stanford's knowledge of the reports (USCA5 Supp. 6 6403-6405; GX 305).  The shareholder funding reports gave a detailed analysis of the Stanford-affiliated companies grouped by region and the total amount of SIB depositor funds used to support them (USCA5 Supp. 6 6399-6400; GX 331A, 331B, 331C, 332C).  Amadio tracked Stanford's misuse of depositor funds, and by the end of 2008, over $2 billion in depositor funds had gone to Stanford-affiliated companies (USCA5 Supp. 6 6421; GX 332C).  Amadio understood from Davis, Kuhrt, and Lopez that he would be fired if he ever disclosed the shareholder funding reports (USCA5 Supp.

16

6 6386-6387, 6744). Only six people in Stanford's entire organization knew of the shareholder funding reports that demonstrated the misuse of depositor funds – Stanford, Davis, Lopez, Kuhrt, Amadio, and Stanford's personal CPA, Henry Failing (USCA5 Supp. 6 6743).

During the 20-year investment fraud scheme, the financial advisors who sold the CDs and depositors repeatedly asked Stanford whether CD funds were invested in Stanford's businesses or were otherwise loaned to Stanford (USCA5 Supp. 6 4925-4926). Stanford consistently lied to them, denying any connection between the CD program and his personal businesses (USCA5 Supp. 6 4510-4511, 5012-5013, 5056, 6163-6164). Employees understood from Stanford that the money for Stanford's projects and companies came from SFG or from Stanford himself (USCA5 Supp. 6 6173, 6186, 6742-6743, 6932-6933, 7062, 8816).

Stanford also lied to his sales staff about the existence of insurance for the deposits. In the early 1990s, Stanford gave a fake insurance policy, which purported to insure the bank and its depositors, to his sales staff to allay any depositors' concerns about buying a CD

17

that lacked FDIC insurance (USCA5 Supp. 6 4435, 4439-4440, 6161-6162; GX 502).    Leo Mejia, the marketing chief for Stanford's advertising company, described how Stanford admitted that the insurance policy had no real value (USCA5 Supp. 6 4653, 4845; GX 502).    Stanford joked that people were greedy and willing to take the risk of no FDIC insurance for an extra 2% interest (USCA5 Supp. 6 4616).    Stanford also revealed to Davis that the policy, which pre-dated Davis's employment, was illegitimate and merely a marketing device that he created (USCA5 Supp. 6 6824-6827, 6831).    When a prospective depositor wanted to confirm the existence of the insurance policy, Stanford instructed Davis to fly to London and fax a false confirmation of the company's existence from a cubicle that Stanford rented (USCA5 Supp. 6 6827-6828).

3.    *Stanford Closely Supervised the Fraud*

Stanford diligently reviewed and revised false investment returns contained in the bank's marketing materials and annual reports before they went to the internal publishing department (USCA5 Supp. 6 4420, 4626, 4965-4966, 6883).  Stanford gave the final approval for the bank's annual reports and promotional materials (USCA5 Supp. 6 6787, 6877-6878).  Ninety percent of the advertising for SFG focused upon the bank (USCA5 Supp. 6 4608).  As Stanford explained to Arnold Knoche, the head of Stanford's real estate company, SIB was the most important of all Stanford-affiliated companies and "drives it all" (USCA5 Supp. 6 6213).  Witnesses involved in marketing, Mejia, Ron Rossi, and Kelly Bailey, all testified that they each, at different times, saw Stanford personally altering asset figures within draft financial statements and annual reports without the use of bank documents (USCA5 Supp. 6 4636-4638, 4896-4897, 8395-8399, 8466, 8527, 9722-9723).

Financial advisors met with potential customers and sold them SIB CDs (USCA5 Supp. 6 6790-6791).  Depositors purchased CDs in two ways, either by a wire transfer from their bank or by a personal

19

check (USCA5 Supp. 6 7084, 7089; GX 4, 7-11). Stanford incentivized his SGC financial advisors to sell CDs to new customers and convince existing depositors to renew their CDs, by paying higher commissions and bonuses (USCA5 Supp. 6 4452-4453, 4449, 7243). Stanford tightly monitored CDs sales, reviewing daily spreadsheets with regional managers (USCA5 Supp. 6 4450, 4999, 5321, 7243; GX 830). He created sales competitions and rewarded financial advisors with annual CD sales of $1 million to Top Producer's Club meetings at luxury hotels, financed by CD depositor funds (USCA5 Supp. 6 5003-5004, 7248-7250).

4. *Stanford Used CD Funds to Finance His Businesses and Opulent Lifestyle*

In addition to the $ 2 billion that Stanford siphoned to his businesses, he diverted millions of dollars in CD deposits to a Swiss slush fund that he controlled at Societe Generale ("Soc Gen") and used for personal expenses (USCA5 Supp. 6 6991). The Soc Gen account existed before Davis began his employment with SFG (USCA5 Supp. 6 6995). Only Stanford and Davis knew about the Soc Gen slush fund account (USCA5 Supp. 6 6992). The account was not documented within the bookkeeping systems of the Stanford companies for internal

20

accountants to track (USCA5 Supp. 6 6992, 6995). Stanford advised Davis that he used the money that flowed from SIB to his Swiss slush fund to pay his personal bills and expenses, to infuse his affiliated companies with cash, and to bribe Leroy King, the Antiguan regulator at the FSRC (USCA5 Supp. 6 6994-6998).

Stanford spent millions of dollars from the Swiss account, funded by CD depositors, on private planes and mansions around the world. He regularly used private planes to fly dry cleaning to Texas or Florida from the Caribbean; bottled artesian water to his St. Croix home; fish to his koi pond in St. Croix; and an IT employee to Antigua to bring him replacement laptops after Stanford repeatedly destroyed his by throwing it against the wall (USCA5 Supp. 6 8125-8127, 9884-9887, 9910).

5.    *Stanford Orchestrated an Elaborate Cover-Up*

a.    The Secretive Culture of the Organization

Stanford represented in marketing materials given to financial advisors that SFG employed a group of expert research analysts in Memphis, Tennessee, who oversaw the bank's entire investment

portfolio, as well as monitored the global money managers who purportedly reviewed the investments on a daily basis (USCA5 Supp. 6 6907).

Laura Pendergest-Holt, SFG's Chief Investment Officer (CIO), supervised the Memphis analysts, who purportedly managed the entire investment portfolio (USCA5 Supp. 6 6910, 6914).    In reality, Pendergest-Holt's analysts managed only 15% of the bank's portfolio, internally referred to as "Tier 2," and had no information about various undisclosed investments in Stanford's personal businesses (USCA5 Supp. 6 6880, 7069, 6919-6920).  Financial analyst Mark Collinsworth testified that he and his Memphis colleagues were expressly instructed never to tell any financial advisors or anyone else that they did not manage the bulk of the bank's portfolio  (USCA5 Supp. 6 5446-5447, 5661-5662).  Davis routinely sent Stanford emails with tracking reports for investment performance in Tier 2 beginning in 2003 through 2008 (GX 200-205, 207-214, 1602).

Cash and cash instruments comprised 10% of the bank's portfolio, internally referred to as "Tier 1" (USCA5 Supp. 6 6871).  Thus, only

25% of the bank's reported assets, Tier 1 and Tier 2, were invested consistently with its annual reports and marketing materials (USCA5 Supp. 6 6881).

Stanford siphoned the remaining 75% of the bank's assets, "Tier 3," to his companies, real estate purchases, and lifestyle (USCA5 Supp. 6 6881-6882). The pet companies were non-liquid and non-marketable investments that did not have securities traded on worldwide exchanges (USCA5 Supp. 6 6884). Although some employees knew about the existence of "Tier 3," they were unaware of its true contents. They were advised that Tier 3 comprised stock and bonds and other investments that were even more conservative than the investments in Tier 2 (USCA5 Supp. 6 5442-5443). Only Stanford, Davis, Lopez, and Kuhrt knew the true nature of "Tier 3" (USCA5 Supp. 6 6881-6882).

At the start of his employment as an accountant at SFG, Amadio traveled to Antigua to conduct an internal audit of SIB in 2002 (USCA5 Supp. 6 6361). Amadio failed to obtain supporting documentation or confirmation of the existence of $1.5 billion in assets reported on the year-end annual report (USCA5 Supp. 6 6360, 6361-6362). Amadio was

23

advised that supporting documents for the investment portfolio were "unique" and "confidential" (USCA5 Supp. 6 6362-6363). This culture of secrecy surrounding the investment portfolio pervaded SFG, where information was strictly disclosed on a "need-to-know basis" (USCA5 Supp. 6 6363). Although Amadio worked for SFG from 2002 through 2009, he never performed another internal audit after the futile 2002 attempt (USCA5 Supp. 6 6361). Luis Garcia, director of internal auditors at SFG, confirmed for Amadio at the end of 2008 that the SIB investment portfolio had never been shared with SIB internal auditors (USCA5 Supp. 6 6498).

The SIB operation manual for senior investment officers instructed them that Antiguan bank regulators prohibited them from discussing specifics about the bank's investment portfolio (GX 218). The director of the FSRC, Althea Crick, whom Stanford promptly removed upon the bank's arrival in Antigua, testified that this was a false statement of Antiguan regulations (USCA5 Supp. 6 6025-6026).

24

b.      Stanford Bribes C.A.S. Hewlett, the Antiguan Auditor

Beginning on Montserrat, Stanford hired only one auditor, C.A.S. Hewlett, a one-man independent auditor from Antigua (USCA5 Supp. 6 4487).   Hewlett rubber-stamped the bank's false financial statements without performing any audits (USCA5 Supp. 6 7140).   In 16 years, Hewlett never received the proper documentation to verify the accuracy of the bank's assets, nor did he ever require it in order to certify the bank's financial position (USCA5 Supp. 6 7140-7141).   Yet every single year, he issued an opinion contained in the annual report verifying the accuracy of the assets (USCA5 Supp. 6 7141; GX 100-120).   Stanford commented to Davis, "God led me to Hewlett" (USCA5 Supp. 6 7139). Hewlett died prior to trial (USCA5 Supp. 6 7156).

Stanford paid more than $3.3 million to Hewlett from the Soc Gen Swiss slush fund, in addition to the above-normal $1.2 million in auditor fees he paid him through the SFG operating account (USCA5 Supp. 6 7141-7146, 9080; GX 1610).   Stanford was regularly copied on transmittal letters to Soc Gen to increase Hewlett's monthly bribes (USCA5 Supp. 6 6457-6458; GX 1220A).

25

c.      Stanford Corrupts Leroy King, the FSRC Regulator

As one of his first actions on the island of Antigua, Stanford removed Althea Crick, the chief banking regulator for the FSRC, after she declined a free airline upgrade from Stanford and criticized his interference with regulators (USCA5 Supp. 6 5886-5890, 5894-5895, 5923).

Leroy King became the head of the FSRC and regularly accepted cash bribes from Stanford to overlook the false financial reports submitted by SIB to the FSRC (USCA5 Supp. 6 6871-6872, 7091). Stanford and King sealed the deal by cutting themselves in a blood-oath ceremony (USCA5 Supp. 6 6856, 7090).   Stanford authorized cash transfers from SIB to his Soc Gen slush fund and then to his personal account at the Bank of Antigua (USCA5 Supp. 6 7092).   Stanford then withdrew the cash and paid King no less than once a quarter (USCA5 Supp. 6 7092-7094).   In return, King never performed an accurate examination of the SIB financial reports and shared confidential FSRC memoranda with Stanford (GX 618, 672).   Although Stanford stressed to Davis that the false financial statements submitted to the FSRC

26

could not be seen by anyone, the bribes to King eliminated any risk of exposure by the FSRC (USCA5 Supp. 6 7104-7106).

6.    *Stanford Obstructs the SEC Investigation*

In 2005, the SEC sent a confidential request seeking information about SIB to King at the FSRC (GX 668).    The letter, marked "Privileged and Confidential," directed King not to communicate the correspondence to any third party absent permission by the SEC (GX 668).    King immediately shared the confidential correspondence with Stanford (USCA5 Supp. 6 7125-7126).    Stanford informed Davis that the SEC had opened an investigation into SIB's CD program in the United States upon suspicion of a possible Ponzi scheme (USCA5 Supp. 6 7115-7116).    Stanford worked with SIB's general counsel and drafted a response, purporting to come from King, that confirmed SIB's solvency, requested that the SEC provide specific support for its allegations of fraud, and invited the SEC to visit the FSRC office only in accordance with the notice requirements of a mutual agreement between the United States and Antigua (USCA5 Supp. 6 7128-7132, 7137; GX 671).

27

After the SEC investigation surged in December 2008 and again after subpoenas issued in 2009, Kelly Taylor, the manager of Stanford's St. Croix estate, complied with Stanford's instructions to fill empty barrels with his bank records and personal financial information and burn the documents (USCA5 Supp. 6 8138-8144; GX 726C, 735). Taylor had never been asked by Stanford to burn documents prior to December 2008 (USCA5 Supp. 6 8139).

7.    *The Scheme Unravels*

In the financial crisis of 2008, CD redemptions dramatically increased and new sales flatlined, a deadly combination that finally exposed Stanford's scheme (USCA5 Supp. 6 5007, 6686-6887, 7232, 7266-7267). His unprofitable businesses, which hemorrhaged $1 million per day in depositors' funds, were illiquid and could not be readily sold (USCA5 Supp. 6 7265-7267, 7269-7270). Stanford responded by issuing fraudulent statements of solvency and engaging in prodigal spending.

In October 2008, during a meeting with a global executive team, Stanford represented that the bank was "$5 billion more liquid than it

28

should be," with an oversupply of cash and marketable securities (USCA5 Supp. 6 5017-5018, 5312; GX 1532). He never disclosed to executives, like SFG manager Green, that throughout this period, Maldonado (the SFG treasurer) and Davis routinely updated Stanford on the dwindling stockpile of cash and liquid securities to cover CD deposits (USCA5 Supp. 6 5017-5018, 7270-7283; GX 1524, 1526-1528).

In November 2008, Green met with Stanford to discuss the rapid rate of CD redemptions (USCA5 Supp. 6 5008-5009, 5019). Stanford gave Green a list of "talking points" for financial advisors to give to potential investors, which stressed the bank's emphasis on strong, liquid, diverse investments (USCA5 Supp. 6 5025; GX 1149). Stanford promised a personal capital cash infusion to assuage the withdrawals (USCA5 Supp. 6 5011, 5014, 5026). When Green suggested that Stanford also solicit wealthy friends to contribute, Stanford responded "I'll go to the Libyans. They love me" (USCA5 Supp. 6 5014-5015, 5026-5027). Stanford's trip to Libya proved unsuccessful (USCA5 Supp. 6 7327-7328, 8144).

In December 2008, Stanford drafted a newsletter to depositors assuring them that the bank remained strong, despite the dire financial climate and the panic surrounding "Madoff's hedge fund collapse" (GX 138).  The letter advised depositors that the Board of Directors made a $541 capital injection in November 2008, which increased shareholder equity to over $1 billion and total assets to over $8.5 billion (GX 138). Stanford admitted to Davis that the $541 million cash injection was merely a bookkeeping entry to support the announcement and that no actual transfer of cash or assets to the bank by Stanford had occurred (USCA5 Supp. 6 7287-7290).    SFG Controller Lopez and accounting executive Kuhrt executed the fraudulent bookkeeping entry (USCA5 Supp. 6 7291-7292; GX 5).  Stanford also discussed the newsletter with Green (USCA5 Supp. 6 5028).  Green understood from Stanford that this capital infusion came from cash Stanford had saved for an island resort project (USCA5 Supp. 6 5011, 5026, 5031-5032).

Stanford planned a real estate "flip" to bolster the announcement of the putative $ 541 million capital contribution.  In June 2008, the bank paid $63.5 million for undeveloped Antiguan real estate that

Stanford intended to use to build a resort for billionaires (USCA5 Supp. 6 7293, 7300-7301.  The proposed flip allowed for the land to be transferred to Stanford, marked up to $3.2 billion, and then transferred to SIB at the inflated price in order to repay Stanford's $2 billion "loan" and support the capital contribution (USCA5 Supp. 6 7300-7301). Kuhrt and Lopez worked on the fraudulent calculations and transfers, but SIB collapsed before the sham transaction could be executed (USCA5 Supp. 6 7302, 7306-7307).

In January 2009, Stanford spoke privately with top executives to discuss subpoenas that the SEC had issued to Stanford, Davis and Pendergest-Holt  (USCA5 Supp. 6 7315-7322; GX 726A-C).  During this same time, Stanford assured the financial advisors at a Top Producer's Club  meeting  that  SIB  remained  strong  (USCA5  Supp.  5038). Nevertheless, victim-depositor Flynn was unable to redeem his CD when he attempted to do so in January 2009  (USCA5 Supp. 6 5372-5373).  Flynn, a 69-year-old retiree and disabled Vietnam veteran, and his wife lost their life savings (USCA5 Supp. 6 5348-5352, 5375). Green, a manager of financial advisors, questioned the bank's president

31

about why another depositor, with $50 million in deposits, could not redeem his CD during this time if the bank had over a billion dollars in capital  (USCA5 Supp. 6 5313-5314).  The depositor never received his money (USCA5 Supp. 6 5313-5314).

SIB and SGC executives, including Davis, the bank president, the SGC president, a consultant, a compliance officer, and Pendergest-Holt, met in February 2009 to prepare for a presentation to the SEC in Fort Worth, Texas (USCA5 Supp. 6 7328).  At this meeting, Davis revealed to the executives by way of a pie chart that a "hole" existed between the bank's reported and actual assets, exposing the true nature of the investment portfolio in Tier 3 for the first time (USCA5 Supp. 6 7328-7330; GX 332).  He explained that the bulk of CD deposits went to Stanford's real estate, companies that the bank never owned, and to personal "loans" to Stanford (USCA5 Supp. 6 7344).  Prior to this meeting, the executives did not know any differently from the financial advisors regarding the true assets and value of the bank's investments (USCA5 Supp. 6 7344-7345).

Even after top executives learned of his fraud, Stanford sent an email to every SFG employee on February 12, 2009, representing that the bank remained strong, due in part to his capital infusions, and that the SEC's investigation into SIB was a standard and routine examination (USCA5 Supp. 6 5048-5049; 6474-6475; GX 6, 157).

Shortly after the meeting, the Northern District of Texas appointed a receiver for the Stanford companies on February 16, 2009, and the Receiver took over the companies the following day on February 17, 2009 (USCA5 Supp. 6 5054, 7715-7716). After the imposition of the receivership, the FSRC led by Crick, whom the Antiguan minister of finance appointed, conducted an investigation into SIB (USCA5 Supp. 6 5932-5935). The investigation revealed that the SEC had sent correspondence to King regarding suspected fraudulent activity at SIB, but King destroyed it (USCA5 Supp. 6 5937). King appeared before the FSRC in 2009 and admitted to receiving the SEC correspondence that was absent from the FSRC files (USCA5 Supp. 6 5937). At the time of trial, King was awaiting extradition from Antigua to the United States to face charges related to the fraud on SIB investors (USCA5 Supp. 6 5945).

33

By the end of December 2008, SIB reported $8.59 billion in assets (GX 138). FBI Agent Robert Martin traced $2 billion in "loans" to Stanford's businesses, which left a $5 billion "hole" in untraceable funds (USCA5 Supp. 6 9107; GX 1607).

At trial, Stanford never disputed that he diverted over $2 billion in funds to his businesses and real estate ventures. He relied on various defensive theories to explain his use of depositors' funds, including that: Davis single-handedly committed the investment fraud scheme; the Receiver's actions caused the loss to depositors; and the businesses were legitimate investments (USCA5 Supp. 6 12684-12689, 12692, 12404).

The jury rejected Stanford's theories and convicted him on all counts except for one count of wire fraud (count two), which alleged that Stanford used a credit card tied to an account in Houston to purchase $9,000 Super Bowl tickets for King as a bribe for King's role in the fraud (USCA5 Supp. 6 12688-12872). Although Stanford faced a total maximum statutory sentence of 230 years of imprisonment, Judge Hittner imposed a 110-year total sentence (USCA5 Supp. 6 14014).

34

## SUMMARY OF ARGUMENT

I.    Stanford's jurisdictional challenge regarding the SEC fails because the SEC is not a party to the criminal prosecution.   This issue is improper for appellate review in this case.

II.    The superseding indictment apprised Stanford of the charges against him.   Stanford's challenges to the superseding indictment involving the enlargement of the timeframe of the charged offenses, particularity, multiplicity, duplicity, and incorporation by reference fail under plain-error review.

III.    Judge Hittner properly exercised his discretion and denied a continuance.  Stanford sought a 90-day trial continuance on the grounds of:    detention center conditions; voluminous discovery; budgetary restraints; recent competency; and an ill-defense team member.  Judge Hittner documented an extensive history of Stanford's access to his defense team, to legal documents, and to two new computers designated exclusively for the defense team at the detention center.   Consistent with the open-file discovery policy approved by this Court in *United States v. Skilling,* 554 F.3d 529, 576 (5th Cir. 2009), *vacated on other*

*grounds,* 130 S. Ct. 2896 (2010), the United States provided Stanford with 1,511 "hot documents" searchable on a computer database available to the defense well before trial. This Court authorized millions of dollars in Criminal Justice Act ("CJA") funds for Stanford's defense at every stage of trial. Judge Hittner issued detailed findings rejecting Stanford's claim of recent competency. Finally, the trial transcript establishes that the parties reached an agreement to accommodate the absence of an ill defense team member.

Stanford fails to establish, under plain-error review, that he was entitled to a continuance based upon alleged defects in the superseding indictment and a putative violation of *Brady v. Maryland,* 373 U.S. 83 (1963).

IV. Both the Supreme Court and this Circuit have rejected Stanford's general complaint that parallel civil proceedings brought by the SEC and criminal proceedings brought by the United States violate the Double Jeopardy Clause. *See United States v. Kordel,* 397 U.S. 1, 11-12 (1970); *United States v. Setser,* 568 F.3d 482, 492-493 (5th Cir. 2009). No improper civil/criminal collusion exists by the Receiver's compliance

with a court order to produce documents to federal investigative authorities in the criminal case. *See Setser,* 586 F.3d at 493. As a result of the January 5, 2010, stay of SEC proceedings during the criminal case, no judgment or fine of any kind had been imposed against Stanford in the SEC civil action at the time of the criminal judgment. No viable claim of double jeopardy exists. *See Hudson v. United States,* 522 U.S. 93, 99 (1997).

V.    Judge Hittner correctly denied Stanford's motion to suppress evidence obtained by the Receiver in the SEC civil case and produced to investigative agencies in the criminal case. Stanford's Fourth Amendment challenge fails for lack of governmental action because the Receiver is a private, non-governmental entity. Stanford lacks standing to challenge the actions of the Receiver under this Court's decision in *Setser.* Investigative agencies relied in good faith upon the valid federal court order authorizing the Receiver to produce requested documents in furtherance of the criminal investigation. Finally, the United States never used information from SIB's computer database at trial, mooting

Stanford's entire Fourth Amendment claim. This Court can affirm the district court's suppression ruling on any of the foregoing grounds.

VI. Judge Hittner properly responded to jury notes #2 and #3 on the definition of "scheme" and the meaning of "CDO." Stanford argues that Judge Hittner's definition of "scheme" failed to account for the poisonous atmosphere created by the pervasive use of the word at trial. The use of the word "scheme" is consistent with the mail and wire fraud statutes, case law, and the Fifth Circuit Pattern Jury Instructions. Stanford's argument is meritless under plain-error review. Judge Hittner properly instructed the jury on the meaning of "CDO" contained in GX 1149 as a "Collateralized Debt Obligation." No error exists, plain or otherwise, in the court's definition.

VII. Neither *Apprendi v. New Jersey,* 530 U.S. 466 (2000), nor *Alleyne v. United States,* __ U.S. __ , 133 S. Ct. 2151 (2013), applies to Stanford's 110-year sentence, which is below the statutory maximum sentence of 230 years of imprisonment and is not the result of a statutory minimum sentence. This Court has rejected the argument that the rules announced in *Apprendi* and *Alleyne* apply to adjustments

under the Sentencing Guidelines.  Judge Hittner's factual findings and the evidence in the record support various enhancements under the Sentencing Guidelines.

VIII. Stanford fails to show any judicial bias toward the United States. Judge Hittner correctly exercised his discretion in denying Stanford's request to appoint substitute counsel for a limited purpose and in precluding counsel unrelated to the criminal case from access to Stanford.  Stanford fails to demonstrate that the district court's competency ruling following a three-day competency hearing was "clearly arbitrary or unwarranted."  His general, vague claim regarding the jury charge is waived for inadequate briefing.  Finally, Stanford fails to establish that Judge Hittner abused his discretion in a variety of evidentiary rulings.

IX.    Stanford fails to demonstrate cumulative error.  His constitutional issues fail for lack of legal support.  Overwhelming evidence in the form of testimony and supporting documentary evidence support his convictions.    Stanford cannot establish any cognizable errors to cumulate.

# **ARGUMENT**

## **I.**

### **Stanford's Jurisdictional Challenge Regarding the SEC Fails Because the SEC is Not a Party to the Criminal Prosecution.**

A.  Standard of Review

Although jurisdictional challenges are reviewed de novo, Stanford raises his challenge to the SEC's jurisdiction in an incorrect forum and the claim should be dismissed.  *See United States v. Traxler,* 764 F.3d 486, 488 (5th Cir. 2014).

B.  Application

In his first issue, Stanford argues that the SEC lacked jurisdiction and regulatory authority over SIB and its CDs (Appellant's Brief, 8-28, esp. 11-24).  Stanford refers to portions of testimony and exhibits from the SEC civil case, not from his criminal case (Appellant's Brief, 15-17, 20).

The SEC was never a party to this criminal prosecution and is an entirely separate entity from the United States.  *See United States v. Hickey,* 367 F.3d 888, 893 (9th Cir. 2004) (noting that the SEC and the

United States are "not the same party," because the SEC's civil action derives from the Securities Act of 1933 and the Securities Exchange Act of 1934, not from the criminal laws of the United States); *SEC v. First Financial,* 659 F.2d 660, 666-67 (5th Cir. 1981) (noting that the SEC, through civil actions, and the Justice Department, through criminal actions, vindicate different interests simultaneously through distinct forums). The proper forum for Stanford's challenge to the SEC's jurisdiction is the civil litigation, where the SEC is a named party. *SEC v. Stanford,* 3:09-CV-298 (N.D. Tex.) (USCA5 Supp. 6 1478).

Although Stanford's SEC challenge is procedurally improper for this direct criminal appeal, the United States briefly responds to the following factual misrepresentations in Stanford's first issue.

Stanford asserts that the United States was "compelled to remove" Counts 1, 19, 20 and 21 from the original indictment in direct response to his argument that the SIB CDs were not "securities" (Appellant's Brief, 9; USCA5 Supp. 3 263-267). He argues that the removal of these counts from the indictment "demonstrated that the 'Securities Fraud'

charge was included solely as a means to use SEC civil evidence" in his criminal case and to seize his assets (Appellant's Brief, 9).

Stanford's assertions are completely false. Counts 19 (conspiracy to obstruct SEC investigation), 20 (obstruction of SEC investigation), and 21 (conspiracy to commit money laundering) were merely renumbered in the superseding indictment as counts 12 (conspiracy to obstruct SEC investigation), 13 (obstruction of SEC investigation), and 14 (conspiracy to commit money laundering). *Compare* USCA5 59-66, *with* USCA5 Supp. 6 669-674.

Count one of the original indictment, which charged conspiracy to commit mail, wire, and securities fraud, was substantively revised in the superseding indictment by charging only conspiracy to commit mail and wire fraud (USCA5 19-62, Supp. 6 660-664). The United States removed securities fraud to narrow the indictment and streamline the evidence at trial. Contrary to Stanford's arguments, the United States did not agree with Stanford that the CDs failed to meet the definition of a "security" under *Reves v. Ernst & Young,* 494 U.S. 56, 58 (1990). In fact, the United States adamantly argued that the SIB CDs met the

42

definition of a "security" under *Reves* (USCA5 Supp. 3 798-821, esp. 812-820).

Finally, Stanford takes various portions of argument and trial testimony out of context to erroneously assert that the United States conceded that the SEC lacked jurisdiction over the bank (Appellant's Brief, 10-11, 13-15). During argument related to Stanford's motion for acquittal on the SEC obstruction counts (counts 12 and 13), the lead prosecutor, former Assistant United States Attorney (AUSA) Gregg Costa, noted that, while Judge Godbey in the civil case determined that the SEC exercised proper authority over the bank, the SEC's jurisdiction was entirely irrelevant to the criminal case (USCA5 Supp. 6 11537, 11539). This was a correct statement of the law. *See Hickey,* 367 F.3d at 893; *First Financial,* 659 F.2d at 666-67. In any event, the prosecutor noted that, assuming arguendo, the SEC did not have authority over the bank (which the prosecutor expressly argued it did), a criminal charge of obstruction could be brought without a review of the merits of the SEC investigation (USCA5 Supp. 6 11537-11538). This is also a correct statement of the law of obstruction. *See United*

43

*States v. Simpson,* 741 F.3d 539, 552 (5th Cir.) (noting that an obstruction of justice conviction merely requires some nexus between the obstructive act and some official government proceeding), *cert. denied,* 134 S. Ct. 2318 (2014).

Stanford argues that the United States conceded a lack of jurisdiction over the bank because prosecutor William Stellmach, FBI Agent Kalford Young, and defense witness Michael Callaghan all acknowledged that SIB was an offshore bank not subject to United States-banking regulations (Appellant's Brief, 13-15). Stanford seizes on a fact that was never in dispute and is not relevant to the United States' jurisdiction in this case.

In the late 1980s and early 1990s, Stanford's bank operated under the name of Guardian and marketed CDs from his United States' office in Houston, Texas (USCA5 Supp. 6 4409, 4412, 4393, 4397). Material misrepresentations surrounding the bank's investment portfolio ie., high quality, liquid, and conservative investments; no loans; oversight by global money managers; and rigorous independent auditing, key bases for the criminal action against Stanford, existed at this time in

marketing materials disseminated to potential foreign CD investors from the Houston office (GX 519, 522). After the bank rebranded as SIB in the 1990s, SGC formed in Houston and began selling CDs to United States citizens (USCA5 Supp. 6 4442, 4445-4447). The same material misrepresentations surrounding the bank's CD program appeared in marketing materials, annual reports, and other bank brochures (USCA5 Supp. 6 6830, 6835; GX 107-120, 131, 136). The Houston epicenter of the marketing and sales for the bank's CD program conferred federal jurisdiction over SIB as early as the late 1980s and certainly by 1990.

In sum, Stanford's jurisdictional challenge to the SEC in the civil case is improper for criminal appellate review. *See Hickey,* 367 F.3d at 893; *First Financial,* 659 F.2d at 666-67.

## II.

**Under Plain-Error Review, the Superseding Indictment Sufficiently Apprised Stanford of the Charges Against Him.**

A.  Standard of Review

In his second issue, Stanford alleges the following defects in the superseding indictment:  (1) it impermissibly broadened the dates of the charged offenses; (2) it lacked particularity; (3) it was duplicitous and multiplicitous; and (4) it re-alleged and incorporated four non-existent counts (Appellant's Brief, 29-51).

This Court reviews preserved challenges to the sufficiency of the indictment de novo. *Simpson,* 741 F.3d at 547.  Where a defendant raises a specific challenge to the indictment for the first time on appeal, this Court reviews the issue for plain error. *See United States v. Blevins,* 755 F.3d 312, 319 (5th Cir. 2014); *United States v. McGilberry,* 480 F.3d 326, 328-29 (5th Cir. 2007).  To establish plain error, a defendant must demonstrate (1) error, (2) that was clear and obvious at the time of appeal, and (3) that affected his substantial rights. *Henderson v. United States,* __ U.S. __ , 133 S. Ct. 1121, 1124-1125

46

(2013). Even with such a showing, this Court may exercise its discretion to correct the error only where "it seriously affects the fairness, integrity or public reputation of the proceedings." *Id.* at 1126-1127 (citation omitted).

Stanford asserts that he preserved his challenges to the indictment in various pre-trial motions to dismiss the indictment and for bills of particulars filed on October 4, 2010, December 19, 2011, and January 6, 2012 (USCA5 Supp. 3 254-268, 271-283, Supp. 6 1250-1260, 1401-1409, 1412-1433), and in an oral motion for judgment of acquittal (USCA5 Supp. 6 11534-11547) (Appellant's Brief, 32-33).

In a single sentence contained in his January 2012 motion, Stanford argued that the superseding indictment failed "to inform [him] of the charges against him in sufficient detail to enable him to prepare his defenses and minimize surprise at trial" (USCA5 Supp. 6 1404). This general assertion is insufficient to preserve any of the specific attacks on the superseding indictment that Stanford now raises. *See United States v. Fuchs,* 467 F.3d 889, 900 (5th Cir. 2006) (recognizing that where a defendant raises challenges to the sufficiency of the

47

indictment on appeal different from those presented to the district court, the sufficiency of the indictment is reviewed for plain error). Stanford conceded in his dismissal motion that the superseding indictment was "relatively clear" (USCA5 Supp. 6 1405).

The only argument preserved in any of Stanford's written or oral motions is his contention that the superseding indictment improperly alleged misconduct after the Receiver took over on February 17, 2009 (USCA5 Supp. 3 257). *See Simpson,* 741 F.3d at 547. All of his other arguments related to the sufficiency of the indictment are subject to plain-error review. *See Fuchs,* 467 F.3d at 900.

B.   Application

An indictment is sufficient to pass constitutional muster if it contains the elements of the charged offense, describes the elements with particularity, and is specific enough to protect the defendant against a subsequent prosecution for the same offense. *See Simpson,* 741 F.3d at 547 (citations omitted).

### 1.    Enlarged Time Period

For the first time on appeal, Stanford argues that the superseding indictment is defective because it enlarged the time period for the charged offenses by ten years, from 1999-2009 in the original indictment, to 1990-2010 in the superseding indictment (Appellant's Brief, 33-38).

The United States may file a superseding indictment any time before trial, absent prejudice to the defendant.  *See United States v. Stricklin,* 591 F.2d 1112, 1115 n.1 (5th Cir. 1979).  If the allegations and charges in the superseding indictment are substantially the same as those in the original indictment, the defendant is on notice of the charges against him.  *United States v. Schmick,* 904 F.2d 936, 940 (5th Cir. 1990).  "That is, he knows that he will be called to account for certain activities and should prepare a defense."  *Id.* (citation omitted).

Alleging that an offense occurred "on or about" a certain date is legally sufficient.  *United States v. Ellender,* 947 F.2d 748, 755-56 (5th Cir. 1991).  The United States need not prove the exact date of an offense so long as the indictment includes the language "on or about"

and the date proved at trial is "reasonably near" the date alleged in the indictment. *United States v. Swafford,* 512 F.3d 833, 844 n.6 (6th Cir. 2008); *United States v. Valdez,* 453 F.3d 252, 259-60 (5th Cir. 2006). The "on or about" language notifies the defendant that the charge is not limited to a precise date. *United States v. Mitov,* 460 F.3d 901, 907 (7th Cir. 2006).

As an introductory point, the superseding indictment actually narrowed the offenses charged in the original indictment. The superseding indictment named Stanford as the only defendant, whereas the original indictment named Stanford and four co-conspirators. *Compare* USCA5 Supp. 6 650, *with* USCA5 19. The superseding indictment reduced the total number of charged counts from 21 to 14. *Compare* USCA5 Supp. 6 660-673, *with* USCA5 19-66. Finally, the superseding indictment removed the offense of conspiracy to commit mail, wire, and securities fraud under 18 U.S.C. § 371, and charged only conspiracy to commit mail and wire fraud under 18 U.S.C. § 1349. *Compare* USCA5 Supp. 6 660, *with* USCA5 19. As in the original

indictment, the superseding indictment charged substantive wire and mail fraud counts (USCA5 52-59, Supp. 6 665-668).

In support of his challenge to the scope of the superseding indictment, Stanford takes portions of AUSA Costa's opening statement out of context. Stanford claims that the superseding indictment is defective for alleging conduct on or about 1990 because AUSA Costa observed that SGC, the broker dealer for sales of SIB CDs in the United States, did not exist until 1995 (Appellant's Brief, 34). He further contends that the prosecutor's reference to the 1995 formation of SGC prevented him from formulating his defense (*Id.*).

The transcript from the opening statement establishes that AUSA Costa merely explained the history of Stanford's bank and affiliated companies to the jury (USCA5 Supp. 6 4286-4292). The prosecutor never stated that the fraud began in 1995 with the formation of SGC. Rather, AUSA Costa explained that Stanford's fraudulent misrepresentations to investors spanned 20 years, beginning on the island of Monserrat in 1985 when Stanford's bank operated under the name Guardian and continuing from the 1990s through 2009, when the

bank operated under the name SIB in Antigua (USCA5 Supp. 6 4286-4311).   Stanford's contention that the prosecutor's reference to the formation of SFG in 1995 during opening statements rendered him ill-prepared to defend himself against pre-1995 fraudulent activity is baseless given that the superseding indictment contained detailed allegations of Stanford's fraud beginning in the late 1980s and early 1990s (USCA5 Supp. 6 653, 657, 660,  663, 665, 667, 672).

Likewise, Stanford takes portions of Chambliess's testimony out of context (Appellant's Brief, 35-36).   He incorrectly asserts that Chambliess was "the only former Stanford Financial Advisor" who testified (Appellant's Brief, 35).   The jury also heard lengthy and detailed testimony from Jason Green, a SGC financial advisor and subsequent manager to a group of financial advisors in the Baton Rouge, Louisiana, branch office of SGC (USCA5 Supp. 6 4903-4904, 4908, 4912, 4921).

Chambliess testified that SIB CDs were not sold to United States citizens until approximately 1998 (USCA5 Supp. 6 4447).  According to Stanford, because CD sales in the United States began eight years after

the start date of the fraud alleged in the superseding indictment, the superseding indictment is defective (Appellant's Brief, 35). His claim is meritless.

Chambliss worked for Guardian International Investment Services, the Houston-based marketing and sales arm of Guardian, the predecessor to SIB (USCA5 Supp. 6 4392-4397). Beginning in 1988, Guardian marketed to depositors that the bank invested their CDs in high quality, conservative, liquid investments that were overseen by global money managers on a daily basis and that the bank carried insurance from British Insurance Fund, Ltd., from London (USCA5 Supp. 6 4409, 4412, 4437, 4435).

Arnold Knoche, who worked for Stanford's development company starting in 1987 and oversaw Stanford's building projects in Antigua beginning in the mid-1990s, gave similar testimony (USCA5 Supp. 6 6146, 6178). Stanford explained to Knoche that all of the funding for Stanford's personal projects came from his own wealth (USCA5 Supp. 6 6179, 6186, 6189). At Stanford's request, Knoche read Guardian's promotional materials and the 1990 annual report (USCA5 Supp. 6

53

6156-6157, 6173, 6167; GX 103).   Both the marketing materials and annual report represented that the bank's investment portfolio contained conservative, low-risk investments (USCA5 Supp. 6 6156-6157, 6173, 6167; GX 103, 522).   Stanford personally confirmed to Knoche that Guardian made only conservative investments, that the bank enlisted Swiss money managers to oversee the investments, and that the bank maintained a British insurance policy (USCA5 Supp. 6 6152, 6161-6162).

In 1990, Davis discovered that all of Stanford's representations, of which Chambliss and Knoche testified, were entirely false and that the bank was illegitimate (USCA5 Supp. 6 6830).   Guardian never invested the depositors' money in the way Stanford represented in the marketing materials he approved or to his employees (USCA5 Supp. 6 6835). Stanford used the funds for his own personal real estate and business projects (USCA5 Supp. 6 6835).   Davis understood from Stanford that the bank never had a profitable year after 1986, although the annual reports and marketing materials promoted consistent profitability year after year (USCA5 Supp. 6 6888, 6898, 7074).

By 1991, Davis discovered that half of the money that the bank reported as assets in its 1990 annual report to investors was missing (USCA5 Supp. 6 6833-6834, 6840, 6877). Global money marketers never oversaw the bulk of investments (USCA5 Supp. 6 6815, 6834).

Davis also discovered in 1991 that the British Insurance Fund policy, which was in place before he began working for Stanford, was illegitimate because the company was owned in its entirety by Stanford (USCA5 Supp. 6 6826, 6831; GX 502). Stanford explained to Davis that the policy was not real and had no ability to pay any loss to depositors (USCA 5 Supp. 6 6825-6827). Stanford also admitted to Leo Mejia, the marketing chief for Stanford's advertising company, that the policy had no real value (USCA5 Supp. 6 4653, 4845; GX 502).

In sum, overwhelming record evidence, in the form of testimony and admitted exhibits, establishes that Stanford's fraudulent misrepresentations to CD investors began as early as 1990 when he operated the bank under the name of Guardian, but marketed the bank from Houston, Texas. The superseding indictment properly alleged an

approximate start date of "on or about" 1990 for the fraudulent conduct. *See Ellender,* 947 F.2d at 755-56.

Stanford raises prosecutorial vindictiveness by the addition of ten years to the superseding indictment because the enlarged timeframe enabled the United States to seize his assets before the formation of SGC, which hamstrung his defense budget (Appellant's Brief, 36-38). These allegations of vindictiveness are not supported by the record.

The addition of approximately 10 years to the conduct charged in the superseding indictment merely reflects new evidence of fraud discovered by federal investigators during the time period when the proceedings were stayed due to Stanford's medical incapacity. *See United States v. Bryant,* 770 F.2d 1283, 1286-1288 (5th Cir. 1985) (upholding sufficiency of superseding indictment that added additional counts to original indictment for fraudulent conversion of Small Business Administration collateral because additional counts reflected discovery of new evidence during trial preparation that Bryant's misconduct was greater than had been known at the time of the original indictment). Judge Hittner declared Stanford incompetent to stand

56

trial following a January 2011 competency hearing and admitted him to
FMC-Butner for psychiatric evaluation on February 18, 2011 (USCA5
Supp. 6 13812-13813).  During this period, the federal investigation into
the scope of Stanford's fraud continued, uncovering evidence to support
a larger time frame and new overt acts to support the charged offenses.
*See Bryant,* 770 F.3d at 1286-1288.  The grand jury returned the
superseding indictment on May 4, 2011, and Judge Hittner deemed
Stanford competent to stand trial on December 23, 2011, following a
three-day hearing (USCA5 Supp. 6 650, 13789).  Trial began on
January 23, 2012 (USCA5 Supp. 6 3764).  No evidence of prosecutorial
vindictiveness, under plain-error review or otherwise, exists under the
circumstances of the continuing federal investigation.  *See Bryant,* 770
F.3d 1286-1288.  As the Supreme Court noted in *United States v.
Goodwin,* 457 U.S. 368, 381 (1982):

> In the course of preparing a case for trial the prosecutor may
> uncover additional information that suggests a basis for
> further prosecution or he simply may come to realize that
> the information possessed by the State has a broader
> significance. At this stage of the proceedings, the
> prosecutor's assessment of the proper extent of prosecution
> may not have crystallized.

Stanford asserts that no evidence of loss to depositors existed prior to February 17, 2009, the date the Receiver took over his companies (Appellant's Brief, 37). This contention is completely false and rebutted by the record evidence.

Victim-depositor Flynn transferred 90% of his and his wife's life savings into SIB CDs in 2006, based upon the representations by a SGC financial advisor and from marketing materials that SIB invested funds in a diversified, liquid, and secure investment portfolio (USCA5 Supp. 6 5354-5356, 5362-5363; GX 118). In January 2009, Flynn tried to redeem all of his CDs (USCA5 Supp. 6 5373). Flynn's financial advisor told him that Stanford had frozen all of the bank's assets the week prior and therefore Flynn could not withdraw any of his funds, nor redeem any interest (*Id.* at 5373-5374). The Flynns lost 90% of their life savings (*Id.* at 5375).

Green, the Baton Rouge manager of the SGC financial advisors, testified that Michael Moreno, a depositor who had invested $50 million in SIB CDs, unsuccessfully attempted to redeem his money before Stanford froze the bank's assets in February 2009 and before the

58

Receiver took over on February 17, 2009 (USCA5 Supp. 6 5313). Stanford's pre-February 17, 2009, no-loss argument is meritless even without the testimony from Flynn and Green. The criminal prosecution stemmed from Stanford's actions and misrepresentations prior to February 17, 2009, which caused losses even if those losses were not discovered until February 17, 2009. No plain error exists as to any of the foregoing arguments related to the timeframe of the fraud alleged in the superseding indictment. *See Fuchs,* 467 F.3d at 900.

As he did below, Stanford asserts that the superseding indictment was defective because the time frame for the offenses continued to February 2010, an entire year after the Receiver took over his companies (Appellant's Brief, 33, 36-37). He concludes that any allegation of misconduct after the Receiver took over on February 17, 2009, is improper because he had no control over his companies after that date (Appellant's Brief, 36-36, 37 n.5). Although the introduction section of the superseding indictment refers to February 2010 as the end of the scheme, the rest of the indictment actually alleges earlier end dates.

59

Only two counts in the superseding indictment allege overt acts past February 17, 2009. Count one, conspiracy to commit mail and wire fraud, alleges that the conspiracy occurred "on or about" 1990 through on or about March 3, 2009 (USCA5 Supp. 6 660). Conspiracy to obstruct the SEC investigation, count 12, alleges that Stanford conspired to commit "at least one of" nine overt acts that occurred as late as March 3, 2009  (USCA5 Supp. 6 671).

Circuit precedent allows for allegations of illegal activity, such as a conspiracy, to continue beyond incarceration. *See United States v. Davis,* 226 F.3d 346, 353 (5th Cir. 2000) (citations omitted). Evidence at trial established that the wire fraud and obstruction conspiracies continued through March 2009. FBI Agent Young tracked the flow of funds from various bank accounts of Stanford to accounts held by King (USCA5 Supp. 6 7638; GX 641A, 643A). After the Receiver took over the Stanford companies on February 17, 2009, Agent Young discovered unusual wire transfers from King's United States accounts to Antiguan bank accounts, one on February 24, 2009 ($150,000), and another on March 3, 2009 ($410,000) (USCA5 Supp. 6 7716; GX 647, 648). Jurors

60

could reasonably infer that these wire transfers derived from funds Stanford used to bribe King to obstruct the investigation of the SEC in support of the conspiracy counts charged in counts one and 12 (USCA5 Supp. 6 660, 670-671). *See United States v. Stephens,* 571 F.3d 401, 404 (5th Cir. 2009); *United States v. Ismoila,* 100 F.3d 380, 389 (5th Cir. 1996).

None of the remaining counts in the superseding indictment allege an end date beyond February 2009 and all counts allege that conduct occurred before the date of Stanford's surrender to authorities on June 18, 2009 (USCA5 Supp. 6 660, 665, 667, 669, 671-672).

That the date of February 2010 appears in the introduction section of the superseding indictment as the approximate end date of Stanford's scheme is of no moment. The date is reasonably near the "on or about" end date of 2009 alleged in the individual counts and is entirely reasonable for a 20-year investment fraud scheme of this magnitude. *See Swafford,* 512 F.3d at 844 n.6; *Valdez,* 453 F.3d at 259-60. No error exists with respect to the approximate end date alleged in the superseding indictment. *See Valdez,* 453 F.3d at 259-60.

61

### 2.    Particularity

For the first time on appeal, Stanford argues that the superseding indictment lacks particularity because (1) the wire fraud in count four failed to identify the name of the specific victim-investor, other than the investor's initials "WJ," which was too vague to give Stanford notice of the offense and (2) the mail fraud counts failed to identify victims or actual monetary losses (Appellant's Brief, 39, 41-42, 45-46).

Although an indictment must contain sufficient information to alert the defendant of the charges to prepare a defense and to assert double jeopardy where appropriate, the indictment need not plead evidentiary detail or specifically identify all of the factual proof supporting the charges. *United States v. Pratt,* 728 F.3d 463, 478 (5th Cir. 2013) (citing *United States v. Sutherland,* 656 F.2d 1181, 1197 & n.12 (5th Cir. 1981) and upholding the sufficiency of a RICO indictment although it failed to identify specific dates, locations, or details of bribery scheme beyond that of the participants and a general overview of the scheme), *cert. denied,* 134 S. Ct. 1328 (2014); *United States v. Crippen,* 579 F.2d 340, 342 (5th Cir. 1978).  No requirement exists that

an indictment identify an individual victim by name. *See United States v. Arlen,* 947 F.2d 139, 144-45 (5th Cir. 1991) (rejecting defendant's challenge that the indictment was deficient for failing to identify the defrauded victim); *United States v. Hatch,* 926 F.2d 387, 392 (5th Cir. 1991) (affirming sufficiency of mail fraud indictment even without an identifiable victim because the indictment alleged a scheme or artifice to defraud).

Wire Fraud Count Four

Stanford's assertion that the identification of the victim-investor by his initials "WJ" in count four deprived him of adequate notice to prepare his defense to wire fraud is frivolous (Appellant's Brief, 41-42).

Count four charged substantive wire fraud under 18 U.S.C. § 1343, which requires the United States to prove (1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud. *See Simpson,* 741 F.3d at 547-548. The focus upon the wire fraud statute is upon the use of the wires to perpetuate a fraudulent scheme, "not upon any particular kind of victim." *Hatch,* 926 F.2d at 392.

The superseding indictment identified: the date of the wire communication (December 24, 2008); the amount of the wire transmission ($700,000); the precise account number at SGC (#4183); the location of the account (Houston, Texas); and the deposit location of the wire transmission (a SIB account in Houston, Texas) (USCA5 Supp. 6 666). Count four charged the essential elements of wire fraud with sufficient particularity by identifying the manner and means of the scheme, i.e., by soliciting billions of investors' funds through false representations in order to obtain substantial economic benefit through the payment of fees, bonuses, unauthorized diversions, misuse and appropriation of funds by use of wire communications (USCA5 Supp. 6 665-666). *See Simpson,* 741 F.3d 539; *Hatch,* 926 F.2d at 392. No requirement exists that the United States disclose the name of the victim in the indictment. *See Arlen,* 947 F.2d at 144-145; *Hatch,* 926 F.2d at 392. The United States complied with the federal redaction rule by filing its pleadings using the victim-investor's initials. *See* Fed. R. Crim. P. 49.1.

In any event, in orders dated July 7, 2010, December 28, 2011, and January 5, 2012, Judge Hittner determined that the United States gave the defense all relevant documents supporting its case in chief ("hot documents"), available to the defense on an indexed and searchable computer database well before trial (USCA5 Supp. 1 871-872, Supp. 6 1314-1315, 1366-1368). The United States' "hot documents" comprised 1,511 total documents provided to the defense on the searchable database: 458 documents by May 28, 2010, 500 documents by November 22, 2010, and 553 documents by August 4, 2011 (USCA5 Supp. 2 286, Supp. 6 1298-1299).

Stanford incorrectly argues that the United States failed to put on any evidence to support count four (Appellant's Brief, 42). Davis specifically testified at trial about how funds were wired from investor-victim's accounts to SIB accounts in Antigua (USCA5 Supp. 6, 7079). Referring to exhibit four, which corresponded to count four of the superseding indictment, Davis identified the account statement from SGC for count four and explained that the depositor purchased a CD for $700,000, which was held in escrow at SGC, then sent to SIB in

Antigua, and ultimately the depositor received a CD issued by SIB (USCA5, Supp. 6 7079, 7081-7083; GX 4).

Mail Fraud Counts Seven through Eleven

Stanford's claim that the mail fraud counts failed to identify individuals, dollar amounts, or other identifiable characteristics, thus depriving him of notice and double jeopardy protection fails for the same reasons (Appellant's Brief, 45-46).

Counts seven through eleven charged substantive mail fraud under 18 U.S.C. § 1341, which requires the United States to establish (1) a scheme to defraud; (2) use of the mails to execute the scheme; and (3) the specific intent to defraud. *Simpson,* 741 F.3d at 547. As with the wire fraud statute, the focus of the mail fraud statute is upon the use of the mails to perpetuate a fraudulent scheme, "not upon any particular kind of victim" *Hatch,* 926 F.2d at 392.

Counts seven through eleven charged the essential elements of mail fraud with sufficient particularity by identifying the manner and means of the scheme, i.e., by soliciting billions of investors' funds through false representations in order to obtain substantial economic

66

benefit through the payment of fees, bonuses, unauthorized diversions, misuse and appropriation of funds by use of mail communications (USCA5 Supp. 6 667-668). For each of the five counts of mail fraud, the superseding indictment detailed approximate dates (February 22, 2008, August 13, 2008, September 18, 2008, October 16, 2008, and December 16, 2008) and described the mail material as "package of documents, including investor subscription information, sent and delivered via Federal Express from SGC in Houston, Texas, and delivered to SIB in Antigua" (USCA5 Supp. 6 668). The mail fraud counts contain the essential elements of mail fraud described with particularity. *See Simpson,* 741 F.3d at 548; *United States v. Marek,* 238 F.3d 310, 319 (5th Cir. 2001) (en banc) (recognizing that mail fraud statute encompasses private interstate commercial carriers such as Federal Express, in addition to the United States Postal Service).

As with the wire fraud counts, Judge Hittner concluded that the United States supplied defense counsel the "hot documents" supporting these counts well prior to trial (USCA5 Supp. 1 871-872, Supp. 6 1314-1315, 1366-1368). Stanford's contention that the lack of victim

67

identifiers in the wire fraud and mail fraud counts "left [him] to guess as to which mailings required a defense" is completely devoid of merit (Appellant's Brief, 45).

Stanford's argument that statements made by prosecutors Costa and Stellmach amounted to a constructive amendment of the superseding indictment is meritless (Appellant's Brief, 42-43). A constructive amendment occurs when the jury convicts a defendant upon a factual basis that modifies an essential element of the charged crime. *United States v. Isgar,* 739 F.3d 829, 840 (5th Cir.), *cert. denied,* 135 S. Ct. 123 (2014).

In closing argument, prosecutor Stellmach described the wire transaction in support of count four, and corresponding exhibit four, as a wire transfer of $700,000, from the investor's bank in Texas to an account in Canada held by SIB for the purchase of the CD (USCA5 Supp. 6 12652, 12654; GX 4). The fact that SIB placed the CDs funds in a Canadian bank account is not an essential element of wire fraud. *See Isgar,* 739 F.3d at 840. The important point is not the ultimate location

of the funds, but the *use* of the wire itself to further the fraudulent CD scheme on depositors. *See Hatch,* 926 F.2d at 392.

Stanford's reference to an isolated statement made by AUSA Costa is also misleading (Appellant's Brief, 43). Outside the presence of the jury, the prosecutor informed Judge Hittner that defense exhibit 1325 had been altered from its original form to include the header "consolidation underway at SIBL" (USCA5 Supp. 6 7924). The defense explained that a litigation support member inadvertently altered the exhibit (USCA5 Supp. 6 7929). AUSA Costa merely asserted that, whether the alteration was an accident or intentional, for both "Mr. Stanford's liberty" and for the "thousands of victims" the jury needed to base its decision on unaltered evidence (USCA5 Supp. 6 7939). All parties agreed to Judge Hittner's explanation to the jury that the altered document would be replaced with the original (USCA 5 Supp. 6 7940-7941). The prosecutor's comments show no concession to a constructive amendment to the indictment.

Finally, Stanford summarily contends that Judge Hittner "allowed the Government to put the subprime debacle and massive taxpayer

bailout before the jury as evidence" (Appellant's Brief, 44). This is absolutely false. During a pre-trial conference, the United States argued that, because SIB was never eligible for federal bailout funds (i.e., "TARP" funds), any reference to other foreign banks with United States subsidiaries who received TARP funds could potentially mislead the jury to misunderstanding that SIB failed for lack of federal bailout funds (USCA5 Supp. 6 15453, 15456). Likewise, the prosecutor argued that any discussion of the broader financial crisis as to other specific banks was irrelevant (USCA5 Supp. 6 15454). Judge Hittner agreed and granted the United States' motion in limine (USCA5 Supp. 6 15469). No error, plain or otherwise, exists with respect to the particularity of the superseding indictment. *See Fuchs,* 467 F.3d at 900.

### 3.    **Multiplicity and Duplicity**

For the first time on appeal, Stanford argues that the superseding indictment was multiplicitous and duplicitous (Appellant's Brief, 47-50). *See Blevins,* 755 F.3d at 319.

70

Under Rule 12(b)(3) & (e), where a defendant fails to raise a multiplicity or duplicity objection to the indictment before trial, as here, the issue is waived on appeal, although a defendant may still challenge his sentence on these grounds.  Fed. R. Crim. P. 12(b)(3) & (e); *United States v. Njoku,* 737 F.3d 55, 67 (5th Cir. 2013) (multiplicity), *cert. denied,* 134 S. Ct. 2319 (2014); *United States v. Reedy,* 304 F.3d 358, 364 (5th Cir. 2002) (multiplicity); *United States v. Creech,* 408 F.3d 264, 270 (5th Cir. 2005) (duplicity).  Stanford's challenges regarding multiplicity and duplicity are not to his sentence, but solely to the superseding indictment.  Accordingly, his challenges to the superseding indictment are waived and should not be considered on appeal.  *See Njoku,* 737 F.3d 55 at 67; *Creech,* 408 F.3d at 270.  Out of an abundance of caution, the United States briefly explains why his arguments nevertheless fail under plain-error review.  *See Blevins,* 755 F.3d at 319.

An indictment is multiplicitous when it charges a single offense in different counts.  *United States v. Jones,* 733 F.3d 574, 584 (5th Cir. 2013).  A multi-count indictment is not multiplicitous when Congress unambiguously intended to create separate offenses and allow for

71

multiple or cumulative punishment to be imposed for the same act. *See Missouri v. Hunter,* 459 U.S. 359, 367 (1983).

The superseding indictment charged Stanford with separate and distinct offenses. Count one charged conspiracy to commit wire and mail fraud in violation of 18 U.S.C. § 1349, whereas counts two through six charged the substantive offenses of wire fraud under 18 U.S.C. § 1343 and counts seven through eleven charged the substantive offenses of mail fraud under 18 U.S.C. § 1341. No multiplicity exists in the superseding indictment because each statute contains distinct elements. *See Jones,* 733 F.3d at 584.

Conversely, an indictment is duplicitous where it joins two or more distinct crimes into a single count and the defendant suffers prejudice. *United States v. Reagan,* 596 F.3d 251, 253 (5th Cir. 2010); Fed. R. Crim. P. 8(a). To determine whether an indictment is duplicitous, appellate courts examine whether the offenses require proof of different facts. *United States v. Davis,* 306 F.3d 398, 415-16 (6th Cir. 2002).

Stanford incorrectly argues that count one is duplicitous because the conspiracy charges different crimes, wire fraud and mail fraud (Appellant's Brief, 49-50). Count one properly charges a single count of conspiracy with diverse objects of wire fraud and mail fraud. *See Braverman v. United States,* 317 U.S. 49, 54 (1942); *United States v. Mauskar,* 557 F.3d 219, 225 (5th Cir. 2009). The superseding indictment is not duplicitous. No plain error exists. *See Blevins,* 755 F.3d at 319.

### 4.     Incorporation by Reference

For the first time on appeal, Stanford alleges that because the superseding indictment contains a total of 14 counts, the incorporation by reference of counts two through 18 of the original indictment referenced four "non-existent" counts, rendering the superseding indictment defective (Appellant's Brief, 50-51).

The United States may supersede the indictment any time before trial and may select the indictment under which to proceed at trial. *United States v. Rainey,* 757 F.3d 234, 240 (5th Cir. 2014), *cert. denied,* 2015 WL 303235 (U.S. Jan. 26, 2015) (No. 14-374); *Stricklin,* 591 F.2d

at 1115 n.1. Here, the original indictment against Stanford was never dismissed because co-conspirator Leroy King was awaiting extradition to the United States (*See* USCA5 Supp. 6 5945). The United States proceeded under the superseding indictment at trial. *See Rainey,* 757 F.3d at 240; *Stricklin,* 591 F.2d at 1115 n.1.

Rule 7(c)(1) of the Rules of Criminal Procedure permits allegations in one count to be incorporated into other counts by reference, rather than repeating the allegations verbatim in each count. *See United States v. Knowles,* 29 F.3d 947, 952 (5th Cir. 1994). The incorporation by reference must be explicit or it may not be considered in determining whether an indictment is sufficient. *Knowles,* 29 F.3d at 952 .

Under the "overt acts" portion of count one, which charged conspiracy to commit wire and mail fraud, the superseding indictment expressly incorporated counts two through 18 of the original "Indictment." *Compare* USCA5 Supp. 6 664, *with* USCA5 52-58. The incorporation by reference of counts two through 18 from the original indictment, which charged wire and mail fraud, avoided mere repetition in the superseding indictment. *Knowles,* 29 F.3d at 952. Stanford's

74

challenge to the superseding indictment on this basis fails under plain-error review.  *See Fuchs,* 467 F.3d at 900.

## III.

### Judge Hittner Acted Within His Discretion in Denying Stanford's Request for a 90-Day Trial Continuance.

A.     Standard of Review

On December 19, 2011, and December 30, 2011, Stanford requested and reurged a 90-day trial continuance (USCA5 Supp. 6 1232-1246, 1304-1309, 1319-1331, 1776-1793).    The United States opposed the continuance (USCA5 Supp. 6 1295-1303).   Judge Hittner denied Stanford's motions in comprehensive orders dated December 28, 2011 and January 5, 2012 (USCA5 Supp. 6 1311-1318, 1364-1373).

On appeal, Stanford renews the continuance arguments he asserted below:   detention center conditions; voluminous discovery; recent competency; budgetary and expert restraints; and an ill defense team member (Appellant's Brief, 60-65) (USCA5 Supp. 6 1232-1246, 1304-1309, 1319-1331, 1776-1793).   As to these preserved grounds, this Court reviews the district court's denial of a continuance for an abuse of

discretion. *See United States v. Akins,* 746 F.3d 590, 609 (5th Cir.), *cert. denied,* 135 S. Ct. 189 (2014).

For the first time on appeal, Stanford argues that alleged deficiencies in the superseding indictment and a *Brady* violation also warranted a continuance (Appellant's Brief, 52-60). This Court reviews these grounds for continuance for plain error only. *See United States v. Kizzee,* 150 F.3d 497, 501 (5th Cir. 1998).

B.    Application

If the denial of a motion for continuance is "neither arbitrary nor unreasonable," this Circuit upholds the district court's decision, even if the decision is a harsh one. *United States v. Stalnaker,* 571 F.3d 428, 439 (5th Cir. 2009). This Court reviews the district court's decision under the totality of the circumstances, examining the following factors: (1) the amount of time available; (2) the defendant's role in shortening the time needed; (3) the likelihood of prejudice from denial; (4) the availability of discovery from the prosecution; (5) the complexity of the case; (6) the adequacy of the defense actually provided at trial; and (7) the experience of the attorney with the accused. *Id.*

76

A brief chronology of the case as set forth in Judge Hittner's December 28, 2011, order follows below:

| | |
|---|---|
| June 18, 2009 | Original indictment filed |
| January 26, 2011 | Judge Hittner deems Stanford incompetent to assist defense counsel after prison assault in September 2009 |
| February 18, 2011 | Stanford admitted to FMC-Butner for psychiatric evaluation |
| May 4, 2011 | Superseding indictment filed |
| November 4, 2011 | FMC-Butner deems Stanford competent |
| December 22, 2011 | Judge Hittner deems Stanford competent after three-day hearing |
| June 21, 2011 | Court order setting trial for January 23, 2012 |
| December 19, 2011 | Stanford files request for 90-day continuance. |
| January 23, 2012 | Trial begins |

(USCA5 Supp. 6 1311-1312).

## 1.    Detention Center Conditions

Stanford argues that it was impossible for him to review the United States' "hot documents" prior to trial because the Federal Detention Center in Houston (FDC) permitted him to keep only one compact disc of discovery per day Monday through Friday, excluding holidays, in his cell (Appellant's Brief, 60).

77

Judge Hittner rejected this argument because FDC records indicated that for "most of 2010" Stanford met with his legal defense team "on a daily basis, including weekends and evenings" (USCA5 Supp. 6 1313 n.3).    A July 7, 2010, order detailed the FDC's accommodations for the Stanford defense team, which included access to two new computers in April 22, 2010, for document review (USCA5 Supp. 1, 871-872).    Judge Hittner found Stanford's complaint about access to his legal material non-compelling given that "according to the FDC, as of June 3, 2010, Stanford had made no request to the warden to be allowed to keep more than the standard allowable amount of legal material in his cell" (*Id.*).    *See United States v. Vincent,* 416 F.3d 593, 599 (7th Cir. 2005) (upholding denial of continuance in complex mail and wire fraud case where defendant failed to take advantage of the resources available to him).    No abuse of discretion exists.    *See Akins,* 746 F.3d at 609.

## 2.    **Voluminous Discovery**

Stanford suggests a continuance was warranted based on the voluminous nature of the discovery (Appellant's Brief, 64).    Judge

Hittner rejected this argument based upon the transparent discovery policy of the United States (USCA5 Supp. 6 1314-1315, 1366-1368). Moreover, Judge Hittner noted that the United States had "even turned over in paper form all of the [sic] FBI Form 302 interview statements," which the court deemed "most unusual" because Fed. R. Crim. P. 16(a)(2) did not require the United States to do so (USCA5 Supp. 2 286-287, Supp. 6 1314 n.7). The United States went so far as to provide defense counsel with copies of the Form 302s instead of requiring counsel to view them at the United States Attorney's Office (USCA5 Supp. 2 286, USCA5 Supp. 6 1300).

The United States' case rested on a very narrow set of documents, *tailored specifically to SIB* and not to the other Stanford entities, including:  annual reports, marketing materials, training manuals for financial advisors, bank records, and internal accounting spreadsheets (USCA5 Supp. 6 1314 n.7). The United States provided the defense team with a searchable and indexed computer database of 1,511 total "hot documents" well before the trial began on January 23, 2012:  458 documents by May 28, 2010, 500 documents by November 22, 2010, and

553 documents by August 4, 2011 (USCA5 Supp. 2 286, Supp. 6 1298-1299).  As explained in Issue V, this Court has approved this type of open-file discovery procedure involving the production of a searchable database of "hot documents" in complex fraud cases.  *See Skilling,* 554 F.3d at 576; *see also Vincent,* 416 F.3d at 599 (upholding denial of continuance where defendant's business generated most of the documents in a complex wire and mail fraud case, the government opened its discovery file soon after the indictment, and the government gave the defendant a computer, software, and independent support staff to review the documents); *United States v. Ferguson,* 478 F. Supp. 2d 220, 244 (D. Conn. 2007) (finding no Rule 16 or *Brady* problem where the government provided a set of "hot docs" and a "text searchable" database that placed both parties in similar positions vis-à-vis the evidence).

The Eleventh Circuit's opinion in *United States v. Verderame,* 51 F.3d 249, 252 (11th Cir. 1995), upon which Stanford relies (Appellant's Brief, 64), is wholly distinguishable.  In *Verderame,* the district court denied a continuance early in the prosecution, 34 days after

arraignment; the focus of the trial shifted to a forfeiture action four days prior to trial; and the government was unable to provide the defense with copies of documents from its discovery file. 51 F.3d at 252. Here, Stanford sought a continuance years after the start of the proceedings, no significant changes occurred in the prosecution's theory, and the United States presented the defense with far more discovery than required by Rule 16.

### 3.    Recent Competency

Stanford maintains that he was "still-symptomatic" until five days prior to trial and was unable to assist defense counsel (Appellant's Brief, 61).  Judge Hittner acknowledged that although Stanford was declared legally competent on December 22, 2011, the FMC-Butner staff had determined that Stanford was malingering with his claim of retrograde amnesia in a staff report issued on November 4, 2011 (USCA5 Supp. 6 1364-1366, nn. 2-3).  By the time of Stanford's January 23, 2012, trial date, Stanford had been able to assist his defense team for at least two and a half months (USCA5 Supp. 6 1366).  Indeed, as Judge Hittner observed during trial, fully supported in the

memorandum opinion of competency and the trial transcript, Stanford actively assisted defense counsel throughout the trial (USCA5 Supp. 6 5295, 13811-13839).    Stanford's mental capacity as a basis for continuance is refuted by the record.

### 4.    Budgetary and Expert Restraints

Stanford also argues that the resignation of his experts ten days before trial created "chaos" that prejudiced him and could not be cured by the Fifth Circuit's subsequent order "forcing them to proceed without guarantee of payment - - and under threat of contempt" (Appellant's Brief, 61-62).

In rejecting this ground, Judge Hittner noted that Marcum and Accumyn, the electronic discovery companies retained by the defense but paid for by CJA funds, were not designated by Stanford as defense experts, and arguably did not qualify as experts under Fed. R. Evid. 702 (USCA5 Supp. 6 1371-1372).  In two January 4, 2012, orders, the Fifth Circuit rejected resignation letters from Accumyn and Marcum "*despite having been assured that further compensation would be available*" (USCA5 Supp. 6 1344-1345) (emphasis added).  As of the date of the

82

orders, Accumyn had been paid more than $780,000 and Marcum had been paid over $600,000 in CJA funds, which included billings at "hourly rates significantly in excess of the rates payable under the Criminal Justice Act to even the most experienced attorneys" (USCA5 Supp. 6 1344-1345).  Based upon the extensive billings to the date of the order, the then-Chief Judge of the Fifth Circuit deemed it "neither feasible nor economical to obtain a replacement" for these companies (*Id.*).  As a result, this Court denied the companies' requests to resign but certified their payments through November 2011, subject to the district court's certification (*Id.*).  The orders specifically provided that the two companies could submit compensation requests "for work done through January 22, after that date, for work done through the end of trial, after the end of trial, and for any work done after the end of trial, on a monthly basis"  (*Id.*).  Based upon this Court's orders, Judge Hittner did not abuse his discretion in denying Stanford's request for a continuance based upon the failed attempt at resignation by his two discovery companies that continued to receive CJA funds.  *See Akins,* 746 F.3d at 609.

### 5.    Illness of Litigation Specialist

Stanford argues that the illness of his litigation support specialist ten days before trial warranted the continuance (Appellant's Brief, 62-64).  He explains that this specialist had worked with defense counsel for months to identify and collate various documents for trial (Appellant's Brief, 63).  Stanford argues that this specialist possessed a unique ability to "quickly retrieve documents" (Appellant's Brief, 63-64).

During a January 18, 2012, pretrial hearing, the defense informed Judge Hittner that the specialist was undergoing cancer surgery (USCA5 Supp. 6 15375-15376).  Judge Hittner concluded that the continuance request of just three weeks was impracticable under these circumstances (USCA5 Supp. 6 15376).  He acknowledged that many other employees worked at Acumen, as noted by the Fifth Circuit's January 4, 2012, order denying Acumen's request for resignation (USCA 5 Supp. 6 15376).  After the defense explained that the specialist was no longer an Acumen employee, the parties agreed to accommodate the defense by permitting the defense to notify the United States merely one week prior to a witnesses' testimony about any exhibits to

84

be used (USCA5 Supp. 6 15409-15412).   No abuse of discretion exists under these circumstances.

Stanford argues that the motion to withdraw filed by his defense team is "the most compelling evidence" in support of a continuance (Appellant's Brief, 61, 64-65).   On January 11, 2012, Stanford's four defense lawyers filed a consolidated motion to withdraw from representation, citing inter alia, time and budgetary constraints (USCA5 Supp. 6 1776-1794).

Judge Hittner denied the motion, noting that defense counsel raised the same time and budgetary restraint arguments previously addressed and rejected in the court's prior rulings (USCA5 Supp. 6 3558).   Since the inception of the case in 2009, an "extensive legal defense team" of fourteen different attorneys had represented Stanford (USCA5 Supp. 6 1313).   For the first 16 months of the case, Stanford retained ten attorneys (*Id.*).   On October 27, 2010, the court declared Stanford indigent and thereafter a total of four full-time CJA-funded attorneys were assigned to his defense (*Id.*).   Even during Stanford's eight-month evaluation period at FMC-Butner, his defense team

85

continued to prepare for trial. *See* USCA5 Supp. 6 265 (order admonishing defense counsels to diligently prepare for trial notwithstanding Stanford's absence). Two of the defense lawyers, Robert Scardino and Ali Fazel, had been appointed to represent Stanford since November 2010 and the other two lawyers had been appointed since March 2011 (USCA5, Supp. 6 3557-3558). Scardino has been a member of the Southern District of Texas since December 1985 and Fazel has been a member of the Southern District of Texas since February 2000 (USCA5 Supp. 6 1313 nn. 4-5). Indeed, the trial record supports that Stanford received a sound defense, in light of the amount of defense motions filed, counsels' aggressive cross-examination of witnesses and effective defense tactics, which resulted in an acquittal on wire fraud count two. *See United States v. Alford,* 999 F.3d 818, 822 (5th Cir. 1993) (affirming denial of continuance in complex conspiracy to commit mail fraud, money laundering, and securities violations, where defense counsel exhibited sound knowledge of case, effectively cross-examined witnesses, mounted vigorous defense, and obtained acquittals on several counts).

86

Judge Hittner considered other factors in denying Stanford's request for a continuance. The expenses in the case had reached "massive" proportions (USCA5 Supp. 6 1315-1317). CJA funds were approved for expenses associated with Stanford's defense including third-party subpoenas, discovery hearings, and document production (*Id.*) The court summarized the following CJA funds remitted to the defense team: (1) over $1.5 million to two defense-retained companies for trial preparation and electronic discovery; (2) over $78,000 to a defense-retained investigative company for securing trial witnesses; (3) over $945,000 in vouchers for two electronic-discovery companies during a three month period from September to November 2011 and over $34,000 for an investigation company (*Id.*). These sums did not include amounts paid and requested for attorney and paralegal fees (*Id.* at 1316 n. 10).

Finally, Judge Hittner determined that both the public's and Stanford's interests warranted trial without further delay (*Id.* at 1318). The public was entitled to a speedy trial to decide not only Stanford's guilt but whether frozen funds could be returned to the alleged victims

87

(*Id.*).  As for Stanford, the court noted that he had been incarcerated over two and a half years  (*Id.* at 1318).

The record supports Judge Hittner's denial of Stanford's continuance based upon the totality of the circumstances:  amount of time afforded to the defense team since the inception of the case in 2009; the United States' open-file discovery policy approved by this Court's precedent; the adequacy of the Government-funded defense evidenced by the massive use of CJA funds to assist the defense with discovery and support staff; experienced counsels who secured an acquittal on one count; and both the public's and Stanford's interests in avoiding further delay.  *See Stalnaker,* 571 F.3d at 439.  No abuse of discretion occurred on this record.  *See id.*

C.  Under Plain-Error Review, Stanford Was Not Entitled to a
    Continuance on the Basis of His Challenges to the
    Superseding Indictment and on the Basis of an Alleged
    *Brady* Violation.

For the first time on appeal, Stanford argues that Judge Hittner erred in denying the trial continuance because the superseding indictment broadened the time frame of the fraud scheme and the United States violated *Brady* (Appellant's Brief, 52-60). His arguments fail under plain-error review. *See Kizzee,* 150 F.3d at 501.

Stanford quotes from a portion of the arraignment transcript where he informed Judge Hittner that he "had not been advised of the new charges prior to the arraignment date" (Appellant's Brief, 55). The transcript establishes that Stanford advised Judge Hittner that he had not reviewed the superseding indictment with defense counsel, not that he had not received *notice* of the new charges, as he now asserts on appeal (USCA5 Supp. 6 15372) (emphasis added).

In any event, as fully explained in Issue II of this brief, the superseding indictment did not broaden the case against him and Stanford was on notice of the charges by the original indictment in June 2009. The grand jury returned the superseding indictment on May 4,

89

2011, and trial began eight months later on January 23, 2012.

Stanford's reliance upon *United States v. Guzman,* 754 F.2d 487, 484

(2d Cir. 1985), is misplaced because the district court there abused its

discretion in denying a continuance one day after the filing of the

superseding indictment, which expanded the scope of the conspiracy by

10 years (Appellant's Brief, 58-59).  Likewise, Stanford's reliance upon

*United States v. Feldman,* 761 F.2d 380, 388-389 (7th Cir. 1985), is

inapposite where the district court denied a continuance and began trial

less than 30 days after the government filed a superseding indictment

that added new charges and substantive offenses.

For the first time on appeal, Stanford argues that in the 1,511

"hot documents" documents that the United States deemed relevant to

its case, "the Government did not provide or identify exculpatory

material, as is required"  (Appellant's Brief, 63).  As explained in Issue

V, Stanford's putative *Brady* claim fails based upon the comprehensive

open-file policy adhered to by the United States since the inception of

the litigation and approved by this Court in *Skilling.*  In *Skilling,* this

Court rejected conclusory allegations of *Brady* violations based merely

90

upon a claim of voluminous documents.  *See Skilling,* 554 F.3d at 577.

Stanford's argument fails given that the United States provided a

searchable database of 1,511 hot documents beginning over two years

prior to trial (USCA5 Supp. 1 871-872, Supp. 2 286, Supp. 6 1298-1299,

1314-1315,  1366-1368).    Stanford's conclusory *Brady* claim is

insufficient to support a trial continuance under plain-error review.  *See*

*Skilling,* 554 F.3d at 577 (rejecting conclusory *Brady* claim based upon

unsupported assertion that the government found exculpatory evidence

and failed to disclose it to the defense).  No plain error exists in the

denial of a trial continuance.  *See Kizzee,* 150 F.3d at 501.

## IV.

### The Parallel Civil Proceedings Brought by the SEC and Criminal Proceedings Brought by the United States Did Not Violate the Double Jeopardy Clause.

A.    Standard of Review

As he did below, Stanford argues that the parallel civil

proceedings brought by the SEC and criminal proceedings brought by

the United States violated the Double Jeopardy Clause (Appellant's

Brief, 67-72; USCA5 Supp. 3 285-380).  The United States filed an

extensive response to Stanford's motion for dismissal of the indictment on double jeopardy grounds (USCA5 Supp. 3 896-916). This Court reviews de novo the denial of a motion to dismiss the indictment on double jeopardy grounds. *See United States v. Jones,* 733 F.3d 574, 579-580 (5th Cir. 2013).

B.    Application

Stanford's general complaint that parallel civil and criminal proceedings violate the Double Jeopardy Clause fails on the law. This Court and the Supreme Court recognize that parallel proceedings do not violate Double Jeopardy where the SEC and Justice Department seek to vindicate different interests through separate forums. *Kordel,* 397 U.S. at 11-12; *Setser,* 568 F.3d at 492-493; *First Financial,* 659 F.2d at 666-667.

Stanford contends that the Receiver took punitive action by selling Stanford's assets (Appellant's Brief, 67-72). Because these actions occurred during the course of his criminal trial, he asserts that a double jeopardy violation exists (*Id.*). He further argues that the Receiver's liquidation of his assets before a final disposition in his criminal case

together with his 110-year prison sentence, violated the Double Jeopardy Clause (Appellant's Brief, 70-71).

Stanford's arguments fail for numerous reasons.  First, the Double Jeopardy Clause protects against the imposition of "multiple *criminal* punishments for the same offense."  *Hudson v. United States,* 522 U.S. 93, 99 (1997) (emphasis in original).  Here, the Northern District of Texas imposed a stay of the SEC civil action on January 5, 2010, pending the resolution of the criminal case.  *SEC v. Stanford,* 3:09-CV-298 (N.D. Tex.) (dkt entry # 948).  Because no judgment or fine of any kind had been imposed against Stanford in the SEC action at the time of the criminal judgment, no viable claim of double jeopardy exists.  *See Hudson,* 522 U.S. at 99.  Stanford himself acknowledges that the Northern District of Texas did not grant a summary judgment against him until April 25, 2013, well after the conclusion of his criminal trial (Appellant's Brief, 71 n.10). *See SEC v. Stanford,* 3:09-CV-298 (N.D. Tex.) (dkt entry # 1858).

Second, the Receiver is not a governmental actor, and only government conduct triggers the Double Jeopardy Clause. *See United States v. Beszborn,* 21 F.3d 62, 67-68 (5th Cir. 1994).

Third, the SEC action and resulting Receivership are civil in nature. Fed. R. Civ. P. 66. Sanctions resulting from SEC civil enforcement actions or consequences of a Receivership do not constitute criminal punishment. *See eg., United States v. Van Waeyenberghe,* 481 F.3d 951, 958-959 (7th Cir. 2007); *Quilling v. Funding Res. Grp.,* 227 F.3d 231, 232-234 (5th Cir. 2000); *United States v. Perry,* 152 F.3d 900, 904 (8th Cir. 1998); *SEC v. Palmisano,* 135 F.3d 860, 865-66 (2d Cir. 1998); *United States v. Gartner,* 93 F.3d 633, 635 (9th Cir. 1996); *SEC v. Bilzerian*, 29 F.3d 689, 969 (D.C. Cir. 1994); *SEC v. Credit Bancorp, Ltd.,* 738 F. Supp. 2d 376, 389-390 (S.D.N.Y. Sept. 13, 2010).

Stanford also asserts that the Reciever acted as an "Agent of the Prosecution" by turning over documents to various government entities such as the SEC, the FBI, and the Justice Department and by "preparing material for the criminal prosecution and conducting a significant portion of their investigations" (Appellant's Brief, 68-70).

94

This argument too is meritless. This Circuit has repeatedly affirmed the role of receivers in SEC cases, which includes providing documents to law enforcement. *Setser,* 568 F.3d at 486-493 (rejecting argument of improper civil/criminal collusion by the receiver's document production to the FBI); *United States v. Gray,* 751 F.2d 733, 737 (5th Cir. 1985) (rejecting argument that Receiver's document production to government raised constitutional violation).

No evidence of bad faith in the criminal prosecution exists on this record. *See Kordel,* 397 U.S. at 11-12 (including as examples of bad faith, where the civil action is brought solely to obtain evidence for the criminal case, the defendant is unaware of criminal prosecution, the defendant lacks counsel, and the defendant fears prejudice from adverse pretrial publicity); *Setser,* 568 F.3d at 482. The SEC brought the civil action on its own, and did not cloak it as a criminal investigation. The SEC action was stayed on January 5, 2010, pending the criminal prosecution, which ensured no prejudice to Stanford in the parallel proceedings. *See Kordel,* 397 U.S. at 11-12; *Setser,* 568 F.3d at 482.

95

In *SEC v. Stanford.,* 3:09-CV-0298 (N.D. Tex.), the SEC lawsuit against SIB, Stanford, and other Stanford entities, Judge Godbey ordered the Reciever, a private actor, to "promptly provide the [SEC] and other governmental agencies with all information and documentation they may seek in connection with regulatory or investigative functions" (USCA5 Supp. 6 1478-1488). No collusion exists by the Receiver's compliance with the federal court order to produce documents to the United States. *See Setser,* 568 F.3d at 486-493; *Gray,* 751 F.2d at 737. Stanford's Double Jeopardy claim fails. *See Jones,* 733 F.3d at 579-580.

## V.

### Judge Hittner Correctly Denied Stanford's Motion to Suppress Evidence Obtained By the Receiver and Produced to Investigative Agencies.

A.    Factual Background

On January 6, 2012, 17 days prior to trial, Stanford filed a motion to suppress evidence obtained by the Receiver including emails, documents, and "Confidential Bank Customer Data" downloaded from computer databases (USCA5 Supp. 6 1435-1472). He argued that the

Receiver acted as a governmental actor and stole these materials in violation of the Fourth Amendment (USCA5 Supp. 6 1442-1471).

The United States responded that the motion should be denied on any of the following grounds:  lack of governmental action; Stanford's lack of standing; compliance with a valid court order; and mootness (USCA5 Supp. 6 3525-3534).

Judge Hittner denied the motion to suppress because (1) Stanford's claim related to his "Confidential Bank Customer Data" was moot because the United States did not intend to use the evidence at trial and (2) *Setser* foreclosed Stanford's Fourth Amendment claim (USCA5 Supp. 6 3561).

B.    Standard of Review

Stanford renews his arguments that the Receiver violated the Fourth Amendment when he entered the Houston SFG offices and obtained various documents, including Stanford's address book, and accessed SIB's computer databases "Temenos" and "Data Pro," which contained confidential customer account information and other materials (Appellant's Brief, 73-88).  Although Stanford refers to these

97

databases separately, the Temenos database was the accounting software database that SIB used, which included customer information. Data Pro is a database software used to access the Temenos database. *See* (USCA5 Supp. 3 410).

In reviewing the denial of a motion to suppress, this Court views the evidence in the light most favorable to the United States, examining the district court's legal conclusions de novo and factual findings for clear error. *United States v. El-Mezain,* 684 F.3d 467, 540 (5th Cir. 2011) (citations omitted). As explained below, Stanford's claim fails for four independent grounds. This Court may affirm the district court's denial of Stanford's suppression motion on any one of the grounds alone. *See id.*

C.   Application

1.   No Government Action

The Fourth Amendment applies only to government action, not actions by private entities. *Walter v. United States,* 447 U.S. 649, 656 (1980). Robert Janvey, the Receiver appointed by Judge Godbey in the civil case brought by the SEC against Stanford, is a private entity

98

(USCA5 Supp. 6 1478).   *See Beszborn,* 21 F.3d at 68 (noting that the receiver appointed by the Resolution Trust Corporation "stands as a private, non-governmental entity").   By appointing Janvey as Receiver of the Stanford entities, Judge Godbey invoked "a well-established equity remedy available to the SEC in its civil enforcement proceedings." *First Financial,* 645 F.2d at 438-39.   A receiver is court-appointed to "take control, custody or management of property that is involved or is likely to become involved in litigation for the purpose of preserving the property"  12 Charles Alan Wright, et. Al., Fed. Prac. & Proc. § 2981 at 8-9 (2d ed. 1997) (noting that "[A] receiver is considered to be an officer of the court, and therefore not an agent of the parties"). Even in a situation where a government entity acts as a receiver, *unlike the situation here*, a court of appeals determined that the receiver did not function as a governmental actor.   *See United States v. Ely,* 142 F.3d 1113, 1121 (9th Cir. 1997) (recognizing that the FDIC, when serving as a receiver, was not acting in a governmental capacity). Stanford fails to cite to any law supporting the position that a Receiver is a governmental actor.

99

Several disagreements over the Receiver's fees between the SEC and the Receiver demonstrate that the Receiver is an independent, non-governmental entity. *See SEC v. Stanford,* No. 3:09-CV-298 (N.D. Tex.) (dkt entries # 738, 853, 946). Moreover, in *Janvey v. Adams,* 588 F.3d 831, 833-834 (5th Cir. 2009), the SEC opposed the Receiver's attempt to obtain both interest and principal from particular CD purchasers.

To the extent that Stanford asserts that the assistance of the United States Marshal's Service, the FBI, and the state police in entering his Houston SFG offices amounted to state or governmental action, he is incorrect (Appellant's Brief, 74). First, the FBI never assisted the Receiver in executing the Receivership Order (*See* USCA5 Supp. 6 3530 n. 4). Second, one of the missions of law enforcement is civil process, even when a government agency is not involved. *See Smart v. Jones,* 530 F.2d 64, 64-65 (5th Cir. 1976). The assistance of the United States Marshal's Service is consistent with this function (USCA5 Supp. 6 3530). The Receivership Order expressly authorized the "assistance of local peace officers or United States marshals" to

enter and secure the premises and to assist the Receiver in carrying out his duties (USCA5 Supp. 6 1481, 1483).

In support of his assertion that the United States and various government agencies improperly colluded with the Receiver, Stanford points to testimony from FBI Agent Kalford Young, who explained that the Receiver permitted the FBI to enter Stanford's Houston offices in April 2009, after the Receiver took over the Stanford companies (Appellant's Brief, 75). *See* USCA5 Supp. 6 7691.  Stanford argues that the Receivership Order never allowed for this type of "cooperation with law enforcement" (Appellant's Brief, 75).  He is wrong.  The Receivership Order expressly ordered the Receiver to "[p]romptly provide the United States Securities and Exchange Commission and *other governmental agencies* with all the information and documentation they may seek in connection with its regulatory or *investigative activities*" (USCA5 Supp. 6 1482) (emphasis added).  The Receivership Order granted the Receiver the authority to permit the FBI to enter the SFG offices consistent with the FBI's investigative function.  (USCA5 Supp. 6 1482).  By virtue of the valid Receivership

101

Order, the Receiver became the virtual possessor of the entire premises and property therein and could freely give consent to enter the premises. *See Setser,* 568 F.3d at 491.

Stanford cites to *Gray* to argue that the Receiver is precluded from using law enforcement to enter premises and conduct a search (Appellant's Brief, 76). *Gray* never addressed this issue. Rather, *Gray* holds that once a Receiver exercises authority over a business and its premises by way of a court order, the original owner loses all reasonable expectation of privacy to challenge the seizure of any records and the production of those records to law enforcement. *Gray,* 751 F.3d at 737. As Agent Young's testimony demonstrates, the FBI entered the premises in April 2009, *after the Receiver took over* the Stanford entities in February 2009 (USCA5 Supp. 6 7691). No showing exists that the Receiver improperly collaborated with law enforcement.

In conclusory fashion, Stanford nevertheless asserts that the Receiver engaged in an "unhealthy relationship" of "ubiquitous and overwhelming" collusion with the Government, FTI Consulting, Baker Botts and other attorneys and firms working for the Receiver

102

(Appellant's Brief, 76-78). Stanford provides no specific examples to establish that the Receiver colluded with any government agency. This claim of collusion fails for inadequate briefing. *See Yohey v. Collins,* 985 F.2d 222, 225 (5th Cir. 1993) (noting that even under a liberal construction afforded to briefs of pro se appellants, arguments must be fully briefed to be considered on appeal); *Oliver v. Scott,* 276 F.3d 736, 741 (5th Cir. 2002) (noting that conclusory assertions are insufficient to establish a viable constitutional violation).

Because the Receiver is not a governmental actor, Stanford's entire Fourth Amendment challenge fails.

## 2.    Lack of Standing

A party must have a "reasonable expectation of privacy" in the area searched or the property seized to have standing to assert a Fourth Amendment violation. *See Minnesota v. Carter,* 525 U.S. 83, 88, 91 (1998); *Setser,* 568 F.3d at 490. Stanford lacks standing to challenge the Receiver's custody over documents, the Temenos computer database, and other paper documents recovered from his offices, including his address book (Appellant's Brief, 74-88).

Judge Hittner correctly held that *Setser* forecloses Stanford's Fourth Amendment argument (USCA5 Supp. 6 3561). There is "no violation of the Fourth Amendment for a receiver who is the lawful custodian of the records to turn them over to law enforcement agents at their request." *Setser,* 568 F.3d at 490. Once the Receiver took over Stanford's companies on February 17, 2009, pursuant to Judge Godbey's February 16, 2009, order, Stanford lost any reasonable expectation of privacy over any of his company records. *See Setser,* 568 F.3d at 482, 490-91; *Gray,* 751 F.2d at 737; *Pentz v. United States,* 2011 WL 3269460 at * 3 (M.D. Florida July 29, 2011) (unpublished) ("A law enforcement officer can lawfully request, without obtaining a search warrant, a receiver to turn over property the receiver has obtained during the course of his receivership").

Stanford nevertheless relies on a single comment from Judge Hittner during a discussion outside the presence of the jury about the admissibility of Stanford's address book (GX 1500) in the criminal case (Appellant's Brief, 74).

104

During the bench conference, the defense renewed its objection to the admissibility of the address book, arguing that the prosecution obtained the book without a warrant (USCA5 Supp. 6 6857-6858, 7670; GX 1500).    Judge Hittner recalled previously denying the defense motion to suppress, which the court denied on the basis of *Setser* (USCA5 Supp. 6 3561, 6860-6861, 6865).    The defense nevertheless reurged that the Receiver in the civil lawsuit impermissibly turned over the address book to law enforcement in the criminal investigation (USCA5 Supp. 6 6866). Stanford relies upon the judge's comment to the defense: "How can you go back and clean up a situation like this? I think there's no way to redeem it, because they had no warrant, that's for sure" (USCA5 Supp. 6 6866).    Despite that comment, Judge Hittner rejected the Fourth Amendment challenge pretrial and again immediately following the comment (USCA5 Supp. 6 3561, 6866-6867). Judge Hittner's pretrial and trial ruling is consistent with the law of this Circuit that once the Receiver took control of the Stanford entities as a result of the SEC civil lawsuit, Stanford lost all expectation of any privacy over any documents and the Receiver could legally produce

105

them to any investigating agency in the criminal prosecution consistent with Judge Godbey's order. *See Setser,* 568 F.3d at 486, 490-91; *Gray,* 751 F.2d at 737.

Stanford's asserts in a conclusory sentence without identifying any particular documents or providing any detailed supporting facts, that the Receiver provided investigating agencies with documents subject to attorney-client and work-product privileges (Appellant's Brief, 77). He made the same broad allegation in his motion to suppress, but failed to identify in his motion, and now on appeal, any privileged communications that the Receiver allegedly improperly remitted to the United States (USCA5 Supp. 3 906 n.4). His conclusory allegation is insufficient to establish a constitutional violation and is waived for inadequate briefing. *See Yohey,* 985 F.2d at 225; *Oliver,* 276 F.3d at 741.

Stanford's lack of standing forecloses this issue. *See Setser,* 568 F.3d at 490-491.

106

### 3.     Lawful Court Order

The good-faith exception to the exclusionary rule provides that evidence obtained from an unconstitutional search need not be suppressed "when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *United States v. Leon,* 468 U.S. 897, 918-919 (1984).

Federal officers acted in good faith reliance upon existing law that authorized them to request information from receivers, therefore suppression is not an appropriate remedy. *See Setser,* 568 F.3d at 490-491; *Gray,* 751 F.2d at 737. No basis exists to suppress the evidence obtained from the Stanford entities where the United States acted in good faith and in strict compliance with binding precedent by following Judge Godbey's Receivership Order, which permitted investigators to seek documents from the Receiver. *See Davis v. United States,* 131 S. Ct. 2419, 2428-2429 ("Indeed, in 27 years of practice under *Leon*'s good-faith exception, we have 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct").

107

### 4.     Mootness

Finally, Stanford argues that the Receiver violated the Fourth Amendment by accessing from Houston "Confidential Bank Customer Data" maintained on the electronic Temenos database (Appellant's Brief, 78-86).

Judge Hittner determined this issue was moot, given that the United States did not intend to use any evidence from the Temenos database at trial (USCA5 Supp. 6 3525-3527, 3561).

In a written response, the United States represented,

> On a few occasions, the FBI or Department of Justice requested from the Receiver Temenos account information for victims it had already identified as potential witnesses. Those witnesses, however, will be referring to their Stanford Group Company brokerage statements during their testimony, not from the data from the Temenos database. The FBI also requested Temenos information for some Stanford Financial executives to see [] the extent of their CD investments, if any, but those individuals are not being tried in this case and thus those documents will not be used.

(USCA5 Supp. 6 3527).   This representation was consistent with the Receiver's production log, which indicated that the Receiver produced "Temenos Data Pro Source Data" to the FBI on April 27, 2010 (USCA5 Supp. 3 410).

Stanford continues to argue on appeal that the United States used depositor account information obtained from the Temenos database (Appellant's Brief, 83-85).  He points to 2009 pretrial hearing testimony from Jeffrey Ferguson, an auditor employed by the Receiver, and trial testimony from defense witnesses Frank Goll and Morris Hollander (Appellant's Brief, 83-85).  None of the testimony establishes that the United States improperly used information from the Temenos database at trial.  The United States' exhibit list, filed on January 12, 2012, and revised on March 8, 2012, did not contain any Temenos database records (USCA5 Supp. 6 1844-1866, 12904-12931).  In any event, as briefed above, Stanford has no reasonable expectation of privacy in any of the materials seized by the Receiver. *See Setser,* 568 F.3d at 486, 490-91; *Gray,* 751 F.2d at 737.

Ferguson, a certified fraud examiner and CPA, worked for FTI consultants, who assisted the Receiver in locating assets (USCA5 224-225).  During a June 25, 2009, arraignment and detention hearing, Ferguson explained that he accessed SIB financial statements, accounting records, finance records, and general documents located at

109

the SFG office in Houston (USCA5 226-227, 234).  FTI reviewed the computer database at the Houston office, which contained customer banking records for SIB before the server connection was terminated (USCA5 234-235).  The Receiver's seizure of this database is entirely consistent with the authority granted to him and his agents, like Ferguson, by the civil receivership order.  *See Setser,* 568 F.3d at 490. Ferguson's testimony simply does not establish that the United States improperly used information from the database at trial.

Stanford argues in one sentence "during testimony of Frank Goll, the Government revealed it did indeed utilize these unlawfully accessed databases located in Antigua, as it was the source of the Government's information that Mr. Goll was not a depositor of SIB" (Appellant's Brief, 83).  Goll's testimony does not support Stanford's conclusory statement. Goll testified that he invested in two SIB CDs, issued in the name of another person (USCA5 Supp. 6 10248, 10251, 10253).  None of the defense exhibits admitted during Goll's testimony established that Goll was a beneficiary of a SIB CD (DE 17, 81).  On cross-examination by the United States, Goll conceded that he had no record of either of his CD

110

investments, he had no idea where the records were kept, and he never retained a copy of any CD subscriber agreements (USCA5 10283, 10285-10288). Thus, the prosecutor's cross-examination of Goll establishes that the United States did not have any information whatsoever that Goll was even a legitimate investor in SIB CDs. Goll's testimony simply fails to establish any use of Temenos database information by the United States.

With respect to Hollander, a defense witness employed by the CPA firm Marcum, Stanford argues in a single sentence that the United States illegally accessed the Temenos database by questioning "whether [Hollander] was aware that a particular number was verified through detailed account statements and bank records of depositors" (Appellant's Brief, 83). The United States effectively established through cross-examination that Hollander never reviewed any financial documents from SIB to support his opinion of the bank's legitimacy and $8 billion in purported total assets (USCA5 Supp. 6 10671-10672, 10722-10723). Unlike FBI Agent Robert Martin who examined financial documents to discover that the bank's $8 billion in reported

111

assets were false, Hollander's opinion of the bank's legitimacy rested upon reviewing auditor reports prepared by Hewlett, the auditor Stanford bribed for years (USCA5 Supp. 6 10671-10672, 10795-10796).

Stanford's cursory reference to the civil deposition of Karyl Van Tassel, an FTI employee in a lawsuit brought by the Receiver is entirely irrelevant to this criminal case (Appellant's Brief, 85).  In any event, as briefed, the Receiver and his agents, were vested with full authority to exercise control over all of the Stanford entities and evidence, such as the Temenos computer database.  *See Setser,* 568 F.3d at 486, 490-91; *Gray,* 751 F.2d at 737.

Without citing any authority, Stanford summarily asserts that the alleged access by the United States of the Temenos database violated Antiguan laws and foreign treaties (Appellant's Brief, 85-86).  This argument fails for inadequate briefing and is otherwise meritless.

Judge Hittner correctly determined that any alleged Fourth Amendment claim was moot because no evidence exists that the United States even used the Temenos database records at trial.  *See Setser,* 568 F.3d at 489 (noting that the Fifth Circuit does "not rule in the abstract

112

on questions of suppression . . . We must know what evidence was admitted in violation of some specifically identified right.").

In a sub-issue, Stanford argues, as he did below in a motion to compel, that the United States violated *Brady*, by failing to turn over exculpatory information located in the Temenos database (Appellant's Brief, 87-88; USCA5 Supp. 1, 884-916).

To establish a cognizable claim under *Brady,* Stanford must establish that (1) the United States suppressed exculpatory evidence, (2) the evidence was favorable and (3) the evidence was material. *See Skilling,* 554 F.3d at 575 (citation omitted).

Stanford argues that the entire Temenos database contained exculpatory material that the United States failed to disclose in violation of *Brady* (Appellant's Brief, 87-88).

This Court's decision in *Skilling* defeats Stanford's generalized *Brady* claim. Skilling, the Enron CEO convicted of conspiracy, securities fraud, and insider trading, argued that the United States' open-file discovery policy related to millions of pages of documents violated *Brady* because it "resulted in the effective concealment of a

113

huge quantity of exculpatory evidence." *Skilling,* 554 F.3d at 534, 576. In rejecting Skilling's *Brady* argument, this Court acknowledged that the Government had no duty to search for exculpatory evidence within a mass of evidence disclosed to Skilling. *Id.* at 576. Skilling nevertheless argued that no amount of due diligence could have resulted in his effective review of the volume of documents produced by the Government. *Id.* This Court rejected this argument because the Government provided Skilling with an electronic and searchable database of its "hot documents" that were important to the prosecution's case or relevant to the defense. *Id.* at 577. In addition, the United States created indices to the database as well as to databases related to other Enron litigation. *Id.* Accordingly, "the government was in no better position to locate any potentially exculpatory evidence than was Skilling." *Id.* Finally, Skilling failed to provide any evidence that the United States found exculpatory evidence and hid it in the open file "with the hope that Skilling would never find it." *Id.* In sum, Skilling's *Brady* claim amounted to an "unsupported assertion of improper conduct on the part of the government." *Id.*

Stanford's *Brady* claim fails for the same reasons. As in *Skilling,* the United States adopted a transparent discovery policy from the inception of the case. Judge Hittner acknowledged in three separate orders that the United States narrowed its "hot documents" to 1,511 total documents on an indexed and searchable computer database for the defense well before the trial began on January 23, 2012: 458 documents by May 28, 2010, 500 documents by November 22, 2010, and 553 documents by August 4, 2011 (USCA5 Supp. 1 871-872, Supp. 2 286, Supp. 6 1298-1299, 1314-1316, 1366-1368). Both the United States and Stanford had equal access to the database and a firewall existed so neither party could see what the other party viewed on the database (USCA5 Supp. 6 1298 n.3). *See Skilling,* 554 F.3d at 577. Moreover, the United States paid for a separate defense contractor to assist the defense team with any technical difficulties in accessing the database (USCA5 Supp. 6 1298 n.3). Stanford's *Brady* claim relative to the Temenos database amounts to an "unsupported assertion of improper conduct on the part of the government" that this Court rejected in *Skilling*, 554 F.3d at 577.

115

## VI.

### Judge Hittner Properly Responded to Jury Notes #2 and #3 on the Definition of "Scheme" and the Meaning of "CDO."

A.    <u>Factual Background for "Scheme" Definition</u>

In jury note #2, the jury requested the "definition of the word 'scheme' as it pertains to counts 2 through 11" (USCA5 Supp. 6 12799). Stanford tendered the definition of "a design or plan formed to accomplish some purpose" (USCA5 Supp. 6 14836). The United States tendered a more concise definition of "a design or plan," because the jury instruction already included a complete definition of "scheme to defraud" as part of the instructions for mail and wire fraud (USCA5 Supp. 6 14833, 14835). Judge Hittner denied the defense tender and submitted the definition of "a design or plan" (USCA5 Supp. 6 12799, 14836-14837).

B.    Standard of Review

For the first time on appeal, Stanford argues that Judge Hittner's definition of "scheme" was deficient because it failed to address that he was "tried in an atmosphere poisoned with the word 'scheme'" (Appellant's Brief, 90).

This Court reviews preserved objections to jury note responses for an abuse of discretion, subject to a harmless-error analysis.  *United States v. Ramos-Cardenas,* 524 F.3d 600, 610 (5th Cir. 2008).  However, Stanford's complaint that the court's definition of "scheme" failed to account for the poisonous atmosphere of the word's usage at trial is reviewed for plain error because it was never raised before the district court. *See id.*

C.    Application

In support of his poisonous-atmosphere argument, Stanford tallies the number of times the word "scheme" appeared at trial:  25 times in the superseding indictment; references in area newspapers to Stanford as a "Ponzi schemer;" 23 times by Judge Hittner; 9 times during closing argument; and 24 times in the jury instruction (Appellant's Brief, 90-92).

117

The word "scheme" appears in the statutory language of wire fraud and mail fraud statutes. *See* 18 U.S.C. §§ 1343, 1341. Case law recognizes that the statutes include the word "scheme" as an element of the offenses. *See Simpson,* 741 F.3d at 547-548. The pattern jury instructions for the offenses also include the word "scheme" throughout the instructions. *See* Fifth Circuit Pattern Jury Instructions (Criminal) §§ 2.59, 2.60 (West 2012). The use of the word "scheme" at trial is consistent with the statutory offenses of wire fraud and mail fraud. Stanford's argument is frivolous.

To the extent that Stanford argues that the court's definition of "scheme" failed to account for negative newspaper publicity, Judge Hittner gave the jury explicit instructions to "completely disregard" any publicity about the case (USCA5 Supp. 6 12829). The jury is presumed to follow the court's instructions. *See e.g., Weeks v. Angelone,* 528 U.S. 225, 234 (2000); *Isgar,* 739 F.3d at 841 n.39. Judge Hittner also gave the jury an instruction regarding their duty to follow the court's instructions (USCA5 Supp. 6 12824).

118

Stanford also argues that AUSA Costa's reference to the Madoff scheme during closing argument was inflammatory and prejudicial (Appellant's Brief, 92). In a single reference, AUSA Costa stated:

> Who else have they blamed? Well, the receiver, the fact that they try to say everyone was paid until the receiver came in. First of all, you heard about depositors who were denied payment before the receiver came in. But that's the way a scheme like this works. They were paid for 20 years, just like Madoff was able to carry something on that long.

(USCA5 Supp. 6 12730). After the defense objected, Judge Hittner gave the following instruction:

> Ladies and gentlemen, keep in mind you're here to decide this one case. Remember the instruction. Anything anybody else may have done, involved in this case or otherwise, is not a concern of yours. There's one individual that we're here on today. So, anything the lawyers say is not evidence. Remember that. You'll consider the evidence and the instructions.

(USCA5 Supp. 6 12730-12731). In addition, the court specifically instructed the jury to disregard any Madoff reference (USCA5 Supp. 6 12731). The jury is presumed to follow the instructions and disregard the prosecutor's statements. *See Weeks,* 528 U.S. at 234; *Isgar,* 739 F.3d at 841 n.39.

119

In any event, the prosecutor's reference was a summary of the evidence. *See United States v. Mendoza,* 522 F.3d 482, 491 (5th Cir. 2008). References to the Madoff scheme appear throughout the trial. Lula Rodriguez, Stanford's director of public relations, sent an email to Laura Pendergest-Holt in December 2008, which was ultimately sent to Stanford, entitled "Losses in Madoff Ponzi Scheme spread to famous victims" with an attached article from the Wall Street Journal (USCA5 Supp. 6 8684-8685; GX 1135). Concern existed in the entire Stanford organization that clients would question "potential similarities between the two operations" (USCA5 Supp. 6 8684).

After the news of the Madoff scheme broke in December 2008, Collinsworth, a Memphis analyst, also expressed concern to Pendergest-Holt over how Tier 3 was invested because he noticed that specific funds in SIB's portfolio were feeder funds for Madoff-managed funds (USCA5 Supp. 6 5687-5689).

Stanford sent depositors a newsletter in December 2008, in an effort to stall the rapid rate of CD redemptions in one of the "most turbulent times in history" and to assure depositors of SIB's financial

120

strength (USCA5 Supp. 6 5008-5009, 5019; GX 138).    Stanford's letter

informed  depositors that SIB "had no direct or indirect exposure to any

of Madoff's investments" (GX 138).    Green testified that Stanford's

December 2008 newsletter was the first of its kind sent to depositors

and that he discussed it with Stanford prior to its circulation (USCA5

Supp. 6 5028-5029; GX 138).  Green read the entire newsletter aloud at

trial (USCA5 Supp. 6 5028-5031).

On February 11, 2009, Green sent an email entitled, "Our

Victim-depositor Flynn received Stanford's letter around the time

that "the Madoff Ponzi scheme came to light" (USCA5 Supp. 6 5368; GX

138).  Flynn called his financial advisor, who assured him that his CDs

were safe (USCA5 Supp. 6 5368).  Not only did the letter ease Flynn's

concerns about the "economy after Madoff," but the financial advisor

told Flynn that Stanford had made a personal investment of hundreds

of millions of dollars to ensure the bank's liquidity (USCA5 Supp. 6

5371).

On February 11, 2009, Green sent an email entitled, "Our

Survival – Managing Directors' Pe[r]spective" to Davis and Stanford

(USCA5 Supp. 6 5042; GX 1157).  Green proposed various changes in

light of the "post-Madoff environment" such as a new auditor, validations of assets, and transparency of SIB (USCA5 Supp. 6 5043; GX 1157). Green noted that the changes were necessary to defend existing articles that "accus[ed] Sir Allen of being the Antiguan version of Madoff" (USCA5 Supp. 6 5044; GX 1157). Later that same week, Green contacted Pendergest-Holt amidst accusations that Stanford was the "Caribbean Madoff" (USCA5 Supp. 6 5053-5054). Stanford made no objections to these Madoff references during trial.

No error exists in the prosecutor's reference to Madoff during closing argument given that the references to Madoff appeared throughout the trial in relation to the grave concerns expressed by financial advisors and depositors over the crisis of 2008, of which the Madoff investment fraud scheme was a large part. Stanford's 2008 letter to depositors expressly sought to dispel investors' fears after authorities exposed the Madoff scheme (GX 138). The prosecutor's isolated reference to the Madoff scheme is hardly prejudicial under these circumstances. *See United States v. Delgado,* 672 F.3d 320, 337-338 (5th Cir. 2012) (en banc).

Moreover, Judge Hittner gave the jury a thorough limiting instruction, which the jury presumably followed (USCA5 Supp. 6 12730-12731). *Weeks,* 528 U.S. at 234; *Isgar,* 739 F.3d at 841 n.39; *see also Delgado,* 672 F.3d at 337-338. Indeed, no prejudice exists when the jury found Stanford not guilty on count two.

Finally, any putative error is harmless given the overwhelming weight of the evidence supporting Stanford's guilt. *See Delgado,* 672 F.3d at 337-338 (noting that any improper comment by prosecutor harmless when single remark is made, an effective curative instruction is given, and ample evidence supporting the conviction exists).

D.    Factual Background for "CDO" Definition

In jury note #3, the jury asked, "On Government Exhibit #1149, item #3 refers to 'CDO' products. What is the meaning of 'CDO'" (USCA5 Supp. 6 12804). Judge Hittner held a conference with the parties to discuss a response (USCA5 Supp. 6 14844). The prosecutor noted that, although there was no testimony about the meaning of "CDO," the phrase referred to "collateralized debt obligation" (USCA5 Supp. 6 14844). Stanford tendered the following definition – "CDO

refers to 'collateralized debt obligations' like sub-prime loans" (USCA5 Supp. 6 14849).  Because exhibit 1149 contained an express reference "sub-prime exposure" and because "CDO" did not necessarily refer to sub-prime products, the United States tendered "collateralized debt obligation" (USCA5 Supp. 6 14844-14845, 14850).  Judge Hittner gave the following definition: "CDO': Collateralized Debt Obligation" (USCA5 Supp. 6 12804, 14852).

E.    Standard of Review

On appeal, Stanford argues that Judge Hittner's definition "denied jurors an adequate answer" and violated his Sixth Amendment rights because "while it's true that not all 'CDOs' consist of 'subprime loans,' in reality, and certainly in the public's perception, these and other 'Wall Street bailout' – related terms are now inextricably linked and prejudicially impactful on anyone charged, as Stanford was, with a financial crime" (Appellant's Brief, 95).

Stanford did not raise this precise argument before the district court, therefore the plain-error standard applies, but even under an

abuse of discretion standard, no error exists. *See Ramos-Cardenas,* 524 F.3d at 610.

F.   Application

The jury asked for the meaning of the abbreviation "CDO," no more, no less (USCA5 12804).   Judge Hittner responded that CDO meant "Collateralized Debt Obligation" (USCA5 Supp. 6 12804, 14852). The jury did not request any further explanation.

Stanford cannot show error, plain or otherwise, about the exclusion of "subprime loans" given his concession that not all CDO's consist of subprime loans (Appellant's Brief, 95).   Further, he offers no argument of specific harm other than a broad generalization about public perception (Appellant's Brief, 95).   In any event, Government Exhibit 1149 references "subprime exposure" in a line directly above the reference to "CDO" (GX 1149).   No error exists under these circumstances. *See Ramos-Cardenas,* 524 F.3d at 610.

In a footnote, Stanford asserts that exhibit 1149 "indirectly introduced issues prohibited by the Government's own requested Motion in Limine" (Appellant's Brief, 93 n.12).   Stanford provides no

125

specific facts or argument to support this conclusory statement, therefore it is waived for inadequate briefing. *See Oliver,* 276 F.3d at 741 (recognizing that despite the liberal construction afforded to pro se briefs, pro se litigants are not immune to the general rule that issues and arguments insufficiently briefed are abandoned on appeal).

In any event, Green explained at trial that Stanford gave him the document (GX 1149) during a meeting in November 2008 (USCA5 5021-5022).  The document contained "talking points" that Stanford wanted financial advisors to communicate to investors so they would stop redeeming CDs during the financial downturn of 2008 (USCA5 Supp. 6 5007, 5023).  Listed among the "talking points" were inter alia, misrepresentations that SIB remained strong, with long-term liquidity, stricter banking requirements, and a globally diverse investment portfolio (USCA5 Supp. 6 5023-5025; GX 1149).  The exhibit is one of the many examples of Stanford's misrepresentations to investors about the SIB CD program. Stanford's complaint about the jury instruction on the meaning of "CDO" fails under any standard of review. *See Ramos-Cardenas,* 524 F.3d at 610.

# VII.

## Judge Hittner Correctly Applied the Sentencing Guideline Enhancements.

A.    <u>Guideline Calculations and Sentence</u>

The counts of conviction were grouped under U.S.S.G. § 3D1.2(c) and (d) (PSR ¶ 98).[2]  The probation officer selected count 14, conspiracy to commit money laundering, to perform the guideline computations (PSR ¶ 98).   Using the 2011 edition of the Sentencing Guidelines Manual, the PSR contained the following calculations:

- 6:    base offense level (U.S.S.G. § 2B1.1);

- +30:  loss amount exceeds $400 million (U.S.S.G. § 2B1.1(b)(1)(P));

- +6:   250 or more victims (U.S.S.G. § 2B1.1(b)(2)(C));

- +2:   relocation to another jurisdiction to evade regulatory officials (U.S.S.G. § 2B1.1(b)(10)(A));

- +2:   the offense substantially endangered the solvency or financial security of a financial institution of 100 or more victims (U.S.S.G. § 2B1.1(b)(15)(B)(i)).

---

[2] The record as released to the United States does not contain the USCA5-paginated presentence report and sealed documents.   Consequently, the Presentence Report ("PSR") is cited by paragraph number and the sealed documents are identified by their name and corresponding page number.

● +2: a conviction under 18 U.S.C. § 1956 (U.S.S.G. § 2S1.1(b)(2)(B));

● +4: Stanford exercised a leadership role in the offense (U.S.S.G. § 3B1.1(a));

● +2: Stanford abused a position of trust to significantly facilitate the concealment or commission of the offense (U.S.S.G. § 3B1.3);

● +2: Stanford obstructed or impeded the administration of justice during the SEC investigation (U.S.S.G. § 3C1.1).

(PSR ¶¶ 97, 99-100, Addendum, p.7, Second Addendum, pp.1-2).

These calculations resulted in a total offense level of 56, which was reduced to 43 by virtue of U.S.S.G. § 5A, cmt. (n.2) ("An offense level of more than 43 is to be treated as an offense level of 43") (PSR ¶¶ 107, 109). With a criminal history category I and a total offense level of 43, the advisory guideline imprisonment range of "life" applied (PSR ¶¶ 112, 145; U.S.S.G. Ch. 5, Pt. A).

None of the counts carried a statutory mandatory minimum sentence. The statutory maximum term of imprisonment for counts one (conspiracy to commit wire and mail fraud) and three through 11 (wire fraud and mail fraud) was 20 years, under 18 U.S.C. §§ 1341, 1343, 1349. The statutory maximum term of imprisonment for counts 12

(conspiracy to obstruct SEC investigation) and 13 (obstruction of SEC investigation) was five years, under 18 U.S.C. §§ 1505, 371.   The statutory maximum term of imprisonment for count 14 (conspiracy to commit money laundering) was 20 years under 18 U.S.C. § 1956(h).   Because Stanford is not charged with any offense that carries a maximum term of life imprisonment, the Sentencing Guidelines call for the applicable statutory maxima on all counts of conviction to be added together, which results in a Guidelines sentence of 230 years of imprisonment under U.S.S.G. § 5G1.2(d).

Judge Hittner adopted the PSR and Addenda and imposed the following sentence:  (1) the statutory maximum term of 20 years, or 240 months of imprisonment, as to each of counts one, three, four, five, and six, all to run consecutively with each other; (2) the statutory maximum of 5 years, or 60 months of imprisonment, as to each of counts 12 and 13, all to run consecutively with each other; and (3) the statutory maximum of 20 years, or 240 months of imprisonment, as to each of counts seven, eight, nine, 10, 11, and 14, to be served concurrently with each other and with counts one, three, four, five, six, and 12 and 13, for

129

a total of 110 years, or 1,320 months of imprisonment (USCA5 Supp. 6 14014, 14631, 14691-14692).

B.    Standard of Review

For the first time on appeal, Stanford argues that his various sentencing enhancements violate *Apprendi* and *Alleyne*. These arguments are reviewed for plain error. *United States v. Wallace,* 759 F.3d 486, 497 (5th Cir. 2014); *United States v. Hamilton,* 440 F.3d 693, 699 (5th Cir. 2006).

Under *Apprendi,* "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In *Alleyne,* the Supreme Court held that any fact that increases a defendant's statutory minimum sentence must also be found by a reasonable doubt by a jury. 133 S. Ct. at 2163. This Court has held that neither *Apprendi* nor *Alleyne* applies to adjustments under the Sentencing Guidelines. *See United States v. Hinojosa,* 749 F.3d 407, 412-413 (5th Cir. 2014); *United States v. Tuma,* 738 F.3d 681, 693 (5th Cir. 2013), *cert. denied,* 134 S. Ct. 2875 (2014);

*United States v. Doggett,* 230 F.3d 160, 165 (5th Cir. 2000). Stanford's

reliance upon *Apprendi* and *Alleyne* to challenge each of his sentencing

enhancements is meritless (Appellant's Brief, 96-100, 102-103, 105-110,

112-113).

C.     Stanford's Sentence was Procedurally Sound.

Factual findings, such as actual loss, enhancements for abuse of

trust and perjury, and aggravating role adjustments are reviewed for

clear error. *See United States v. Umawa Oke Imo,* 739 F.3d 226, 240

(5th Cir. 2014). The district court's application or interpretation of the

Guidelines is reviewed de novo. *Id.* Factual findings need only be

found by a preponderance of the evidence and plausible in light of the

entire record. *See Simpson,* 741 F.3d at 556-557.

A district court may adopt factual findings contained in the PSR,

absent rebuttal evidence that the PSR is untrue or materially

inaccurate. *Id.* at 557. Mere objections to the PSR are insufficient

rebuttal evidence. *United States v. Zuniga,* 720 F.3d 587, 591-92 (5th

Cir. 2013).

131

Here, the PSR and the evidence at trial adequately set forth a detailed evidentiary basis to support each enhancement. Stanford failed to produce competent rebuttal evidence.

### 1.     Amount of Loss

Actual loss is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." *Simpson,* 741 F.3d at 557. The district court need only make a reasonable estimate of loss and may rely upon information contained in the PSR so long as it bears some indicia of reliability. *See id.*

The probation officer determined that the amount of loss attributed to Stanford was approximately $5.9 billion, which warranted a 30-level enhancement under § 2B1.1(b)(1)(P) for losses exceeding $400 million (PSR ¶¶ 88, 99). The probation officer derived this amount from a November 11, 2011, report from the Receiver (PSR ¶ 88). The Receiver's report is attached as "Exhibit A" to the United States' Response to Stanford's PSR Objections. As of February 16, 2009, the date the district court appointed the Receiver, SIB CD account balances totaled $7.2 billion (PSR ¶ 88; Exhibit A). Subtracting $1.3 billion in

fictitious interest credited to the CD balances, the $5.9 billion figure represented the amount owed to CD investors prior to February 16, 2009 (PSR ¶ 88; Exhibit A).

Stanford argues that the United States failed to identify any named victims or quantify any specific losses to support the loss enhancement (Appellant's Brief, 100). Stanford argues that no evidence of "any losses" existed prior to February 17, 2009 (Appellant's Brief, 100-101). He concomitantly argues that no evidence exists that he caused losses after the Receiver took over on February 17, 2009, but the United States superseded the indictment to include losses for that time period (Appellant's Brief, 101-102).

Stanford makes no meaningful challenge to the loss calculation. Named victims testified at trial and were identified through victim impact statements submitted to the district court prior to the sentencing hearing. Stanford concedes that over 350 victim impact statements were submitted to Judge Hittner prior to sentencing (Appellant's Brief, 106). Victim-depositors Flynn and Hammer testified about the loss of their life savings as a result of Stanford's fraud

133

(USCA5 Supp. 6, 5346-5416, 8285-8377). Stanford's own marketing materials reported that by the end of 2008, the bank had $8.5 billion in assets (GX 138).

Throughout his brief, Stanford consistently misrepresents the record before this Court by arguing that no evidence of loss existed prior to the February 17, 2009, inception of the receivership (Appellant's Brief, 100-101). Flynn testified that he attempted to redeem his CD in January 2009 but could not recover his funds (USCA5 Supp. 6 5373-5375). Green, the manager of financial advisors at the Baton Rouge SFG office, testified that one of his clients was unable to redeem $50 million from the CD program before the Receiver took over SIB (USCA5 Supp. 6 5313-5314).

Finally, the probation officer based the loss upon CD account balances "as of February 16, 2009," the date Judge Godbey appointed the Receiver (PSR ¶ 88). Stanford's argument that the loss calculation included losses beyond this date is simply not supported by the record (Appellant's Brief, 101-102).

134

### 2.    Endangering the Safety of a Financial Institution

Stanford objects to the two-level enhancement under U.S.S.G. § 2B1.1(b)(15)(B)(i) for endangering the solvency or financial security of a financial institution (Appellant's Brief, 103-105).

As he did with the loss enhancement and elsewhere throughout his brief, Stanford continues to erroneously maintain that no evidence exists that Stanford companies caused losses prior to February 17, 2009 and that SIB met "every single redemption" prior to this date (Appellant's Brief, 103-104).  As briefed by the United States, Stanford's argument fails in light of the testimony from the victim-depositor Flynn and from Green and about failed redemptions of SIB CDs prior to the date of the Receivership (USCA5 Supp. 6 5313, 5373-5375).

Stanford also complains that the United States failed to establish that his organization was a Ponzi scheme (Appellant's Brief, 103-105). He points to incomplete comments by Judge Hittner and incomplete testimony from Davis (*Id.*).

During sentencing, the defense argued that Stanford's organization was not a Ponzi scheme.  Judge Hittner merely noted that

135

the defense had offered supporting case law, and stated to the prosecution, "Well no.  It was cited that this is not a Ponzi scheme and the case law to back it up, ok?" (USCA5 Supp. 6 14667).  Stanford omits the rest of Judge Hittner's commentary, that the United States "Discuss that just briefly" (USCA5 Supp. 6 14667).  The prosecutor recited the definition of the Ponzi scheme adopted by this Circuit in *United States v. Murray,* 648 F.3d 251, 256 (5th Cir. 2011), when a "swindler uses money from later victims to pay earlier victims" (USCA5 Supp. 6 14667-14668).  Testimony from Davis established that Stanford ran a classic Ponzi scheme.  Stanford refers to an incomplete portion of Davis's testimony, where Davis acknowledged that the bank was able to redeem CDs from 1988 until the end of February 2008 (USCA5 Supp 6. 6886).  Davis explained that redemptions were possible as long as new investors purchased CDs, a scenario that fits neatly within this Court's definition of a Ponzi scheme under *Murray*, 648 F.3d at 256 (USCA5 Supp. 6886-6887).  Due to the continuous sales of CDs, redemption requests were possible until the economic crisis of 2008, when depositors withdrew their money and CD purchases flatlined, exposing

136

the bank's insolvency (USCA5 Supp. 6 6886-6887). No error exists with respect to this enhancement.

### 3.    Number of Victims

Stanford argues that Judge Hittner erred in applying a six-level increase under U.S.S.G. § 2B1.1(b)(2)(C) because the offense involved 250 or more victims (Appellant's Brief, 105-109).

The probation officer noted that as of March 23, 2012, the United States identified at least 672 victims, although the number is believed to be in the "tens of thousands" (PSR Addendum, p.6). Stanford concedes that 350 victim statements were submitted to Judge Hittner prior to sentencing (Appellant's Brief, 106-108, nn.15 & 16).

In addition to the number of victims contained in the PSR, victim representatives gave statements at the sentencing hearing. Jaime Escalona, the director of the Coalicion Victimas de Stanford America Latina "COViSAL" recited the following number of Latin American victim/families:  10,432 in Venezuela, 4,350 in the United States, 3,865 in Mexico; and 553 in Peru (USCA5 Supp. 6 14681-14682). Angela Shaw-Kogutt, director and founder of the Stanford Victims Coalition,

137

represented over 20,000 plus member victims of the non-profit advocacy group for Stanford victims, and asked Judge Hittner to impose the 230-year statutory maximum sentence (USCA5 Supp. 6 14685, 14690). No error exists.

### 4.    Relocation to Evade Regulatory Officials

Stanford argues that Judge Hittner erred in applying a two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(A) for relocation of a fraudulent scheme to another jurisdiction to evade regulatory authorities (Appellant's Brief, 109-110). He maintains that the bank, under the name of Guardian relocated to Antigua from Montserrat due to Hurricane Hugo (Appellant's Brief, 109-110).

Mejia, Stanford's marketing executive, testified that Montserrat authorities faxed an intent to revoke the bank's license on November 28, 1990 (USCA5 Supp. 6 4857, 4861-4862; GX 511). The letter cited that the bank operated in a manner detrimental to depositors, employed a formerly bankrupt director, provided unsatisfactory detail of its assets, and engaged the services of C.A.S. Hewlett, an unapproved

auditor (GX 511).   Stanford told Mejia the letter was unimportant (USCA5 Supp. 6 4857, 4861-4862).

Stanford told Davis about the letter in December 1990 and instructed him to lie to employees that Guardian relocated to Antigua due to Hurricane Hugo (USCA5 Supp. 6 6846).   In reality, as Stanford confessed to Davis, Guardian relocated due to the threatened revocation of its banking license by Montserrat authorities (USCA5 Supp. 6 6845-6847; GX 511).   Documentary evidence supported the testimony at trial that Stanford lied to depositors about the bank's relocation to Antigua. No error exists with respect to this enhancement.

### 5.    Abuse of a Position of Trust

Stanford argues that Judge Hittner erred in applying a two-level enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3 (Appellant's Brief, 110-111).   Stanford continues to argue that no SIB depositors incurred losses prior to February 17, 2009 (*Id.*).   As briefed, the testimonies of Flynn and Green defeat this argument (USCA5 Supp. 6 5313, 5373-5375).

He also maintains that he did not assert a fiduciary or trust relationship with SIB depositors (Appellant's Brief, 111).    No requirement exists in the guideline that a defendant violate a fiduciary duty to qualify for the enhancement.   Rather, the defendant need only occupy a position of trust and abuse that position to facilitate the commission or concealment of the crime.   U.S.S.G. § 3B1.3; *see United States v. Willett,* 751 F.3d 335, 344 (5th Cir. 2014); *United States v. Ollison,* 555 F.3d 152, 166-167 (5th Cir. 2009).   As noted in the application note, the enhancement applies to "a bank executive's fraudulent loan scheme" but not "embezzlement or theft by an ordinary bank teller." § 3B1.3 cmt. (n.1).

Evidence at trial established that Stanford used his position as CEO and sole shareholder of SIB, to raid the bank in order to fund his personal businesses and lavish lifestyle, bribed the bank's auditor and Antiguan regulator to conceal the theft, and obstructed the SEC investigation into his crimes (USCA5 Supp. 6 6173, 6833-6840, 6871-6872, 6877, 7091, 7128-7132, 7137,  7141-7146, 9080).

In addition, Stanford controlled SGC, the United States broker dealer that aggressively promoted SIB CDs.  Green explained that Stanford induced his financial advisors through high commissions and competition to sell SIB CDs to prospective clients in order to perpetuate the fraudulent investment scheme (USCA5 Supp. 6 4452-4453, 4449, 7243; GX 830).  No error occurred with respect to this enhancement.

### 6.    Leader or Organizer of Criminal Activity

Stanford objects in conclusory fashion to the four-level increase for leadership role under U.S.S.G. § 3B1.1(a) by simply noting that he adopts argument and authority from Sections I and VII of his brief (Appellant's Brief, 112).  Although he appeals pro se, Stanford must nevertheless make an identifiable argument in order for the United States to respond and for this Court to review.  *See Yohey,* 985 F.2d at 225; *Oliver,* 276 F.3d at 741.  He does not do so.  This issue is waived for inadequate briefing.  *See Yohey,* 985 F.2d at 225; *Oliver,* 276 F.3d at 741.

In any event, Judge Hittner properly applied the enhancement, which warrants a four-level increase where a defendant exercises a

141

leadership role in criminal activity involving five or more participants or was "otherwise extensive." § 3B1.1(a); *see United States v. Dadi,* 235 F.3d 945, 951-952 (5th Cir. 2000). Factors supporting the enhancement include: the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, and the degree of control or authority exercised over others. *See United States v. Alaniz,* 726 F.3d 586, 621 (5th Cir. 2013).

Testimony and documentary evidence established that Stanford closely supervised the extensive 20-year investment fraud scheme on depositors, through revising all of the bank's promotional materials to include fraudulent misrepresentations about the investment portfolio, offering lucrative incentives to financial advisors to sell SIB CDs, and bribing C.A.S. Hewlett and King to ensure that the fraudulent investment scheme continued undiscovered for two decades. *See Alaniz,* 726 F.3d at 621; *Dadi,* 235 F.3d at 951-952. In addition to exercising control over C.A.S. Hewlett and King, Stanford exercised control over

other participants in the investment fraud scheme, including Davis, Pendergest-Holt, Kuhrt, and Lopez. They knew that the bulk of the bank's deposits were not invested according to representations in the bank's market brochures, annual reports, and disclosure statements (USCA5 Supp. 6 6881-6882). Judge Hittner correctly applied the four-level enhancement.

### 7.    Obstruction of Justice

Stanford objects to the two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice (Appellant's Brief, 112). He makes no specific challenge to this enhancement other than to reference sections I and VII of his brief. His conclusory argument is waived. *See Yohey,* 985 F.2d at 225; *Oliver,* 276 F.3d at 741.

In any event, testimony at trial established that Stanford consistently bribed King to thwart the investigation of the SEC in 2005 and 2008, assisted in drafting King's response to the SEC containing false statements about SIB, and instructed Kelly Taylor, the manager of his St. Croix estate, to destroy bank records and personal financial information during the time of the SEC investigation in December 2008

143

and early 2009 (USCA5 Supp. 6 7125-7126, 7128-7132, 7137, 8140-8144; GX 668, 671).  *See United States v. Brooks,* 681 F.3d 678, 717 (5th Cir. 2012) (noting that false statements that impeded investigation warranted obstruction enhancement).  No error exists with respect to this enhancement.

### 8.    Engaging in Monetary Transactions Derived from Unlawful Activity

In conclusory fashion, Stanford argues that Judge Hittner erred in applying a two-level specific offense characteristic for money laundering under U.S.S.G. § 2S1.1(b)(2)(B) for his 18 U.S.C. § 1956 conviction (Appellant's Brief, 113).  Stanford provides no specific argument other than a reference to adoption of Section I and VII of his brief, which again waives his argument on appeal.  *See Yohey,* 985 F.2d at 225; *Oliver,* 276 F.3d at 741.

In any event, overwhelming evidence at trial, both testimony and documentary evidence, showed that Stanford routinely wired over $80 million in depositors' funds to his Swiss account and then siphoned it to his personal accounts in the United States (USCA5 Supp. 6 9039-9041; GX 1205).  No error exists.

144

### 9.     No Cumulative Error

Because Judge Hittner correctly applied the sentencing enhancements in this case, Stanford's cumulative error argument is meritless (Appellant's Brief, 113). *See United States v. Villarreal,* 324 F.3d 319, 328 (5th Cir. 2003).

Stanford argues that Judge Hittner erred in denying his request for a downward variance based upon his inability to assist counsel in his defense due to his Traumatic Brain Injury (Appellant's Brief, 114). Judge Hittner conducted a three-day competency hearing following an eight-month evaluation of Stanford's competency, where FMC-Butner medical staff determined that Stanford was malingering.  The facts supporting this issue are detailed in full in Issue VIII of this brief.  In any event, the court imposed a 110-month sentence, below the 230-month sentence authorized by the advisory Guidelines.  *See* § 5G1.2(d).  Stanford's sentence is presumed reasonable.  *See United States v. Ruiz,* 621 F.3d 390, 398 (5th Cir. 2010).

145

# VIII.

## Judge Hittner Showed No Partiality Toward the United States During Trial.

Stanford asserts that Judge Hittner exhibited partiality toward the United States by: denying his counsel of choice; ruling that Stanford was competent to stand trial; and making various adverse evidentiary rulings (Appellant's Brief, 116-135).

As an introductory note, the record establishes that Judge Hittner accommodated the defense consistently throughout the trial. For example, in the district court's November 29, 2011, scheduling order, the court ordered the parties to file expert reports and exchange all exhibits by January 3, 2012 (USCA5 Supp. 6 969). Judge Hittner granted the defense request to extend the deadline twice, moving the latest deadline to January 12, 2012, a week prior to trial (USCA5 Supp. 6 1335-1336, 1343, 1755-1757, 1762). Stanford filed an exhibit list of approximately 17,748 exhibits on January 12, 2012, but noted that defense counsel had not been able to identify the most relevant exhibits (USCA5 Supp. 6 1911-3504). In contrast, the United States filed an exhibit list comprised of approximately 470 exhibits (USCA5 Supp. 6

146

1844-1866, 15402). During the pretrial conference on January 18, 2012,

Judge Hittner agreed to allow the defense to provide the United States

with an exhibit list relative to each witness merely one week prior to

the witness's testimony (USCA5 Supp. 6 15412).

A.    No Abuse of Discretion in Denying New Counsel

Although the Sixth Amendment guarantees the right of a

defendant to choose retained counsel of choice, some limits exist.

*United States v. Gonzalez-Lopez,* 548 U.S. 140, 144 (2006). The trial

judge exercises "wide latitude" in balancing the defendant's right to

counsel of choice against the needs of prompt and fair administration of

justice. *See id.* at 144; *United States v. Jones,* 733 F.3d 574, 586-588

(5th Cir. 2013); *United States v. Paternostro,* 966 F.2d 907, 912 (5th Cir.

1992). This Court reviews the district court's decision to disallow

substitute counsel for an abuse of discretion. *See Jones,* 733 F.3d at

587.

1.    **Factual Background as to Michael Sydow**

Stanford argues that Judge Hittner abused his discretion by

denying Stanford's request for attorney Michael Sydow to appear as

147

counsel of record (Appellant's Brief, 117-119). Stanford sought Sydow's representation "based on the chance that the issues of the D&O Policy litigation would be resolved in his favor" (Appellant's Brief, 119).

On April 19, 2009, Stanford filed a motion in the civil SEC action seeking an order to release $10 million in funds from the Receivership estate to pay for Stanford's defense (*See* USCA5 1217). *SEC v. Stanford,* No. 3:09-CV-298 (N.D. Tex) (dkt entries # 318 and # 319). On July 1, 2009, Judge Godbey denied Stanford's request because he had failed to demonstrate that the $10 million was untainted by fraud. *SEC v. Stanford,* No. 3:09-CV-298 (N.D. Tex) (dkt entry # 544). Judge Godbey nevertheless agreed to entertain future requests upon a showing of the existence of assets unrelated to the fraud (*See* USCA5 1218). *SEC v. Stanford,* No. 3:09-CV-298 (N.D. Tex) (dkt entry # 544).

On July 6, 2009, Stanford's counsel in the criminal case, Dick DeGuerin, filed an "Expedited Motion for an Order Directing the United States to Take All Necessary Steps to Release Funds to Pay for Mr. Stanford's Defense" (USCA5 561-579). In his motion, Stanford referenced the July 1, 2009, order from Judge Godbey denying his

148

request for $10 million from the Receivership estate and the Receiver's response to Stanford's request to obtain funds from the D&O insurance policy to pay his defense costs (USCA5 576-577).

On the same day, Stanford joined an expedited motion that had been filed by co-defendant Laura Pendergest-Holt in the civil SEC case seeking clarification over whether the Receivership Order applied to a $5 million insurance policy insured by Lloyd's of London Directors and Officers and Company Indemnity Policy ("D&O Policy") (*See* USCA5 1218-1219). *SEC v. Stanford,* No. 3:09-CV-298 (N.D. Tex) (dkt entry # 567). The D&O policy provided coverage in civil and criminal cases and included an excess policy of up to $90 million (*See* USCA5 1218-1219).

Based upon publicly available information in the civil case and information obtained from the Receiver after Stanford filed his expedited motion in the criminal case, the United States filed a thorough response to Stanford's expedited motion for release of funds (USCA5 1215-1233, esp. 1219 n.1). Stanford's motion for the release of funds sought to circumvent Judge Godbey's July 1, 2009, order denying the release of $10 million from the Receivership estate (USCA5 1218,

149

1222-1225).   The United States noted that only the Northern District could exercise jurisdiction to modify the asset freeze order imposed on February 17, 2009 (USCA5 1223).

On July 31, 2009, DeGuerin filed a motion to withdraw as counsel citing an "unwillingness to go forward without the assurance of being paid for work in the future" (USCA5 1235-1236).

Judge Hittner entered an order on August 4, 2009, holding DeGuerin's motion in abeyance, noting that the court would entertain the motion to withdraw "at such time as a simultaneous <u>unconditional</u> Motion for Substitution of Counsel is filed by new counsel" (USCA5 1267) (emphasis in original).

The same day, Stanford filed an expedited motion to permit Michael Sydow to appear as counsel "for the limited purpose of resolving whether Mr. Stanford will be granted access to monies to pay for his legal fees and expenses" (USCA5 1270, 1272-1277).   Stanford acknowledged that the D&O policy issue was "currently being litigated in the SEC civil proceeding by Patton Boggs and Sydow & McDonald" (USCA5 1273).

In response, the United States argued inter alia, that the Northern District of Texas had not yet ruled on the D&O policy issue. The limited appearance by Sydow to argue the D&O policy issue in a different forum would result in confusion over which of the two attorney groups represented Stanford's discrete issues in the criminal case, and cause an unnecessary delay of proceedings over the scope of representation (USCA5 1304-1309).

Judge Hittner denied Stanford's motion to appoint Sydow (USCA5 1303). This Court denied Stanford's petition for writ of mandamus (USCA5 1313).

## 2. Application

Judge Hittner did not abuse his discretion in denying Stanford's request for Sydow's limited appearance in the criminal case because Sydow was already litigating the exact D&O issue in the SEC civil proceedings. The appropriate forum for the D&O policy issue remained with the Northern District of Texas, where the issue was being actively litigated. *See Pendergest-Holt v. Certain Underwriters,* 600 F.3d 562, 565 (5th Cir. 2010) (chronicling history of D & O insurance policy

151

litigation).  Stanford failed to explain in his motion filed in his criminal case, or in his brief on appeal, how a conditional appearance by Sydow on the D&O policy issue would expedite the resolution of the issue already pending before the Northern District of Texas in the SEC case. Judge Hittner's decision promoted the prompt and efficient administration of justice by avoiding confusion among the parties over representation.  *See Jones,* 733 F.3d at 586-588; *Paternostro,* 966 F.2d at 912.  Judge Hittner did not abuse his discretion in denying Sydow's limited appearance request.  *See Jones,* 733 F.3d at 587.

### 3.    Factual Background as to Stephen Cochell

Stanford argues that Judge Hittner denied him access at FDC-Houston to attorney Stephen Cochell (Appellant's Brief, 120).  Stanford argues that the court "arbitrarily denied" Cochell's access but later withdrew the order on January 23, 2012 (Appellant's Brief, 120).

Judge Hittner's November 17, 2011, order precluded Cochell from in-person access to Stanford based upon Cochell's public statement impacting the criminal case:

It has come to the Court's attention that Stephen Cochell, an attorney representing Robert Allen Stanford as a defendant in a civil case filed in the Northern District of Texas, has issued a public statement concerning Mr. Stanford's current mental status, specifically that Mr. Stanford continues to suffer from short-term and long-term memory loss and that he should remain at the federal medical facility in Butner, North Carolina, through the end of January.  The Court finds that this public statement could directly impact the on-going criminal prosecution and impending jury trial against Mr. Stanford in this Court.

(USCA5 Supp. 6 967).

## 4.    Application

The denial of Cochell's access to Stanford reflects Judge Hittner's conscientious effort to ensure a fair trial and to avoid any potential prejudice toward either party by negative publicity.   Moreover, a determination of Stanford's competency rested exclusively with the district court and the three-day competency hearing had not yet occurred at the time the court denied Cochell's request.  Judge Hittner's order in no way prevented Stanford's access to defense counsel.  The order merely reflects the court's concern with ensuring an unbiased trial.  *See Jones,* 733 F.3d at 586-588; *Paternostro,* 966 F.2d at 912.  No abuse of discretion occurred.

153

B.    Judge Hittner's Competency Ruling was Not "Clearly
       Arbitrary or Unwarranted."

Stanford argues that Judge Hittner erred in deeming him

competent to stand trial in January 2012, over two years after he

sustained an injury in prison in September 2009  (Appellant's Brief,

120-128).   He contends that Judge Hittner erred in relying upon the

conclusions of FMC-Butner medical staff that he malingered with his

claim of retrograde amnesia.  Stanford points to two main errors related

to the court's competency ruling:  (1) failure to credit the conclusions of

the four defense-retained physicians and (2) failure to subpoena Dr.

Byron Herbel to testify at his December 20, 2011, competency hearing

(Appellant's Brief, 124-128).

This Court will not set aside a district court's competency ruling

"unless it is clearly arbitrary or unwarranted."  *United States v.*

*Dockins,* 986 F.2d 888, 890 (5th Cir. 1993) (citing *United States v.*

*Birdsell,* 775 F.2d 645, 648 (5th Cir. 1985).   A district court's

assessment following a competency hearing is entitled to considerable

deference.   *See Maggio v. Fulford,* 462 U.S. 111, 115-117 (1983)

(deferring to the district judge's determination of competency that was

154

based upon observations of the defendant at trial who intentionally tried to disrupt the proceedings); *United States v. Williams,* 819 F.2d 605, 608 (5th Cir. 1987) (applying *Maggio* to allow a trial judge to determine competency based upon personal observation rather than a contrary psychiatric report).

### 1.    Relevant Facts

At the competency hearing on January 6, 2011, three psychiatrists testified that Stanford was unable to assist his attorney based upon: (1) overmedication, which had led to an addiction; (2) potential brain damage caused by a head injury sustained in prison in September 2009; or (3) Major Depressive Disorder (USCA5 Supp. 6 13812). None of the testifying doctors opined that Stanford was unable to understand the proceedings, however, they disagreed over whether he was competent to assist defense counsel (USCA5 Supp. 6 13814). The primary concern identified at this hearing was Stanford's addiction to various anxiety and depression medications (USCA5 Supp. 6 13817). On January 26, 2011, Judge Hittner ruled Stanford incompetent on the basis of an inability to assist his attorneys and ordered him to undergo medical

treatment at FMC-Butner (USCA5 Supp. 6 13812-13813).   After an eight-month period of psychological evaluation and treatment from February 18, 2011, through November 4, 2011, the FMC-Butner staff deemed Stanford competent to stand trial (USCA5 Supp. 6 13813).

After a three-day hearing, beginning on December 20, 2011, Judge Hittner declared Stanford competent to stand trial and assist his defense lawyers (USCA5 Supp. 6 13038-13789).  At the conclusion of the competency hearing, Judge Hittner advised that he would issue a detailed memorandum outlining the court's competency findings at a subsequent date (USCA5 Supp 6 13789).   The court did so in a comprehensive memorandum opinion issued on May 10, 2012 (USCA5 Supp. 6 13811-13839).

## 2.   Application

The detailed analysis provided in the memorandum opinion forecloses any appellate argument that Judge Hittner's competency ruling was "arbitrary or unwarranted." *See Dockins,* 986 F.2d at 890. Judge Hittner credited the testimony of Dr. Robert Cochrane, the Director of Psychology Training at FMC-Butner, and the lead evaluator

of Stanford, who conducted weekly formal interviews with Stanford that lasted sixty to ninety minutes, in addition to informal observations on most weekdays (USCA5 Supp. 6 13043-13211, 13815).  During the eight-month evaluation, FMC-Butner Drs. Tracey Pennuto (a neuropsychologist) and Herbel (a neurologist) assisted Dr. Cochrane, and the FMC-Butner medical team consulted with outside specialists including a neurologist, cardiologist, and gastroenterologist (USCA5 Supp. 6 13046-13047, 13095-13096, 13815-13816).  Observations of Stanford's telephone calls between April and August 2011, revealed that Stanford "spoke fluently, recalled past events, organized disparate information, and communicated coherently" (USCA5 Supp. 6 13818). By late June and early July 2011, Stanford exhibited no signs of cognitive decline (USCA5 Supp. 6 13818).  Continuing in September 2011, Stanford was alert and attentive (USCA5 Supp. 6 13819).  During this period, Stanford performed above average on cognitive tests performed by both FMC physicians *and defense-retained* doctors (USCA5 Supp. 6 13819) (emphasis added).

After the FMC-Butner staff successfully withdrew Stanford from the anti-anxiety medication, Stanford began to claim for the first time that he suffered from retrograde amnesia, or a complete memory loss of all events prior to the September 2009 jail assault (USCA5 Supp. 6 13050-13051, 13055-13056, 13821). In June 2011, he asserted that he had "no independent recollections of personal life events or business dealings prior to the assault in September 2009 . . . He characterized having all of his memories 'erased' by the assault" (USCA5 Supp. 6 13057, 13821).

In response, the FMC-Butner staff extended the evaluation period three months and concluded that Stanford was malingering with his claim of retrograde amnesia after conducting an extensive medical evaluation (USCA5 Supp. 6 13058-13061, 13823). Immediately after the September 2009 assault, Stanford exhibited no difficulty recalling personal and business information (USCA5 Supp. 6 13060-13062, 13823). None of the reports drafted by defense-retained physician Dr. Victor Scarano, included any mention of retrograde amnesia after the September 2009 assault and before the commitment to FMC-Butner

(USCA5 Supp. 6 13824).  Similarly, a psychologist at the Houston FDC, confirmed that Stanford exhibited no memory problems following his September 2009 assault and before his February 2011 commitment to FMC-Butner (USCA5 Supp. 6 13824).   Emails and phone calls by Stanford demonstrated his recollection of events that predated the assault (USCA5 Supp. 6 13062, 13824).  A transcript from a May 2010 hearing in a related insurance coverage case further established Stanford's ability to speak cogently and recall events (USCA5 Supp. 6 13825).  Finally, none of the doctors at the January 2011 competency hearing opined that Stanford suffered from retrograde amnesia (USCA5 Supp. 6 13825).

Judge Hittner also credited neuropsychological testing conducted at FMC-Butner to support the conclusion that Stanford's alleged memory loss amounted to malingering and that he was competent to stand trial (USCA5 Supp. 6 13825).   Dr. Pennuto conducted five sessions of neuropsychological evaluation and administered sixteen different tests to Stanford, some administered multiple times (USCA5 Supp. 6 13825-13826).  For each of the tests, Stanford scored well worse

than people with severe cognitive impairment, including those with advanced dementia and mental retardation, thus establishing a purposeful exaggeration of cognitive deficits (USCA5 Supp. 6 13068-13069, 13826-13827).  None of the defense-retained experts challenged the reliability of the neuropsychological tests administered by Dr. Pennuto that Stanford's results were well below that of someone putting forth a genuine effort (USCA5 Supp. 6 13301-13302, 13295-13296, 13299, 13827).  Rather, the defense-retained physicians, Drs. Scarano, Pollock, and Axelrad excused Stanford's poor performance on depression and sleep deprivation (USCA5 Supp. 6 13072-13073, 13296, 13827).  However, none of these doctors witnessed Stanford's condition during FMC-Butner testing, which was delayed for over seven months "to assure [Stanford] was cognitively cleared for testing" (USCA5 Supp. 6 13828).  Moreover, none of Stanford's doctors explained why, even assuming depression and fatigue, Stanford performed worse than individuals suffering from advanced dementia or mental retardation (USCA5 Supp. 6 13069, 13073, 13828).  In sum, none of his doctors was

able to rebut the extensive findings by FMC-Butner that Stanford was malingering (USCA5 Supp. 6 13829-13831).

In addition to compelling evidence of malingering evidenced by observations by FMC-Butner medical staff and Stanford's performance on neuropsychological tests, Judge Hittner credited neurological tests such as Magnetic Resonance Imaging (MRI), which demonstrated no evidence of any damage to Stanford's brain that processed memory (USCA5 Supp. 6 13064-13065, 13831). Dr. Pennuto observed inconsistencies in Stanford's responses to various tests performed, indicating further evidence of malingering (USCA5 Supp. 6 13066-13067, 13832). A defense-retained neurologist, Dr. Lilly, never conducted similar tests or reviewed Stanford's MRI (USCA5 Supp. 6 13399, 13405, 13408, 13419, 13832). Both FMC-Butner and defense-retained doctors agreed that Stanford's retrograde amnesia claim was a "rare phenomenon" (USCA5 Supp. 6 13056, 13387-13392, 13475-13476, 13833). None of the medications for depression or anxiety was demonstrated to produce the level of memory loss claimed by Stanford (USCA5 Supp. 6 13203-13204, 13398-13399, 13833). Judge Hittner

161

noted that "no credible medical evidence was presented at the hearing showing complete amnesia can result from a single head injury like that which Stanford sustained" (USCA5 Supp. 6 13833).   The late onset of the alleged retrograde amnesia, more than 18 months after the assault, cast doubt on Stanford's assertion that single assault caused the substantial memory loss (USCA5 Supp. 6 13397, 13834) (noting that "None of the defense-retained doctors identify a single verifiable case documented in reliable medical literature in which a single head injury had caused complete retrograde amnesia with onset not occurring until eighteen months after the incident.")   Moreover, none of the defense-retained doctors offered any rational medical explanation of how the assault could cause complete retrograde amnesia (USCA5 Supp. 6 13397, 13834-13835).   Even Stanford's own doctor, Dr. Scarano characterized Stanford's claimed retrograde amnesia as an "embellishment" during the December 2011 competency hearing (USCA5 Supp. 6 13475-13476, 13835).   Based upon overwhelming evidence, "including objective, medically valid neuropsychological and neurological testing" the district court concluded that Stanford was

malingering with respect to his claim of retrograde amnesia (USCA5 Supp. 6 13835).

Judge Hittner also noted that Stanford's ability to malinger itself established evidence of competency because Stanford presented a condition that initially appeared convincing to evaluating physicians (USCA5 Supp. 6 13835-13836).   While defense-retained doctors observed Stanford at best for a few days, the FMC-Butner doctors observed him intensively for eight months including formal and daily functioning observations (USCA5 Supp. 6 13272, 13421, 13836-13837). The court concluded that the FMC-Butner medical staff was unbiased, given that the staff sought collateral information from both parties and sought permission to continue to evaluate Stanford for four months beyond the initial four-month assessment (USCA5 Supp. 6 13096-13098, 13837).

Finally, Judge Hittner documented his observations of Stanford's assistance to counsel throughout the seven-week trial, lending credence to the court's competency determination (USCA5 Supp. 6 13838).  After the first full week of trial, Judge Hittner observed that Stanford "was

163

attentive and fully engaged" with defense counsel, "repeatedly writing notes and reviewing exhibits with his counsel and the consulting expert" (USCA5 Supp. 6 5295, 13838).

Stanford's mere disagreement with the district court's analysis, which was based upon a review of medical reports submitted by both the FMC-Butner and defense-retained doctors, testimony, exhibits, and oral arguments, falls gravely short of establishing that the district court's conclusions were "arbitrary or unwarranted." *See Dockins,* 986 F.2d at 890.

### 3.    Dr. Herbel

Stanford argues that Judge Hittner erred in denying his requests to subpoena Dr. Herbel, a FMC-Butner doctor, to testify at the December 20, 2011, competency hearing (Appellant's Brief, 124-125). Stanford quotes from a portion of the record to argue that "the trial court extended a very different offer to the Prosecution" by assurances of issuing subpoenas if necessary to secure witnesses (Appellant's Brief, 124). Stanford is disingenuous with the record. The portion quoted by Stanford relates to the United States' inability to execute service of a

subpoena on defense witness Goll (USCA5 Supp. 6 9673-9674). Judge Hittner assured both parties that he would "backup both sides the same way" by issuing subpoenas or arrest warrants if necessary to secure the appearance of witnesses at trial (USCA5 Supp. 6 9675-9676).

Judge Hittner issued an order on December 6, 2011, requiring all testifying experts to submit their expert reports by December 13, 2011, in advance of the December 20, 2011, competency hearing (USCA5 Supp. 6 1042).

Stanford filed a motion on December 15, 2011, for the court to issue a subpoena for Dr. Herbel to testify at the hearing (Sealed dkt. entry # 540). Judge Hittner denied the motion in orders dated December 16, 2011, and December 19, 2011 (USCA5 Supp. 6 1209-1210, 1227-1229). To summarize, Judge Hittner noted that Stanford had failed to comply with the court's scheduling order and identify Dr. Herbel as a witness on Stanford's initial "hearing plan" (USCA5 Supp. 6 1209, 1228-1229).

The United States listed only one witness, Dr. Cochrane, the lead FMC-Butner evaluator during Stanford's eight-month evaluation period

at FMC-Butner (USCA5 Supp. 6 1228-1229).  In contrast, Stanford listed 10 witnesses on his hearing plan (USCA5 Supp. 6 1228).  Four doctors were among the defense witnesses, Drs. Richard Pollock (neuropsychologist), Ralph Lilly (neurologist), Victor Scarano (forensic pathologist) and David Axelrad (forensic pathologist) (USCA5 Supp. 6 1228).  All of these doctors had evaluated Stanford after his return from FMC-Butner (USCA5 Supp. 6 1229).  Judge Hittner concluded that "Based upon the parties' witness designations, and the level of the witnesses' respective expertise, the Court determines that the four psychiatric and psychological witness designation contained in [the defense's] initial hearing plan are sufficient to offer the Court the defense's position on the status of the Defendant's current mental competency" (USCA5 Supp. 6 1229).

At the competency hearing, Dr. Cochrane affirmed that Dr. Herbel was a secondary FMC-Butner evaluator, who consulted the lead evaluator, Dr. Cochrane (USCA5 Supp. 6 13094-13095).  Dr. Cochrane explained that while Dr. Herbel never disagreed with Dr. Cochrane's conclusions, FMC-Butner's practice permitted only the lead evaluator to

166

issue an opinion on competency (USCA5 Supp. 6 13204).  Indeed, in the court's memorandum opinion, Judge Hittner noted that Dr. Herbel signed the final evaluation of Stanford in conjunction with Dr. Cochrane and another psychologist (USCA5 Supp. 6 1229 n.1).

Stanford also summarily complains about the absence of testimony from Dr. Pennuto, however, Dr. Pennuto consulted Dr. Cochrane, the lead investigator, and the findings of her report were discussed and relied upon by Dr. Cochrane at the hearing (USCA5 Supp. 6 13044-13047).  Judge Hittner's decision to proceed with the designated medical experts and exclude Dr. Herbel's or Dr. Pennuto's testimony was "not arbitrary or unwarranted."  *See Dockins,* 986 F.2d at 890.

C.     Stanford's Challenge to the Jury Charge Fails for Inadequate Briefing.

In a single sentence, with no supporting facts or argument, Stanford argues that Judge Hittner exhibited partiality toward the United States by granting all of the United States tenders and rejecting all of his regarding the jury charge (Appellant's Brief, 128).  Stanford

167

waives the issue for inadequate briefing. *See Yohey,* 985 F.2d at 225;

*Oliver,* 276 F.3d at 741.

In any event, the transcript from the jury charge conference establishes that Judge Hittner granted many of the tenders by the defense and further, the parties reached agreements on many of Stanford's objections (USCA5 Supp. 6 10964-10966, 10968-10969, 10974, 10979, 10990, 11001, 11013, 11015, 11024-11025). The jury instructions largely tracked the Fifth Circuit Pattern Jury Instructions (Criminal) and the relevant statutes (USCA5 Supp. 6 12823-12867). *See Richardson,* 676 F.3d 491, 507 (5th Cir. 2012); *Fuchs,* 467 F.3d at 903; *United States v. Wise,* 221 F.3d 140, 152 (5th Cir. 2000). Stanford fails to provide any authority to establish that Judge Hittner gave incorrect statements of law. *See Richardson,* 676 F.3d at 507. No abuse of discretion exists.

D.    <u>Stanford Fails to Establish that Judge Hittner Abused His Discretion in Various Evidentiary Rulings.</u>

Stanford describes a variety of evidentiary rulings that he argues demonstrate Judge Hittner's partiality toward the United States during

the trial (Appellant's Brief, 128-135).  His arguments lack merit.  No abuse of discretion exists on this record.  *See Setser,* 568 F.3d at 493.

First, Stanford contends that Judge Hittner failed to require the United States to produce exculpatory evidence (Appellant's Brief, 128-129).  Referencing the Temenos computer database material, Stanford asserts that "the sheer quantity of dumped data could not be fully assessed" therefore, the United States must have withheld exculpatory material in violation of *Brady* (Appellant's Brief, 128).  As fully briefed in Issue V, this issue lacks merit because the United States fully complied with the discovery standards approved in *Skilling.*

Second, Stanford argues that Judge Hittner refused to allow him to present evidence to rebut the findings of the Receiver's accountant, Van Tassel (Appellant's Brief, 129).  Specifically, he argues that he was unable to present evidence that he was "the sole owner of a global group of companies, the financial strength of those companies was interdependent" in order to refute Van Tassel's testimony (Appellant's Brief, 129).  Van Tassel never testified at trial.  Stanford does not explain how Judge Hittner prevented him from putting on evidence of

169

"interdependent financial strength" of his companies, other than a very broad, general complaint (Appellant's Brief, 130).   In any event, his argument lacks merit because defense witnesses Larry Campagna and Morris Hollander testified about Stanford's exclusive ownership and interdependence of his companies (USCA5 Supp. 6 12163, 12339, 12341, 12404).

Third, Stanford cites to the Fifth Pattern Jury Instructions for wire fraud and bank fraud to argue that SIB complied with international regulation and "met every demand for payment" and paid "every CD depositor every penny they were owed" (Appellant's Brief, 130).   He contends this was exculpatory evidence that he should have been permitted to present to the jury (Appellant's Brief, 131).   Stanford cites to no ruling from Judge Hittner that prohibited him from making this argument, and in fact, he made it repeatedly during closing argument before the jury (USCA5 Supp. 6 12673, 12681).   The jury simply rejected his contention, a decision amply supported by the testimony of victim-depositor Flynn and SFG manager Green (USCA5 Supp. 6 5313, 5373-5375).

170

Fourth, Stanford contends that Judge Hittner denied him the ability to rebut Government exhibit 1603, which demonstrated that Stanford illegally diverted over $2 billion in "loans" to himself (Appellant's Brief, 131-134). This is completely untrue.

The United States introduced a summary chart (GX 1603), which showed the amount of CD money Stanford siphoned each year from SIB into his own private ventures. By 2008, the total cumulative amount from 2004 to 2008 was $2 billion (GX 1603). The source of this exhibit came from the internal shareholder funding reports prepared by Amadio, who tracked all the money that flowed from depositors to Stanford's companies (USCA5 Supp. 6 6371-6417, 8981-8982; GX 331, 332C).

As Stanford concedes, he attempted to rebut this evidence by testimony from defense witnesses Leonard Lyons and Campagna (Appellant's Brief, 132-133). Lyons opined that GX 1603 was misleading and that the Stanford companies shared intercompany liability and the same financial structure (USCA5 Supp. 6 12339, 12341, 12369). Lyons explained that the $2 billion could have been

171

used for business purposes (USCA5 Supp. 6 12379-12380). He believed that all of the Government's exhibits were misleading (USCA5 Supp. 6 12397). Campagna explained that the "loans" to Stanford were legitimate (USCA5 Supp. 6 11751-11752). The record reflects, and Stanford concedes, that Judge Hittner permitted him to introduce evidence related to his defensive theory that CD depositor funds funneled to his companies were legitimate loans. The jury freely rejected Stanford's theory because the trial evidence established that depositors materially relied upon Stanford's misrepresentations that their CD money would never be used for commercial loans, to fund private, non-liquid, investments such as Stanford's companies and real estate projects, or to fund Stanford's opulent lifestyle.

Fifth, Stanford argues that Judge Hittner erred in granting the United States' motion in limine related to the use of TARP funds (Appellant's Brief, 1330134). As briefed in Issue II, Judge Hittner did not abuse his discretion in precluding any reference to other foreign banks with United States subsidiaries who received federal bailout funds or "TARP" funds. The issue could have potentially misled the

172

jury to misunderstanding that SIB failed for lack of federal bailout funds, when SIB was never eligible for those funds as a foreign bank (USCA5 Supp. 6 15453-15454, 15456, 15469).

Sixth, Stanford argues that Government exhibit 1149 and other "strategically injected references," which Stanford fails to specifically identify, permitted the jury to find him responsible for the "subprime debacle and massive taxpayer bailout" (Appellant's Brief, 134). The United States never alleged, nor did the evidence at trial suggest, that Stanford caused the 2008 financial crisis. The crux of the United States' case focused upon the material misrepresentations made to investors about SIB's CD program and investment portfolio. As briefed in Issue VI, Government Exhibit 1149 came from Stanford himself. SFG manager Green explained at trial that Stanford gave him the document (GX 1149) during a meeting in November 2008 that contained "talking points" that Stanford wanted financial advisors to communicate to investors so they would stop redeeming CDs during the financial downturn of 2008 (USCA5 Supp. 6 5007, 5021-5023).

Finally, Stanford contends that Judge Hittner permitted the United States to conceal from jurors that SIB was incorporated in Antigua and regulated by the FSRC (Appellant's Brief, 134-135). The United States made these facts clear from the very beginning of the case in the superseding indictment and during its opening statement (USCA5 Supp. 6 651-652, 4286, 4291). The fact that SIB was a foreign bank not subject to United States regulatory authority was one of the reasons Stanford was able to successfully perpetrate the fraud on investors for so many years. Stanford's argument is meritless.

## IX.

## No Cumulative Error Exists.

Stanford argues that the cumulative effect of all errors at trial warrants a new trial (Appellant's Brief, 136-137). Stanford cites neither to the record nor to specific facts of his case. Rather, he provides only generic authority on cumulative error (Appellant's Brief, 136-137). His cumulative error argument is waived for inadequate briefing. *See Stalnaker,* 571 F.3d at 439-440 (noting that failure to fully

explain claim of cumulative trial error with citation to record and relevant law waived argument for lack of adequate briefing).

Stanford's arguments on appeal are defeated by overwhelming evidence at trial, as well as by a wealth of legal authority. No cumulative error exists in this case. *See Stephens,* 571 F.3d at 411-412.

## CONCLUSION

This court should affirm the judgment of conviction and sentence in its entirety.

Respectfully submitted,

KENNETH MAGIDSON
United States Attorney

RENATA A. GOWIE
Chief, Appellate Division

s/Lauretta Bahry
LAURETTA DRAKE BAHRY
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
713-567-9102

ATTORNEYS FOR APPELLEE

## CERTIFICATE OF SERVICE

I, Lauretta Drake Bahry, Assistant United States Attorney hereby certify that on March 3, 2015, an electronic copy of the Brief of the United States was served by notice of electronic filing via this court's ecf system and via certified mail return receipt requested upon:

> Robert Allen Stanford
> USP Coleman II
> 846 N.E. 54th Terrace, P.O. Box 1034
> Coleman, FL 33521-0000

Upon notification that the electronically-filed brief has been accepted as sufficient, and upon the Clerk's request, seven paper copies of this brief will be submitted to the Clerk. *See* 5th Cir. R. 25.2.1; 5th Cir. R. 31.1; 5th Cir. ecf filing standard E(1).

> s/Lauretta Bahry
> LAURETTA DRAKE BAHRY
> Assistant United States Attorney

# CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **30,395** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century School Book, 14 point font for text and 12 point font for footnotes.

3.   This brief complies with the privacy redaction requirement of 5th Cir. R. 25.2.13 because it has been redacted of any personal data identifiers.

4.   This brief complies with the electronic submission of 5th Cir. R.25.2.1, because it is an exact copy of the paper document.

5.   This brief is free of viruses because it has been scanned for viruses with the most recent version of Trend Micro scanning program.


s/Lauretta Bahry
LAURETTA DRAKE BAHRY
Assistant United States Attorney
Date:  March 3, 2015